Page 1

1     IN THE UNITED STATES DISTRICT COURT
2         EASTERN DISTRICT OF MICHIGAN
3             SOUTHERN DIVISION
4
5 EQUAL EMPLOYMENT OPPORTUNITY )
6 COMMISSION,                )
7           Plaintiff,  )
8 vs.            ) Case No. 14-13710
9 R.G. & G.R. HARRIS FUNERAL  ) Hon. Sean F. Cox
10 HOMES, INC.,         ) United States
11           Defendants. ) District Court Judge
12 _____)
13
14    30(B)(6) DEPOSITION OF THOMAS ROST
15         PLYMOUTH, MICHIGAN
16       THURSDAY, NOVEMBER 12, 2015
17
18
19
20
21
22
23
24 REPORTED BY:  QUENTINA R. SNOWDEN, CSR NO. 5519
25 JOB NO.:  276003-A

Page 2

1     30(B)(6) DEPOSITION OF THOMAS ROST, taken at
2 the offices of Joel J. Kirkpatrick, PC, located
3 at 843 Penniman Avenue, Suite 201, Plymouth,
4 Michigan on Thursday, November 12, 2015, at 9:30
5 a.m., before Quentina R. Snowden, Certified Court
6 Reporter, in and for the State of Michigan.
7
8 APPEARANCES:
9  For the Plaintiff:
10    EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
11    BY:  DALE R. PRICE, JR., ESQ.
12       MILES E. SHULTZ, ESQ.
13    477 Michigan Avenue
14    Room 865
15    Detroit, Michigan 48226-2552
16    (313) 226-7808
17    E-mail:  dale.price@eeoc.gov
18       miles.shultz@eeoc.gov
19
20
21
22
23
24
25

Page 3

1 APPEARANCES CONTINUED:
2 For the Defendant:
3    JOEL J. KIRKPATRICK, PC
4    BY:  JOEL JAMES KIRKPATRICK, ESQ.
5    843 Penniman Avenue
6    Suite 201
7    Plymouth, Michigan 48170-1770
8    (734) 404-5710
9    E-mail:  joel@joelkirkpatrick.com
10
11 For the Defendant:
12    SCHRAMECK LAW, PLLC
13    BY:  JEFFREY T. SCHRAMECK, ESQ.
14    843 Penniman Avenue
15    Plymouth, Michigan 48170-1757
16    (734) 454-5400
17    E-mail:  jeff@schramecklaw.com
18
19    ALLIANCE DEFENDING FREEDOM
20    BY:  BRADLEY ABRAMSON, ESQ.
21    15100 North 90th Street
22    Scottsdale, Arizona 85260
23    (480) 444-0020
24    E-mail:  babramson@adflegal.com
25

Page 4

1            I N D E X
2 WITNESS:  THOMAS ROST
3 EXAMINATION                PAGE
4 BY:  Mr. Price            05
5 EXAMINATION
6 BY:  Mr. Kirkpatrick      132
7 RE-EXAMINATION
8 BY:  Mr. Price            140
9 (No further examination.)
10        E X H I B I T S
11 NUMBER    DESCRIPTION          PAGE
12 EX. NO. 1   DEFENDANT'S ANSWERS TO     12
13       PLAINTIFF'S AMENDED COMPLAINT
14 EX. NO. 2   CHARGE OF DISCRIMINATION   18
15 EX. NO. 3   RESPONSE TO CHARGE OF      22
16       DISCRIMINATION
17 EX. NO. 4    ARTICLES OF INCORPORATION   78
18 EX. NO. 5   MISSION STATEMENT      81
19 EX. NO. 6   EMPLOYEE MANUAL      103
20 EX. NO. 7   LETTER           109
21        (Exhibits attached.)
22
23
24
25

Page 5

1  PLYMOUTH, MICHIGAN; THURSDAY, NOVEMBER 12, 2015
2         9:40 A.M.
3         -oOo-
4  Whereupon --
5         THOMAS ROST,
6  having been first duly sworn to testify to the
7  truth, the whole truth, and nothing but the
8  truth, was examined and testified as follows:
9         EXAMINATION
10 BY MR. PRICE:
11 Q   Good morning.
12 A   Good morning to you.
13 Q   Yeah, my name is Dale Price, I'm an attorney
14     with the Equal Employment Opportunity
15     Commission here in Detroit and we have two
16     purposes here today.  We'll do them in order.
17         One, we're going to take your
18     30(b)(6) deposition, what's known as.  We sent
19     out a Notice with respect to that designating
20     certain subjects upon which we wish to have a
21     company representative brought forward to
22     testify to.
23         And then secondly, we'll be doing a
24     deposition of you in your personal capacity.
25     Hopefully there won't be a whole lot of

Page 6

1     overlap, but it will probably be inevitable
2     there will be some.  But, for the first part
3     here we're going to be focusing on the 30(b)(6)
4     deposition.
5         And with respect to that I'd like
6     to confirm that you have agreed to consent to
7     speak on behalf of the Defendant with respect
8     to the items we sent in the Notice.
9  A   Yes.
10 Q   Have you had a chance to review the Notice?
11 A   Yes.
12 Q   Okay.  You were shown a Notice by your Counsel?
13 A   Yes.
14 Q   Okay.  And you are prepared to speak upon each
15     of those items within the Notice?
16 A   Yes.
17 Q   Okay.  And not to be tiresome, but I'm just
18     going to go through it.  So you are prepared to
19     speak on behalf of the company with respect to
20     the second affirmative defense, which is the
21     EEOC's bringing and prosecution of this case
22     exceeds the scope of the EEOC's legal authority
23     and is ultra vires.
24         You're prepared to speak on that
25     today?

Page 7

1  A   Yes.
2  Q   You're prepared to speak on Affirmative Defense
3     Number 8 and the Amended Answer to the
4     Complaint which states, "The EEOC's claims are
5     barred due to the fact that they are not
6     brought in the true name of the party in
7     interest and/or for the failure to join an
8     indispensable party"?
9  A   Yes.
10 Q   You're prepared to speak as to the Item Number
11     3, which is the Eleventh Affirmative Defense in
12     the Amended Complaint, "The EEOC's claims
13     violate the Funeral Home's right to due process
14     under the Fifth and Fourteenth Amendments to
15     the United States Constitution"?
16 A   Yes.
17 Q   You're prepared to speak to the Number 4, which
18     is "The EEOC's claims violate the Funeral
19     Home's right to free exercise of religion under
20     the First Amendment to the United States
21     Constitution"?
22 A   Yes.
23 Q   You're prepared to speak to Item Number 5 in
24     the deposition which is "The EEOC's claims
25     violate the Funeral Home's rights under the

Page 8

1     federal Religious Freedom Restoration Act or
2     RFRA"?
3  A   Yes.
4  Q   You're prepared to speak to item number 6,
5     which was "The creation or incorporation of
6     Harris, including any articulated purposes or
7     mission statements and the identity of
8     incorporating officers and subsequent offers
9     during Aimee Stephens' employment"?
10 A   Yes.
11 Q   Item Number 7, prepared to speak to
12     "Non-Privileged communications concerning or
13     touching upon Harris' exercise of religion
14     through or in the course of operating its
15     business"?
16 A   Yes.
17 Q   Number 8, prepared to speak on "Facts
18     concerning Harris' exercise of religion in
19     conducting its business operations or in its
20     personnel practices"?
21 A   Yes.
22 Q   You're prepared to speak to Item Number 9,
23     "Facts concerning any claimed substantial
24     burden to Harris' exercise of religion caused
25     by the EEOC's claims"?

Page 9

1  A  Yes.
2  Q  And Item Number 10, you're prepared to speak to
3     "Facts concerning the designing, editing,
4     loading and/or updating of the content of
5     Harris' website which is http:/www.rgr --
6     ggrharris.com"?
7  A  Yes.
8  Q  Forgive my stuttering, I do that a lot with
9     URLs, so -- and likewise, facts -- you're
10    prepared to speak to "Facts concerning the
11    designing, editing, loading and/or updating of
12    the content on Harris' Facebook page,
13    Facebook.com, RGR (sic) Harris Funeral Home as
14    set forth in the Notice"?
15 A  Yes.
16 Q  And you're prepared to speak on behalf of the
17    company with respect to Item 12, "Harris'
18    personnel and employment policies contained in
19    Harris' employee handbook or otherwise
20    communicated to Harris' employees during the
21    course of Aimee Stephens employment"?
22 A  Yes.
23 Q  We're almost there.  Last one.  You've prepared
24    to speak to Item 13, "The circumstances and
25    reasons for Aimee Stephens' separation of

Page 10

1     employment from Harris and all policies Harris
2     relied upon in terminating Stephens"?
3  A  Yes.
4  Q  Okay.  Thank you very much.  It's tedious, but
5     I've got to go through that.  So --
6        Okay.  What did you do to prepare
7     for today's 30(b)(6) deposition?
8  A  I didn't do very much.  I'm just here
9     representing the company.
10 Q  Okay.  Did you speak -- and again, I don't want
11    to know about the contents of your discussion
12    with Counsel, but did you speak with Counsel
13    for part of your preparation?
14 A  A little bit, yes.
15 Q  Okay.  When did that occur?
16 A  Yesterday.
17 Q  Okay.  How long did that take?
18 A  20 minutes.
19 Q  Okay.  Was that here or at your -- one of your
20    facilities?
21 A  Here.
22 Q  Here?
23 A  Uh-huh.
24 Q  And who was present?
25 A  Just Joel and myself.

Page 11

1  Q  Okay.  Did you do anything else to prepare for
2     the deposition?
3  A  No.
4  Q  You didn't review any documents?
5  A  No.
6  Q  Okay.  You indicated you had reviewed the
7     deposition notice.  When did that occur?
8  A  Oh, I don't know when that occurred.
9  Q  Okay.  Did you speak about the 30(b)(6)
10    Deposition Notice with anyone?
11 A  No.
12 Q  Okay.  Did you speak with anyone at Harris
13    about the fact that you were going to be coming
14    for a 30(b)(6) deposition?
15 A  No.
16 Q  Okay.  So, did you speak with any past or
17    present employees regarding the deposition?
18 A  No.
19 Q  Okay.  Did you review the Answer to the
20    Complaint to prepare for the deposition at all?
21    The Amended Answer to the Complaint?
22 A  I don't know.  I don't know.
23 Q  Okay.  Have you at all -- have you reviewed the
24    Answer to the Complaint at all?
25 A  I don't recall on it.

