UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| Equal Employment Opportunity Commission, | |
| Plaintiff, | |
| | Civil Action No. |
| v. | 2:14-cv-13710 |
| | Hon. Sean F. Cox |
| R.G. & G.R. Harris Funeral Homes, Inc., | |
| Defendant. | |

---

## DEFENDANT R.G. & G.R. HARRIS FUNERAL HOMES, INC.'S STATEMENT OF MATERIALS FACTS NOT IN DISPUTE

---

Defendant R.G. & G.R. Harris Funeral Homes, Inc. (hereinafter "R.G.") asserts that the following material facts are not in dispute in this case and support its Motion for Summary Judgment.

**R.G.'s History and General Operations**

1.   R.G. is a closely held for-profit corporation owned and operated by Thomas Rost (hereinafter "Rost"). (T. Rost 30(b)(6) Dep. 28:10-15 (Ex. 4)).

2.   R.G. has been in business since 1910. (T. Rost 30(b)(6) Dep. 79:19-80:9 (Ex. 4)).

3.   Tom Harris, Rost's uncle, was the previous president of R.G. (T. Rost 30(b)(6) Dep. 78:10-13 (Ex. 4)).

1

4.    R.G. has three locations: Detroit, Livonia, and Garden City. (Kish Dep. 33:24-34:3 (Ex. 5)).

5.    The company averages around thirty funerals a month. (T. Rost Dep. 43:3-16 (Ex. 3)).

6.    Preferred Funeral Directors International gave R.G. the Parker award in 2011 for demonstrating exemplary service. (T. Rost Aff. ¶ 5 (Ex. 1)).

7.    R.G.'s Livonia location was recognized as best hometown funeral home of the year in 2016 by Livonia residents in a survey by Friday Musings newspaper. (T. Rost Aff. ¶ 6 (Ex. 1)).

**Rost's Experience and Role at R.G.**

8.    Rost owns 94.5% of R.G., and the remaining 5.5% is split between his two children. (T. Rost 30(b)(6) Dep. 26:20-28:25 (Ex. 4)).

9.    Rost has been the owner of R.G. for over thirty years. (T. Rost 30(b)(6) Dep. 28:10-15 (Ex. 4); T. Rost Aff. ¶ 2 (Ex. 1)).

10. Rost has been the president of R.G. for thirty-five years and is the sole officer of the corporation. (T. Rost 30(b)(6) Dep. 78:2-9 (Ex. 4)).

11. Rost received a mortuary science degree from Wayne State in 1967, and a Bachelor of Science in Business from Wayne State in 1968. (T. Rost Dep. 7:9-23 (Ex. 3)).

12. Rost has served thousands of grieving families and arranged thousands of funerals during the time that he has operated R.G. (T. Rost Aff. ¶ 3 (Ex. 1)).

13. Rost served as the President of Preferred Funeral Directors International in 1992. (T. Rost Aff. ¶ 4 (Ex. 1)).

14. Rost or his location-managers handle the hiring for R.G. (T. Rost 30(b)(6) Dep. 53:19-20 (Ex. 4)). Rost personally oversees the hiring and discipline of funeral director embalmers. (Crawford Dep. 11:11-23 (Ex. 6)).

15. R.G. has never before been subject to a charge by the EEOC or Michigan Department of Civil Rights. (T. Rost 30(b)(6) Dep. 19:11-18 (Ex. 4)).

16. Rost has never previously been subject to allegations of discrimination in the workplace. (T. Rost Dep. 11:24-12:1 (Ex. 3)).

**R.G.'s and Rost's Religious Beliefs**

17. Rost has been a Christian for over sixty-five years. (T. Rost 30(b)(6) Dep. 30:13-22 (Ex. 4)). He attends both Highland Park Baptist Church and Oak Pointe Church. (T. Rost 30(b)(6) Dep. 29:20-30:3 (Ex. 4)).

18. For a time, Rost was on the deacon board at Highland Park Baptist Church. (T. Rost Dep. 10:2-11 (Ex. 3)).

19. Rost is on the board of the Detroit Salvation Army, a Christian nonprofit ministry, and has been for 15 years; he was the former Chair of the advisory board. (T. Rost Dep. 8:21-9:17 (Ex. 3)).

