# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

              Case No. 14-cv-13710

          Plaintiff,

              Hon. Sean F. Cox

v.

              Mag. David R. Grand

R.G. & G.R. HARRIS FUNERAL
HOMES, INC.,

          Defendant.

---

## ACLU'S *AMICUS CURIAE* BRIEF IN SUPPORT OF
## PLAINTIFF EEOC'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF *AMICI CURIAE* ..................................................................... 1

INTRODUCTION .......................................................................................... 2

FACTUAL AND PROCEDURAL BACKGROUND ....................................... 3

ARGUMENT ................................................................................................. 4

I.      The Funeral Home's dress code is not a defense to its discriminatory
        firing of Aimee Stephens ........................................................................ 4

II.     The Free Exercise Clause and RFRA do not provide religious
        exemptions from Title VII and other civil rights laws ............................ 8

        A.      Enforcement of Title VII against the Funeral Home does not
                violate the Free Exercise Clause ................................................... 9

        B.      Enforcement of Title VII against the Funeral Home does not
                violate RFRA ................................................................................. 13

CONCLUSION .............................................................................................. 21

# TABLE OF AUTHORITIES

## Cases

*Adkins v. City of New York*,
   No. 14-CV-7519 JSR, 2015 WL 7076956 (S.D.N.Y. Nov. 15, 2015).... 17

*Am. Friends Serv. Comm. Corp. v. Thornburgh*,
   951 F.2d 957 (9th Cir. 1991) .................................................. 15

*Bd. of Directors of Rotary Club Int'l v. Rotary Club of Duarte*,
   481 U.S. 537 (1987).............................................................. 16

*Bloch v. Frischholz*,
   587 F.3d 771 (7th Cir. 2009) ................................................ 10

*Bob Jones University v. United States*,
   461 U.S. 574 (1983)......................................................... 11, 21

*Burwell v. Hobby Lobby Stores, Inc.*,
   134 S. Ct. 2751 (2014)...................................................... 13, 18

*Chavez v. Credit Nation Auto Sales, LLC*,
   No. 14-14596, 2016 WL 158820 (11th Cir. Jan. 14, 2016) .................... 6

*City of Boerne v. Flores*,
   521 U.S. 507 (1997)................................................................ 9

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints
   v. Amos*, 483 U.S. 327 (1987)............................................... 20

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005)............................................................. 20

*Dawson v. H&H Elec., Inc.*,
   No. 4:14CV00583 SWW, 2015 WL 5437101 (E.D. Ark.
   Sept. 15, 2015)...................................................................... 6

*Dole v. Shenandoah Baptist Church*,
   899 F.2d 1389 (4th Cir. 1990) ....................................... 13, 16, 21

*EEOC v. Fremont Christian School*,
  781 F.2d 1362 (9th Cir. 1986) ................................................ 12–13, 16, 21

*EEOC v. Mississippi College*,
  626 F.2d 477 (5th Cir. 1980) .................................................... 12

*EEOC v. Pac. Press Publ'g Ass'n*,
  676 F.2d 1272 (9th Cir. 1982), ........................................... 13, 15

*EEOC v. Preferred Mgmt. Corp.*,
  216 F. Supp. 2d 763 (S.D. Ind. 2002)................................... 13, 15

*Employment Division v. Smith*,
  494 U.S. 872 (1990)...................................................................... 9

*Estate of Thornton v. Caldor*,
  472 U.S. 703 (1985)..................................................................... 20

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
  617 F.3d 402 (6th Cir. 2010) .............................................. 14–15

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) ....................................... 5–6, 17

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
  480 U.S. 136 (1987)..................................................................... 20

*J.E.B. v. Alabama*,
  511 U.S. 127 (1994)..................................................................... 17

*Lie v. Sky Pub. Corp.*,
  No. 013117J, 2002 WL 31492397 (Mass. Super. Oct. 7, 2002) ............... 6

*Mount Elliott Cemetery Ass'n v. City of Troy*,
  171 F.3d 398 (6th Cir. 1999) ...................................................... 9

*N. Coast Women's Care Med. Grp., Inc. v. Superior Court*,
  189 P.3d 959 (Cal. 2008)........................................................... 19

