IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | CIVIL ACTION NO. |
| Plaintiff, | ) ) | 2:14-CV-13710 |
| v. | ) ) | Hon. Sean F. Cox |
| R.G. & G.R. HARRIS FUNERAL HOMES, INC., | ) ) ) | Magistrate Judge David R. Grand |
| Defendant. | ) ) | |

**Answer to Defendant's Motion for Summary Judgment**

The Plaintiff Equal Employment Opportunity Commission

respectfully requests that Defendant's motion for summary judgment be

denied for three reasons. First, that there is no material factual dispute

that the Defendant discharged Aimee Stephens based on the sex-based

stereotypes of Thomas Rost. Second, the Religious Freedom Restoration

Act does not protect employers from the mandates of Title VII, and thus

Defendant's RFRA claim must fail as a matter of law. Third, the claim of

a discriminatory clothing allowance is properly before this Court, and

there is no material dispute that the benefits afforded to comparable

female employees were and continue to be inferior to those afforded to

men.

The Commission respectfully directs the Court to the attached

memorandum for the arguments supporting this Answer.

Wherefore, the Commission respectfully asks that the Court deny

Defendant's Motion for Summary Judgment and grant summary

judgment for Plaintiff.

Respectfully submitted,


EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

s/ Miles Shultz
MILES SHULTZ (P73555)
Trial Attorney


Dated: May 2, 2016        s/ Dale Price
DALE PRICE (P55578)
Trial Attorney

DETROIT FIELD OFFICE
Patrick V. McNamara
477 Michigan Avenue, Room 865
Detroit, Michigan 48226
Dale.Price@EEOC.GOV
Tel. No. (313) 226-7808
Fax No. (313) 226-6584

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 2:14-CV-13710 |
| v. | ) ) | Hon. Sean F. Cox |
| R.G. & G.R. HARRIS FUNERAL HOMES, INC., | ) ) ) | Magistrate Judge David R. Grand |
| Defendant. | ) | |

**Memorandum in Support of Plaintiff EEOC's
Answer to Defendant's Motion for Summary Judgment**

# Table of Contents

Counter-Statement of the Issues ...............................................iv

Table of Authorities.........................................................vii

Controlling Authority.........................................................ix

Index of Exhibits ............................................................x

I.   The Court Should Deny Defendant's Motion For Summary
     Judgment Based On The Dress Code ............................................1

     A.   Defendant's Dress Code ..................................................1

     B.   Religious-Belief Claim ..................................................5

     C.   Thomas Rost's Comments are Direct Evidence that Sex
          Stereotyping Motivated Stephens's Termination .........................6

     D.   A Sex-specific dress code does not justify Stephens's Termination
          ....................................................................12

          1. The Dress Code is a Pretext. .....................................13

          2. Despite Stephens's Willingness to Dress Professionally,
             Defendant Wanted to Impose Rost's Stereotypes Upon Her. .....13

          3. Imposition of the Dress Code is not a Legitimate,
             Nondiscriminatory Reason for Stephens's Firing. .................16

     E.   Catering to customer preference based on sex is discriminatory.
          ....................................................................17

II.  RFRA Does Not Authorize Stephens's Firing...............................21

     A.   Eliminating Workplace Sex Discrimination is a Compelling
          Governmental Interest ...............................................22

     B.   Defendant would not be substantially burdened under these facts.
          ....................................................................23

     C.   Defendant's "Least Restrictive Means" is the Abrogation of Title
          VII and the Foreswearing of the Compelling Interest in
          Eradicating Sex Discrimination for Countless Employees.........27

III. Defendant Is Liable For Sex Discrimination Under Its Clothing

Allowance Policy..................................................................29

A.   Defendant's Procedural Arguments are Without Merit.............29

B.   The Defendant Continues to Discriminate Against Female
     Employees Through Inferior Clothing Allowances. ...................32

IV.   Conclusion ......................................................................34

## Counter-Statement of the Issues

1. The Defendant maintains a sex-differentiated dress code for employees who interact with the public. Aimee Stephens indicated that she was willing to abide fully by the dress code for female employees, but was discharged before she had the opportunity to show up at work. Can the existence of a sex-differentiated dress code insulate Defendant from liability where Thomas Rost admits he was motivated by sexual stereotypes in making the firing decision?

   The Commission answers "No."

2. The Defendant asserts that permitting Aimee Stephens to present in female clothing compliant with its dress code would have been disturbing to its customers. Can Defendant use speculative concerns regarding customer preference to insulate itself from liability under Title VII?

   The Commission answers "No."

3. The Defendant asserts that its religious exercise would have been burdened by paying for Aimee Stephens's clothing despite never having purchased clothes for a female funeral director and despite the fact that it did not start paying for clothing for any female employees prior to October 2014. Does this speculative cost constitute a substantial burden under RFRA?

   The Commission answers "No."

4. Even if being forced to pay for Aimee Stephens's clothing had constituted a substantial burden on RGGR's religious exercise, has the Commission shown that enforcing Title VII against Defendant is the least restrictive means of achieving the compelling governmental interest of eradicating sex discrimination in the

iv

workplace?

The Commission answers "Yes."

5. During the investigation of Aimee Stephens's charge of sex discrimination, the Defendant told the Commission that female employees were not provided a clothing allowance. Further, Defendant was given the chance to provide evidence and to conciliate the clothing-allowance issue. Is the issue of the clothing allowance properly before the Court for resolution on the merits?

The Commission answers "Yes."