Page 12

1  Q  Okay.
2  A  I'm assuming that I probably did, but I don't
3     recall.
4  Q  Okay.  All right.  Can you think of anything
5     else you might have done or -- to prepare for
6     the deposition?
7  A  No.
8  Q  Okay.  Now, you -- you -- is it your --
9     believe that you did review the Amended Answer
10    to the Complaint before it went out?  Before it
11    was filed?
12 A  Is that something that Joel submitted or is
13    that something that you submitted?
14 Q  That's a fair question, actually.  How about I
15    show you a copy of that, maybe that will end
16    the problem here.
17       MR. PRICE:  Might as well have this
18    marked as 1, please.
19       (Deposition Exhibit No. 1 was
20    marked for identification.)
21       MR. PRICE:  All right.  Thank you.
22    And here, it's the Amended Answer to the
23    Complaint.  I don't know if I've got an extra
24    copy or not.
25       MR. KIRKPATRICK:  I have a copy if

Page 13

```
1      you want one.
2              MR. PRICE:  Okay.  Yeah.  Good,
3      please.
4              THE WITNESS:  You have the same
5      file.  What was the date on this?  Is there a
6      date up here?
7  BY MR. PRICE:
8  Q   Up on the top.
9  A   Oh, up there.  Okay.  So this was back --
10     (Reviewing.)  Yes, I did see this.
11 Q   Okay.  Did you have a chance to review it
12     before it went out?
13 A   Did not.
14 Q   Okay.  But, do you have any disagreement --
15     you don't have any disagreement with the
16     documents; it fairly represents the defenses of
17     Harris?
18 A   Yes.
19 Q   Okay.  All right.  Moving to the first item on
20     the Exhibit, the first item on the deposition
21     notice, you were asked -- if you look at
22     paragraph -- I'm sorry, page 4 of the answer,
23     "Second Affirmative Defense."
24 A   Page 4, okay.
25 Q   Where it says "Second Affirmative Defense."
```

Page 14

```
1  A   All right.
2  Q   Okay.  Do you -- can you speak to any facts
3      that would support the company's assertion that
4      this complaint was beyond the scope of the
5      authority of the Commission?
6  A   No, I can't.
7  Q   Okay.  Do you know anybody at Harris who could?
8  A   No.
9  Q   And you indicated earlier you didn't have a
10     chance to review it -- did you have a chance to
11     review it before it went out or not?
12 A   No.
13 Q   You did not.  Okay.  All right.  When did you
14     get a copy of it?
15 A   I don't know if I have a copy of this.  I'm
16     assuming.  I might have read it here or --
17 Q   Okay.
18 A   Maybe Joel sent it to me.  I'm not sure, I just
19     don't know.
20 Q   Okay.  It looks familiar, but you couldn't
21     speak to when you received it?
22 A   Not since May, no.
23 Q   Or since June?
24 A   Or June is it?  Yeah.
25 Q   Okay.  Just to clarify, it looks familiar to
```

Page 15

```
1      you --
2  A   Yes.
3  Q   -- but you can't testify as to the receipt?
4  A   Right.
5  Q   All right.  Fair enough.  But okay, just to
6      clarify, you don't -- you might not have any
7      facts to support the defense, but you're not --
8      that is still an affirmative defense of the
9      company of Harris, correct?
10 A   Yes.
11 Q   All right.  Moving on to Item 2, which would be
12     the Eighth Affirmative Defense in the
13     Complaint, and my apologies here, that would be
14     found on --
15 A   The Eighth one you say?
16 Q   Yes, Eighth Affirmative Defense also on page 4.
17 A   Yeah, it goes -- okay.
18 Q   Yes, it spills onto 5.  You're right.  Okay.
19     Do you -- do you as a representative -- as the
20     designated representative of Harris have any
21     facts to support that affirmative defense that
22     you can speak to today?
23 A   "The true name of the party of interest", that
24     means Anthony or Aimee, Mr. Stephens, is that
25     what that means?  "Name of the party of
```

Page 16

```
1      interest"?
2  Q   Do you have any understanding of what that
3      would be?
4  A   That's what I'm trying to ask, yeah.  "Or for
5      the failure to join an --" I do not understand
6      this, no.
7  Q   Okay.  So you don't have any facts to --
8  A   No.
9  Q   -- testify one way or the other?
10 A   No.
11 Q   Okay.  Can you think of anybody at Harris who
12     would be able to testify to that?
13 A   No.
14 Q   Okay.  Moving on to Item 3 in the 30(b)(6)
15     Deposition Notice, it is --
16 A   Is that part of this or --
17 Q   That's still part of this, yeah, I'm moving
18     to -- it's part of the Deposition Notice I
19     talked about before, the multiple page --
20 A   Number 3, you're saying?
21 Q   Well, actually it's more clari -- I apologize
22     for being confusing.  You were sent out a
23     deposition notice with, like, a list of topics.
24 A   All right.
25 Q   And you were the one designated to speak to
```

Page 25

1  Q   Did you have any problem with what she
2      transcribed?
3  A   I don't believe so.
4  Q   Okay.  You were also later in the case
5      presented with the what's called a Letter of
6      Determination and a conciliation package, it
7      was a proposal -- it was basically a finding
8      from the Commission that there was a belief
9      that a law had been violated.  You did receive
10     that?
11 A   Yes.
12 Q   Okay.  And you also received what's called a
13     conciliation package or a proposal for a
14     resolution of the matter?
15 A   Yes.
16 Q   Okay.  You had a chance to respond to that,
17     correct?
18 A   Yes.
19 Q   And you did provide a response to your
20     attorney?
21 A   Yes.
22 Q   You had a chance to review that response before
23     now?
24 A   Yes.
25 Q   Okay.  In light of that, what is the basis that

Page 26

1      you did not have any kind of -- you did not
2      have due process under the Fifth and Fourteenth
3      Amendments to the Constitution?
4  A   I can't speak to that.
5  Q   Okay.  You don't have any facts to support that
6      claim on behalf of Harris?
7  A   No.  Right.
8  Q   All right.  All right.  Moving ahead to, it
9      will be the Twelfth Affirmative Defense in the
10     Answer to the Complaint, document one, which
11     will be found on page 5 of the Answer.
12 A   Okay.
13 Q   Okay.  Specifically that "The EEOC's claims
14     violate the Funeral Home's right to free
15     exercise of religion under the First Amendment
16     to the United States Constitution."
17         Okay.  What are the facts
18     supporting that affirmative defense?
19 A   I wouldn't be able to address that.
20 Q   Okay.  Do you claim that you -- let's try it
21     this way.  Are you the -- if I read correctly,
22     and correct me if I'm wrong, do you own 94.5
23     percent of the shares of the company?
24 A   That's correct.
25 Q   Okay.  And that's R.G. G.R. Harris, correct?

Page 27

1  A   Correct.
2  Q   And I may ask you to make your responses
3      verbal.  I apologize.
4  A   That's fine.
5  Q   I know what -- it's -- I know it's correct, but
6      we want to make sure the transcript is clear.
7  A   I understand.
8  Q   Who owns the remainder of the shares?
9  A   My son and daughter.
10 Q   Your son Matthew?
11 A   Yes.
12 Q   And how much does he own?  If you know?
13 A   He owns twice as much as my daughter.
14 Q   Okay.  Now, is he older?
15 A   He is older.
16 Q   And he works for R.G. G.R.?
17 A   He does work there.
18 Q   Okay.  What -- in what capacity?
19 A   He's a funeral director there.
20 Q   Okay.  Which location?
21 A   On the east side.
22 Q   Is he also in charge of the Cremation Society
23     functions?
24 A   He is.  He is.
25 Q   And your daughter, what's her name?

Page 28

1  A   Nicole.
2  Q   And does she have any function within the R.G.
3      G.R.?
4  A   No.
5  Q   Okay.  I'm sorry, what are their ages,
6      respectively?
7  A   My son is 42 and she is 40.
8  Q   Okay.  No other children?
9  A   No, no other children.
10 Q   Okay.  So is R.G. G.R. Harris is a closed
11     corporation?
12 A   Yes.
13 Q   And how long have you been the 94.5 percent
14     owner?
15 A   30 years.
16 Q   30 years.  Okay.  And the remainder have been
17     owned by your children from that time frame
18     too?
19 A   No, no.
20 Q   When did that occur?
21 A   I'll just take a guess, maybe five years ago.
22 Q   Okay.  So the 5.5 percent remainder you
23     designated to them roughly -- roughly five
24     years ago?
25 A   That's correct.

Page 29

```
 1  Q   All right.  Let's try it this way.  Are you
 2      claiming that your rights to exercise religion
 3      have been affected by this lawsuit?
 4  A   Repeat that again.
 5  Q   Sure.  Sure.  Okay.  You're the 94.5 percent
 6      owner --
 7  A   Yes.
 8  Q   -- of R.G. G.R.  So, any -- if the funeral
 9      home's rights to free exercise of religion are
10      being impacted really it's your -- your rights,
11      religious rights that would be impacted because
12      you're the majority owner, correct?
13  A   Okay.  Okay.
14  Q   Okay.  Is it your belief -- is it your
15      allegation that the fact that we have filed
16      suit in this action has affected your rights to
17      free exercise of religion under the First
18      Amendment of the Constitution?
19  A   No.
20  Q   What is your religious affiliation?
21  A   I'm a Christian.
22  Q   A Christian.  Okay.
23  A   Uh-huh.
24  Q   What church do you attend?
25  A   I attend a couple churches, actually.
```

Page 30

```
 1  Q   Okay.
 2  A   I attend Highland Park Baptist Church, another
 3      church called Oak Pointe.
 4  Q   And where are those churches located?
 5  A   One is in Southfield, the Highland Park Baptist
 6      is in Southfield and the other one is in Novi.
 7  Q   Are they -- either of those churches affiliated
 8      with, say like, the southern baptists or
 9      anything like that?
10  A   No.
11  Q   "No"?
12  A   No.
13  Q   Okay.  All right.  How long have you been a
14      Christian?
15  A   65 years.
16  Q   Just how old are you, sir?
17  A   71.
18  Q   71.  Okay.  Now, is -- now you said you became
19      a Christian at roughly 6 years of age.  Was
20      that in Highland Park Baptist Church or was
21      that somewhere else?
22  A   It was in my home at the time.
23  Q   Okay.  Where was that?
24  A   In Highland Park.
25  Q   In Highland Park.  Okay.
```

Page 31

```
 1  A   Uh-huh.
 2  Q   Okay.  Presumably baptized at that point?
 3  A   Yes.
 4  Q   Okay.  Do you recall if there was any
 5      particular church that it was associated with
 6      or no?
 7  A   That same church.
 8  Q   Highland Park?
 9  A   Yeah.
10  Q   Oh, it was Highland Park.  Okay.
11  A   Yeah.
12  Q   All right.  Now, R.G. G.R. Harris is not owned
13      by any church, correct?
14  A   Correct.
15  Q   Okay.  And it's not affiliated with a church,
16      for instance it's not really the official
17      funeral home of Highland Park Baptist or Oak
18      Pointe, correct?
19  A   Correct.
20  Q   Okay.  Does R.G. G.R. Harris sponsor any kind
21      of religious activities?
22  A   I don't know what you mean by "Sponsor."
23  Q   Does it -- well, let's try this.  Does it send
24      out, like, newspaper ads wishing people a Merry
25      Christmas or Happy Easter?  Does it take out
```

Page 32

```
 1      ads like that?
 2  A   We don't take out ads like that.
 3  Q   Okay.
 4  A   We -- we do things like we have a memorial
 5      service here at Christmastime that we recognize
 6      the people that have passed away over the last
 7      year.  I don't know how you would define that,
 8      but we have a memorial service like that.
 9      Obviously we're involved in a ministry with --
10      what we do is involved, religious rights and
11      customs and rituals for families.
12  Q   Okay.
13  A   There's a huge ministry aspect to what we do.
14  Q   Now, this memorial service is -- what happens
15      during this service?  This annual Christmas
16      service?
17  A   Yes.  Well, we make an ornament with the
18      person's name on it, and the family members can
19      come and we have a short service.  We read the
20      names and then they hang this on an outside
21      tree.
22  Q   Okay.  You said it's a short service, what's --
23  A   Because it's outside.  We -- we purposefully do
24      this outside so it can be a pretty nasty day.
25  Q   Sure.
```

Page 33

1  A   So we try and move things along.  But we -- we
2      have a couple people speak, we sing silent
3      night, we read their names.
4  Q   Who speaks?
5  A   I speak, a lady now -- her name is Karen, I
6      can't -- I forgot what her last name is.  She's
7      from New Hope.  It's a support group.
8  Q   Okay.
9  A   She heads that up.
10 Q   Is that for grieving people?
11 A   Yes.  Uh-huh.  And she talks about things for
12     the holidays, helps for the holidays.
13 Q   Getting through the new year without your loved
14     one, that sort of thing?
15 A   Correct.  Exactly.
16 Q   Is this New Hope support group, is it an
17     explicitly Christian ministry?
18 A   No.
19 Q   Now, the people who come to the -- let's try it
20     this way.  I believe your web page indicates
21     that you're -- or you will offer services to
22     people of multiple religions?
23 A   Absolutely.
24 Q   Okay.  Does that include people who are not
25     Christians?