20. Rost's faith informs the way he operates his business, and he "practice[s] [his] faith through [his] businesses." (T. Rost 30(b)(6) Dep. 86:20-22, 87:3-24 (Ex. 4); T. Rost Aff. ¶¶ 7, 10 (Ex. 1)).

3

21. R.G.'s mission statement is published on its website (T. Rost 30(b)(6) Dep. 80:20-81:3 (Ex. 4)), which reads: "R.G. & G.R. Harris Funeral Homes recognize that its highest priority is to honor God in all that we do as a company and as individuals. With respect, dignity, and personal attention, our team of caring professionals strive to exceed expectations, offering options and assistance designed to facilitate healing and wholeness in serving the personal needs of family and friends as they experience a loss of life." (R.G. Webpage (Ex. 15)).

22. The R.G. website also contains a Scripture verse at the bottom of the mission statement page. (R.G. Webpage (Ex. 15)).

23. Rost ensures that all R.G.'s customers have access to spiritual guidance by placing throughout his funeral homes Christian devotional booklets called "Our Daily Bread" and small cards with Bible verses on them called "Jesus Cards," and by making a Bible available to visitors at all of his funeral homes. (T. Rost 30(b)(6) Dep. 39:23-40:17 (Ex. 4); Nemeth Dep. 27:13-28:2 (Ex. 7); Cash Dep. 47:17-24 (Ex. 8); Kowalewski Dep. 31:17-32:21, 33:5-22 (Ex. 9); M. Rost Dep. 28:20-29:19 (Ex. 10); Peterson Dep. 28:18-30:12 (Ex. 11)).

24. Rost leads prayer at R.G. business meetings and corporate events. (Kowalewski Dep. 60:13-61:18 (Ex. 9); M. Rost Dep. 27:6-15 (Ex. 10)).

25. Funerals are events of deep spiritual significance for many people. (T. Rost Aff. ¶¶ 10, 20, 26, 30 (Ex. 1); EEOC Deliberative After Action Memo at

EEOC002785 (Ex. 23); EEOC T. Rost Aff. ¶ 11 (Ex. 16); T. Rost 30(b)(6) Dep. 32:3-13 (Ex. 4)).

26. Having worked at R.G. for over twenty-five years, Livonia location-manager David Cash believes it is a Christian business based on the mission statement, the Bible verse on the website, and his knowledge that Rost has been "affiliated with the church over the years." (Cash Dep. 8:25-9:25, 46:5-18 (Ex. 8); Kish Dep. 35:14-15 (Ex. 5)).

27. Garden City location-manager David Kowalewski considers R.G. to be a Christian business. (Kowalewski Dep. 29:8-10 (Ex. 9); Kish Dep. 35:14-18 (Ex. 5)).

28. Rost sincerely believes that the Bible teaches that a person's sex (whether male or female) is an immutable God-given gift and that it is wrong for a person to deny his or her God-given sex. (T. Rost Aff. ¶¶ 41-42, 44 (Ex. 1)).

29. Rost sincerely believes that he would be violating God's commands if he were to pay for or otherwise permit one of R.G.'s funeral directors to wear the uniform for members of the opposite sex while at work. (T. Rost Aff. ¶¶ 43-46 (Ex. 1)).

**R.G.'s Ministry to the Grieving**

30. Rost operates R.G. as a ministry to serve grieving families while they endure some of the most difficult and trying times in their lives. (T. Rost 30(b)(6) Dep. 86:2-19 (Ex. 4); T. Rost Aff. ¶ 7 (Ex. 1)).

31. Rost sincerely believes that God has called him to serve grieving people. He sincerely believes that his purpose in life is to minister to the grieving, and his religious faith compels him to do that important work. (T. Rost Aff. ¶ 10 (Ex. 1); T. Rost 30(b)(6) Dep. 86:2-19 (Ex. 4)).

32. Rost describes R.G.'s ministry as one of healing—to help families on the "worst day of their lives" by "meet[ing] their emotional, relational and spiritual needs . . . in a religious way." (T. Rost 30(b)(6) Dep. 86:2-19 (Ex. 4)).