*Newman v. Piggie Park Enters., Inc.*,
    256 F. Supp. 941 (D.S.C. 1966) ........................................................ 11, 21

*Prater v. City of Burnside*,
    289 F.3d 417 (6th Cir. 2002) ................................................................. 10

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)............................................................................. 4-5

*Redhead v. Conference of Seventh-Day Adventists*,
    440 F. Supp. 2d 211 (E.D.N.Y. 2006) ........................................ 13, 15–16

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)......................................................................... 14, 16

*Romer v. Evans*,
    517 U.S. 620 (1996)............................................................................... 14

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008)...................................................... 5, 8

*Sherbert v. Verner*,
    374 U.S. 398 (1963)......................................................................... 10–11

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ......................................................... *passim*

*Swanner v. Anchorage Equal Rights Comm'n*,
    874 P.2d 274 (Alaska 1994) .................................................................. 19

*United States v. Burke*,
    504 U.S. 229 (1992)......................................................................... 14, 19

*Vigars v. Valley Christian Ctr. of Dublin, Cal.*,
    805 F. Supp. 802 (N.D. Cal. 1992)..................................................... 9–10

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)......................................................................... 10–11

## **Administrative Decision**

*Lusardi v. McHugh*,
EEOC DOC 0120133395, 2015 WL 1607756 (Apr. 1, 2015) ........................ 8

## **Statutes**

42 U.S.C. § 2000bb–1(b) ................................................................... 14

42 U.S.C. § 2000bb(b)(1) ............................................................. 10–11

## **Other Authorities**

Jaime Grant, et al., *Injustice at Every Turn: A Report of the National
Transgender Discrimination Survey* (2011) ....................................... 18

M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to
Reflect Modern Medical Science Is Key to Transgender Rights*, ...................... 7
39 Vt. L. Rev. 943 (2015)

E.L. Lombardi, et al., *Gender Violence: Transgender Experiences With
Violence and Discrimination*, 42 Journal of Homosexuality 89 (2001)............ 18

Rebecca Stotzer, *Violence Against Transgender People: A Review of
United States Data*, 14 Aggression and Violent Behavior 170 (2009) ....... 17–18

## <u>INTEREST OF *AMICI CURIAE*</u>

The American Civil Liberties Union and the American Civil Liberties Union of Michigan (collectively, "ACLU") submit this *amicus* brief in support of Plaintiff's motion for summary judgment. The right to practice one's religion, or no religion, is a core component of our civil liberties and is of vital importance to the ACLU. For this reason, the ACLU regularly brings cases aimed at protecting the right to religious exercise and expression. At the same time, the ACLU is committed to fighting discrimination and inequality, including discrimination against transgender people by, for example, denying transgender employees the ability to dress consistently with their gender identity.

*Amici* support the motion for summary judgment filed by Plaintiff Equal Employment Opportunity Commission ("EEOC"). *Amici* submit this brief to explain why an employer may not use a sex-specific dress code as a license to subject a transgender employee to an adverse employment action, such as firing, because she intends to dress consistently with her gender identity, and to explain why Title VII is essential to furthering the government's compelling interest in preventing invidious discrimination. *Amici* take no position on the other issues presented by the parties' cross-motions for summary judgment.

## INTRODUCTION

*Amici* agree with the EEOC that terminating a transgender employee because she intends to dress consistently with her gender identity constitutes illegal sex discrimination even if couched as the enforcement of a so-called "biological" sex-specific dress code. To hold otherwise would allow employers through the adoption and application of such a dress code to reinforce the sex-stereotypes that Title VII was intended to eradicate. To be clear, this case is not a challenge to gendered dress codes, as Defendant R.G. & G.R. Harris Funeral Homes, Inc. ("Funeral Home") would have this Court believe. The EEOC's case is only about whether firing a transgender female employee because of her plan to start dressing as a woman constitutes sex stereotyping in violation of Title VII. It plainly does.