# Table of Authorities

**Page(s)**

## Cases

*Burwell v. Hobby Lobby Stores, Inc.*,
134 S. Ct. 2751 (2014)........................................................28

*Carroll v. Talman Federal Sav. & Loan Ass'n of Chicago*,
604 F.2d 1028 (7th Cir. 1979)..........................................18

*Chavez v. Credit Nation Auto Sales*,
LLC, No. 14-14596, 2016 WL 158820.............................11

*Cicero v. Borg-Warner, Inc.*,
280 F.3d 579 (6th Cir. 2002)............................................12

*Dawson v. H&H Elec., Inc.*,
No. 4:14CV00583 SWW, 2015 WL 5437101 (E.D. Ark.
Sept. 15, 2015) ..................................................................11

*Diaz v. Pan American World Airways, Inc.*,
442 F.2d 385 (5th Cir. 1971)......................................19, 21

*East Texas Baptist Univ. v. Burwell*,
793 F.3d 449 (5th Cir. 2015)............................................26

*EEOC v. Bailey Co.*,
563 F.2d 439 (6th Cir. 1977)..............................29, 30, 31

*EEOC v. Cambridge Tile Mfg. Co.*,
590 F.2d 205 (6th Cir. 1979)......................................30, 31

*EEOC v. Fremont Christian School*,
781 F.2d 1362 (9th Cir. 1986)..........................................22

*EEOC v. Kronos, Inc.*,
620 F.3d 287 (3rd Cir. 2010).............................................39

*EEOC v. St. Anne's Hospital of Chicago, Inc.*,
664 F.2d 128 (7th Cir. 1981).............................................21

*Fabian v. Hospital of Central Connecticut*,
No. 3:12-cv-1154, __ F. Supp. 3d __, 2016 WL 1089178 (D.
Conn. March 18, 2016).................................................................. 10

*Fernandez v. Wynn Oil Co.*,
653 F.2d 1273 (9th Cir. 1981) ...................................................... 19

*G.G. v. Gloucester Cty. School Bd.*,
__F.3d__, 2016 WL 1567467 (4th Cir. Apr. 19, 2016) ........................ 15

*General Telephone Co. v EEOC*,
446 U.S. 318 (1980)...................................................................... 29

*Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*,
176 F.3d 921 (6th Cir.1999)............................................................ 7

*Jesperson v. Harrah's Operating Co.*,
444. F.3d 1104 (9th Cir. 2006) ....................................................... 4

*Jesperson v. Harrah's Operating Co.*,
444 F.3d 1104 (9th Cir. 2006) ................................................... 14, 17

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C.Cir.2008) ......................................................... 25

*Laderach v. U-Haul of Northwestern Ohio*,
207 F.3d 825 (6th Cir. 2000) ......................................................... 7

*Manzer v. Diamond Shamrock Chems. Co.*,
29 F.3d 1078 (6th Cir.1994)............................................................ 7

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)...................................................................... 16

*Michigan Catholic Conference & Catholic Family Servs. v.
Burwell*,
807 F.3d 738 (6th Cir. 2015).......................................................... 25

*Norbuta v. Loctite Corp.*,
181 F.3d 102 (6th Cir.1999) (unpublished) ....................................... 7

vii

*Olsen v. Marriott Intern., Inc.*,
    75 F.Supp.2d 1052 (D. Ariz. 1999) ................................................... 19

*Price Waterhouse v. Hopkins*,
    490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ...... 7, 13, 14, 16

*Rucker v. Higher Educational Aids Bd.*,
    669 F.3d 1179 (7th Cir. 1982) ........................................................... 18

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ....................................................... 10, 13

*Turic v. Holland Hospitality, Inc.*,
    842 F.Supp. 971 (W.D. Mich. 1994) ................................................. 18

**Statutes**
42 U.S.C. § 2000bb–1(a), (b) ................................................................ 23

42 U.S.C. § 2000e–2(m) ...................................................................... 10

**Other Authorities**
29 C.F.R. § 1604.1(ii) .......................................................................... 18

viii

## Controlling Authority

*Employment Division v. Smith*, 494 U.S. 872 (1990).

*Burwell v. Hobby Lobby Stores, Inc.,* 134 S. Ct. 2751 (2014)

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004).

*Michigan Catholic Conf. v. Burwell*, 755 F.3d 372 (6th Cir. 2014), vacated and remanded, 135 S. Ct. 1914; affirmed after remand, 807 F.3d 738 (6th Cir. 2015).

*Mt. Elliott Cemetery Ass'n. v City of Troy*, 171 F.3d 398 (6th Cir. 1999).

*Hansen v. Ann Arbor Pub. Schools*, 293 F. Supp. 2d 780 (E.D. Mich. 2003).

# Index of Exhibits

Exhibit A, Stephens Letter (Doc. 51-2)

Exhibit B, Rost 30(b)(6) (Doc. 51-3)

Exhibit F, Shaffer Dep. (Doc. 51-7)

Exhibit I, Kish Dep. (Doc. 51-10)

Exhibit J, Cash Dep. (Doc. 51-11)

Exhibit K, Crawford Dep. (Doc. 51-12)

Exhibit M, McKie Dep. (Doc. 51-14)

Exhibit N, Kowalewski Dep. (Doc. 51-15)

Exhibit O, Rost Dep. (Doc. 51-16)

Exhibit P, Clothing Allowance Benefits Checks (Doc. 51-17)

Exhibit Q, Stephens Dep. (Doc. 51-18)

Exhibit S, Dress Code (Doc. 51-20)

Exhibit T, Defendant's Responses to Plaintiff's Frist Set of Discovery
    Requests (Doc. 51-21)

Exhibit U, Charge

Exhibit V, Onsite Investigation Notes

Exhibit W, Letter of Determination

Exhibit U, Charge

x

Exhibit V, Onsite Investigation Notes

Exhibit W, Letter of Determination

Exhibit X, Rost 30(b)(6) Dep.

Exhibit Y, Kowalewski Dep.

Exhibit Z, Cash Dep.

Exhibit AA, Kish Dep.

Exhibit AB, Shaffer Dep.

Exhibit AC, Crawford Dep.

Exhibit AD, Rost Dep.

Exhibit AE, Stephens Dep.

Exhibit AF, Severance Agreement

Exhibit AG, McKie Dep.

Exhibit AH, http://sammichaels.com/about/

Exhibit AI, Defendant's Position Statement

Exhibit AJ, The Experience of Healing Diagrams

Case 1, *Chavez v. Credit Nation Auto Sales*, __Fed.Appx.__, 2016 WL 158820 (11th Cir. Jan. 14, 2006)

Case 2, *Dawson v. H&H Elec., Inc.*, No. 4:14-00583, 2015 WL 5437101 (E.D. Ark. Sept. 15, 2015)

Case 3, *Fabian v. Hospital of Central Connecticut*, No. 3:12-cv-1154, __F. Supp. 3d __, 2016 WL 1089178 (D. Conn. March 18, 2016)

Case 4, *G.G. v. Gloucester Cty. School Bd.*, __F.3d__, 2016 WL 1567467 (4th Cir. Apr. 19, 2016)

## I.   THE COURT SHOULD DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED ON THE DRESS CODE

The Equal Employment Opportunity Commission brought this Title VII, sex-discrimination action after receiving and investigating a charge of discrimination filed by Aimee Stephens, a transgender woman who served as a funeral director/embalmer for the Defendant for nearly six years under the name of Anthony Stephens. During the course of the investigation, evidence was uncovered demonstrating that Defendant maintained a discriminatory clothing-allowance policy that favored male employees who interacted with the public over their comparable female co-workers.