Page 34

1  A   Oh yeah, sure.
2  Q   Okay.  What religions does R.G. G.R. help with
3      burial services and --
4  A   You name it, we do it.
5  Q   Muslims?
6  A   Yes.
7  Q   Hindus?
8  A   Yes.
9  Q   Sikhs or Sikhs (different pronunciation),
10     sometimes is how it's said?
11 A   Yeah, I think they're kind of Hindu.
12 Q   Yeah, they're a derivation of Hindu.
13 A   Yes.  Uh-huh.
14 Q   So you've done religious for the Sikhs?
15 A   Sure.
16 Q   Chinese religions?
17 A   Yes.
18 Q   Can you think of -- I'm not up on my Chinese
19     religions, my apologies.
20 A   Neither am I.
21 Q   Confucian or Buddhist?
22 A   Well, that would all be part of that, I would
23     just -- but we do have Buddhist services, yes.
24 Q   Okay.  On site?
25 A   Yes.  Uh-huh.

Page 35

1  Q   Okay.  So you've had all of these in the past
2      three, four years you've had Muslim --
3  A   I don't know about the last three or four
4      years.  I mean, some of them you're -- like
5      Buddhists, there's, you know, maybe one every
6      ten years or something.
7  Q   But you've had them there?
8  A   Yeah, we have had them.  Yeah.
9  Q   What about how frequently do you have Hindu
10     services?
11 A   Well, we'll have a few a year.
12 Q   Okay.
13 A   Uh-huh.
14 Q   And somebody from the Hindu religion will come
15     and conduct the rights and so forth on site?
16 A   Yes.  Yes.
17 Q   Okay.  What about, how often Islamic, Muslim
18     people?
19 A   Not very much.  They -- they stay to
20     themselves.
21 Q   But some?
22 A   But some.
23 Q   Okay.  How many in the past ten years, would
24     you say?
25 A   Just a couple a year.

Page 36

1  Q   Couple a year.  Okay.  What about
2      Chinese-related services, how often does that
3      happen?
4  A   Well, most of the Chinese that we take care of
5      are Christian.
6  Q   Okay.  Fair enough.
7  A   They're not -- you know --
8  Q   Okay.  So most Chinese would fall within the
9      Christian --
10 A   Yes.
11 Q   What about people who are Jewish, any services
12     for them?
13 A   Very rarely.
14 Q   Okay.  You're open to it, but it just doesn't
15     happen very often?
16 A   No, they have Jewish funeral homes.  Yes.
17 Q   Okay.  What about people of no religious
18     affiliation?
19 A   Well, we do that too, sure.
20 Q   How often do you do that?
21 A   Well nowadays almost every week.
22 Q   Really?
23 A   Yeah.
24 Q   Okay.  What do you do in the circumstances
25     where there is no professed religion, is

Page 37

1     there -- do you offer a service yourself?
2  A   We do.
3  Q   What's involved in that?
4  A   We do.  We have a celebrant; I have a lady
5     that's a celebrant that would provide a service
6     of memorialization, let's put it that way.  Or
7     sometimes families will just do it themselves.
8  Q   Okay.
9  A   And they will speak and share.  We'll call it a
10    sharing memorial time.
11 Q   Okay.  Now, is this celebrant, is she somebody
12    who works for Harris?
13 A   Yes, she does.
14 Q   Who is that?
15 A   Lady by the name of Summer -- I forgot her last
16    name, starts with a "P".
17 Q   Okay.
18 A   But Summer.
19 Q   And how long has she worked for Harris?
20 A   She's worked part-time for us for, I'm going to
21    take a guess, about four years, but she's just
22    recently become a celebrant.
23 Q   Okay.
24 A   About two or three months ago.
25 Q   Okay.  Now, with respect to getting back to --

Page 38

1     not the operational aspect, but does R.G. G.R.
2     advertise in like church bulletins, like
3     Catholic church bulletins?
4  A   We don't.  We have.  We have, but we're not
5     doing that now.
6  Q   When did you stop doing that?
7  A   Oh, quite awhile ago.  20 years ago.
8  Q   Okay.  And why not?
9  A   It's not cost-effective.
10 Q   Okay.  Where do you advertise or do you not
11    advertise at all?
12 A   We are not advertising, no.
13 Q   So not even in the Yellow Pages?
14 A   Oh, well -- yep -- yes, Yellow Pages, yes,
15    you're right.  Yes.
16 Q   Okay.  Now you'll sometimes see something like
17    the Christian Yellow Pages or something like
18    that?
19 A   Yes.
20 Q   Do you advertise in those?
21 A   I think once I might have.  I don't know if
22    those are still going.  I haven't seen one of
23    those in years.
24 Q   When do you believe you might have
25    advertised --

Page 39

1  A   Probably 20 years ago.
2  Q   Okay.  Does R.G. G.R. help sponsor something
3     like a church festival?  You know, sometimes
4     Catholic parishes will have a festival or there
5     are harvest parties at a baptist church, that
6     sort of thing?
7  A   We'll -- we'll maybe put an ad in a booklet.
8  Q   Okay.  What do you mean by a booklet?
9  A   Well, usually they'll have a booklet, and I'm
10    thinking of just one Catholic church that we do
11    this, I think, that's the only thing I can
12    think of.  And we do it as just it's a gift,
13    it's not an advertisement.
14 Q   Okay.
15    You don't get anything from it, it's just as a
16    gift.
17 Q   Okay.  What parish would this be, if you can
18    recall?
19 A   This one was called St. Raphael's in Garden
20    City.  They've changed the name to St. Thomas
21    of the -- something, I think, but just St.
22    Raphael's.
23 Q   Okay.  Can you think of any ways in which you
24    express your faith through Harris, R.G. G.R.
25    Harris; you exercise your faith using your

Page 40

1     business?
2  A   The only thing in a direct way is little things
3     that we leave out, we give away Daily Breads
4     which is a little daily devotional; it's a pick
5     up.  We have a little card that people can pick
6     up.  That would be the only thing.
7  Q   Okay.  And this is just -- as they walk out
8     they can grab something like that?
9  A   Yes.  It's a pick up item if they so desire.
10 Q   What about, you say a little card, what's that?
11 A   We call it a Jesus card.
12 Q   Okay.
13 A   I forgot what it says on the front.  It's kind
14    of to grab your attention and then on the back
15    it just has references, verse references.
16 Q   Scriptural references about Jesus?
17 A   Yes, exactly.  Yes.
18 Q   You do employ people who -- to your knowledge,
19    do you employ people who are not of your faith?
20 A   Yes.
21 Q   Can you think of some of the people, the
22    religious or non-religious people that work for
23    you?
24 A   Well, I have an Orthodox individual.
25 Q   Eastern Orthodox or Greek Orthodox or --

Page 41

1  A   I'm going to say Greek Orthodox.
2  Q   Okay.
3  A   I have Catholics.  That would pretty much be
4      it.
5  Q   Okay.  Any Episcopalians or anything like that
6      you can think of?
7  A   Not at the present time that I'm aware of.
8  Q   Lutherans, Evangelicals, others you can think
9      of?
10 A   I would classify them under the -- you know,
11     under my -- under Christian faith, but now
12     you're asking about denominations.  I don't
13     think I have any Lutherans right now.
14 Q   Okay.  And by Christians, do you have any kind
15     of other -- do you have a breakdown of what you
16     consider Christian, I mean just --
17 A   That they are a follower of Jesus.
18 Q   Okay.
19 A   Specifically that way, not just in word only.
20 Q   Okay.  And do you have people that you employ
21     who you believe are not Christian in that
22     sense?
23 A   I don't believe so.
24 Q   Now, if you're employing someone who is
25     Orthodox or Catholic it's certainly not the

Page 42

1      case that you would be endorsing everything
2      they say or believe, you know, their church
3      beliefs and certain different things than yours
4      does, but that's -- you know, that's not taken
5      as an endorsement by Harris or anything like
6      that, right?
7  A   Correct.
8  Q   Okay.  It's not a problem for you, it's just
9      not, you know, it's not endorsement of their
10     beliefs, correct?
11 A   Correct.
12 Q   Okay.  Is there anything about the suit that
13     was brought -- again, I apologize if I'm
14     repeating myself.  Can you think of anything
15     about the suit as brought by the Commission
16     that interferes with religious freedom rights,
17     right to free exercise under the Constitution?
18 A   Not in -- not in terms of religion.
19 Q   Okay.  So -- let's try it this way.  Harris is
20     subject to laws like the Americans with
21     Disabilities Act, correct?
22 A   Yes.
23 Q   Equal Pay Act?
24 A   Yes.
25 Q   Age Discrimination Employment Act?

Page 43

1  A   Yes.
2  Q   None of those are -- there's no objection to
3      that, correct?
4  A   Correct.  Right.
5  Q   There's also Title VII; race, color, national
6      origin, sex and religion?
7  A   Correct.
8  Q   Okay.  None of those -- you don't object to any
9      of those?
10 A   Correct.
11 Q   All right.  So you said "Not religion."  What
12     do you mean then?  What's the interference
13     here, then?
14 A   Well, I don't think there is an interference,
15     but I just wanted to be clear what --
16 Q   Okay.  So, it's the case that there is -- you
17     would disagree that the -- I want to phrase it
18     properly here.  You don't believe that the
19     funeral home's right to free exercise of
20     religion has been violated here?
21 A   Correct.
22 Q   Okay.  Now you also own the Cremation Society
23     of America, correct?
24 A   Correct.
25 Q   Okay.  And I believe during your interview with

Page 44

1      Mrs. Dickinson, our investigator --
2  A   Could have been.
3  Q   Yeah, the lady was --
4  A   Yes.
5  Q   You recall a female investigator?
6  A   Yes.
7  Q   You talked about how your cremation business
8      has actually been growing?
9  A   Yes.
10 Q   How long have you operated the cremation
11     business?
12 A   Almost 30 years.
13 Q   30 years.  Okay.  So when was it established?
14     It would be roughly 1980 --
15 A   I'm going to say 19 --
16 Q   -- '86?
17 A   Something like that.
18 Q   Okay.  Now were you the whole -- the complete
19     owner at that point or were you still working
20     with family?
21 A   Well, Harris Funeral Home owns it.
22 Q   Okay.  But you established it yourself?
23 A   Correct.
24 Q   Why did you establish it?
25 A   Because there was a need for it and a market

Page 49

1    (sic) and then 15 years later cremation -- CSM
2    Cremation Services --
3 A    Yes.
4 Q    -- because of a rise in demand, or a need?
5    Would it be safe to say it would be a need?
6 A    Okay.  Cremation Society of Michigan is --
7 Q    Of Michigan, I'm sorry.
8 A    Yeah -- is a -- just think of it as funeral
9    home, okay?
10 Q    Okay.
11 A    Think of it that way, even though it only
12    provides one service.  The crematory is a
13    separate thing.  And that was -- that was
14    started -- we used to use a cemetery for that.
15    Crematories in this state are pretty much third
16    party institutions.
17 Q    Okay.
18 A    Our third party that we were using was bought
19    by a large conglomerate.  We no longer wanted
20    to do business with them and so we decided that
21    we would seek an alternative and that's how we
22    went out and did this.
23 Q    Okay.  But as far as just going to overall need
24    for cremation services, leaving aside the
25    actual physical part, isn't it the case that

Page 50

1    you've seen your cremation side of your
2    business going up over time?
3 A    Yes, it's 50 percent of the market.
4 Q    50 percent.  And what -- why do you see that;
5    do you have any insight as to why that's the
6    case?
7 A    I do not know.
8 Q    I believe at least at one point when you were
9    talking to our investigator you thought it
10    was -- you think it was kind of a cultural
11    shift; is that a possibility?
12 A    Well, there's a lot of reasons people want to
13    save some money.
14 Q    Okay.
15 A    People don't have the same types of -- I want
16    to say family ties, cultural ties, religious
17    ties, they don't see the value the same as in
18    years ago.  They don't see the need for a
19    traditional type of service.  We live in a
20    disposable culture now, disposable society.
21 Q    I believe, and correct me if I'm wrong, did you
22    believe that there was kind of like the
23    disvaluing of human life was an aspect, you
24    told our investigator?
25 A    Yes, I would agree with that.