33. R.G. strives to meet clients' emotional, relational, and spiritual needs by training staff in grief management and maintaining strict codes of conduct and decorum at all times so that grieving clients have a place free of distractions to grieve and heal. (T. Rost Aff. ¶ 8 (Ex. 1)).

34. Part of R.G.'s ministry is performing religious rites, customs, and rituals for families. (T. Rost 30(b)(6) Dep. 32:3-13 (Ex. 4)).

**Charging Party Stephens's Employment at R.G.**

35. Charging Party Stephens (hereinafter "Stephens") started at R.G. on October 1, 2007 as an apprentice. (Stephens Dep. 50:8-17 (Ex. 14)).

36. After completing the apprenticeship, Stephens was hired as funeral director embalmer. (Stephens Dep. 50:18-51:4 (Ex. 14); Crawford Dep. 16:1-3 (Ex. 6)).

37. Funeral director embalmers' duties include body removal; embalming; dressing, cosmetizing, and casketing bodies; and conducting visitations and funerals.

(Stephens Dep. 22:14-24:14 (Ex. 14); Kowalewski Dep. 69:20-70:11, 70:21-24 (Ex. 9); T. Rost Aff. ¶¶ 14-15, 24-31 (Ex. 1)).

38. Funeral director embalmers often meet and interact with grieving families. (Shaffer Dep. 48:23-49:14, 53:4-54:16 (Ex. 12); T. Rost Aff. ¶¶ 14-31 (Ex. 1); EEOC T. Rost Aff. ¶¶13-14 (Ex. 16); EEOC Kish Aff. ¶ 15 (Ex. 17)).

39. Funeral director embalmers are sometimes responsible for meeting with families to set up funeral arrangements (Cash Dep. 27:13-28:9 (Ex. 8); T. Rost Aff. ¶¶ 16-17, 24-25 (Ex. 1)), and for directing funeral ceremonies. (Cash Dep. 28:10-22 (Ex. 8); T. Rost Aff. ¶¶ 28-31 (Ex. 1)).

40. Funeral arrangements involve "meeting with the family, gathering information necessary for death certificates, newspaper notices, making arrangements for services, be it in the funeral home or the church of the family's choice, arranging for visitations if that's something the family has chosen." (Crawford Dep. 14:8-18 (Ex. 6)).

41. Funeral directors are R.G.'s most prominent public representatives. (EEOC T. Rost Aff. ¶¶ 13-14, EEOC 002761 (Ex. 16); T. Rost Aff. ¶ 32 (Ex. 1); EEOC Kish Aff. ¶ 15 (Ex. 17)). They are the face that R.G. presents to the world. (T. Rost Aff. ¶ 32 (Ex. 1)).

42. "A funeral director is one whose profession is assisting surviving families and friends with the planning and carrying out of all aspects of caring for a decedent and the decedent's family, including removal of remains, embalming and cremation,

7

making funeral and memorial arrangements, making sure funerals and memorial services are carried out in accordance with the decedents' and survivors' desires, and assisting survivors through the emotional distress that accompanies the loss of a loved one." (Def.'s Resp. to Pl.'s First Set of Discovery at Interrogatory No. 6 (Ex. 27)).

43. R.G. requires that "Funeral Directors—in both appearance and behavior—must perform their professional duties without drawing undue attention to themselves or causing the survivors any more stress than absolutely necessary. Indeed, the Funeral Director's job is, to the extent possible, to lessen and protect the survivors from unnecessary stress." (Def.'s Resp. to Pl.'s First Set of Discovery at Interrogatory No. 6 (Ex. 27)).

44. Stephens's duties at R.G. included "embalming, cosmetizing, casketing, [and] dressing" the bodies of the decedents, facilitating the family and public viewings, and taking the bodies from the families into R.G.'s custody. (Stephens Dep. 66:4-17 (Ex. 14); T. Rost Aff. ¶¶ 14-31 (Ex. 1)).

45. Stephens's duties included contact and interaction with the decedents' family members (Stephens Dep. 66:18-20 (Ex. 14); T. Rost Aff. ¶¶ 14-31 (Ex. 1)), and at times involved meeting with families to set up funeral arrangements and directing funeral ceremonies. (Cash Dep. 27:13-28:22 (Ex. 8); T. Rost Aff. ¶¶ 16-31 (Ex. 1)).