*Amici* further agree with the EEOC that neither the Free Exercise Clause nor the Religious Freedom Restoration Act ("RFRA") exempts the Funeral Home from liability under Title VII. The religious defenses raised by the Funeral Home—that it has the right to discriminate based on sex in violation of federal civil rights laws because of its owner's religious beliefs—are, unfortunately, not new. For decades, private employers have attempted to use their religious beliefs to evade compliance with anti-discrimination laws, including Title VII. For example, employers claimed that the right to religious freedom entitled them to pay men more than women, because of their religious belief that men should be the primary breadwinners;

businesses claimed that the right to religious liberty entitled them to discriminate against people of color in public accommodations, because of their religious belief that the races should be kept separate; and universities claimed a religious liberty right to prohibit interracial dating among their students, because of their religious belief against interracial relationships. In each of these cases, courts squarely rejected the notion that religious liberty provides employers, schools, and businesses open to the public with a license to discriminate. This Court should come to the same conclusion here. The exemption the Funeral Home seeks, if granted, would not only contravene clear and consistent precedent, it would threaten decades of progress achieved by important civil rights statutes and would make employees throughout the country vulnerable to discrimination.

## FACTUAL AND PROCEDURAL BACKGROUND

Aimee Stephens is a transgender woman who served as a funeral director and embalmer at the Funeral Home. Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl. Mem.") at 1. On July 31, 2013, Ms. Stephens wrote her coworkers a letter informing them about her transition from male to female, and explaining that she intended to dress in appropriate business attire as a woman. *See id.* Ex. A, Stephens Letter. The Funeral Home's owner, Thomas Rost, responded two weeks later by handing Ms. Stephens a severance agreement. Mr. Rost has said that the "specific

3

reason" he terminated Ms. Stephens was because she "wanted to dress as a woman." Pl. Mem. at 1–2.

The EEOC brought a sex discrimination lawsuit against the Funeral Home, alleging that its termination of Ms. Stephens violated Title VII's prohibition on sex discrimination. The Funeral Home moved to dismiss the case on the ground that gender identity is not protected by Title VII; however, this Court concluded that the EEOC had properly alleged a sex discrimination claim by asserting that Ms. Stephens was fired for failing to conform to Mr. Rost's sex- or gender-based stereotypes. Op. & Order Denying Mot. to Dismiss at 14. After its motion to dismiss was denied, the Funeral Home amended its Answer to raise defenses under the Free Exercise Clause and RFRA. Answer to Am. Compl. at 5. The parties have filed cross-motions for summary judgment.

## <u>ARGUMENT</u>

### I.      The Funeral Home's dress code is not a defense to its discriminatory firing of Aimee Stephens.

The Funeral Home relies on its alleged "biological" sex-specific dress code to justify its termination of Ms. Stephens. Its argument, however, misconstrues the EEOC's argument as a challenge to its dress code, which it is not, and ignores the ample legal precedent establishing that an employer's adverse response to an employee's manner of dress may constitute illegal sex discrimination. Since *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), numerous courts have recognized

4

that disparate treatment of an employee because her clothing fails to comport with the employer's sex-based stereotypes qualifies as illegal sex discrimination. The Sixth Circuit in *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004), extended *Price Waterhouse*'s reasoning to a transgender firefighter who had been suspended after she began to express a more feminine appearance at work. The court reasoned that, under *Price Waterhouse*, "employers who discriminate against men because they *do* wear dresses and makeup, or otherwise act femininely, are also engaging in sex discrimination, because the discrimination would not occur but for the victim's sex." *Id.* at 574.

Consistent with *Price Waterhouse* and *Smith*, courts have repeatedly held that an employer's adverse response to a transgender person's intention to begin dressing consistently with his or her gender identity—such as occurred in the present case—constitutes unlawful sex stereotyping. In *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008), for example, the court found that a transgender woman was subject to sex stereotyping in violation of Title VII, based on evidence that her offer to work at the Library of Congress was retracted because she was perceived as "a man in women's clothing," or would be perceived as such by Members of Congress and their staffs. *Id.* at 305. The Eleventh Circuit reached a similar conclusion in *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), finding that the reason for a transgender woman's termination—because she was perceived