After investigation, the Commission concluded that the Defendant fired Stephens based on sex, but Defendant now asserts that summary judgment should be entered in its favor.

As shown below, Defendant's arguments lack factual and legal merit, and summary judgment should not only be denied to Defendant, but granted in favor of the Commission.

### A.   Defendant's Dress Code

Defendant asserts that enforcement of its sex-specific dress code

1

is a legitimate non-discriminatory reason for the termination of

Aimee Stephens. The dress code is as follows:

## <u>MEN</u>

SUITS: BLACK GRAY, OR DARK BLUE ONLY (as selected) with conservative styling. Coats should be buttoned at all times. Fasten only the middle button on a three button coat

If vests are worn, they should match the suit Sweaters are not acceptable as a vest NOTHING should be carried in the breast pocket except glasses which are not in a case.

SHIRTS: WHITE OR WHITE ON WHITE ONLY, with regular medium length collars. (Button-down style collars are NOT acceptable). Shirts should always be clean. Collars must be neat.

TIES: As selected by company, or very similar.

SOCKS: PLAIN BLACK OR DARK BLUE SOCKS.

SHOES: BLACK OR DARK BLUE ONLY. (Sport styles, high tops or suede shoes are not acceptable). Shoes should always be well-polished.

TOPCOATS: BLACK, GRAY OR DARK BLUE CLOTH ONLY. A current style and length. A velvet collar, or gray coat with velvet collar are optional. No raincoats with or without liners except in rainy weather. Plastic coats are not permitted.

GLOVES: BLACK GRAY OR DARK BLUE ONLY.

PINS: Small service or fraternity pins may be worn.

PERSONAL GROOMING: Hair should be neatly trimmed and combed at all times. (Extreme hair styles, sideburns, or beards are NOT acceptable). Neat moustaches are allowed. Every man should always be clean shaven. Nails should always be trimmed and clean.

PART-TIME MEN: Should wear conservative, dark, business suits, avoiding light brown, light blue, light gray, or large patterns. All part time personnel should follow all details of dress as specified, as near as possible.

FUNERAL DIRECTORS ON DUTY: Are responsible for the appearance of the staff assisting them on services and are responsible for personnel on evening duty.

2

## <u>WOMEN</u>

Because of the particular nature of our business, please dress conservatively. A suit or a plain conservative dress would be appropriate, or as furnished by funeral home. Avoid prints, bright colored materials and large flashy jewelry. A sleeve is necessary, a below elbow sleeve is preferred.

Ex. S, Dress Code (Doc. 51-20). The code presumes that funeral directors will be male, placing "Funeral Directors on Duty" in the subsection for male employees.

Parts of the code ("selected," "selected by company,") refer to Defendant's policy to provide clothing directly to male employees. Also, deposition testimony indicated that the dress code is interpreted generously in favor of male employees, some of whom have goatees. Ex. Y, Kowalewski Dep. (Doc. 51-15) 35:9-36:10. It is also stricter than written for females, who are expected to wear skirts. Ex. AD, Rost Dep. 51:13-16. Rost admitted that skirts are a personal preference and have nothing to do with industry standards. *Id*. Also contrary to the code as written, clothes have never been furnished to women, but are to part-time men. Ex. AD, Rost Dep. 13:4-16:22.

Indeed, the code cannot be read separately from the clothing

3

allowance, which has been consistently afforded to all male employees who interact with the public but not to females in any form until October 2014. Consequently, the Defendant's claim that the dress code does not impose unequal burdens is contrary to fact. *See* Doc. 54 at Pg ID 1303-1305. Thus, on that basis, this case can be distinguished from the principal precedent upon which RGGR relies, *Jesperson v. Harrah's Operating Co.*, 444. F.3d 1104 (9th Cir. 2006).

Too, Defendant's argument that there is a dress code for funeral directors which is separate from other employees, Doc. 54 at Pg ID 1304, is incorrect, and indeed is contradicted by Rost's affidavit in support of the motion for summary judgment. *See* Doc. 54-2, Rost Affidavit paras. 56-57 at Pg ID 1337. The same expectations apply for all employees who interact with the public, males and females. Ex. I, Kish Dep. (Doc. 51-10) 17:25-19:5, 57:12-58:4; and Ex. O, Rost Dep. (Doc. 51-3) at 51:1-8. Defendant also asserts that had there been any female funeral directors, they would have been afforded clothing comparable to the men. Doc 54 at Pg ID 1304-1305. However, this speculative claim is undercut by the fact RGGR contracts for clothing with Sam Michael's, and has for at least a

4

decade. Ex. O, Rost Dep. (Doc. 51-16) 13:22-24. It is undisputed that Sam

Michael's is a *men's* clothier. Ex. AH, http://sammichaels.com/about/

(last visited May 2, 2016). At a minimum, it is clear that Defendant does

not anticipate having a female funeral director and is not prepared to

clothe one.

**B.    Religious-Belief Claim**

Rost asserts that his continued employment of Aimee Stephens

would dishonor God:

```
21  Q   So, your personal faith as a follower of Jesus
22          Christ tells you that it would be improper
23          or -- to employ someone like the person you
24          knew as Anthony Stephens?
25  A   Absolutely.
55: 1 Q   Okay.   You indicated as part of the healing
2          process, but what about your religious beliefs
3          specifically are violated by continuing to
4          employ Stephens?
5  A   I believe it would violate my faith, yes,
6          absolutely.
7  Q   Okay.   What aspects of it?
8  A   Well, I believe that God created a man as a man
9          and God created a woman as a woman.   And to --
10          to not honor that, I would feel it's a
11          violation of my faith, absolutely.
12  Q   So Stephens would be presenting in a way that
13          offended your religious beliefs, essentially?
14  A   Yes.   Yes.
```

5

Ex. B, Rost 30(b)(6) Dep. (Doc. 51-3) 54:21-55:19. In addition, he states that his religious beliefs indicate how others should act with respect to sex and gender:

> 42.   I sincerely believe that the Bible teaches that a person's sex is an immutable God-given gift and that people should not deny or attempt to change their sex.
>
> * * *
>
> 44.   I sincerely believe that the Bible teaches that it is wrong for a biological male to deny his sex by dressing as a woman or for a biological female to deny her sex by dressing as a man.