Page 51

1 Q    You certainly -- is it safe to say you
2    certainly would rather be doing funeral, full
3    funeral services as opposed to cremations?
4 A    Yes.
5 Q    That aligns more with your personal religious
6    values?
7 A    Yes, it does.
8 Q    How so?
9 A    I believe in the traditional funeral.  I
10    believe in the traditions that go with it, yes.
11    Absolutely.
12 Q    And for religious reasons as well you believe
13    you'd rather do full funerals?
14 A    I'm talking about for myself and for my family.
15    What's your question?  Because I thought that's
16    what you were asking me personally.
17 Q    Yeah.  Does it -- as a Christian would you
18    rather be doing funerals more often than
19    cremations?
20 A    Traditional funerals, yes.
21 Q    Traditional funerals.
22 A    Yes, of course.
23 Q    Now, is it the case that you -- you indicated
24    kind of before, I just want to clarify kind of
25    the way religious ties have been lessening over

Page 52

1    time people tend to choose cremation over a
2    full funeral; is that -- did I catch that
3    accurately?
4 A    I don't know if I'd say it that way.  Let's
5    just say the immediate disposal, because it
6    could be burial.
7 Q    Okay.
8 A    We'll do immediate burials also.
9 Q    Okay.  What's an immediate burial?
10 A    With no -- no visitation, no embalming
11    preparation, just go into a cemetery.
12 Q    And how much of that do you do?
13 A    Oh, a couple a month.
14 Q    Would you say that cremation services tend to
15    be demanded more by people who have less of a
16    religious outlook?
17 A    I would say yes.  In general.  Yeah.  If you
18    want to make a general statement.
19 Q    In general, right.  I mean it's not --
20    obviously people could very well --
21 A    But it's changing.  It is changing, yes.
22 Q    In what way?
23 A    It's becoming more recognized in all faiths
24    now.  I mean, years ago Catholics didn't allow
25    it.  Now, you know, it's very prevalent, you

Page 53

1    can take the cremated remains to church now.
2  Q   Okay.
3  A   So things have changed.
4  Q   And it's -- part of the reason you are doing
5      cremation services is to remain -- is because
6      the demand and just the way the funeral
7      industry has shifted?
8  A   Exactly.
9  Q   You need it to stay in business really?
10 A   Exactly.
11          MR. PRICE:  If we could take a
12     break here.
13          (Off the record at 10:37 a.m.)
14          MR. PRICE:  Back on.
15          (Back on the record at 10:47 a.m.)
16          (Mr. Schrameck did not return to
17     the conference room.)
18 BY MR. PRICE:
19 Q   Who handles the hiring for R.G. G.R.?
20 A   Either myself or my managers.
21 Q   Okay.  Do either you or your managers, to your
22     understanding, ask about anybody's religion
23     when you're hiring them?
24 A   No.
25 Q   Going back to this affirmative defense that we

Page 54

1      have been talking about today.  Is it the case
2      that continuing to employ Stephens would
3      violate the free exercise rights of Harris
4      under the Constitution?
5  A   Yes.
6  Q   Okay.
7  A   Yes.  I believe so.
8  Q   Okay.  How so?
9  A   Well, I do believe in my -- from my personal
10     faith aspect as a follower of Jesus Christ that
11     I have the right to minister to the families
12     and the people that I serve in a way that is
13     protective and safe for them, and meets their
14     needs as they begin to heal in such a way that
15     they're protected and safe, and having an
16     individual that does not conform to our dress
17     code is not appropriate.
18          (Mr. Schrameck entered the
19     conference room at 10:48 a.m.)
20 BY MR. PRICE:
21 Q   So, your personal faith as a follower of Jesus
22     Christ tells you that it would be improper
23     or -- to employ someone like the person you
24     knew as Anthony Stephens?
25 A   Absolutely.

Page 55

1  Q   Okay.  You indicated as part of the healing
2      process, but what about your religious beliefs
3      specifically are violated by continuing to
4      employ Stephens?
5  A   I believe it would violate my faith, yes,
6      absolutely.
7  Q   Okay.  What aspects of it?
8  A   Well, I believe that God created a man as a man
9      and God created a woman as a woman.  And to --
10     to not honor that, I would feel it's a
11     violation of my faith, absolutely.
12 Q   So Stephens would be presenting in a way that
13     offended your religious beliefs, essentially?
14 A   Yes.  Yes.
15 Q   And as a result you would not have to -- it
16     would be within your rights to terminate them
17     according to your religious belief, terminate
18     Stephens from your religious belief?
19 A   Yes.  Uh-huh.
20 Q   Have you ever terminated anybody else because
21     of the belief that they were acting contrarily
22     to your religious faith?
23 A   No.
24 Q   Are there any other circumstances you can think
25     of where you would terminate somebody for

Page 56

1      violating your religious beliefs?
2  A   No, offhand I can't.
3  Q   Okay.  Are your religious expectations
4      communicated to your employees in any way?
5  A   I would say indirectly.
6  Q   Indirectly?
7  A   Yes.
8  Q   How so?
9  A   Well, number one, they know the material is
10     around the funeral home.
11 Q   The material?
12 A   Yeah, I mean, we have little devotional books
13     for people to pick up, they have these Jesus
14     cards, they know where I attend church.  They
15     do know, yes.
16 Q   Okay.  Would the continued employment of
17     Stephens have interfered with your right to
18     place the devotional booklets or Jesus cards
19     around your facility?
20 A   No.
21 Q   Would it have been interfered in any way with
22     your ability to continue to worship as you
23     chose?
24 A   Go back to the question.  You said just because
25     he was there or if he was there dressed as a

Page 57

1    woman?
2  Q   After he made the announcement to you, okay?
3      Would the continued presence of Stephens as an
4      employee presenting as female have interfered
5      with your ability to place devotional booklets
6      or Jesus cards?
7  A   No, he wouldn't be an employee.
8  Q   Okay.  I'm just speaking hypothetically.
9  A   Yes, that is hypothetical.  Yeah.
10 Q   Okay.  But you could have still placed Jesus
11     cards and devotional booklets, right?  There's
12     nothing about Stephens presence that would
13     affect that?
14 A   No, hypothetically.
15 Q   Okay.  Likewise, hypothetically, there would
16     have been nothing about Stephens presence that
17     would have affected your ability to go to Oak
18     Pointe or Highland Park, correct?
19 A   Yeah, hypothetically, yes.
20 Q   Okay.  Would you say that your dress code for
21     men and women also embodies your religious
22     beliefs?  As to how men and women are supposed
23     to dress?
24 A   No, I would say our dress code conforms to what
25     is acceptable attire in a professional manner

Page 58

1      for the services that we provide.  In other
2      words, there's an expectation for people that
3      work in a funeral home how they're going to
4      dress and how they're going to look.
5  Q   Okay.
6  A   The culture dictates that.
7  Q   So the culture dictates what you're supposed to
8      be wearing?
9  A   To some extent, uh-huh.
10 Q   But isn't it the case that the dress code does
11     align with the way you believe that men should
12     dress in the workplace and that women should
13     dress in a workplace?
14 A   Yes, of course.
15 Q   Okay.  And that also aligns with your religious
16     beliefs on that point?
17 A   I guess if you want to put it in that term, but
18     I don't know what it would have to do with
19     religious terms.
20 Q   Okay.
21 A   I mean, you're an attorney, you have a white
22     shirt and a tie like just about all attorneys
23     look.  You have a certain dress.
24 Q   Okay.  You indicated earlier that God made men
25     as men and women as women.  That was one of

Page 59

1      your concerns about continuing to employ
2      Stephens.  You have a deep belief in that --
3  A   Yes.
4      -- stemming presumably from Genesis, correct?
5  A   Yes.
6  Q   Male and female, he created them?
7  A   Yes.
8  Q   Okay.  So, men and women should dress
9      accordingly in your opinion, right, men should
10     dress as men and women should dress as women;
11     is that one of your concerns with Stephens?
12 A   For employment at the funeral home, yes.
13 Q   Okay.  Now, you indicated also that one of the
14     concerns you had was that people be protected
15     and safe in the grieving process, I believe so.
16     How would continuing to employ Stephens affect
17     that?
18 A   Well, his employment there would be looked upon
19     as -- well, a -- let me back up.
20         Let's see.  Families come to us
21     because they want an environment where they can
22     begin the grieving process and the healing
23     process and begin the experience of healing.
24     We're there to meet their emotional, relational
25     and spiritual needs.  They're there with their

Page 60

1      family and friends in an environment that they
2      don't need some type of a distraction that is
3      not appropriate for them and their family that
4      they want to be involved in.  And his continued
5      employment would negate that.
6  Q   So it's your belief that continuing employment
7      would have posed that kind of distraction to
8      people who are coming to use your services?
9  A   Absolutely.
10 Q   Okay.  You never saw Stephens in anything other
11     than a suit and tie, correct?
12 A   That is correct.
13 Q   Okay.  So, you can't speak as to how Stephens
14     would have presented -- you never saw Stephens
15     present in female attire, correct?
16 A   Correct.
17 Q   Okay.  So you don't know how they would have --
18     how Stephens would have looked, correct?
19 A   I don't know how he would have looked, no.
20 Q   Okay.  So, but nevertheless, despite that it
21     was your belief that it would have been a
22     distraction?
23 A   Yes.
24 Q   Why would it be distracting for Stephens to so
25     present?

Page 69

1    follower of Jesus to present that faith through
2    your business?
3  A   That is true.
4  Q   However, when you were presented with the
5    letter, that did interfere with --
6         MR. KIRKPATRICK:  Objection, what
7    letter are you talking about?
8         MR. PRICE:  The letter Stephens
9    gave you.
10        MR. KIRKPATRICK:  Okay.
11 BY MR. PRICE:
12 Q   So when you were presented with that letter, at
13   that point it was your belief that there was --
14   they could no longer serve that function, he
15   could no longer serve that function?
16 A   That is true.  He what not going to conform to
17   the dress code that was required.
18 Q   The dress code is part of that ministry,
19   correct?
20 A   Yes, it is.
21 Q   Okay.  And it's part of the way you present
22   your business through -- as a follower of Jesus
23   Christ, correct?
24 A   Yes.
25 Q   And part of the way that you present your

Page 70

1    business and your ministry and your exercise of
2    your religious freedom is that men should be
3    dressing in suits as part of this process and
4    that women should be dressing conservatively in
5    skirts, correct?
6  A   Yes.
7  Q   Now, with respect to this and also the previous
8    affirmative defense, did you ever raise
9    religious freedom or free exercise during the
10   investigation as a basis for your
11   decision-making?
12 A   When the young lady was there?
13 Q   Yeah.  Or any other point?
14 A   I don't recall.
15 Q   Okay.  If I tell you that there was no such
16   mention in any of the filings that came through
17   your attorney of religious freedom or free
18   exercise, would you have any explanation for
19   why that is?
20 A   No.
21 Q   Okay.  Do you have any understanding why the
22   religious freedom and free exercise were not
23   mentioned in your first Answer to the Complaint
24   that was filed starting this lawsuit?
25 A   No.