46. When hired at R.G., Stephens's immediate supervisor was David Cash. Rost would make rounds to the different locations every day, but was not at Stephens's location full time. (Stephens Dep. 56:14-57:6 (Ex. 14)).

47. David Cash was Stephens's supervisor only for six months before Stephens moved to the Garden City location where George Crawford was the manager. (Stephens Dep. 58:3-17 (Ex. 14)).

48. Within six months prior to Stephens's final day at R.G., Stephens had been reprimanded for job performance issues such as a bad attitude and insubordination. The situation had become so bad that Stephens's immediate supervisor asked Rost to fire Stephens. Rost talked with Stephens about the issue. (EEOC T. Rost Aff. ¶ 18, EEOC002762 (Ex. 16); EEOC Crawford Aff. ¶¶ 23, 25, EEOC002772-74 (Ex. 18)).

**R.G.'s Dress Code**

49. R.G.'s handbook outlines a general dress code for men requiring that they wear dark suits with nothing in the jacket pockets, white shirts, ties, dark socks, dark polished shoes, dark gloves, and only small pins. (R.G. & G.R. Harris Funeral Home Employee Manual, EEOC002717-19 (Ex. 19)).

50. R.G.'s handbook outlines a general dress code for women requiring "a suit or a plain conservative dress" in muted colors. (R.G. & G.R. Harris Funeral Home Employee Manual, EEOC002717-19 (Ex. 19)).

51. Apart from the handbook, R.G. employees understand that men who interact with the public are to wear suits and ties, and that women who interact with the public are to wear skirts and business jackets. (Peterson Dep. 30:24-31:25, 32:3-8 (Ex. 11); Kish Dep. 17:8-16, 58:5-11 (Ex. 5); Shaffer Dep. 52:12-22 (Ex. 12); Cash

9

Dep. 23:1-4 (Ex. 8); Kowalewski Dep. 22:10-15 (Ex. 9); McKie Dep. 22:22-25 (Ex. 13); M. Rost Dep. 14:9-19 (Ex. 10)).

52. R.G. administers its dress code based on its employees' biological sex. (T. Rost Aff. ¶ 35 (Ex. 1)).

53. R.G.'s employees understand that the dress code for funeral directors is to wear company-provided suits. (Kish Dep. 17:8-22 (Ex. 5); Crawford Dep. 18:3-11 (Ex. 6)).

54. R.G.'s dress code is consistent with the standard for the industry. (T. Rost 30(b)(6) Dep. 57:20-58:6 (Ex. 4) (stating that R.G.'s "dress code conforms to what is acceptable attire in a professional manner for the services that [R.G.] provide[s]"); T. Rost Dep. 49:22-50:15 (Ex. 3) (stating that the dress code ensures that R.G.'s "staff is . . . dressed in a professional manner that's acceptable to the families that [R.G.] serve[s]")).

55. Maintaining a professional dress code that is not distracting to grieving families is an essential industry requirement that furthers their healing process. (T. Rost Aff. ¶ 34 (Ex. 1); T. Rost Dep. 49:22-50:21 (Ex. 3); T. Rost 30(b)(6) Dep. 59:13-60:5 (Ex. 4); Kish Dep. 63:19-64:7 (Ex. 5)).

56. R.G.'s dress code ensures that R.G. does not violate Rost's religious belief that a person's sex (whether male or female) is an immutable God-given gift or his religious belief that R.G. cannot pay for or otherwise permit one of its funeral

directors to wear the uniform for members of the opposite sex while at work. (T. Rost Aff. ¶¶ 41-46 (Ex. 1); T. Rost 30(b)(6) Dep. 57:20-59:12, 69:12-24 (Ex. 4)).

57. Stephens has been involved in the funeral industry for nearly 30 years, and every place Stephens has worked has had a dress code. (Stephens Dep. 90:1-6 (Ex. 14)).

58. Stephens agrees that the industry standard is to dress professionally because of the grieving process. (Stephens Dep. 90:7-25, 91:22-92:9 (Ex. 14)).