5

"as 'a man dressed as a woman and made up as a woman,'"—provided "ample direct evidence to support the district court's conclusion" that she was fired due to sex stereotyping in violation of the Fourteenth Amendment. *Id.* at 1320–21; *see also Chavez v. Credit Nation Auto Sales, LLC*, No. 14-14596, 2016 WL 158820, at *7 (11th Cir. Jan. 14, 2016) (testimony that transgender woman was told not to wear a dress to and from work evidence of sex discrimination); *Dawson v. H&H Elec., Inc.*, No. 4:14CV00583 SWW, 2015 WL 5437101, at *4 (E.D. Ark. Sept. 15, 2015) (finding that there was "ample evidence from which a reasonable juror could find that [a transgender employee] was terminated because of her sex," where employer "repeatedly forbade" her to "wear feminine clothes at work" and terminated her employment "soon after she disobeyed [her employer's] orders and began wearing makeup and feminine attire at work"); *Lie v. Sky Pub. Corp.*, No. 013117J, 2002 WL 31492397, at *5 (Mass. Super. Oct. 7, 2002) (firing of transgender woman for refusing to "wear traditionally male attire" made out case of sex stereotyping).

The Funeral Home suggests that its termination of Ms. Stephens did not violate Title VII because it fired her for failing to comply with its dress code "based on the biological sex of its employees." Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def. Mem.") at 8. But the Funeral Home's assertion that it may require Ms. Stephens to wear men's attire because it perceives her to be

"biologically" male is simply another way of describing its illegal sex stereotyping—its refusal to allow a person it perceives as male to dress as a female.[1] As such, this case is no different than *Smith* and the other cases cited *supra*. And while the Funeral Home claims that the EEOC is challenging its ability to maintain a sex-specific dress code, the lawfulness of sex-specific dress codes is not at issue in this case. What is at issue is the Funeral Home's discriminatory application of its dress code to Ms. Stephens. None of the cases cited by the Funeral Home involve transgender employees, nor do they permit an employer to treat transgender men and women differently from other men and women. Rather, the cases cited by the Funeral Home involve employees who did not comply with the dress code applicable to them. Here, by contrast, there is no dispute that Ms. Stephens intended to comply with the dress code consistent with her gender identity.

Nor is there any basis for the Funeral Home's argument that accepting the EEOC's position in this case would require employers "to allow an employee to dress in a female uniform one day, switch to a male uniform the next day, and return to the female uniform whenever that employee chooses." Def. Mem. at 15.

---

[1] While it is unnecessary for this Court to resolve this question, it bears pointing out that the Funeral Home's assertion that Ms. Stephens is "biologically" male is inaccurate—research indicates that gender identity itself has a biological component. *See* M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to Reflect Modern Medical Science Is Key to Transgender Rights*, 39 Vt. L. Rev. 943, 944 (2015) (summarizing research).

A transgender person's decision to live consistent with her gender identity is not one that is made lightly, nor is going to be reversed on a whim. *See, e.g., Schroer v. Billington*, 577 F. Supp. 2d 293, 296 (D.D.C. 2008) (transgender job applicant explaining "that she did not see being transgender as a choice and that it was something she had lived with her entire life"). The Funeral Home's argument that its "business needs and the interests of the grieving people [it] serves" allows it to refuse Ms. Stephens the ability to dress as a woman is similarly devoid of merit Def. Mem. at 14. The record shows that Ms. Stephens intended to dress professionally as a woman. Moreover, "Title VII prohibits discrimination based on sex whether motivated by hostility, by a desire to protect people of a certain gender, by gender stereotypes, or by the desire to accommodate other people's prejudices or discomfort." *Lusardi v. McHugh*, EEOC DOC 0120133395, 2015 WL 1607756, at *9 (Apr. 1, 2015) (collecting cases).

## II.    The Free Exercise Clause and RFRA do not provide religious exemptions from Title VII and other civil rights laws.

A central question presented in this case is whether a for-profit business can rely on the religious beliefs of its owners to discriminate against a lay employee on the basis of her sex, where other employers would face liability under Title VII or another civil rights statute for engaging in such discrimination. The answer is no. Neither the Constitution's Free Exercise Clause nor RFRA gives for-profit businesses the right to discriminate against lay employees on the basis of sex, race,

or other federally protected characteristics, even if the discrimination is motivated by the sincerely held religious beliefs of the business's owners. To the contrary, courts have consistently refused to grant employers religious exemptions from civil rights laws in circumstances such as these. This Court should apply the same principle here.