*See* Doc 54-2, Rost Affidavit at Pg ID 1334.

Indeed, Defendant now goes so far to say that its dress code is a proxy for Rost's religious beliefs regarding the sexes. *See* Doc. 55 at Pg ID 1692 ("R.G.'s dress code ensures that R.G. does not violate Rost's religious belief that a person's sex (whether male or female) is an immutable God-given gift").

## C.   Thomas Rost's Comments are Direct Evidence that Sex Stereotyping Motivated Stephens's Termination

According to the Defendant, permitting Stephens to present as female would disrupt the business and even "harm" its clients because of the claimed effect on their healing process. Thus, Defendant claims that

6

it fired Stephens to enforce its sex-specific dress code. Defendant's

argument is disingenuous and even if true, supports a finding that its

justification for Stephens' termination constitutes evidence of

discriminatory animus in violation of Title VII.

> "In discrimination cases, direct evidence is that evidence which, if
> believed, requires the conclusion that unlawful discrimination was
> at least a motivating factor in the employer's actions." *Jacklyn v.*
> *Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926
> (6th Cir.1999) (citations omitted). *See Norbuta v. Loctite Corp.,* 181
> F.3d 102 (6th Cir.1999) (unpublished) ("[D]irect evidence proves
> the existence of a fact without any inferences or presumptions.").
> *See also Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078,
> 1081 (6th Cir.1994) (evidence that requires the jury to infer a fact is
> not direct evidence). "Once there is credible direct evidence, the
> burden of persuasion shifts to the defendant to show that it would
> have terminated the plaintiff's employment had it not been
> motivated by discrimination." *Jacklyn v. Schering Plough*
> *Healthcare Prods. Sales Corp.,* 176 F.3d at 926 (citations omitted).
>
> In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104
> L.Ed.2d 268 (1989), the Supreme Court held: "In saying that
> gender played a motivating part in an employment decision, we
> mean that, if we asked the employer at the moment of the decision
> what its reasons were and if we received a truthful response, one of
> those reasons would be that the applicant or employee was a
> woman."
>
> *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th

Cir. 2000). Such is the case here—Rost's testimony demonstrates that

the real reason Stephens was fired was because Stephens did not

conform to Rost's stereotypes as to how men and women are supposed to behave and present themselves.

Rost is forthright in admitting that he objected to Stephens's decision to present as female. In addition to the statements in I.B. above, when asked by his own attorney why he fired Stephens, Rost re-affirmed that Stephens's non-conformance with his beliefs regarding the behavior of men and women prompted the decision:

> Q    Okay. Why did you -- what was the specific
>      reason that you terminated Stephens?
> A    Well, because he -- he was no longer going to
>      represent himself as a man. He wanted to dress
>      as a woman.

Ex. B, Rost 30(b)(6) Dep. (Doc. 51-3) 135:24-136:1.

Rost also testified that he objected to Stephens's use of "Aimee" in the charge of discrimination, saying that this made him "uncomfortable….because he's [Stephens] a man." Ex. O, Rost Dep. (Doc. 51-16) 23:4-8.

And Rost indicated discomfort with the idea of Stephens wearing female clothing outside of work, and concern with how the public would react:

8

18    You testified earlier when you were
19    asked by your Counsel, you said that you would
20    not have had a problem with Stephens presenting
21    as female outside of work. · Did I hear that
22    correctly?
23    A That's true.
24    Q Okay. What if a customer would have seen that
25    and complained to you about it, what would you
Page 31
1    have done?
2 ·   A Don't know.
3    Q Do you think there might have been -- you
4    indicated earlier, I believe, that you get a
5    lot of word-of-mouth business, people coming
6    back, families and stuff like that?
7    A Oh, yes.
8    Q Okay. · Would you say that's the bulk of your --
9    A Repeat business or -- yes, or in family before
10    we call it, yes.
11    Q Okay. So if -- so would you have been
12    comfortable with word getting around that
13    Stephens was dressing as female outside of
14    work?
15    A I don't know. I probably would be
16    uncomfortable with that. · But it never came up,
17    so --
18    Q Okay. Would it have affected Stephens'
19    employment if word had gotten around?
20    A Don't know.

Ex. AD, Rost Dep. 30:18-31:20.

The bottom line is that, at a minimum, a jury could reasonably

conclude that sex stereotyping motivated Rost's statements and actions,

9

at least in part.[1]  In *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), the Sixth Circuit explained that an employer violates Title VII when it takes action against an employee based on "[s]ex stereotyping," that is, "based on a person's gender non-conforming behavior." This includes penalizing an employee for dress or mannerisms that, in the employer's mind, conform to the wrong sex stereotypes.

As the Court noted in its opinion denying Defendant's Motion to Dismiss, Title VII "protects transsexual persons from discrimination for failing to act in accordance and/or identify with their perceived sex or gender." Doc. 13 at Pg ID 189 (quoting *Myers v. Cuyahoga Cty.*, 182 Fed. Appx. 510, 519 (6th Cir. 2006)); *see also Fabian v. Hospital of Central Connecticut*, No. 3:12-cv-1154, __ F. Supp. 3d __, 2016 WL 1089178 at *13 (D. Conn. March 18, 2016) ("discrimination on the basis of gender stereotypes … constitutes discrimination on the basis of the properties or characteristics typically manifested in sum as male and female—and that discrimination is literally discrimination 'because of sex'").

---

[1] A Title VII plaintiff has a valid sex discrimination claim if she can demonstrate that sex "was a motivating factor for any employment practice, even if other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

10

Rost's admissions clearly support a finding that "Stephens' failure to conform to sex stereotypes was the driving force behind the Funeral Home's decision to fire Stephens." *See* Doc. 13 at Pg ID 195. In that Title VII prohibits an employer from acting on such stereotypes, summary judgment for the EEOC on the basis of sex stereotyping is appropriate on this evidence alone.