Page 71

1         MR. KIRKPATRICK:  Objection,
2    relevance, but you already answered, so --
3  BY MR. PRICE:
4  Q   Is it your belief that you at any point talked
5    about religious freedom or free exercise during
6    the investigation part of the case?
7  A   To the young lady?
8  Q   Yeah.
9  A   No.
10 Q   You did not do so?
11 A   I don't believe so.
12 Q   Do you believe that you did so at any point
13   through stuff that was filed on your behalf?
14 A   I don't believe so.
15 Q   Okay.  And you have no understanding of why you
16   would not have done so?
17 A   No.
18 Q   Okay.  Do you claim that any other statutes
19   violate your religious freedom rights?  We've
20   talked about, like, Americans with Disabilities
21   Act, you don't believe that that affects your
22   free exercise or religious freedom, correct?
23 A   Right.
24 Q   Okay.  Equal Pay Act, you don't believe that
25   that affects your free exercise or religious

Page 72

1    freedom rights?
2  A   Right.
3  Q   Age Discrimination Employment Act, that also
4    does not affect your free exercise or religious
5    freedom rights?
6  A   That's true.
7  Q   Okay.  And Title VII, bracketing the dispute we
8    have here, but Title VII provisions on race,
9    color, national origin, religion and sex also
10   don't violate your free exercise rights?
11 A   That's true.
12 Q   Okay.  Or religious freedom rights, correct?
13 A   Okay.  Yes.
14 Q   Is that the case?
15 A   Yes.
16 Q   Okay.  So, again, it sounds like it's going to
17   be kind of repeated, but so the -- it is your
18   argument that the continued employment of
19   Stephens after Stephens had announced in the
20   letter to you that he was going to present as
21   female, violates your religious freedom?
22 A   Yes.
23 Q   Okay.
24 A   Absolutely.
25 Q   And there's no other way that the EEOC's claims

Page 81

1  Q   Apart from that, is there any other statement
2      you can think of?
3  A   No.
4  Q   Okay.  Now, when you deeded -- when you passed
5      some of the stock onto your family, was there
6      any kind of restriction or statement of purpose
7      that they had to sign?
8  A   No.
9  Q   Okay.  Is there anything other than this
10     Exhibit 4, and the mission statement on the web
11     page which sets forth the purposes of Harris?
12 A   No.
13 Q   Okay.  Is there anything anyone has to sign
14     indicating one's going to uphold Harris'
15     principles before you get stock or anything
16     like that?
17 A   No.
18 Q   Okay.  Is -- are employees of Harris expressly
19     asked if they were -- are going to be upholding
20     the religious values of the corporation?
21 A   They're not asked that, no.
22         MR. PRICE:  Okay.  All right.  I'm
23     going to mark this as 5, please.
24         (Deposition Exhibit No. 5 was
25     marked for identification.)

Page 82

1         MR. KIRKPATRICK:  Thank you.
2         THE WITNESS:  (Reviewing.)
3  BY MR. PRICE:
4  Q   Please take as much time as you need to review
5      that.
6  A   (Reviewing.)
7  Q   Okay.  Do you recognize this document?
8  A   Yes.
9  Q   Okay.  Now it says at the bottom that it's a
10     web page capture as of May 15th, 2014.  But,
11     does this look like an accurate depiction of
12     the Harris' mission statement?
13 A   Yes.
14 Q   Is there anything that has changed in this?
15 A   No.
16 Q   How long has this mission statement been
17     posted, as far as you know?
18 A   Oh, probably 15 years.
19 Q   And what is the purpose of the mission
20     statement?
21 A   It was originally designed to just kind of put
22     some focus on and give some definition to who
23     we are and what we want to be about.
24 Q   Is there anything like this given to employees
25     when they're hired?  Are they directed to read

Page 83

1      it, for example?
2  A   They're not directed to read it, but I think it
3      might be in their little employee manual.
4  Q   Okay.  And it's your understanding it's been up
5      for about 15 years?
6  A   I would say so.
7  Q   And it -- you say it's basically to let people
8      know who are and what you're about?
9  A   Yes.
10 Q   And the public too, obviously?
11 A   Yeah, for the public, sure.
12 Q   Sure.  And it indicates that you provide
13     services to people of all cultural and
14     religious backgrounds.  And you've already
15     testified about that before.
16 A   Uh-huh.
17 Q   Okay.  Now, when you're hosting a service for
18     somebody who is not of the Christian religion,
19     what's involved with that?  Is there anything
20     that people bring in, religious artifacts from
21     their religion or anything like that?  Is there
22     anything done to prepare the chapel
23     differently?
24         MR. KIRKPATRICK:  Can I object,
25     that's kind of a compound question.

Page 84

1  BY MR. PRICE:
2  Q   Okay.  Is there -- do people bring in objects
3      of their religion if it's --
4  A   They do.
5  Q   Is the chapel decorated differently?
6  A   Not from our perspective.
7  Q   Okay.  What's -- how is the chapel decorated?
8      What does it look like?
9  A   It's like a living room.  We don't have a
10     formal chapel.
11 Q   Okay.
12 A   So it's like a living room in your house.
13 Q   Is there any kind of specifically Christian
14     decorations in the chapel?
15 A   No.  Not specific, no.
16 Q   And that makes it easier for people of -- who
17     are not of the Christian faith to be able to
18     use it?
19 A   That's true.  Uh-huh.
20 Q   Correct?
21 A   Correct.
22 Q   And you have to be sensitive to that.  I mean,
23     you don't want to offend people of another
24     religion, correct, that are coming here to use
25     your facility?

Page 85

1  A   Well, it wouldn't be intent to.
2  Q   Okay.
3  A   Yeah.
4  Q   So that's why it's kept as living room-like as
5      possible?
6  A   Yes.
7  Q   Okay.  And at the bottom there is a quote from
8      the Gospel of Matthew, Chapter 6, Verse 33.
9  A   Uh-huh.
10 Q   Did you pick that verse?
11 A   I did.
12 Q   And how long has the verse been up there?
13 A   Same, same amount of time.
14 Q   About 15 years?
15 A   Uh-huh.
16 Q   And why did you pick that verse?
17 A   Oh, I don't know, I just thought it was
18     appropriate.
19 Q   Why?
20 A   Because I believe in it and it would represent
21     my faith.
22         MR. PRICE:  I hate to do this, but
23     I need to take another break.
24         (Off the record at 11:33 a.m.)
25         (Back on the record at 11:45 a.m.)

Page 86

1  BY MR. PRICE:
2  Q   Just to clarify, earlier, actually a couple
3      times you described it as -- your business as a
4      ministry.  What do you mean by that?
5  A   Well, what I mean by that is, it's a ministry
6      to people to serve them on the worst day of
7      their lives for them and their family, and they
8      come to us under the highest anxiety that they
9      can possibly have, and they need help.
10         They need help to make
11     decisions and they need help to get their lives
12     and their family's lives back together and
13     that's why we say that we're there to help them
14     begin healing and to help them meet their
15     emotional, relational and spiritual needs.  And
16     in a sense so much of what we do is involved,
17     in a religious way if you want to call it that,
18     it is a ministry.  And my faith calls me to do
19     that.
20 Q   Your faith informs the way you operate the
21     ministry?
22 A   Yes.  Yes.  Absolutely.
23 Q   Moving on to Number 7 in the Deposition Notice,
24     it talks about "Non-privileged communications
25     concerning or touching upon Harris' exercise of

Page 87

1      religion through or in the course of operating
2      its business."
3          Now, this may be somewhat
4      repetitive, but you've already kind of talked
5      about how you put out the Daily Breads in
6      your -- and pamphlets.
7  A   Uh-huh.
8  Q   And that's at all of the Harris locations?
9  A   Uh-huh.
10 Q   "Yes"?  I'm sorry.
11 A   Yes.
12 Q   And you have the Jesus cards put out at all of
13     the locations?
14 A   Yes.
15 Q   Okay.  Can you think of any other ways that
16     Harris communicates or exercises its religion
17     through business operations?
18 A   Well, other than the way we practice our
19     business and we practice our faith through our
20     business.  But not in a direct -- with things
21     around or like you had referred to at Christmas
22     and Easter, no, nothing.
23 Q   No direct evangelism or anything like that?
24 A   No, there's no direct, no.
25 Q   Okay.  You're not putting out newspaper ads

Page 88

1      calling people to faith in Jesus or anything
2      like that?
3  A   No.  No.
4  Q   Or like religious, you know, Happy Easter --
5  A   No.
6  Q   -- with reference to the Resurrection or
7      anything like that; you're not publishing that
8      sort of thing?
9  A   No.
10 Q   You're not even publishing that sort of thing
11     on your website or your Facebook page, correct?
12 A   No.
13 Q   And as you've said before, you are open to
14     people of all sorts of religions or none,
15     correct?
16 A   That is true.
17 Q   And in terms of clients or even in terms of
18     possibly hiring people, correct?
19 A   Yes.
20 Q   Now moving on to Number 8 out of 13.  "Facts
21     concerning Harris' exercise of religion in
22     conducting its business operations or in its
23     personnel practices."
24         Again, we've kind of plowed this
25     ground a little bit before, but you've -- we

Page 89

1    have talked a bit about this, but with respect
2    to when you're open, are you open 24/7, 365?
3  A  Yes.
4  Q  Okay.  And that's all the locations?
5  A  Yes.
6  Q  And you do have paid holidays for the
7    employees, correct?
8  A  Correct.
9  Q  All right.  Christmas is one of them?
10  A  Yes.
11  Q  Okay.  But if I read the employee manual
12    correctly, Easter is not a paid holiday; is
13    that correct?
14  A  That is correct.
15  Q  Okay.  Why is that the case?
16  A  It's not a legal holiday.
17  Q  Okay.  So paid holidays are the ones that are
18    legal holidays?
19  A  Correct.
20  Q  And Harris is open on Easter, correct?
21  A  Oh, yes.
22  Q  Now when you have a holiday like Christmas or
23    Easter, do all of the people show up?
24  A  No.
25  Q  Okay.  What kind of staffing do you have?

Page 90

1  A  Usually just a manager and maybe a part-time
2    person.
3  Q  Are there people on call?
4  A  Well, that would be the person that's on call
5    and working too.
6  Q  Okay.
7  A  They do everything.
8  Q  All right.  Now, have you -- you indicated
9    you've done cremation related services within
10    the home.  Have you done the religious services
11    like other religions, like a Hindu, do they
12    sometimes have funeral services in the home
13    that you've gone to?
14  A  Yes.  Hindu, they do.  They tend to go to the
15    crematory and do it right there, but they do it
16    in a funeral home setting.
17  Q  Also, do you ever do in-home funeral related
18    services?
19  A  On rare occasions.
20  Q  Okay.  What circumstances?
21  A  Just that the family would want it.
22  Q  Okay.  Can you think of any religions --
23  A  No, has nothing to do with religion.
24  Q  Okay.  Are Sundays full staff days?
25  A  No.

Page 91

1  Q  What is the staffing on a Sunday?
2  A  It's just about like a holiday.
3  Q  Okay.  What about Saturdays?
4  A  That's a full staff day.
5  Q  Sundays, when you say it's just about like a
6    holiday, is there more people on --
7  A  No, there's just one manager on, and a few
8    other people.
9  Q  And what other people?
10  A  In some instance there is a funeral director, a
11    licensed funeral director that might be working
12    that Sunday and then some part-time people.
13  Q  What part-time people?
14  A  Well, we use the ladies.
15  Q  The administrative people?
16  A  Yeah, we call them administrative assistants.
17  Q  Anyone else?
18  A  No.
19  Q  Does Harris provide health insurance to
20    employees?
21  A  Yes.
22  Q  Okay.  What kind of health insurance?
23  A  Just regular health insurance, I guess.
24  Q  I -- there was something in the manual about
25    Blue Cross/Blue Shield?