59. Stephens agrees that R.G. is entitled under industry standards to require a sex-specific dress code for its employees. (Stephens Dep. 90:7-25, 91:22-92:9, 102:19-103:14, 118:19-25 (Ex. 14)).

60. Employees have been disciplined in the past for failing to abide by R.G.'s dress code. (Kish Dep. 54:1-16, 68:22-69:8 (Ex. 5); M. Rost Dep. 37:22-39:6 (Ex. 10)).

**Stephens's Sex**

61. Stephens's assigned sex at birth was male. Stephens's legal name was William Anthony Beasley Stephens from the time of birth throughout Stephens's employment at R.G. (Stephens Dep. 49:5-13, 79:22-80:10 (Ex. 14); Order and Petition for Name Change, EEOC002816-17 (Ex. 24)).

62. Stephens was married to a woman, Donna, while employed by R.G. (Stephens Dep. 41:14-21 (Ex. 14)).

63. All R.G.'s employment records regarding Stephens—including driver's license, insurance policy, tax records, unemployment insurance claim, and mortuary-

science license—identify "Anthony Stephens" as a male. (T. Rost Dep. 21:1-25 (Ex. 3); Def.'s Resp. to Charge at 5, EEOC002744-45 (Ex. 22); Kish Dep. 67:9-68:21 (Ex. 5)).

64. Stephens dressed in accordance with the male uniform for funeral directors during Stephens's employment at R.G. (Kowalewski Dep. 57:18-20, 68:11-13 (Ex. 9); Pl.'s First Supp. Resp. to Def.'s First Set of Discovery at Interrogatory No. 10 (Ex. 26)).

65. One of Stephens's supervisors George Crawford always understood Stephens to be a man, and Stephens never indicated to Crawford that Stephens was not a man. (Crawford Dep. 42:1-4 (Ex. 6)).

66. R.G. purchased men's suits for Stephens to wear, and Stephens wore them. (Stephens Dep. 59:14-60:1 (Ex. 14); Pl.'s Resp. to Def.'s First Set of Discovery at Request for Admission No. 2 (Ex. 25) (stating that at "all times during Stephens's employment with [R.G.] Stephens . . . received professional male clothing" from R.G.)).

**Stephens's Refusal to Comply with the Dress Code**

67. On July 31, 2013, Stephens approached Rost in the Chapel at R.G.'s Garden City location and presented Rost with a letter (hereinafter "the letter") that stated Stephens's intent to transition from presenting as a man to presenting as a woman, including Stephens's intent (starting a few weeks later on August 26, 2013) to

12

wear female attire at work. (T. Rost 30(b)(6) Dep. 110:3-111:15 (Ex. 4); Stephens Dep. 67:3-68:17 (Ex. 14); Stephens's Letter, EEOC000040-41 (Ex. 20)).

68. Before receiving the letter, Rost had no indication that Stephens wanted to dress as a woman. (T. Rost 30(b)(6) Dep. 109:10-19 (Ex. 4); Stephens Dep. 103:16-104:24, 107:20-25 (Ex. 14)).

69. After Stephens gave Rost the letter, Rost told Stephens that he would get back to Stephens about the letter before Stephens's planned vacation. (T. Rost 30(b)(6) Dep. 111:11-112:10 (Ex. 4)).

70. Rost understood from the letter and conversation that Stephens refused to comply with the dress code for male funeral directors. (T. Rost 30(b)(6) Dep. 136:14-23 (Ex. 4)).

71. After considering Stephens's proposal, Rost told Stephens approximately two weeks later, on August 15, 2013, that Stephens could not violate R.G.'s dress code for male funeral directors, and Rost offered Stephens a severance package. (T. Rost 30(b)(6) Dep. 126:1-25 (Ex. 4); Stephens Dep. 74:13-75:24, 76:2-10, 79:22-80:10 (Ex. 14); Charge of Discrimination, EEOC002748 (Ex. 21)).

72. Stephens did not offer to continue to comply with the dress code for male funeral directors, and Stephens planned to return to work in two weeks "wearing . . . female attire." (Stephens Dep. 81:9-16 (Ex. 14)).