### A. Enforcement of Title VII against the Funeral Home does not violate the Free Exercise Clause.

In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) (citing *Smith*). Since *Smith*, courts—including the Sixth Circuit—have consistently held that neutral laws of general applicability do not violate the Free Exercise Clause. *See, e.g.*, *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 405 (6th Cir. 1999) ("[T]he City of Troy's ordinances governing residential and community facilities districts are neutral laws of general applicability. As a result, we find that judgment was properly entered in favor of the City with respect to the free exercise claim.").

Here, Title VII is a neutral law of general applicability, and it is well-settled that the law does not target any specific religion for discriminatory treatment. *See, e.g.*, *Vigars v. Valley Christian Ctr. of Dublin, Cal.*, 805 F. Supp. 802, 809 (N.D. Cal. 1992) ("Title VII neither regulates religious beliefs, nor burdens religious acts,

*because* of their religious motivation. On the contrary, it is clear that Title VII is a secular, neutral statute . . . ."). Even if particular religious beliefs are disproportionately burdened by Title VII, this burden is insufficient to show the statute is *intended* to discriminate against that religion, such that heightened judicial scrutiny of the statute is required. *See, e.g.*, *Bloch v. Frischholz*, 587 F.3d 771, 785 (7th Cir. 2009) ("*Smith* requires more than just evidence of an adverse impact on [religious believers] . . . . Under *Smith*, the denial of a religious exception is not intentional discrimination."); *Prater v. City of Burnside*, 289 F.3d 417, 428–29 (6th Cir. 2002) ("Discrimination may not be inferred . . . simply because a public program is incompatible with a religious organization's spiritual priorities . . . . The Church, therefore, must show more than disparate impact in order to prove discriminatory animus on the part of the City."). The Free Exercise Clause accordingly does not exempt lay employees from Title VII's protections.

Even under the more rigorous pre-*Smith* analysis, courts repeatedly found that antidiscrimination laws such as Title VII meet strict scrutiny and therefore survive Free Exercise Clause challenges.[2] These courts held that any burdens on

---

[2] Before *Smith*, courts analyzed religious exemption claims by determining whether: (1) the denial of an exemption substantially burdened the claimant's religious exercise; and (2) if so, whether the denial of an exemption was nevertheless justified by the need to further a compelling government interest. *See Wisconsin v. Yoder*, 406 U.S. 205, 210–11 (1972); *Sherbert v. Verner*, 374 U.S. 398, 406–09 (1963). Because RFRA was meant "to restore the compelling interest

10

the free exercise of religion imposed by antidiscrimination statutes are outweighed by the compelling state interest in eradicating discrimination and promoting equality. In *Bob Jones University v. United States*, 461 U.S. 574 (1983), for example, the Supreme Court held that the IRS's denial of tax exempt status to Bob Jones University and Goldsboro Christian Schools—on the ground that the schools engaged in racial segregation because of its religious belief against interracial relationships—did not violate the Free Exercise Clause, because "the Government has a fundamental, overriding interest in eradicating racial discrimination in education . . . [which] outweighs whatever burden denial of tax benefits places on [the schools'] exercise of their religious beliefs." *Id.* at 604; *see also, e.g.*, *Newman v. Piggie Park Enters., Inc.*, 256 F. Supp. 941, 945 (D.S.C. 1966) ("refus[ing] to lend credence or support to [a restaurant owner's position] that he has a constitutional right to refuse to serve members of the Negro race in his business establishments upon the ground that to do so would violate his sacred religious beliefs"), *aff'd in relevant part and rev'd in part on other grounds*, 377 F.2d 433 (4th Cir. 1967), *aff'd and modified on other grounds*, 390 U.S. 400 (1968).

In the employment context, courts consistently rejected pre-*Smith* Free Exercise Clause challenges to Title VII and other nondiscrimination statutes. For instance, in *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), the Fifth

---

test as set forth" in *Sherbert* and *Yoder*, 42 U.S.C. § 2000bb(b)(1), the pre-*Smith* case law is informative with respect to the Funeral Home's RFRA defense.