Defendant's insistence that Stephens wear men's clothing at work, despite knowledge that she now identifies as female, is sex discrimination in violation of Title VII. *See Chavez v. Credit Nation Auto Sales*, LLC, No. 14-14596, 2016 WL 158820 at *7 (transgender plaintiff told she could not wear a dress after completing transition because it would be "disruptive" was evidence of sex discrimination); *Dawson v. H&H Elec., Inc.*, No. 4:14CV00583 SWW, 2015 WL 5437101, at *4 (E.D. Ark. Sept. 15, 2015) (amongst the "ample evidence" of sex discrimination provided by transgender plaintiff were an order not to wear feminine clothes at work and the termination for being "a distraction" after wearing feminine attire at work).

Defendant's argument is also dubious on the factual record. First,

11

Rost never proposed that Stephens could continue to work—in men's clothing— prior to his deposition. Indeed, the possibility was raised by defense counsel as a "hypothetical":

> Q   So hypothetically speaking, if Stephens had told you that he believed that he was a woman, but would only present as a woman outside of work, would you have terminated him?
> A   No.

Ex. X, Rost 30(b)(6) Dep. 137:11-15.

At a minimum, given the certitude of Rost's opinions on the wrongness of transgenderism, it is open to question whether he could, in fact, tolerate such, and a jury could consider the hypothetical proposal a pretextual, after-the-fact rationale. *Cicero v. Borg-Warner, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

## D.   A Sex-specific dress code does not justify Stephens's Termination

Summary judgment must be denied because there is evidence that Defendant's citation to the dress code is merely a pretext. In addition, Defendant's reliance on the dress code is misplaced because even if the dress code were the reason for Stephens' termination, requiring Stephens to comply based on her biological gender rather than her

12

gender identity is discrimination because of sex in violation of Title VII. Thus, the dress code does not rescue Defendant from liability.

        1. <u>The Dress Code is a Pretext</u>.

A jury could find the dress code defense pretextual because Rost did not discuss the code when firing Stephens, merely telling her that "this is not going to work out [ ] [a]nd that your services are no longer needed here." *See* Ex. B, Rost Dep. 126:1-127:10, Pg ID 666. Moreover, as discussed above, a jury could find that RGGR's current suggestion that it did not care if Stephens presented as female when outside of work is also unworthy of credence. In short, a jury is not required to accept the assertion of the dress code as dispositive.

        2. <u>Despite Stephens's Willingness to Dress Professionally, Defendant Wanted to Impose Rost's Stereotypes Upon Her</u>.

The Defendant asserts that it was permitted to force Stephens to present in masculine clothing under a sex-specific dress code and to fire her if she did not. Specifically, Defendant argues that "unlike the employers in *Price Waterhouse* or *Smith*, RGGR never indicated that Stephens's behavior was too feminine or not masculine enough. RGGR

13

simply maintained that Stephens, like all other employees, whether male or female, must comply with the dress code." Doc. 54 at Pg ID 1307.

To the contrary, RGGR's acts do demonstrate sex stereotyping, albeit of a different sort than that exhibited in *Price Waterhouse*. Here, RGGR demonstrated that it expected Stephens to conform to Rost's stereotypes for how men and women are supposed to behave and present themselves. When Stephens informed Rost that she was transitioning to female, Stephens indicated that she fully intended to dress professionally and abide by RGGR's dress requirements for women. Ex. S, Dress Code (Doc. 51-20); Ex. A, Stephens Letter (Doc. 51-2); Ex. Q, Stephens Dep. (Doc. 51-18) 133:6-133:9. In other words, she still intended to meet all of the Respondent's legitimate business expectations. Thus, this case differs from *Jesperson v. Harrah's Operating Co.,* 444 F.3d 1104 (9th Cir. 2006), where the plaintiff was engaged in a challenge to the code itself.

Defendant's analogies—to allowing an employee to switch clothing every day and to allowing female employees to work topless—display Defendant's sex stereotypes about Aimee Stephens. Doc 54 at Pg ID

14

1311. What Stephens proposed in her letter was neither obscene nor anything other than tasteful and conservative dress, consistent with RGGR's own, sex-specific guidelines. She was not intending to draw attention to herself—to the contrary, she was fully sensitive to the concerns of the grieving and intended to blend in. Ex. X, Rost 30(b)(6) Dep. 75:5-76:5, 108:21-24; Ex. AE Stephens Dep. 90:1-90:2, Ex. A, Stephens Letter (Doc. 51-2). Hence, the fact that she would present according to the dress code renders Defendant's parade of horribles inapplicable. Doc 54 at Pg ID 1310-1311.

Defendant's claim that transgender people render sex-specific dress codes void is unpersuasive and unsupported by precedent. Indeed, what precedent exists suggests no such thing. *See G.G. v. Gloucester Cty. School Bd.*, __F.3d__, 2016 WL 1567467 at *8 (4th Cir. Apr. 19, 2016) (upholding Department of Education regulatory policy permitting transgender student to use bathroom consistent with the student's gender identity and noting that the decision does not change validity of sex-segregated restrooms).

Additionally, any sex-specific dress code, including Defendant's, is

15

premised on self-identification. The Defendant's emphasis on biological sex cannot be dispositive, because taken to its logical conclusion, it would create an employer's right to determine the "proper" gender identity, including, as was tried here, the right to seek very sensitive personal information. *See* Doc. 34 and 45, denying Defendant's attempt to discover, *inter alia*, information on Stephens's genitalia. Indeed, the real parade of horribles is not the specter of topless female laborers, but rather employers using sex-specific dress codes to deny employment to transgender people entirely.

### 3. Imposition of the Dress Code is not a Legitimate, Nondiscriminatory Reason for Stephens's Firing.

The Supreme Court has emphasized that, to pass muster under Title VII, any employment action taken against a protected employee must be legitimate and nondiscriminatory—a reasonable basis for the particular action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973).

In the Title VII context, if an employee's individual expression is tied to a protected trait, such as race or sex, discrimination based on such expression is a violation of the law. *Cf. Price Waterhouse v. Hopkins*, 490

16

U.S. 228, 250-51 (1989) (plurality) (finding Title VII violation where employer demanded that employee's appearance and deportment match sex stereotype associated with her gender); *Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104, 1112 (9th Cir. 2006) (en banc ) ("If a grooming standard imposed on either sex amounts to impermissible stereotyping, something this record does not establish, a plaintiff of either sex may challenge that requirement under [Title VII].")