Page 92

1  A  Well, we used to, but we don't have Blue Cross
2    and Blue Shield for them now.
3  Q  Okay.
4  A  Yeah, it's --
5  Q  Who is it now, do you know?
6  A  I do not.  You could ask Shannon.
7  Q  Okay.
8  A  I don't want to speculate because I'm now on
9    Medicare, so --
10  Q  Okay.
11  A  That's what happens when you get old.
12      MR. KIRKPATRICK:  A young man like
13    you, huh?
14      THE WITNESS:  A young man like --
15    that's why I got to keep you guys paying taxes.
16  BY MR. PRICE:
17  Q  With -- with respect to the health insurance
18    that's offered, do you know what's covered?
19  A  I do not.
20  Q  Do you recall if you've had any things that you
21    will not cover?
22  A  No, I don't recall that, no.
23  Q  Okay.  So you don't know if there's any -- do
24    you recall if there's anything like on a
25    religious basis where it won't cover abortions

Page 93

1   or anything like that?
2 A   No.
3 Q   And you don't know if there's any such
4   restrictions?
5 A   No, I do not know.
6 Q   You have not asked for any such restrictions?
7 A   I have not.
8 Q   Okay.  Or any other kind of things that might
9   be controversial, sterilizations or anything
10   like that?
11 A   Correct.  No.
12 Q   All right.  So you had no moral objections to
13   your insurance coverage that you've put in
14   place?
15 A   Whatever is there, yes.
16 Q   Whatever is offered you take?
17 A   Yeah, whatever is offered is -- yeah.
18 Q   Okay.  That was back in the case when it was
19   Blue Cross as well?
20 A   Yes.
21 Q   Okay.  And you said Ms. Kish would be the one
22   to ask questions about --
23 A   She would know the company, uh-huh.
24 Q   Okay.  To your knowledge, have you done
25   funerals for people, Episcopalians?

Page 94

1 A   Sure.
2 Q   How recently?  Any recently?
3 A   Don't know.
4 Q   Okay.  You can't specifically recall?
5 A   No.
6 Q   What about Evangelical Lutherans?
7 A   Yes.
8 Q   Okay.  Recently, but no specifics?
9 A   I wouldn't know.
10 Q   Okay.  Is there any way that you would keep
11   track of the type of -- is there any kind of
12   log where you would be able to tell what
13   religious services have been held at --
14 A   Yeah, we would have the minister's name in the
15   church that was the officiant.
16 Q   Because you would have a list of the
17   officiants?
18 A   Yes, on their -- what we would call a worksheet
19   for that particular individual.
20 Q   Okay.  And how far back do the worksheets go?
21 A   I guess 1910.  I don't know.  They don't go
22   back that far.
23 Q   I'm sure they don't.  But okay.  But there is a
24   list you would note the officiant and so forth.
25   Is there a regulatory purpose for that?  Do you

Page 95

1   have to kind of --
2 A   No.
3       MR. KIRKPATRICK:  I would object on
4   relevance, but go ahead and answer if you can.
5       THE WITNESS:  Yeah, there's no --
6   no.
7 BY MR. PRICE:
8 Q   Okay.  But it would tell the minister and the
9   denomination for which they worked?
10 A   Well, it might not have all -- all of the
11   denominations, but it would have the minister's
12   name.
13 Q   Okay.  All right.  Do you advertise for
14   employees?  When you need them?
15 A   Sometimes.  Sometimes, yes.
16 Q   Where do you advertise when you -- on the
17   occasions you do so?
18 A   You know, I have -- it's been so long, that
19   I -- I have advertised or contacted like the
20   mortuary school, Wayne State mortuary school if
21   I need somebody like that.  But my managers are
22   advertising online now for staff.  I don't know
23   where that is or how they do it, but they go
24   online now, that seems to be the new thing.
25 Q   Would Ms. Kish have any understanding of that?

Page 96

1 A   She might.
2 Q   Okay.  But it would be left in the hands of the
3   managers pretty much?
4 A   Yes, for their staff.
5 Q   Okay.  Moving on to Number 9 in the deposition
6   notice, "Facts concerning any claimed
7   substantial burden to Harris' exercise of
8   religion caused by the EEOC's claims."
9       And we've already kind of talked
10   about how you believe that your continued
11   employment of Stephens would have been a
12   violation of your free exercise and religious
13   freedom rights.
14 A   That is correct.
15 Q   Okay.  Is there anything else about any of the
16   claims that the Commission has filed that would
17   burden, substantially burden your exercise of
18   religion?
19 A   Well, not any additional claims, but just that
20   claim itself is a violation of my -- my
21   religious rights.
22 Q   As we discussed previously?
23 A   As we discussed, exactly.
24 Q   Okay.  Do you have in your locations, do you
25   have like the employee posters that explain,

Page 105

1  Q   Is the medical reimbursement policy still in
2      effect?
3  A   Yes, it is.
4  Q   Okay.  And -- okay.  Now, it sets forth the
5      dress code policy.  And so forth.  Are there --
6      apart from this document, Exhibit 6, and --
7      well, apart from this, are there any other
8      documents which set forth Harris' expectations
9      for its employees?
10 A   No.
11 Q   Okay.  Now there is nothing -- I could be wrong
12     and I missed it, but I did not see anything
13     setting forth any kind of religious expression
14     within the manual?
15 A   No, there -- no, there isn't anything there for
16     that.
17 Q   Okay.  Nothing setting forth your, you know,
18     religious faith as expressed through Harris in
19     there.  Why is that the case?
20 A   Doesn't seem like it would be part of an
21     employee manual for what we want to accomplish
22     here.  When you're as small as we are, you
23     can --
24 Q   So you wouldn't want to put that in there, you
25     want to put --

Page 106

1  A   Well, I'd be happy to do that, but, you know,
2      when you're as small as we are, we're talking
3      all the time, you don't need to have everything
4      written down.
5  Q   Okay.  Are there any unwritten policies?
6  A   No.
7  Q   Okay.  Any unwritten expectations of employees?
8  A   No.
9  Q   Are there any reviews conducted, evaluations,
10     that sort of thing?
11 A   Not -- not in a -- in a formal setting.
12 Q   Not like an annual review process or anything
13     like that?
14 A   No.  No.
15         MR. PRICE:  All right.  I'm going
16     to take a break before we finish the last
17     section.
18         (Off the record at 12:10 p.m.)
19         MR. PRICE:  Okay.  We are back on.
20         (Back on the record at 12:17 p.m.)
21 BY MR. PRICE:
22 Q   Moving on to 30(b)(6) Deposition Notice, Number
23     13, "The circumstances and reasons for Aimee
24     Stephens' separation from employment -- of
25     employment from Harris and all policies Harris

Page 107

1      relied upon in terminating Ms. Stephens."
2          Basically we'll be talking about
3      just that whole process, determining to end the
4      employment of Aimee Stephens.
5          Now, were -- you were involved in
6      the hiring of Stephens, correct?
7  A   I was.
8  Q   What role did you play?
9  A   I believe, if I remember, he -- he just came in
10     looking for a job.  I don't think he came in
11     from an advertisement.  I don't remember the
12     circumstances.  But, I believe I was the
13     initial one that interviewed him.
14 Q   Okay.  And what job was this for?
15 A   For a funeral director/embalmer, I guess.
16 Q   Did you check-out the resume and references?
17 A   Don't know.
18 Q   Did you ever have any reason to believe that
19     Stephens did not have the certifications or
20     background to do the job?
21 A   No.
22 Q   In fact Stephens was able to perform the jobs
23     of a funeral director and embalmer, correct?
24 A   He was.  Uh-huh.
25 Q   All right.  Now, was there somebody already

Page 108

1      working as a funeral director and embalmer at
2      that time?
3  A   Don't know.
4          (Mr. Schrameck exited the
5      conference room at 12:19 p.m.)
6  BY MR. PRICE:
7  Q   Okay.  What location was this?
8  A   This is at the Garden City location.
9          (Jeffrey Schrameck entered the
10     conference room at 12:19 p.m.)
11 BY MR. PRICE:
12 Q   All right.  Do you recall whether or not
13     Stephens replaced somebody at that location?
14 A   I don't recall.  I don't know.
15 Q   Is it possible?
16 A   Oh sure, it's possible.
17 Q   Okay.  During your interview with Mrs.
18     Dickinson, I believe you said that Stephens
19     could do the job, correct?
20 A   Yes.
21 Q   All right.  We've already talked earlier about,
22     you know, that Stephens showed sensitivity and
23     compassion to the clients who came in, correct?
24 A   Yes.
25 Q   Okay.  And that there were no -- is it safe to

Page 109

1  say then that there were no performance-related
2  reasons for termination of employment?
3  A  Not at that time, but we did have some issues
4  beforehand.
5  Q  But they didn't motivate the decision to
6  terminate the employment, correct?
7  A  No.  No.
8  Q  So performance was not the basis for discharge?
9  A  That's right.
10 Q  Did you have any kind of suspicion that --
11    prior to receiving the letter from Stephens
12    announcing this desire to present as female,
13    did you have any suspicion or thought that
14    anything like that could be happening?
15        MR. KIRKPATRICK:  Objection.
16        THE WITNESS:  No --
17        MR. KIRKPATRICK:  Objection based
18    on foundation.  Go ahead.
19        THE WITNESS:  No.
20 BY MR. PRICE:
21 Q  Okay.  How did you receive this letter?
22        MR. PRICE:  And let's have it
23    marked as 7, please.
24        (Deposition Exhibit No. 7 was
25    marked for identification.)

Page 110

1        THE WITNESS:  (Reviewing.)
2  BY MR. PRICE:
3  Q  Have you had a chance to review the letter?
4  A  Well, I -- I know it from before.
5  Q  Okay.  You recognize it then?
6  A  Yes.
7  Q  Okay.  Is this the letter that Stephens gave to
8    you?
9  A  Yes.
10 Q  Okay.  How did you come to get it?
11 A  He handed it to me.
12 Q  Okay.  Where was this?
13 A  I believe at the Garden City location.
14 Q  Now, do you visit all the facilities every day?
15 A  No.
16 Q  No.  Okay.  How often do you get out to each of
17    them?
18 A  Oh, I'm -- couple times a week.  Yeah.
19 Q  Okay.  Do you recall time of day, whatever,
20    like that?
21 A  I don't recall.  I'm assuming he wanted -- he
22    asked me to speak to him.  I don't recall that
23    though.
24 Q  Okay.  Do you recall -- was it in an office
25    there?

Page 111

1  A  I believe it was just in the chapel.
2  Q  Okay.
3  A  What we call a chapel.
4  Q  The living room facility?
5  A  The living room, yes.  You probably wouldn't
6    call it that.
7  Q  Okay.  Was there anybody else present?
8  A  No.
9  Q  Do you recall the time of day?
10 A  I don't.
11 Q  Okay.  So Stephens asked to meet with you or
12    just approached you, what was the --
13 A  I'm not quite sure.
14 Q  Okay.  Handed you the letter, though, correct?
15 A  Uh-huh.
16 Q  All right.  You read the letter?
17 A  I read the letter.
18 Q  Okay.  What was your reaction upon reading it?
19 A  Well, it was kind of a shocking letter.  I
20    believe I just said to him that I would get
21    back to him.  He was going to go away on
22    vacation in a couple weeks and I would get back
23    to him.
24 Q  He was going on vacation?
25 A  Yes.