73. Stephens rejected the severance package, expressed sorrow "that it wasn't going to work out," and indicated a tentative plan to contact an attorney. Rost replied,

"[Y]ou do whatever you feel you have to do." Then the conversation ended, and Stephens left the facility. (T. Rost 30(b)(6) Dep. 127:5-12 (Ex. 4); Stephens Dep. 76:3-12 (Ex. 14)).

74. Stephens was at an attorney's office days later and subsequently filed the EEOC claim that resulted in this suit. (Stephens Dep. 79:12-21 (Ex. 14)).

**Reasons for R.G.'s Decision to Dismiss Stephens**

75. The specific reasons that Rost dismissed Stephens were (1) that Stephens "refus[ed] to comply with [R.G.'s] male dress/grooming policy" and (2) that allowing Stephens to wear the uniform for female funeral directors would have "violated . . . [Rost's] sincerely held religious beliefs." (Def.'s Resp. to Pl.'s First Set of Discovery at Interrogatory No. 3 (Ex. 27); T. Rost 30(b)(6) Dep. 54:1-17, 55:1-14, 135:24-136:3 (Ex. 4)).

76. Stephens testified that the reason R.G. dismissed Stephens "was that me coming to work dressed as a woman was not going to be acceptable." (Stephens Dep. 80:11-19 (Ex. 14)).

77. Rost would not have dismissed Stephens if Stephens had expressed a belief in being a woman and an intent to dress or otherwise present as a woman outside of work. (T. Rost Aff. ¶ 50 (Ex. 1); T. Rost 30(b)(6) Dep. 137:11-15 (Ex. 4)). It was Stephens's refusal to wear the prescribed uniform and intent to violate the dress code while at work that was the decisive consideration in the employment decision. (T. Rost Aff. ¶¶ 50-51 (Ex. 1)).

14

78. Based on Rost's lengthy professional experience in the funeral industry and his many years interacting with Stephens at work, Rost believed that if Stephens violated the dress code by wearing a female uniform in the role of funeral director, it would have been distracting to R.G.'s clients mourning the loss of their loved ones, would have disrupted their grieving and healing process, and would have harmed R.G.'s clients and its business. (T. Rost Aff. ¶¶ 39-40 (Ex. 1); T. Rost 30(b)(6) Dep. 54:8-17, 59:13-60:9, 61:2-18, 139:5-23, 142:23-143:12 (Ex. 4); EEOC T. Rost Aff. ¶ 21, EEOC002763 (Ex. 16)).

79. Allowing Stephens to contravene the dress code by wearing a female uniform in the role of funeral director would have violated Rost's religious belief that a person's sex (whether male or female) is an immutable God-given gift and his religious belief that R.G. cannot pay for or otherwise permit one of its representatives to wear the uniform of the opposite sex while at work. (T. Rost Aff. ¶¶ 41-46 (Ex. 1); T. Rost 30(b)(6) Dep. 54:8-17, 55:1-14 (Ex. 4)).

80. Because R.G. provides suits for all its funeral directors, if Rost would have agreed that Stephens could continue to work at R.G. while dressing in the female uniform, Rost would have been paying for Stephens to wear the female uniform, which would have violated his faith. (T. Rost Aff. ¶¶ 46-47 (Ex. 1)).

81. If Rost were to be compelled as the owner of R.G. to violate his sincerely held religious beliefs by paying for or otherwise permitting one of his employees to dress inconsistently with his or her biological sex at work, he would feel significant

15

pressure to sell the business and give up his life's calling of ministering to grieving people as a funeral home director and owner. (T. Rost Aff. ¶ 48 (Ex. 1)).

82. Rost was also concerned about requiring female customers, grieving family members, and employees to share restroom facilities with a biological male dressed as a woman. (T. Rost 30(b)(6) Dep. 73:17-74:20 (Ex. 4)).

83. Two of R.G.'s three funeral homes have only sex-specific restrooms. They do not have separate employee restrooms. Stephens worked at all three facilities. (T. Rost 30(b)(6) Dep. 76:25-77:14 (Ex. 4); McKie Dep. 13:21-14:22 (Ex. 13); Cash Dep. 30:11-31:5 (Ex. 8)).