Circuit held that application of Title VII to a sectarian university's employment practices did not violate the Free Exercise Clause. *Id.* at 489. Although the College argued that it should be allowed to discriminate on the basis of sex because of its religious belief that only men should teach certain courses, the court concluded that the College was not exempt from Title VII's prohibition against discrimination because of sex and that any claimed burden on religious exercise in complying with the law were justified by the government's "compelling interest in eradicating discrimination in all forms." *Id* at 488*.* To take another example, in *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1986), the Ninth Circuit held that a sectarian school's policy of providing health insurance benefits only to persons it considered to be "head of household"—i.e., single persons and married men, but not married women—violated Title VII and the Fair Labor Standards Act (FLSA). *Id.* at 1364. The school challenged the statutes on Free Exercise Clause grounds, arguing that its practice of providing health insurance benefits to single employees and married men, but not married women, was motivated by the sincere religious belief that men should be the head of the household. *Id.* at 1367. The court, however, held that the school's policy discriminated on the basis of sex and that enforcement of the anti-discrimination statutes was the least restrictive means for furthering Congress's compelling interest in eliminating discrimination. *Id.* at 1368–69 (citing *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1279 (9th Cir.

1982)); *accord Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir.
1990) (holding that enforcement of the FLSA's minimum wage and equal pay
provisions against a sectarian school that paid female teachers less than male
teachers did not violate the school's free exercise rights, because enforcement of
these provisions was the least restrictive means for furthering the government's
compelling interest in preventing discrimination and ensuring fair wages).

### B. Enforcement of Title VII against the Funeral Home does not violate RFRA.

Just as courts refused to grant religious exemptions from Title VII and other
civil rights laws under the pre-*Smith* Free Exercise Clause, so too they have
refused to grant such exemptions under RFRA. *See Redhead v. Conference of
Seventh-Day Adventists*, 440 F. Supp. 2d 211, 221–22 (E.D.N.Y. 2006) (rejecting
sectarian school's RFRA defense to Title VII sex discrimination claim by teacher
who was fired after becoming pregnant outside of marriage); *EEOC v. Preferred
Mgmt. Corp.*, 216 F. Supp. 2d 763, 810–13 (S.D. Ind. 2002) (rejecting for-profit
company's RFRA defense to Title VII religious discrimination claims); *see also
Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2783 (2014) (stating that
"[t]he Government has a compelling interest in providing an equal opportunity to
participate in the workforce without regard to race").

Under RFRA, which was meant to restore the pre-*Smith* approach to
religious exemption claims, employers must comply with federal laws, including

13

Title VII—even where the requirements of those laws impose a substantial burden on its owner's religious beliefs—so long as the government "demonstrates that application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b). Here, Title VII is the least restrictive means for furthering the government's interest in preventing invidious employment discrimination on the basis of sex. "It is beyond question that discrimination in employment on the basis of sex, race, or any of the other classifications protected by Title VII is . . . an invidious practice that causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238 (1992). Such discrimination "both deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). To prevent these evils, Title VII and other civil rights laws ensure equal access to the "transactions and endeavors that constitute ordinary civic life in a free society." *Romer v. Evans*, 517 U.S. 620, 631 (1996).[3]

---

[3] To be sure, there are many cases where a court may dispose of RFRA claims on alternative grounds. For example, the Sixth Circuit has held that RFRA does not apply in a suit between private parties. *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010). Or, as the EEOC argues here, a court may conclude that the challenged government action does not impose a substantial burden on the RFRA claimant's religious exercise. Pl. Mem. at 18–24.

Courts have acknowledged the government's compelling interest in eradicating *all* forms of invidious discrimination proscribed by Title VII. In *EEOC v. Pacific Press Publishing Association*, for example, the Ninth Circuit rejected an employer's pre-*Smith* free exercise challenge to an EEOC retaliation case, because of the government's compelling interest in preventing employment discrimination. 676 F.2d 1272, 1280 (9th Cir. 1982), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991).[4] It held that "Congress clearly targeted the elimination of *all forms* of discrimination as a 'highest priority.' Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions." *Pac. Press*, 676 F.2d at 1280 (emphasis added) (citations omitted). Courts have similarly rejected RFRA challenges to Title VII liability, explaining that Title VII furthers the government's compelling interest in "the eradication of employment discrimination based on the criteria identified in Title VII." *Preferred Mgmt. Corp.*, 216 F. Supp. 2d at 811; *see also Redhead*, 440 F. Supp. 2d at 221–22 (stating that the government has a compelling interest in making sure that "Title VII remains enforceable as to [non-ministerial] employment relationships").