Here, it is clear that Defendant's dress code embodies Rost's sex-stereotypes. *See* Doc 55 at Pg ID 1692 ("R.G.'s dress code ensures that R.G. does not violate Rost's religious belief that a person's sex (whether male or female) is an immutable God-given gift"). A rationale based in sexual stereotypes cannot be as a legitimate non-discriminatory reason for Stephens' firing, and must be rejected.

Consequently, Defendant's dress-code argument must fail.

### E. Catering to customer preference based on sex is discriminatory.

Defendant spends much time stating that its dress code is part of the healing process, and asserting that Stephens would be a distraction in female clothing and even "harm" the clients. Doc 54 at Pg ID 1310.

17

Such language is itself evidence of stereotypes, especially since Stephens was fired without even having the opportunity to work after presenting her letter. *See Carroll v. Talman Federal Sav. & Loan Ass'n of Chicago*, 604 F.2d 1028, 1033 (7th Cir. 1979) ("'assumptions steeped in ... stereotypes * * * are inconsistent with the purposes of the Act'") (internal citation omitted).

Title VII law establishes that no employee should be subjected to discrimination merely because a customer demands it. *Cf. Rucker v. Higher Educational Aids Bd.*, 669 F.3d 1179, 1181 (7th Cir. 1982) ("it is clearly forbidden by Title VII, to refuse on racial grounds to hire someone because your customers or clientele do not like his race"); *Turic v. Holland Hospitality, Inc.*, 842 F.Supp. 971, 978 n.7 (W.D. Mich. 1994) (customer or colleague preference does not provides a justification for race discrimination); 29 C.F.R. § 1604.1(ii) (stating "the refusal to hire an individual because of the preferences of co-workers, the employer, clients or customers" not permissible under Title VII).

Therefore, catering to a customer's assumed preferences or prejudices is not a defense to a claim of sex discrimination. *See*

18

*Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276-77 (9th Cir. 1981)

("stereotyped customer preference [cannot] justify a sexually

discriminatory practice," therefore female employee could not lawfully be

denied a promotion because employer's South American clients would

only work with males); *Diaz v. Pan American World Airways, Inc.*, 442

F.2d 385, 389 (5th Cir. 1971) (rejecting customer preference for female

flight attendants, stating "[w]hile we recognize that the public's

expectation of finding one sex in a particular role may cause some initial

difficulty, it would be totally anomalous if we were to allow the

preferences and prejudices of the customers to determine whether the

sex discrimination was valid. Indeed, it was, to a large, extent, these very

prejudices the Act was meant to overcome"); *Olsen v. Marriott Intern.,*

*Inc.*, 75 F.Supp.2d 1052 (D. Ariz. 1999) (customer preference could not be

invoked to prevent hiring of male massage therapist).[2]

-----

[2] Notably, Rost's willingness to cater to customer preference
extends beyond exclusion of transgender persons:

Q….[I]f there was an objection to having an
African-American employee present during funeral,
would you adhere to that?
A   If there was an objection?  Well, I can't ever
see it happening, so I don't know.
Q   Okay.  But if there was?  I mean, there are

19

Moreover, Defendant's claim—which rests solely on Rost's speculation alone, sight unseen and uninformed by any actual experience—that transgender persons presenting according to their identity will necessarily be distracting and harmful to grieving clients is unsubstantiated and is the very essence of stereotyping that must be rejected out of hand. Rost terminated Stephens before she interacted with clients as a woman. Thus, there is no tangible evidence to support Rost's belief that the clients would consider Stephens' transgender status to be a distraction. Additionally, Rost has not offered any example of how Stephens's female presentation would "harm" the grieving clients.

---

people -- unfortunately there are people out
there who have racist mindsets.
. . .

BY MR. PRICE:
    Q   And if they thought that was -- the presence of
    an African-American staffer was disrupting
    their grieving experience, what would you do?
    A   I don't know.
    Q   Would you remove the person?
    A   I don't know.
    Q   Would you remove the employee?
    A   I don't know.
    Q   You might?
    A   I might.  They might temporarily, but, you
    know, I've never had that happen, so I don't
    know.

Ex. AD, Rost Dep. 27:22-28:20 .

20

Even if Rost believed that retaining Stephens would harm his business, his discriminatory behavior would not be justified. The potential loss of business and customers or the possibility of economic backlash has long been rejected in customer-preference cases. Therefore, such "harm" does not provide Defendant with an independent, legitimate, and nondiscriminatory reason to justify Stephens' termination. *See EEOC v. St. Anne's Hospital of Chicago, Inc.*, 664 F.2d 128, 133 (7th Cir. 1981) (Title VII does not permit an "employer to reject job applicants on the basis of sex because the prejudicial preferences of customers were a threat to the business"); *cf. Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir.), cert. denied, 404 U.S. 950 (1971) ("it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome"). Accordingly, Defendant's customer preference/harm justification must fail.

## II.   RFRA DOES NOT AUTHORIZE STEPHENS'S FIRING

RFRA has never been interpreted to insulate an employer from

21

liability under Title VII, and should not be here. In its Answer to the Commission's amended complaint, Defendant raised for the first time that it was justified in firing Stephens because she offended Rost's religious beliefs. *See* Doc. 22, Answer to Amended Complaint, p. 5 (Affirmative Defenses 12-13). Defendant's religious-freedom defense lacks merit.

### A.    Eliminating Workplace Sex Discrimination is a Compelling Governmental Interest

Congress's mandate to eliminate workplace discrimination is a compelling governmental interest, as Defendant acknowledges:

> By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a 'highest priority'.... Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions.

*EEOC v. Fremont Christian School*, 781 F.2d 1362, 1368-69 (9th Cir. 1986) (quoting *EEOC v. Pacific Press Pub. Ass'n.*, 676 F.2d 1272, 1280 (9th Cir. 1982)). This is the governmental interest against which Defendant's assertion of religious belief must be assessed. *See also* Doc 51 at Pg ID 628-630.

22

## B. Defendant would not be substantially burdened under these facts.

The Religious Freedom Restoration Act ("RFRA") prohibits the government from substantially burdening the exercise of religion unless the government demonstrates that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1(a), (b).