Page 112

1  Q  Stephens was going on vacation?
2  A  Yes.
3  Q  Okay.  All right.  Did Stephens say anything to
4    you?
5  A  I think he just -- he explained to me how he
6    had been taking medication, I don't know how
7    long, but he had been involved in wanting to
8    present himself as a female.
9  Q  Okay.  Anything else?
10 A  I don't believe so.
11 Q  You indicated you were shocked at the letter.
12    Did you have any other feelings about it?
13 A  No, I don't think so.
14 Q  Okay.  You indicated that you would get back --
15    you were going to decide what to do?
16 A  Yes.
17 Q  Okay.  So what did you do next?
18 A  Contacted our corporate attorney.
19 Q  Okay.  And I don't want to know anything about
20    details or anything like that.  But who is your
21    corporate attorney?
22 A  David Thoms.
23 Q  Was that the same day?
24 A  I'm not sure.
25 Q  All right.  Do you recall roughly when -- are

Page 113

1 we talking about the first week of August here,
2 end of July, what's the time frame for this?
3 A  I'm going to say it was in August, because it
4 seemed like he was going to go away in
5 September and so I think it was two weeks
6 before. So, I think it was probably certainly
7 in August.
8 Q  Certainly in August. Okay. Now, who is David
9 Thoms?
10 A  He's an attorney.
11 Q  From what firm?
12 A  Miller Canfield at the time.
13 Q  Where is Mr. Thoms now?
14 A  He's just moved to another law firm and I don't
15 know the name offhand.
16 Q  Okay. Still your corporate attorney, though?
17 A  He is.
18 Q  How long has Mr. Thoms been your corporate
19 attorney?
20 A  40 years.
21 Q  What kind of work does Mr. Thoms do for you,
22 what kind of --
23 A  Well, whatever corporate attorneys do. You
24 know, they fill out our forms and --
25 Q  Okay. The corporate filings --

Page 114

1 A  Corporate filings and minutes and things like
2 that, yeah.
3 Q  And again, without getting into detail, have
4 you ever consulted with respect to hiring and
5 firing decisions?
6 A  I may have. I don't recall offhand, though.
7 Q  Now did you contact Mr. Thoms by e-mail or was
8 it a phone call?
9 A  Phone call.
10 Q  Okay. So, was it that same day? I'm sorry.
11 I'm going to assume the same day or certainly
12 the next day.
13 Q  Okay. What was the next thing you did?
14 A  Well, of course I faxed him the letter and
15 asked him what our response should be.
16 Q  What was the next thing you did?
17 A  I talked to my managers, made them aware, let
18 them know.
19 Q  Which managers?
20 A  What we -- all of them. All of them.
21 Q  Who were they at the time?
22 A  Well, Dave Cash and it was -- a George Crawford
23 that actually worked at the Garden City
24 location at the time, and my son and Shannon
25 Kish.

Page 115

1 Q  Okay. With respect to the persons at R.G. &
2 G.R. Harris, who did you -- what did you talk
3 about; what did you say specifically to them?
4 A  To them?
5 Q  Yes.
6 A  I just presented the letter, showed them the
7 letter. That's all.
8 Q  Did you ask them for any input or anything like
9 that?
10 A  I don't recall on that. They didn't have much
11 to say.
12 Q  That was my next question. Do you recall any
13 other -- do you recall reactions to the letter
14 or anything like that?
15 A  No. They were surprised, of course.
16 Q  Anything else you recall being said?
17 A  No.
18 Q  Why did you present the letter to them?
19 A  Well, they're part of my management team. They
20 need to be informed what's going on.
21 Q  Okay. What did you do next?
22 A  I'm not sure what I did next, but I --
23 eventually I had a conversation with Miller
24 Canfield and the lady that handled their
25 department for whatever that is -- whatever

Page 116

1 department that would be.
2 Q  Okay. Do you recall the lady's name?
3 A  I do not.
4       MR. KIRKPATRICK: Objection on
5 relevance on contacting lawyers. I mean, you
6 already established that you talked to Dave
7 Thoms.
8       THE WITNESS: Yeah.
9 BY MR. PRICE:
10 Q  Well, you talked to another person from
11 Canfield; who was that?
12 A  Well, he put me in touch with -- yeah, somebody
13 else.
14 Q  Don't recall her name?
15 A  No. Uh-uh. And I know she's not there
16 anymore.
17 Q  Okay. What did you do next?
18 A  Well, then I was in touch with Joel. It came
19 over to Joel. I was in touch with Joel.
20 Q  Had you worked with Mr. Kirkpatrick before?
21 A  No.
22 Q  Okay. Do you recall when you first met with
23 that -- in a time frame -- in reference to the
24 letter, how soon after?
25 A  I would say -- let's say ten days later.

Page 117

1 Q  All right.  What was the next thing that you
2    did?
3 A  Well, I met with Joel and --
4 Q  We don't need to know the substance.
5         MR. KIRKPATRICK:  Let's just be
6    clear I'm objecting now, we're getting into
7    some privileged communication.
8         THE WITNESS:  Oh, okay.
9         MR. KIRKPATRICK:  So I think -- I
10   don't want to tell you what you're asking, but
11   what did you do after -- what was next thing
12   that happened.  I -- go on and ask your
13   question.
14 BY MR. PRICE:
15 Q  Right.  I do not want to, I'm not entitled to
16   know what your conversations with your attorney
17   are.  So that is a privileged matter, but I do
18   want to know what you yourself did.
19 A  Well, the only thing I did was -- was meet with
20   him and then formulate a letter in response.
21 Q  Was this the severance letter?
22 A  Yes.
23 Q  Okay.  So you decided to terminate Aimee
24    Stephens' employment, correct?
25 A  Yes.  That -- yes.  Yes.

Page 118

1 Q  Okay.  And it was your decision?
2 A  Yes, it was.
3 Q  Did you get any input from anybody else in
4    making the decision apart -- leaving aside
5    lawyer stuff, we don't want to touch that?
6 A  No.  No.
7 Q  Okay.  Did you tell anyone at Harris that you
8    were going to be terminating Stephens?
9 A  I don't believe so.  Not ahead of time.
10 Q  Did you give a copy of Exhibit 7, Stephens'
11   letter, to your attorney, Mr. Kirkpatrick as
12   well?
13 A  Oh, yes.  Yes.
14 Q  Okay.  Now, why did you decide to offer a
15   severance agreement to Stephens?
16 A  It was just determined that we would want to
17   approach it that way.  I don't really recall
18   why.
19 Q  Okay.  Do you -- have you ever offered
20   severance agreements to any other employees
21   that you've terminated?
22 A  I have not.
23 Q  You can't think of any specific reasons why you
24   would choose to do so in this case?
25 A  Not specifically.

Page 119

1 Q  Generally did you have any mindset behind
2    offering that -- your thinking behind offering
3    an agreement in this case?
4 A  Well it was just, I would say, to see if there
5    was some kind of a fair agreement that we could
6    come to with his leaving under the
7    circumstances.
8 Q  Okay.
9         MR. KIRKPATRICK:  I'm going to
10   object to this line of questioning on the fact
11   that this goes along with settlement
12   discussions, potentially, and that's not
13   admissible.
14         MR. PRICE:  Okay.  Well, let me see
15   if I can --
16 BY MR. PRICE:
17 Q  You did -- as part of the severance agreement
18   wasn't there an agreement to waive Title VII
19   claims?
20         MR. KIRKPATRICK:  Again, it's --
21   I'm just going to object again and place it so
22   we're really clear that we're getting into
23   settlement options which are not admissible in
24   court.
25         MR. PRICE:  Well, the fact that --

Page 120

1    yeah, I recognize the money would not have been
2    probably admissible.  The fact that there's a
3    severance --
4         MR. KIRKPATRICK:  Any settlement.
5    I know, but any settlement, any settlement
6    discussions, any settlement terms would be
7    inadmissible in court.
8 BY MR. PRICE:
9 Q  Was there any concern on your part that you
10   might be liable under Title VII?
11 A  No, because I didn't even know what it was.
12 Q  You never heard of Title VII --
13 A  I had not.
14 Q  -- prior to this lawsuit?
15 A  No.
16 Q  Had you heard of sex discrimination before?
17 A  Oh, I've heard of the terms, yes.
18 Q  Okay.  Were you aware that generally speaking
19   there was a Federal law against discrimination
20   including sex discrimination?
21 A  Yes.
22 Q  Okay.  You just didn't know that the verbiage
23   was Title VII?
24 A  Yes.  Yes.
25 Q  Is that correct?

Page 125

1   you're -- I'm going to object on this.  You're
2   asking from legal conclusions, somebody out
3   there, I don't know if I'm going to get sued or
4   not, I don't even understand if what he was
5   doing would allow him to be sued, I mean,
6   there's just a host of objections that we have
7   placed on there.
8           MR. PRICE:  And I agree, but I'm
9   still allowed to ask the question in discovery.
10          MR. KIRKPATRICK:  All right.
11          THE WITNESS:  What was the question
12  again?
13          MR. KIRKPATRICK:  If you can answer
14  the question.
15  BY MR. PRICE:
16  Q   Did you have any concern that in firing
17      Stephens you would by subjecting yourself to a
18      sex discrimination lawsuit?
19  A   Yes, that's always a possibility.  Yes.
20  Q   Has Harris ever been sued before by an employee
21      for discharge?
22          MR. KIRKPATRICK:  Objection,
23      relevance.  Go ahead and answer, if you can.
24          THE WITNESS:  No.
25  BY MR. PRICE:

Page 126

1   Q   Okay.  How did you fire Stephens; how did you
2       let Ms. Stephens know that she was being
3       released?
4   A   Well, I said to him, just before he was -- it
5       was right before he was going to go on vacation
6       and I just -- I said -- I just said "Anthony,
7       this is not going to work out.  And that your
8       services would no longer be needed here."
9   Q   That's at the Garden City location?
10  A   Yes.
11  Q   What time of day was it?
12  A   It was later in the afternoon.
13  Q   Where did you meet Stephens?
14  A   In the chapel.
15  Q   Chapel again?
16  A   Uh-huh.
17  Q   Did you ask for the meeting or did he ask --
18  A   Yes.
19  Q   All right.  Did you present them with a
20      severance agreement?
21  A   I did.
22  Q   Okay.  Apart from saying "Not going to work
23      out", do you recall anything else that you
24      said?
25  A   No.

Page 127

1   Q   How long did this conversation take?
2   A   Not very long.  Couple minutes.
3   Q   Couple minutes total?
4   A   Uh-huh.
5   Q   What did Stephens say?
6   A   He was sorry that it wasn't going to work out.
7       And said that he might have to contact his
8       attorney or an attorney.  And I said, "Well,
9       you do whatever you feel you have to do."  And
10      that was the end of the conversation.
11  Q   Did Stephens leave the facility at that point?
12  A   He did.
13  Q   Did you ever talk to anybody else about --
14      apart from your management team, did you ever
15      talk to anybody else about Stephens and the
16      letter that you received?
17  A   No.  Obviously everybody became aware of it in
18      the staff pretty quickly, but no.
19  Q   Did you let people know that you fired
20      Stephens?
21  A   After the -- sure.  Afterwards, sure.
22  Q   Okay.  Who did you contact?
23  A   I probably sent it out in a little notice of
24      some kind, that's usually what we would do,
25      just to --

Page 128

1   Q   Is that e-mail or what?
2   A   No, it's fax.
3   Q   Okay.  Do you still have a copy of that fax?
4   A   No.
5   Q   Do you recall what it said?
6   A   I do not.
7   Q   Would you have personally faxed it or would
8       that have been something that you would have
9       Shannon or --
10  A   She would have sent it, yes.
11  Q   Okay.  Now, when your -- did you tell Stephens
12      about any of your concerns regarding that
13      you've talked about today, your religious
14      freedom rights, you know, the affect on the
15      ministry or anything like that?
16  A   Did not talk to him about anything.
17  Q   Just said "This is not going to work out"?
18  A   That's exactly right.
19  Q   And "Here's a severance agreement"?
20  A   Yes.
21  Q   And that's it?
22  A   That's it.
23  Q   Have you ever fired anyone else at Harris
24      because of a -- what you believe to be a
25      conflict with your religious concerns?