**R.G.'s Provision of Clothing for Funeral Directors**

84. R.G. provides dress-code-conforming suits for all funeral directors, whether male or female (T. Rost Dep. 13:4-14, 47:23-48:11 (Ex. 3); Kish Dep. 64:12-24 (Ex. 5); Def.'s Resp. to Pl.'s Second Set of Discovery at Interrogatory No. 14 (Ex. 28); McKie Dep. 38:19-23 (Ex. 13)).

85. R.G. also provides ties for its male funeral directors. (T. Rost Dep. 13:15-24 (Ex. 3)).

86. R.G. initially provides full-time funeral directors with two suits and two ties and part-time funeral directors with one suit and one tie. These are replaced by R.G. as they wear out, which generally occurs every one to four years for full-time funeral directors (T. Rost Dep. 14:9-15:2, 18:10-19:8 (Ex. 3); Crawford Dep. 19:1-3 (Ex. 6);

16

Kowalewski Dep. 22:21-23:1 (Ex. 9)), and much less frequently (approximately once every five to ten years) for part-time funeral directors. (T. Rost Dep. 18:10-24 (Ex. 3)).

87. R.G. has not employed a female funeral director since 1950. (T. Rost Aff. ¶ 52 (Ex. 1); Def.'s Resp. to Pl.'s First Set of Discovery at Request for Admission No. 5 (Ex. 27); EEOC Kish Aff. ¶ 19, EEOC002768 (Ex. 17); Stephens Dep. 102:4-14) (Ex. 14)).

88. Throughout all Rost's years owning and operating R.G., he has never had a qualified female apply for an open funeral director position. (T. Rost Aff. ¶ 53 (Ex. 1)). During that time, he has had only one female applicant apply for an open funeral director position, but she was not qualified. (T. Rost Aff. ¶ 53 (Ex. 1)).

89. If R.G. one day has the opportunity to hire female funeral directors, R.G. will provide them with skirt suits in the same manner that it provides pant suits to male funeral directors. (T. Rost Aff. ¶ 54 (Ex. 1)).

**R.G.'s Clothing Allowance for Other Employees**

90. R.G. gives an annual clothing allowance to female employees who interact with the public in positions other than funeral director. The allowance is $150 per year for full-time employees and $75 per year for part-time employees. (T. Rost Dep. 15:16-16:4 (Ex. 3); Nemeth Dep. 13:5-23 (Ex. 7); Kish Dep. 20:16-25 (Ex. 5)).

91. The annual allowance provided to female employees who interact with the public in positions other than funeral director is sufficient to purchase clothing that conforms to R.G.'s dress code for those positions. (Kish Aff. ¶ 5 (Ex. 2)).

92. An outfit that one of these female employees purchases with the clothing allowance typically lasts at least one year. (Kish Aff. ¶ 6 (Ex. 2)).

93. R.G. provides a suit similar to the funeral director suit for male employees who interact with the public in positions other than funeral director. (T. Rost Aff. ¶ 56 (Ex. 1)).

94. All current male employees, other than funeral directors, who interact with the public are part-time and receive one suit that is replaced by R.G. when it is no longer serviceable. (T. Rost Aff. ¶ 57 (Ex. 1)).

95. R.G. does not provide a clothing allowance or suit to employees who are not expected to have client contact such as maintenance personnel (whether male or female). (Kish Dep. 56:14-58:4, 65:17-66:18 (Ex. 5)).

Dated: April 7, 2016

Respectfully submitted,

/s/ James A. Campbell
James A. Campbell (AZ Bar 026737)
Douglas G. Wardlow (AZ Bar 032028)
Joseph P. Infranco (NY Bar 1268739)
Bradley S. Abramson (AZ Bar 029470)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jcampbell@ADFlegal.org
dwardlow@ADFlegal.org
jinfranco@ADFlegal.org
babramson@ADFlegal.org

Joel J. Kirkpatrick (P62851)
JOEL J. KIRKPATRICK, P.C.
843 Penniman Ave., Suite 201
Plymouth, MI 48170
(734) 404-5710
(866) 241-4152 Fax
joel@joelkirkpatrick.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2016, I electronically filed the foregoing Statement of Material Facts Not in Dispute with the Clerk of the Court using the ECF system, which will send notification of this filing to all parties in the case.

/s/ James A. Campbell
James A. Campbell