---

[4] The employer in *Pacific Press* was a Seventh-Day Adventist non-profit publishing house, and maintained that the charging party's participation in EEOC proceedings violated church doctrines prohibiting lawsuits by members against the church. 676 F.2d at 1280.

Although it is unnecessary to consider separately the interest in protecting equal employment opportunity based on each of the protected characteristics under Title VII, it is well established that the government has a compelling interest in eradicating discrimination based on sex. As the Supreme Court stated in *Roberts*, the "stigmatizing injury" of discrimination, "and the denial of equal opportunities that accompanies it, is surely felt as strongly by persons suffering discrimination on the basis of their sex as by those treated differently because of their race." 468 U.S. at 625; *see also Bd. of Directors of Rotary Club Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (acknowledging the State's "compelling interest in assuring equal access to women extends to the acquisition of leadership skills and business contacts as well as tangible goods and services"). In the employment context, in particular, courts have consistently recognized that the government interest in preventing gender discrimination is "of the highest order." *Dole*, 899 F.2d at 1392 (internal quotation marks omitted); *accord Fremont Christian School*, 781 F.2d at 1368.

The government's interest in preventing invidious sex discrimination is no less compelling when the discrimination is directed at transgender persons. Our nation has a long and painful history of sex discrimination against transgender people. *See Smith*, 378 F.3d at 575 (holding that employer engaged in impermissible sex discrimination when it suspended transgender firefighter after

16

she began to exhibit a more feminine appearance at work); *cf. Glenn*, 663 F.3d at

1319–20 (holding in a case involving employment discrimination against a

transgender employee that "governmental acts based upon gender stereotypes—

which presume that men and women's appearance and behavior will be determined

by their sex—must be subjected to heightened scrutiny [under the Fourteenth

Amendment] because they embody 'the very stereotype the law condemns'"

(quoting *J.E.B. v. Alabama*, 511 U.S. 127, 138 (1994)); *Adkins v. City of New*

*York*, No. 14-CV-7519 JSR, 2015 WL 7076956, at *4 (S.D.N.Y. Nov. 15, 2015)

(holding that transgender people are a quasi-suspect class for purposes of the

Fourteenth Amendment, in part because they "have suffered a history of

persecution and discrimination").

Numerous studies have shown that transgender people face a serious risk of

bodily harm, violence, and discrimination because of their transgender status. One

systematic review of violence against transgender people in the United States up to

2009 found that between 25 and 50% of respondents had been victims of physical

attacks because of their transgender status, roughly 15% had reported being

victims of sexual assault, and over 80% had reported being victims of verbal abuse

because of their transgender status. Rebecca Stotzer, *Violence Against Transgender*

*People: A Review of United States Data*, 14 Aggression and Violent Behavior 170

(2009). With respect to employment discrimination in particular, one national

17

study found that 37% of transgender people reported experiencing some form of adverse employment action because of their transgender status. E.L. Lombardi, et al., *Gender Violence: Transgender Experiences With Violence and Discrimination*, 42 Journal of Homosexuality 89 (2001). More recently, the National Transgender Discrimination Survey ("Survey") found that nearly half of respondents had experienced some form of adverse employment action, and 26% had lost a job, because of their transgender status. Jaime Grant, et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* at 50 (2011), *available at* http://www.thetaskforce.org /static_html/downloads/reports/reports/ntds_full .pdf. The Survey found that transgender people report twice the unemployment rate of the general population, and that 44% of transgender people report being underemployed. *Id.* There can be no doubt that the government has a compelling interest in addressing such rampant discrimination.