However, Defendant, speaking through Rost, maintains that its religious exercise would be burdened by having to provide female clothing to Stephens. But RGGR has never purchased clothing for a female funeral director, indeed, never paid for the clothing of any female employee until October 2014. Ex. O, Rost Dep. (Doc. 51-16) 15:16-16:12; Ex. I, Kish Dep. (Doc. 51-10) 20:16-21:3; Ex. P, Clothing Allowance Benefits Checks (Doc. 51-17). It is undisputed that Rost fired Stephens in 2013. Further, Defendant did not identify a clothing purchase as an issue in his response to discovery requests. Ex. T, Defendant's Responses to Plaintiff's Frist Set of Discovery Requests (Doc. 51-21).

As stated previously, there is no separate funeral-director dress code—there are simply different requirements for male and female

23

employees. Consequently, Defendant's statement that it would have had to pay for a suit of women's clothing is speculative and unsupported. For her part, Stephens herself planned to wear her own attire and did not ask Defendant to provide clothing. Ex. A, Stephens Letter (Doc. 51-2). Consequently, Defendant would not have been burdened by a financial outlay that was not contemplated by either Stephens or Rost.

And even if there is a burden in having to provide Stephens with clothing, Defendant has not established that providing two suits of clothing constitutes a *substantial* burden. In fact, Defendant cannot even specify how much it would have cost to have such suits made. Using its own stipend calculation for full-time females, the amount would have been as little as $150—which is less than Defendant pays for men's suits. Such is not a *substantial* burden—in fact, it is a ***lesser*** burden. Further, Defendant's practice of providing suits, ties and shirts to its male funeral directors whenever they desired them negates the view that providing female clothing to Stephens would be unduly costly. Indeed, as a male funeral director, Stephens had already received clothing at Defendant's expense for six years. Thus, Defendant's provision of female rather than

24

male attire cannot constitute a substantial burden.

Finally, Defendant's argument that its purchase of two suits of women's clothing constituted a "substantial burden" is spurious and certainly does not justify terminating Stephens's employment. When Stephens informed Defendant about her transition, she stated that she would be willing to provide her own clothing. In that Stephens's offer relieved Defendant of the need to provide female attire, Defendant has failed to establish any basis for concluding that it was engaged in a religious exercise or that such engagement would result in a substantial burden. *See Michigan Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738, 747 (6th Cir. 2015) ("Whether a law imposes a substantial burden on a party is something that a court must decide, not something that a party may simply allege."); *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C.Cir.2008) ("accept[ing ] as true the factual allegations that [appellants'] beliefs are sincere and of a religious nature—but not the legal conclusion, cast as a factual allegation, that [their] religious exercise is substantially burdened").

Stripped of its unsustainable clothing-burden claim, Defendant's

25

essential objection is that Stephens is behaving in a way which offends Rost's religious beliefs. However, the perceived immorality of other persons cannot constitute a burden on Defendant's religious exercise. Defendant was not being asked to facilitate Stephens's behavior—it was being asked to respect her Title VII rights, regardless of how offensive Rost perceived her behavior to be from a religious standpoint. This is not cognizable under RFRA. As the Fifth Circuit noted in *East Texas Baptist Univ. v. Burwell*, 793 F.3d 449, 459 (5th Cir. 2015) (emphasis in original):

> Although the plaintiffs have identified several acts that offend their religious beliefs, the acts ***they*** are required to perform do not including providing access to or facilitating access to contraceptives. Instead, the acts that violate their faith are those of third parties. Because RFRA confers no right to challenge the independent conduct of third parties, we join our sister circuits in concluding that the plaintiffs have not shown a substantial burden on their religious exercise.

Such is the same here—Rost is not being asked to perform any actions which he finds religiously offensive. He is simply being asked to not terminate an employee he believes is acting contrary to his religious beliefs.

26

### C. Defendant's "Least Restrictive Means" is the Abrogation of Title VII and the Foreswearing of the Compelling Interest in Eradicating Sex Discrimination for Countless Employees.

Defendant's RFRA argument also fails because enforcement of Aimee Stephens's Title VII right to be free of workplace sexual discrimination is the least restrictive means to achieve the government's goal of eradicating sex discrimination and it is precisely tailored to achieve this goal.

The Defendant argues that the continued employment of Stephens is not the least restrictive means to achieve the EEOC's interest in preventing discrimination and asks that the government not enforce Title VII where "distressed people" are served by persons who have to comply with dress codes. Doc 54 at Pg ID 1317. Or, in the alternative, the government could enforce Title VII only when transgender people are fired because the employer objects to them presenting according to their identity outside of work, but allowing them to fire such employees for refusing to wear employer-designated sex-specific uniforms on the job. *Id*. While the above recommendations assuredly do not restrict

27

employers who make a religious objection, they are not ***means*** of addressing discrimination at all. RFRA limits government action to the least restrictive *means necessary to achieve the governmental interest.* RFRA does not prevent government from achieving its goals. However, Defendant's solution—of not enforcing Title VII in these circumstances—would render null and void the Title VII rights of persons like Stephens, and leave them without remedy.

This goes far beyond anything suggested by the most recent Supreme Court review of RFRA. In *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), the Supreme Court held that RFRA exempted the employer from paying for certain contraceptive medications and devices which could also be abortifacient. Even there, the Court held that the government still had options to ensure the employees would have access to the disputed medications. *See Burwell*, 134 S. Ct. at 2780-82 (outlining available options to ensure access). Here, Defendant's proposal leaves Stephens with no redress, and thus should be rejected.

28

## III.   DEFENDANT IS LIABLE FOR SEX DISCRIMINATION UNDER ITS CLOTHING ALLOWANCE POLICY

### A.   Defendant's Procedural Arguments are Without Merit.

Finally, Defendant states that it is entitled to summary judgment on the sexually discriminatory clothing-allowance claim because the issue did not properly arise out of the investigation of Stephens's sexual discrimination charge. The Defendant also alleges that it does not currently discriminate against female employees because it now pays a stipend to female employees of either $75 or $150 per year.

The Supreme Court stated in *General Telephone Co. v EEOC*, 446 U.S. 318, 331 (1980) that "[a]ny violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable." *Accord EEOC v. Kronos, Inc.*, 620 F.3d 287, 297 (3rd Cir. 2010) ("Once the EEOC begins an investigation, it is not required to ignore facts that support additional claims of discrimination if it uncovers such during the course of a reasonable investigation").