Page 133

1 A   Yes.
2 Q   And I think Mr. Price asked you about the
3     verse, the scripture verse at the bottom?
4 A   Yes.
5 Q   The Matthew verse?
6 A   Yes.
7 Q   And asked you if that was the only thing on
8     this mission statement or the website that
9     describes your, you know, religious beliefs.
10    Do you recall that?
11 A   Yes.
12 Q   Is that in fact the only thing on that website,
13    mission statement?
14 A   Well, there is up at the top the statement that
15    our highest priority is to honor God and all
16    that we do as a company and as individuals.
17 Q   So that's the first statement of your mission
18    statement?
19 A   It's the first statement and the bottom is the
20    last statement.
21 Q   So would it be fair to say that this statement
22    reflects your entire belief from your personal
23    religious position?
24 A   Yes.
25 Q   Okay.  I'm going to have you go with Exhibit 1,

Page 134

1     which is the answer to the Complaint.  Turn to
2     page 3.
3         Now, you were asked by Mr. Price
4     about the affirmative defenses; do you recall
5     that?
6 A   Yes.
7 Q   Just so we understand, are you an attorney?
8 A   No.
9 Q   Do you have any legal training, per se?
10 A   No.
11 Q   Do you understand, perhaps conceptually, what
12    affirmative defenses are in the context of a
13    Federal lawsuit?
14 A   No.
15 Q   Okay.  So, can you speak to perhaps what may be
16    an appropriate affirmative defense or what
17    might not be an appropriate affirmative defense
18    in the context of answering a lawsuit?
19 A   No.
20 Q   Okay.  You just relied on Counsel's advice?
21 A   Yes.
22 Q   All right.  I'm going to ask you to review
23    Exhibit 2.  Can you tell me the date of that
24    Exhibit at the bottom, what it's dated?
25 A   It looks like 9, September, '13.

Page 135

1 Q   2013?
2 A   Yes.
3 Q   Would it be fair to say that that date is
4     shortly after Stephens was terminated from
5     employment?
6 A   Yes.
7 Q   Was there a Federal lawsuit filed against your
8     company at the time, Harris Funeral Homes at
9     the time that that thing was filled out?
10 A   No.  I -- no.
11 Q   Okay.  And so, would it be fair to say that you
12    received that document at some point; was it
13    mailed to your location?
14 A   Yes.
15 Q   Okay.  I think there was testimony you didn't
16    recall and that it might have gotten to
17    somebody else, but is it possible that you
18    received that?
19 A   Yes, we would have received it, yes.
20 Q   Now, you had given some testimony pursuant to
21    Mr. Price's questioning about why you
22    terminated Stephens.  Do you recall that?
23 A   Yes.
24 Q   Okay.  Why did you -- what was the specific
25    reason that you terminated Stephens?

Page 136

1 A   Well, because he -- he was no longer going to
2     represent himself as a man.  He wanted to dress
3     as a woman.
4 Q   Okay.  So he presented you this letter, which I
5     think is Exhibit -- I forgot what Exhibit
6     Number it was -- might have been the last one.
7     Is it 7?
8 A   Number 7, yes.
9 Q   Yeah, Exhibit 7.  So just for a little
10    background and pursuant to the question of Mr.
11    Price, you were presented that letter from
12    Stephens?
13 A   Correct.
14 Q   Okay.  And did anywhere in that letter indicate
15    that Stephens would continue to dress under
16    your dress code as a man in the workplace?
17 A   No.
18 Q   Did he ever tell you during your meeting when
19    he handed you that letter that he would
20    continue to dress as a man?
21 A   No.
22 Q   Did he indicate that he would dress as a woman?
23 A   Yes.  Yes.
24 Q   Okay.  Is it -- the reason you fired him, was
25    it because he claimed that he was really a

Page 137

```
 1   woman; is that why you fired him or was it
 2   because he claimed -- or that he would no
 3   longer dress as a man?
 4 A   That he would no longer dress as a man.
 5 Q   And why was that a problem?
 6 A   Well, because we -- we have a dress code that
 7   is very specific that men will dress as men; in
 8   appropriate manner, in a suit and tie that we
 9   provide and that women will conform to their
10   dress code that we specify.
11 Q   So hypothetically speaking, if Stephens had
12   told you that he believed that he was a woman,
13   but would only present as a woman outside of
14   work, would you have terminated him?
15 A   No.
16 Q   Would you have hired and terminated somebody
17   for being gay?
18 A   No.
19       MR. PRICE:  Objection, speculation.
20       MR. KIRKPATRICK:  Okay.  Okay.
21   Speculation.
22 BY MR. KIRKPATRICK:
23 Q   You had some questions about your moral beliefs
24   and whether or not you fired somebody for being
25   an adulterer; do you recall that?
```

Page 138

```
 1 A   Yes.
 2 Q   Would you fire someone just for being an
 3   adulterer?
 4 A   No.
 5 Q   As long as they followed the rules would they
 6   stay?
 7 A   Yes.
 8 Q   Including the dress code?
 9 A   Yes.
10 Q   Okay.  Or a woman who claimed that she had an
11   abortion, as long as she followed the rules,
12   would you have fired her?
13 A   Yeah -- no, I wouldn't have fired her.
14 Q   Okay.  As long as she followed the rules, she
15   could stay?
16 A   Yes.
17 Q   All right.  Have you ever hired any gay people?
18 A   Yes.
19 Q   Or I should say, have you ever had any gay
20   people work for you?
21 A   Yes.
22 Q   Have you ever fired them for that reason?
23 A   No.
24 Q   Okay.  Now, there was questions about issues
25   after Stephens was fired and things that you
```

Page 139

```
 1   were thinking of when Mr. Price was questioning
 2   you and there was an issue of safety using
 3   restrooms; do you recall that?
 4 A   Yes.
 5 Q   That word "Safety", was it -- what, you
 6   believed that he was going the be physically
 7   dangerous to people?
 8 A   No.  No.
 9 Q   What do you mean about you were concerned about
10   safety about girls and women and granddaughters
11   using the restroom with someone who was a man
12   dressed as a woman?
13 A   Well, just presenting in a funeral home an
14   environment that is suitable for them to begin
15   the healing process.
16 Q   Okay.  Would it be uncomfortable?
17 A   Yeah, that it's a comfortable situation, yeah.
18 Q   But, just to be clear, you didn't believe that
19   just because Stephens had presented you this
20   letter and told you what he told you, that
21   somehow he was going the be a physical danger
22   to anyone?
23 A   No.
24 Q   Okay.  There was some questions that Mr. Price
25   asked you about your interview you had with the
```

Page 140

```
 1   EEOC investigator.  Do you recall that?
 2 A   Yes.  Yes.
 3 Q   Now, you were interviewed by this EEOC
 4   investigator prior to this lawsuit being filed
 5   against you?
 6 A   That's correct.
 7 Q   Okay.  And I think there was questions about
 8   did you bring up anything about religious
 9   issues or religious objections or anything like
10   that.  Do you recall that question?
11 A   Yes.
12 Q   And we just made it clear that there was no
13   lawsuit filed at the time?
14 A   That's right.
15 Q   And you just answered her questions, correct?
16 A   That's right.
17 Q   Did you -- were you under any belief that you
18   had to present all and any defenses to -- might
19   be from a lawsuit that wasn't filed yet?
20 A   No.
21       MR. KIRKPATRICK:  Okay.  All right.
22   That's it for me.
23       RE-EXAMINATION
24 BY MR. PRICE:
25 Q   You were just asked about the investigator, you
```

Page 141

1    know, whether you were in a lawsuit or not. Is
2    it your understanding that you only had
3    religious freedom or protection under the
4    Religious Freedom Restoration Act only if
5    you're being sued?
6  A  I don't understand.
7  Q  Do you have to be sued before you have --
8    you're declaring your right to exercise your
9    religious freedom or free exercise of religion?
10  A  No. But it wasn't up in a discussion, so it
11    wouldn't be something that I would bring up.
12  Q  Okay. But it was one of your -- it's --
13    obviously it's one of your reasons for
14    justifying your decisions with respect to
15    Stephens, correct?
16  A  Yes.
17  Q  Okay. Now you're dealing with a Federal agency
18    that's asking you your position on a charge,
19    correct?
20  A  Yes.
21  Q  Okay. Wouldn't you feel the need to be as
22    forthright and complete as possible in setting
23    forth your justifications?
24  A  Yes, but she didn't ask me specific questions
25    about my religious beliefs, or beliefs at the

Page 142

1    funeral home.
2  Q  Why would she have to if you don't mention that
3    in any of your earlier responses?
4  A  I don't know why I would have to necessarily
5    bring it up.
6  Q  So, how was the government supposed to
7    understand that you have a religious objection
8    or religious concerns if you don't raise them?
9  A  That's why they're raised now.
10  Q  Okay. But you didn't feel -- you felt like you
11    didn't need to bother to bring that up during
12    the investigation part?
13  A  I just thought that was just an investigation,
14    she presented herself and said she's there just
15    to investigate this, and make it as simple and
16    as clean as possible.
17  Q  You were asked about the mission statement.
18    Talking about, yes, at the first paragraph.
19  A  Uh-huh.
20  Q  My apology, I did miss that. Talks about
21    honoring God in all you do as a company and
22    individuals.
23    Do you believe that it would -- you
24    would not have been honoring God if you
25    continued to employ Aimee Stephens?

Page 143

1  A  Yes.
2  Q  You would not have been honoring God to keep
3    that person in place?
4  A  Yes.
5  Q  And why not?
6  A  Because it would be, I believe, a huge
7    disservice to the families that have called
8    upon me, and expect certain criteria and
9    certain services to be offered them. I think I
10    would be doing them a huge disservice to them
11    and to my -- to my staff, people that work for
12    me, everybody that's involved.
13  Q  And to your own personal faith?
14  A  Absolutely.
15  Q  Okay. Because as you said before, God made men
16    as men and women as women?
17  A  Exactly.
18  Q  Your -- it was mentioned before that you don't
19    honor all of the legal holidays, obviously like
20    Veteran's Day. Why are those six picked and no
21    others?
22  A  Well, I didn't have anything to do with picking
23    those, but they go back way before my time. I
24    guess those were the original six considered
25    legal holidays.

Page 144

1  Q  Okay.
2  A  And I guess just out of tradition we've never
3    changed.
4  Q  Has there been any discussion of having Easter
5    as a --
6  A  It has been discussed.
7  Q  Okay. What was the -- what was the thought?
8    Why not?
9        MR. KIRKPATRICK: Objection to
10    relevance. Go ahead and answer if you can.
11        THE WITNESS: It would require, you
12    know, additional pay for one thing.
13  BY MR. PRICE:
14  Q  There's an expense to it?
15  A  Yeah, there's an expense to it, of course.
16  Q  Okay. Because I believe the holiday pay works
17    you get -- you get an extra paid day, like paid
18    for six days even though you're working five?
19  A  Exactly. Even when you're -- yeah, when you're
20    not working so you're getting paid, yeah.
21  Q  Okay. You said -- you've been told -- or
22    mentioned that you've had gay people work for
23    you. Do you recall when most recently that
24    was?
25  A  It's been awhile. It's been quite a number of