Finally, uniform enforcement of anti-discrimination laws, such as Title VII, is the least restrictive means of achieving the government's interest in preventing the social harms of discrimination. *Hobby Lobby*, 134 S. Ct. at 2783 (recognizing that prohibitions against discrimination are "precisely tailored" to achieve the goal of equal opportunity). There is simply no way to prohibit discrimination except to prohibit discrimination, and any RFRA exemption from Title VII risks imposing concrete harms on employees subjected to invidious discrimination. *See N. Coast*

*Women's Care Med. Grp., Inc. v. Superior Court*, 189 P.3d 959, 967 (Cal. 2008)

(holding that a state law prohibiting discrimination in public accommodations

"furthers California's compelling interest in ensuring full and equal access to

medical treatment irrespective of sexual orientation, and there are no less

restrictive means for the state to achieve that goal" other than enforcement of the

statute).

Every single instance of discrimination "causes grave harm to its victims,"

*Burke*, 504 U.S. at 238, and denies society the benefit of their "participation in

political, economic, and cultural life," *Jaycees*, 408 U.S. at 625. Because of the

individual harms associated with each instance of invidious discrimination, there is

simply no "numerical cutoff below which the harm is insignificant." *Swanner v.*

*Anchorage Equal Rights Comm'n*, 874 P.2d 274, 282 (Alaska 1994) (per curiam)

(rejecting state Free Exercise Clause challenge to municipal ordinance prohibiting

housing discrimination based on marital status, on the ground that any exemption

to the ordinance would directly impede the government's interest in preventing

such discrimination). For the same reasons, enforcement of Title VII against some

employers cannot alleviate the harms imposed by allowing other employers to

engage in invidious discrimination. *See* Def. Mem. at 20–21.[5]

---

[5] Indeed, the Constitution requires the government and courts to account for the
harms a religious exemption to Title VII would impose on employees. As the
Supreme Court cautioned in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the

19

The implications of allowing a RFRA exemption in this context are staggering. People hold sincere religious beliefs about a wide variety of things, including racial and religious segregation and the role of women in society. Our country's tradition of respect for religious freedom, in all its diversity, requires that we not subject an individual's assertions about his or her religious beliefs to unduly invasive scrutiny. As a result, if religious motivation exempted businesses from anti-discrimination laws, our government would be powerless to enforce those laws to protect all Americans against the harms of invidious discrimination. To name just a few examples: Business owners could refuse service to people of color, on the ground that their religious beliefs forbid racial integration. *See Piggie Park*, 256 F. Supp. at 945. Employers could refuse to hire women or pay them less than men, because their religious beliefs require women to remain at home. *See Fremont Christian School*, 781 F.2d at 1367–69; *Dole*, 899 F.2d at 1398. And

_____

Establishment Clause requires courts analyzing religious exemption claims under RFRA and the Religious Land Use and Institutionalized Persons Act to "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Id.* at 720; *see also Estate of Thornton v. Caldor*, 472 U.S. 703, 709–10 (1985) (holding that the Establishment Clause prohibited a Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath," because the statute took "no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath"). Otherwise, "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334–35 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987)).

educational institutions receiving federal benefits could impose religiously motivated racial segregation policies on their students. *See Bob Jones Univ.*, 461 U.S. at 604. All civil rights laws would be vulnerable to such claims where the discrimination was motivated by religion. Such challenges have no foundation in the law, and should not be countenanced by this Court.

## CONCLUSION

For the foregoing reasons, the EEOC's motion for summary judgment as to the Funeral Home's liability for Ms. Stephens's gender-motivated termination should be granted.

Respectfully submitted,

/s/ Jay D. Kaplan
Jay D. Kaplan (P38197)
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6800
jkaplan@aclumich.org
dkorobkin@aclumich.org
msteinberg@aclumich.org

/s/ Brian Hauss
Brian Hauss (*admission pending*)
Ria Tabacco Mar
American Civil Liberties Union
   Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2604
bhauss@aclu.org
rmar@aclu.org

/s/ John A. Knight
John A. Knight
American Civil Liberties Union
   Foundation
180 N. Michigan Avenue, Suite 2300
Chicago, IL 60606
(312) 201-9740
Dated: April 21, 2016          jaknight@aclu.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2016, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system which will send

notification of such filing to all counsel of record.

/s/ Jay D. Kaplan
Jay D. Kaplan (P38197)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6812
jkaplan@aclumich.org