Defendant argues that since the discriminatory clothing-allowance was not the subject of the Charge, the Commission cannot litigate it, citing *EEOC v. Bailey Co.*, 563 F.2d 439 (6th Cir. 1977); Doc. 54 at Pg ID

29

1317-1320. *Bailey* is easily distinguished, and has been by the Sixth

Circuit. *Bailey* involved a charge of sex discrimination upon which the

Commission found no probable cause to believe discrimination had

occurred. Instead, the Commission filed suit on a claim of alleged

religious discrimination against a separate person entirely. *Bailey Co*.,

563 F.2d at 447-48. Hence, the Sixth Circuit held that the lawsuit could

not have reasonably grown out of the investigation of the complaint. *Id*.

at 448-49.

  Here, there is no dispute that Stephens filed a charge of sex and

gender discrimination under Title VII. During the course of the

investigation, further evidence of sex discrimination was obtained in the

form of undisputed evidence that Defendant had a clothing allowance

which assisted male—and only male—employees to meet the

requirements of Defendant's dress code. Consequently, the allowance

was investigated (Ex. V, Onsite Notes) and subject to an offer of

conciliation after a finding of cause to believe that RGGR had

discriminated on the basis of sex with respect to both discharge and the

clothing allowance. Ex. W, Letter of Determination.

30

The situation here is much more like that of *EEOC v. Cambridge Tile Mfg. Co.*, 590 F.2d 205 (6th Cir. 1979). In *Cambridge Tile*, two employees had filed charges, one for sexual harassment and the other for a racially-motivated discharge. *Cambridge Tile*, 590 F.2d at 205. During the investigations, the Commission found evidence of sex discrimination in job classifications, and subpoenaed documents relevant to the job classifications. *Id.* at 206. The Court distinguished *Bailey* by noting that the job classification issue was not "wholly unrelated," and specifically held "the possibility the employer was discriminating against women in job classifications [was] relevant to the specific charges of sex and race discrimination in firing." *Id.* As the court observed, "a company's business practices are not so compartmentalized as the defendant in this case would contend." *Id.*

Such is the case here: evidence that an employer was giving a clothing benefit only to male employees was relevant to the investigation of Stephens's sex discrimination discharge claim, and properly grew out of it. Defendant asserts that the dress code is important for its business and justifies the firing of Stephens. But Defendant also says that its

31

refusal until October 2014 to provide women with comparable benefits to adhere to the dress code is both irrelevant and not subject to legal remedy. This argument conforms to neither the facts nor the law, and should be rejected by the Court.

**B.    The Defendant Continues to Discriminate Against Female Employees Through Inferior Clothing Allowances.**

The relevant law and facts have been set forth in the Commission's Motion for Summary Judgment. Doc. 51 at Pg ID 614-616, and 636-638. To summarize, Defendant's policy of paying for the work clothing of male employees, while failing to provide a comparable benefit to female employees, violates Title VII. Two significant omissions mar the Defendant's substantive arguments.

First, Defendant's brief fails to inform the Court that no benefits were provided to female employees prior to October 2014, after this litigation commenced. Ex. O, Rost Dep. (Doc. 51-16) 15:16-16:12; Ex. I, Kish Dep. (Doc. 51-10) 20:16-21:3; Ex. P, Clothing Allowance Benefits Checks (Doc. 51-17). Reading RGGR's brief, one could be excused for coming to the (erroneous) conclusion that stipends have always been

32

paid to females. As the evidence set forth in the Commission's Brief indicates, this is not so, and Defendant's refusal to acknowledge this does it no credit.

Second, Defendant's current stipends for females are still inferior to the benefits afforded to men. Defendant does not acknowledge the value of the suits and ties provided to men, which are approximately $235 per suit/tie and can be repaired or replaced as necessary and without cost. Ex. O, Rost Dep. (Doc 51-16) 14:20-15:6.

Women, on the other hand, are given a stipend described by Rost himself as "little" and in any event inferior to those afforded to males who have contact with the public, "runners" (those who transport bodies) included. Ex. O, Rost Dep. (Doc. 51-16) 15:3-18. The sums ($150 for full-time women and $75 for part-time women) were determined by Rost's notion of what was "fair." Ex. O, Rost Dep. (Doc. 51-16) 45:12-20. Unfortunately, such subjective notions of fairness cannot be dispositive, given the Defendant's history of affording women employees absolutely no clothing allowance.

An examination of the amounts paid for men, and the flexibility

33

afforded to the male clothing benefit (e.g., new suits available at necessary, picked up on company time) demonstrate the continuing discrimination against female employees. The Defendant continues to violate Title VII and is liable for damages for discrimination on the basis of sex.

## IV.   CONCLUSION

Thomas Rost has forthrightly and repeatedly stated that his sex and gender stereotypes motivated his decision to terminate Stephens's employment. These admissions are dispositive. Moreover, Defendant's sex-differentiated dress code cannot excuse the firing of a transgender person who was willing to professionally adhere to it according to her identity. Defendant's concerns about customer reactions have been disposed of by settled precedent regarding third party prejudices.

Furthermore, Defendant's RFRA-burden claim is undercut by the absence of evidence supporting its claim that it would have paid for Aimee Stephens's funeral-director clothing. In any event, such expense would have at most required her to pay for her own clothing, not fire her. Additionally, Defendant's "least restrictive means" requires a cessation

of Title VII enforcement and no remedy for persons like Stephens, a result not contemplated by RFRA nor any precedent.

Finally, Defendant's arguments regarding the clothing-allowance claim are without merit. The claim grew reasonably from the Commission's investigation of Stephens's sex-discrimination charge, and significant evidence supporting the unlawful differential treatment regarding this privilege of employment supports summary judgment in favor of the EEOC on this claim.

Accordingly, we urge the Court to deny Defendant's Motion in its entirety, and instead grant the Commission's renewed request for entry of summary judgment in its favor.

Respectfully submitted,

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

s/ Miles Shultz
MILES SHULTZ (P73555)
Trial Attorney

Dated: May 2, 2016          s/ Dale Price
                            DALE PRICE (P55578)

35

Trial Attorney

DETROIT FIELD OFFICE
Patrick V. McNamara
477 Michigan Avenue, Room 865
Detroit, Michigan 48226
Dale.Price@EEOC.GOV
Tel. No. (313) 226-7808
Fax No. (313) 226-6584

## Certificate of Service

I hereby certify that on May 2, 2016, I electronically filed the forgoing with the clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all record attorneys.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

Dated: May 2, 2016          s/ Dale Price
                           DALE PRICE (P55578)
                           Trial Attorney

36