UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Equal Employment Opportunity
Commission,

       Plaintiff,

v.                                  Case No. 14-13710

R.G. & G.R. Harris Funeral Homes,      Sean F. Cox
Inc.,                              United States District Court Judge

       Defendant.
_____/

## **OPINION & ORDER**

      In enacting Title VII of the Civil Rights Act of 1964, Congress prohibited employers from

discharging or otherwise discriminating against any individual with respect to compensation,

terms, conditions, or privileges of employment "because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

      In filing this action against Defendant R.G. & G.R. Harris Funeral Homes, Inc. ("the

Funeral Home"), the Equal Employment Opportunity Commission sought to expand Title VII to

include transgender status or gender identity as protected classes.  The EEOC asserted two Title

VII claims.  First, it asserted a wrongful termination claim on behalf of the Funeral Home's

former funeral director Stephens, who is transgender and transitioning from male to female,

claiming that it "fired Stephens because Stephens is transgender, because of Stephens's transition

from male to female, and/or because Stephens did not conform to [the Funeral Home's] sex- or

gender-based preferences, expectations, or stereotypes."  Second, it alleges that the Funeral

1

Home engaged in an unlawful employment practice by providing work clothes to male but not female employees.

This Court previously rejected the EEOC's position that it stated a Title VII claim by virtue of alleging that Stephens's termination was due to transgender status or gender identity – because those are not protected classes. The Court recognized, however, that under Sixth Circuit precedent, a claim was stated under the *Price Waterhouse* sex/gender-stereotyping theory of sex discrimination because the EEOC alleges the termination was because Stephens did not conform to the Funeral Home's sex/gender based stereotypes as to work clothing.

The matter is now before the Court on cross-motions for summary judgment. Neither party believes there are any issues of fact for trial regarding liability and each party seeks summary judgment in its favor. The motions have been fully[1] briefed by the parties. The motions were heard by the Court on August 11, 2016.

The Court shall deny the EEOC's motion and shall grant summary judgment in favor of the Funeral Home as to the wrongful termination claim. The Funeral Home's owner admits that he fired Stephens because Stephens intended to "dress as a woman" while at work but asserts two defenses.

First, the Funeral Home asserts that its enforcement of its sex-specific dress code, which requires males to wear a pants-suit with a neck tie and requires females to wear a skirt-suit, cannot constitute impermissible sex stereotyping under Title VII. Although pre-*Price*

---

[1]This Court granted all requests by the parties to exceed the normal page limitations for briefs. The Court also granted the sole request for leave to file an amicus brief. Thus, the American Civil Liberties Union and the American Civil Liberties Union of Michigan filed an Amicus Curiae Brief.

*Waterhouse* decisions from other circuits upheld dress codes with slightly differing requirements for men and women, the Sixth Circuit has not provided any guidance on how to reconcile that previous line of authority with the more recent sex/gender-stereotyping theory of sex discrimination.  Lacking such authority, and having considered the post-*Price Waterhouse* views that have been expressed by the Sixth Circuit, the Court rejects this defense.

Second, the Funeral Home asserts that it is entitled to an exemption under the federal Religious Freedom Restoration Act ("RFRA").  The Court finds that the Funeral Home has met its initial burden of showing that enforcement of Title VII, and the body of sex-stereotyping case law that has developed under it, would impose a substantial burden on its ability to conduct business in accordance with its sincerely-held religious beliefs.  The burden then shifts to the EEOC to show that application of the burden "to the person:" 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest*.*  The Court assumes without deciding that the EEOC has shown that protecting employees from gender stereotyping in the workplace is a compelling governmental interest.

Nevertheless, the EEOC has failed to show that application of the burden on the Funeral Home, under these facts, is the least restrictive means of protecting employees from gender stereotyping.  If a least restrictive means is available to achieve the goal, the government must use it.  This requires the government to show a degree of situational flexibility, creativity, and accommodation when putative interests clash with religious exercise.  It has failed to do so here.  The EEOC's briefs do not contain any indication that the EEOC has explored the possibility of any accommodations or less restrictive means that might work under these facts.  Perhaps that is

3

because it has been proceeding as if gender identity or transgender status are protected classes under Title VII, taking the approach that the only acceptable solution would be for the Funeral Home to allow Stephens to wear a skirt-suit at work, in order to express Stephens's female gender identity.

In *Price Waterhouse*, the Supreme Court recognized that the intent behind Title VII's inclusion of sex as a protected class expressed "Congress' intent to forbid employers to take gender into account" in the employment context. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989). That is, the goal of the sex-stereotyping theory of sex discrimination is that "gender" "be *irrelevant*" with respect to the terms and conditions of employment and to employment decisions. *Id.* (emphasis added).

The EEOC claims the Funeral Home fired Stephens for failing to conform to the masculine gender stereotypes expected as to work clothing and that Stephens has a Title VII right *not to be subject to gender stereotypes* in the workplace. Yet the EEOC has not challenged the Funeral Home's sex-specific dress code, that requires female employees to wear a skirt-suit and requires males to wear a pants-suit with a neck tie. Rather, the EEOC takes the position that Stephens has a Title VII right to "dress as a woman" (*ie.*, dress in a stereotypical feminine manner) while working at the Funeral Home, in order to express Stephens's gender identity. If the compelling interest is truly in eliminating gender stereotypes, the Court fails to see why the EEOC couldn't propose a gender-neutral dress code as a reasonable accommodation that would be a *less restrictive* means of furthering that goal under the facts presented here. But the EEOC has not even discussed such an option, maintaining that Stephens must be allowed to wear a skirt-suit in order to *express* Stephens's gender identity. If the compelling governmental interest

4

is truly in *removing or eliminating* gender stereotypes in the workplace in terms of clothing (*i.e.*, making gender "irrelevant"), the EEOC's chosen manner of enforcement in this action does not accomplish that goal.

This Court finds that the EEOC has not met its demanding burden. As a result, the Funeral Home is entitled to a RFRA exemption from Title VII, and the body of sex-stereotyping case law that has developed under it, under the facts and circumstances of this unique case.

As to the clothing allowance claim, the underlying EEOC administrative investigation uncovered possible unlawful discrimination of a kind not raised by the charging party and not affecting the charging party. As such, under the Sixth Circuit precedent, the proper procedure is for the filing of a charge by a member of the EEOC and for a full EEOC investigation of that new claim. Because the EEOC did not do that, it cannot proceed with that claim in this action. The clothing allowance claim shall be dismissed without prejudice.

## BACKGROUND

The EEOC filed this action on September 25, 2014. The First Amended Complaint is the operative complaint. The EEOC asserts two different Title VII claims against the Funeral Home. First, it asserts that the Funeral Home violated Title VII by terminating Stephens because of sex. That is, the EEOC alleges that the Funeral Home's "decision to fire Stephens was motivated by sex-based considerations. Specifically, [the Funeral Home] fired Stephens because Stephens is transgender, because of Stephens's transition from male to female, and/or because Stephens did not conform to [the Funeral Home's] sex- or gender-based preferences, expectations, or stereotypes." (Am. Compl. at ¶ 15). Second, the EEOC alleges that the Funeral Home violated Title VII "by providing a clothing allowance / work clothes to male employees but failing to

5

provide such assistance to female employees because of sex." (*Id.* at ¶ 17).

Following the close of discovery, each party filed its own motion for summary judgment. This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The Counter-Statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(D.E. No. 19 at 2-3).

In compliance with this Court's guidelines, in support of its motion, the EEOC filed a "Statement of Material Facts Not In Dispute" (D.E. No. 52) ("Pl.'s Stmt. A").  In response to that submission, the Funeral Home filed a "Counter-Statement of Disputed Facts" (D.E. No. 61) ("Def's Stmt. A").  In support of its motion, the Funeral Home filed a "Statement of Material Facts Not In Dispute" (D.E. No. 55) (Def.'s Stmt. B").   In response, the EEOC filed a Counter-Statement of Disputed Facts" (D.E. No. 64) ("Pl.'s Stmt. B").

Notably, neither party believes that there are any genuine issues of material fact for trial regarding liability.  (*See* D.E. 64 at Pg ID 2087, "The Commission does not believe there are any

6

genuine issues of material fact regarding liability for trial;" D.E. No. 61 at Pg ID 1841, "[the

Funeral Home] avers that none of the facts in dispute is material to the legal claims at issue.").

The following relevant facts are undisputed.

**The Funeral Home and Its Ownership**

The Funeral Home has been in business since 1910.  The Funeral Home is a closely-held,

for-profit corporation owned and operated by Thomas Rost ("Rost").  (Stmts. B at ¶ 1).  Rost

owns 94.5 % of the shares of the Funeral Home.  (Stmts. A at ¶ 19).  The remaining shares are

owned by his children.  (Stmts. B at ¶ 8).  Rost's grandmother was a funeral director for the

business up until 1950. (Rost Aff. at ¶ 52).  Rost has been the owner of the Funeral Home for

over thirty years.  Rost has been the President of the Funeral Home for thirty-five years and is the

sole officer of the corporation.  (Stmts. B at ¶¶ 9-10).  The Funeral Home has three locations in

Michigan: Detroit, Livonia, and Garden City.

The Funeral Home is not affiliated with or part of any church and its articles of

incorporation do not avow any religious purpose.  (Stmts. A at ¶¶ 25-26).  Its employees are not

required to hold any religious views.  (*Id*. at ¶ 27).  The Funeral Home serves clients of every

religion (various Christian denominations, Hindu, Muslim, Jewish, native Chinese religions) or

none at all.  (Stmts. A at ¶ 30).  It employs people from different religious denominations, and of

no religious beliefs at all.  (*Id*. at ¶ 37).

**The Funeral Home's Dress Code**

Both parties attached the Funeral Home's written Employee Manual as an exhibit to the

pending motions.  It contains the following regarding dress code:

DRESS CODE

September 1998

For all Staff:

To create and maintain our reputation as "Detroit's Finest", it is fundamentally important and imperative that every member of our staff shall always be distinctively attired and impeccably groomed, whenever they are contacting the public as representatives of The Harris Funeral Home. Special attention should be given to the following consideration, on all funerals, all viewings, all calls, or on any other funeral work.

MEN

SUITS        BLACK GRAY, OR DARK BLUE ONLY (as selected) with conservative styling. Coats should be buttoned at all times. Fasten only the middle button on a three button coat.

If vests are worn, they should match the suit. Sweaters are not acceptable as a vest. NOTHING should be carried in the breast pocket except glasses which are not in a case.

SHIRTS        WHITE OR WHITE ON WHITE ONLY, with regular medium length collars. (Button-down style collars are NOT acceptable). Shirts should always be clean. Collars must be neat.

TIES        As selected by company, or very similar.

SOCKS        PLAIN BLACK OR DARK BLUE SOCKS.

SHOES        BLACK OR DARK BLUE ONLY. (Sport styles, high tops or suede shoes are not acceptable). Shoes should always be well polished.

. . . .

PART TIME MEN - Should wear conservative, dark, business suits, avoiding light brown, light blue, light gray, or large patterns. All part time personnel should follow all details of dress as specified, as near as possible.

FUNERAL DIRECTORS ON DUTY – Are responsible for the appearance of the staff assisting them on services and are responsible for personnel on evening duty.

WOMEN

Because of the particular nature of our business, please dress conservatively.  A suit or a plain conservative dress would be appropriate, or as furnished by funeral home.  Avoid prints, bright colored materials and large flashy jewelry.  A sleeve is necessary, a below elbow sleeve is preferred.

Uniformity creates a good impression and good impressions are vitally important for both your own personal image and that of our Company.  Our visitors should always associate us with clean, neat and immaculately attired men and women.

(D.E. No. 54-20 at Pg ID 1486-87) (underlining and capitalization in original).

In addition, it is understood at the Funeral Home that men who interact with the public are required to wear a business suit (pants and jacket) with a neck tie, and women who interact with the public are generally[2] required to wear a business suit that consists of a skirt and business jacket.  (Stmts. B at 51; D.E. No. 54-11 at Pg ID 1423).

The Funeral Home administers its dress code based upon its employees' biological sex. (Stmts. B at ¶ 51).  Employees at the Funeral Home have been disciplined in the past for failing to abide by the dress code.  (Stmts. B at ¶ 60).

**Stephens's Employment And Subsequent Termination**

The Funeral Home hired Stephens in October of 2007.  At that time, Stephens's legal name was Anthony Stephens.  All of the Funeral Home's employment records pertaining to Stephens – including driver's license, tax records, and mortuary science license – identify Stephens as a male.  (Stmts. B at ¶ 63).

Stephens served as a funeral director/embalmer for the Funeral Home for nearly six years

---

[2]Rost testified that female employees at the Detroit location do not wear a skirt and jacket "all the time over there," and sometimes wear pants and a jacket.  (Rost Dep., D.E. No. 54-11 at Pg ID 1423).

9

under the name Anthony Stephens.  (Stmts. A at ¶¶ 1-2).

On July 31, 2013, Stephens provided the Funeral Home/Rost with a letter that stated, in

pertinent part:

> Dear Friends and Co-Workers:
>
> I have known many of you for some time now, and I count you all as my friends.
> What I must tell you is very difficult for me and is taking all the courage I can
> muster.  I am writing this both to inform you of a significant change in my life and
> to ask for your patience, understanding, and support, which I would treasure
> greatly.
>
> I have a gender identity disorder that I have struggled with my entire life.  I have
> managed to hide it very well all these years . . .
>
> . . . It is a birth defect that needs to be fixed. I have been in therapy for nearly four
> years now and have been diagnosed as a transexual.  I have felt imprisoned in my
> body that does not match my mind, and this has caused me great despair and
> loneliness.  With the support of my loving wife, I have decided to become the
> person that my mind already is.  I cannot begin to describe the shame and
> suffering that I have lived with. Toward that end, I intend to have sex
> reassignment surgery.  *The first step I must take is to live and work full-time as a*
> *woman for one year.  At the end of my vacation on August 26, 2013, I will return*
> *to work as my true self, Amiee Australia Stephens, in appropriate business attire*.
>
> I realize that some of you may have trouble understanding this . . . It is my wish
> that I can continue my work at R.G. & G. R. Harris Funeral Homes doing what I
> have always done, which is my best!

(D.E No. 53-22) (emphasis added).

It is undisputed that Stephens intended to abide by the Funeral Home's dress code for its

female employees – which would be to wear a skirt-suit.  (Stmts. A at ¶ 8; Stmts. B at ¶ 51; D.E.

No. 54-11 at Pg ID 1423; *see also* D.E. No. 51 at Pg ID 605, and First Am. Compl. at 4).

Stephens hand-delivered a copy of the letter to Rost.  (Rost Dep. at 110).  Rost made the

decision to fire Stephens by himself and did so on August 15, 2013.  (Stmts. A at ¶¶ 10, 12-13;

Rost Dep. at 117-18).  Rost privately fired Stephens in person.  (Stmts. A at ¶ 11).  Rost testified:

> Q.      Okay. How did you fire Stephens: how did you let Ms. Stephens know that
>          she was being released?
> A.      Well, I said to him, just before he was – it was right before he was going to
>          go on vacation and I just – I said – I just said "Anthony, this is not going to
>          work out.  And that your services would no longer be needed here."

(Rost Dep. at 126).  Stephens also testified that Rost said it was not going to work out.  (Stephens

Dep. at 80).  Stephens's understanding from that conversation was that "coming to work dressed

as a woman was not going to be acceptable."  (*Id.*).  It was a brief conversation and Stephens left

the facility.  (Rost Dep. at 127).

   After being terminated, Stephens met with an attorney and ultimately filed a charge of

discrimination with the EEOC.  (Stephens Dep. at 79-80; D.E. No. 54-22).  The EEOC charge

filed by Stephens checked the box for "sex" discrimination and indicated that the discrimination

took place from July 31, 2013 to August 15, 2013.  (D.E. No. 54-22 at Pg ID 1497).  The charge

stated "the particulars" of the claimed sex discrimination as follows:

> I began working for the above-named employer on 01 October 2007; I was last
> employed as a Funeral Director/Embalmer.
>
> On or about 31 July 2013, I notified management that I would be undergoing
> gender transitioning and that on 26 August 2013, I would return to work as my
> true self, a female.  On 15 August 2013, my employment was terminated.  The
> only explanation I was given was that management did not believe the public
> would be accepting of my transition.  Moreover, during my entire employment I
> know there are no other female Funeral Directors/Embalmers.
>
> I can only conclude that I have been discharged due to my sex and gender identity,
> female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id.*).

**Administrative EEOC Proceedings**

During the EEOC administrative proceedings, the Funeral Home filed a response to the

Charge of Discrimination that stated, among other things, that it has a written dress code policy

and that Stephens was terminated because Stephens refused to comply with that dress code.

(D.E. No. 63-16).

During the administrative investigation, the EEOC discovered that male employees at the

Funeral Home were provided with work clothing and that female employees were not.  (D.E. No.

63-3, March 2014 Onsite Memo).

On June 5, 2014, the EEOC issued its "Determination."  (D.E. No. 63-4).  It stated, in

pertinent part:

> The Charging Party alleged that she was discharged due to her sex and gender
> identity, female, in violation of Title VII of the Civil Rights Act of 1964, as
> amended.
>
> Evidence gathered during the course of the investigation reveals that there is
> reasonable cause to believe that the Charging Party's allegations are true.
>
> Like and related and growing out of this investigation, the Commission found
> probable cause to believe that the Respondent discriminated against its female
> employees by providing male employees with a clothing benefit which was denied
> to females, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(D.E. No. 63-4).

**Complaint, Amended Complaint, and Affirmative Defenses**

The EEOC filed this civil action against the Funeral Home on September 25, 2014,

asserting its two claims.

As its first responsive pleading, the Funeral Home filed a Motion to Dismiss seeking

dismissal of the wrongful termination claim.  This Court denied that motion, ruling that the

EEOC's complaint stated a claim on behalf of Stephens for sex-stereotyping sex-discrimination under binding Sixth Circuit authority.  (*See* 4/23/15 Opinion, D.E. No. 13).  This Court rejected, however, the EEOC's position that its complaint stated a Title VII claim on behalf of Stephens by virtue of alleging that the Funeral Home fired Stephens because of transgender status or gender identity.  (*See* D.E. No. 13 at Pg ID 188) (noting that "like sexual orientation, transgender or transsexual status is currently not a protected class under Title VII.").

On April 29, 2015, the Funeral Home filed its Answer and Affirmative Defenses.  (D.E. No. 14).

On May 15, 2015, the EEOC sought to file a First Amended Complaint, in order to correct the spelling of Stephens's first name.  That First Amended Complaint, that contains the same two claims, was filed on June 1, 2015. (D.E. No. 21).[3]

On June 4, 2015, the Funeral Home filed its Answer and Affirmative Defenses to the EEOC's First Amended Complaint, (D.E. No. 22).  In it, the Funeral Home included additional affirmative defenses, including: 1) "The EEOC's claims violate the Funeral Home's right to free exercise of religion under the First Amendment to the United States Constitution;" and 2) "The EEOC's claims violate the Funeral Home's rights under the federal Religious Freedom Restoration Act (RFRA)."  (*Id*. at Pg ID 254).

_____

[3]Although this Court rejected the EEOC's position that it could pursue a Title VII claim based on transgender status or gender identity, the EEOC kept those allegations in the First Amended Complaint because it wished to preserve its right to appeal this Court's ruling.  (*See* D.E. No. 37 at Pg ID 462-63).

13

**Relevant Discovery In This Action**

        **a.**      **Termination Decision**

Again, Rost made the decision to terminate Stephens.  (Stmts. A at ¶¶ 12-13).  It is

undisputed that job performance did not motivate Rost's decision to terminate Stephens.  (Stmts.

A at ¶ 16).  During his deposition in this action, Rost testified:

> Q.      Okay.  Why did you – *what was the specific reason that you terminated Stephens?*
> A.      *Well, because he – he was no longer going to represent himself as a man. He wanted to dress as a woman.*
> Q.      Okay.  So he presented you this letter . . .
> A.      Number 7, yes.
> Q.      Yeah, Exhibit 7.  So just for a little background and pursuant to the question of Mr. Price, you were presented that letter from Stephens?
> A.      Correct.
> Q.      Okay.  And did anywhere in that letter indicate that Stephens would continue to dress under your dress code as a man in the workplace?
> A.      No.
> Q.      Did he ever tell you during your meeting when he handed you that letter that he would continue to dress as a man?
> A.      No.
> Q.      *Did he indicate that he would dress as a woman?*
> A.      *Yes. Yes.*
> Q.      Okay.  *Is it – the reason you fired him*, was it because he claimed that he was really a woman; is that why you fired him or was it because he claimed – or that he would no longer dress as a man?
> A.      *That he would no longer dress as a man.*
> Q.      And why was that a problem?
> A.      Well, because we – *we have a dress code that is very specific that men will dress as men*; *in appropriate manner, in a suit and tie* that we provide and that women will conform to their dress code that we specify.
> Q.      So hypothetically speaking, if Stephens had told you that he believed that he was a woman, but would only present as a woman outside of work, would you have terminated him?
> A.      No.

(Rost Dep. at 135-37) (emphasis added).

14

### b.      Rost's Religious Beliefs

Rost also testified that the Funeral Home's dress code comports with his religious views. (Stmts. A at ¶ 18).

Rost has been a Christian for over sixty-five years. (Stmts. B at ¶ 17). He attends both Highland Park Baptist Church and Oak Pointe Church. For a time, Rost was on the deacon board of Highland Park Baptist Church. Rost is on the board of the Detroit Salvation Army, a Christian nonprofit ministry, and has been for 15 years; he was the former Chair of the advisory board. (Smts. B at ¶¶ 18-19).

The Funeral Home's mission statement is published on its website, which reads "R.G. & G.R. Harris Funeral Homes recognize that its highest priority is to honor God in all that we do as a company and as individuals. With respect, dignity, and personal attention, our team of caring professionals strive to exceed expectations, offering options and assistance designed to facilitate healing and wholeness in serving the personal needs of family and friends as they experience a loss of life." (Smts. B at ¶ 21). The website also contains a Scripture verse at the bottom of the mission statement page:

> "But seek first his kingdom and righteousness, and all these things shall be yours as well."

> Matthew 5:33

(Stmts. B at ¶ 22 ; D.E. No. 54-16).

In operating the business, Rost places, throughout the funeral homes, Christian devotional booklets called "Our Daily Bread" and small cards with Bible verses on them called "Jesus Cards." (Stmts. B at ¶ 23).

15

Rost sincerely believes that God has called him to serve grieving people.  He sincerely believes that his "purpose in life is to minister to the grieving, and his religious faith compels him to do that important work."  (Stmts. B. at ¶ 31).  It is also undisputed that Rost sincerely believes that the "Bible teaches that a person's sex (whether male or female) is an immutable God-given gift and that it is wrong for a person to deny his or her God-given sex."  (Stmt. B at ¶ 28).

In support of the Funeral Home's motion, Rost submitted an affidavit.  (D.E. No. 54-2). Rost operates the Funeral Home "as a ministry to serve grieving families while they endure some of the most difficult and trying times in their lives."  (*Id*. at ¶ 7).

At the Funeral Home, the funeral directors are the most "prominent public representatives" of the business and are "the face that [the Funeral Home] presents to the world." (*Id*. at ¶ 32).  The Funeral Home "administers its dress code based on our employees' biological sex, not based on their subjective gender identity."  (*Id*. at ¶ 35).

Rost believes "that the Bible teaches that God creates people male or female."  (*Id*. at ¶ 41).  He believes that "the Bible teaches that a person's sex is an immutable God-given gift and that people should not deny or attempt to change their sex." (*Id*. at ¶ 42).  Rost believes that he "would be violating God's commands if [he] were to permit one of the [Funeral Home's] funeral directors to deny their sex while acting as a representative of [the Funeral Home].  This would violate God's commands because, among other reasons, [he] would be directly involved in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift."  (*Id*. at ¶ 43).  Rost believes that "the Bible teaches that it is wrong for a biological male to deny his sex by dressing as a woman." (*Id*. at ¶ 44).  Rost believes that he "would be violating

16

God's commands" if he were to permit one of the Funeral Home's male funeral directors to wear the skirt-suit uniform for female directors while at work because Rost "would be directly involved in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift." (*Id*. at ¶ 45). If Rost "were forced as the owner of [the Funeral Home] to violate [his] sincerely held religious beliefs by paying for or otherwise permitting one of [his] employees to dress inconsistent with his or her biological sex, [Rost] would feel significant pressure to sell [the] business and give up [his] life's calling of ministering to grieving people as a funeral home director and owner." (*Id*. at ¶ 48).

Rost's Affidavit also states that he "would not have dismissed Stephens if Stephens had expressed [to Rost] a belief that he is a woman and an intent to dress or otherwise present as a woman outside of work, so long as he would have continued to conform to the dress code for male funeral directors while at work. It was Stephens's refusal to wear the prescribed uniform and intent to violate the dress code while at work that was the decisive consideration in [his] employment decision." (*Id*. at ¶ 50). Rost "would not discharge or otherwise discipline employees who dress as members of the opposite sex on their own time but comply with the dress code while on the job." (*Id*. at ¶ 51).

### c.    Clothing Benefits

The Funeral Home provides its male employees who interact with clients, including funeral directors, with suits and ties free of charge. (Stmts. A at ¶ 42). Upon hire, full-time male employees who interact with the public are provided two suits and two ties, while part-time male employees who interact with the public are provided one suit and tie. (Stmts. A at ¶ 47). After those initial suits are provided, the Funeral Home replaces them as needed. (*Id*. at ¶ 48). The

17

Funeral Home spends about $225 per suit and $10 per tie.  (*Id.* at ¶ 52).

It is undisputed that benefits were not always provided to female employees. Starting in October of 2014, however, the Funeral Home began providing female employees who interact with the public with an annual clothing stipend that ranged from $75.00 for part-time employees to $150.00 for full-time employees.  (*See* Stmts. A at ¶ 54; Rost Dep. at 15-16).

In addition, the Funeral Home affirmatively states that it will offer the same type of clothing allowance that it provides to male funeral directors to any female funeral directors in the future:  the Funeral Home "will provide female funeral directors with skirt suits in the same manner that it provides pant suits to male funeral directors."  (Rost Aff. at ¶ 54).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Under Title VII, it is an "unlawful employment practice" for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of such individual's sex. 42 U.S.C. § 2000e-2(a).  "We take these words to mean that *gender must be irrelevant* to employment decisions."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989) (emphasis added).

Here, the EEOC asserts that the Funeral Home violated Title VII in two ways.

**I.      Title VII Wrongful Termination Claim On Behalf Of Stephens**

The EEOC alleges that Stephens was terminated in violation of Title VII under a *Price Waterhouse* sex-stereotyping theory of sex discrimination.  That is, the EEOC alleges that the Funeral Home violated Title VII by firing Stephens because Stephens did not conform to the Funeral Home's sex/gender based stereotypes as to work clothing.[4]

This Court previously denied a Motion to Dismiss filed by the Funeral Home and ruled that the EEOC's complaint stated a *Price Waterhouse* sex/gender-stereotyping claim under Title VII.  (*See* D.E. No. 13).  That ruling was based on several Sixth Circuit cases that establish that a transgender person – just like anyone else – can bring such a claim under Title VII.  *See Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004) ("Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity.")*; Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005); *Myers v. Cuyahoga County, Ohio*, 182 F. App'x 510, 2006 WL 1479081 (6th Cir. 2006).

The Court includes here some aspects of those decisions that bear on the positions advanced by the parties in the pending motions.  First, the Sixth Circuit has gone a bit further than other courts in terms of the reach of a sex-stereotyping claim after *Price Waterhouse* and

---

[4]Notably, the parties have confined their claims, defenses, and analysis to *clothing alone*. In addition, unlike many sex-stereotyping cases, this case does not involve any allegations that the Funeral Home discriminated against Stephens based upon any gender-nonconforming *behaviors*.

spoke of discrimination against men who wear dresses:

> After *Price Waterhouse*, an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex. It follows that employers who discriminate against men because they *do* wear dresses[5] and makeup, or otherwise act femininely, are also engaging in sex discrimination, because the discrimination would not occur but for the victim's sex.

*Smith*, 378 F.3d at 574 (emphasis in original).  Second, the cases indicate that Title VII sex-stereotyping claims follow the same analytical framework followed in other Title VII cases, including the *McDonnell Douglas* burden-shifting paradigm.  *See e.g., Myers*, 182 F. App'x at 519.

It is well-established that, at the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to proceed with a Title VII claim.  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009); *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

The EEOC's Motion for Summary Judgment asserts that, based on Rost's testimony, it has direct evidence that the Funeral Home fired Stephens based on sex stereotypes and it is therefore entitled to summary judgment.  That appears to be a solid argument, as the "ultimate question" as to the Title VII sex-stereotyping claim is whether the Funeral Home fired Stephens "because of [Stephens's] failure to conform to sex stereotypes," *Barnes*, 401 F.3d at 738, and Rost testified:

> Q.   Okay.  Why did you – *what was the specific reason that you terminated Stephens?*
> A.   *Well, because he – he was no longer going to represent himself as a man.*

---

[5]Neither *Smith* nor *Barnes* appeared to involve a person who was born male wearing a dress in the workplace. *See, e.g., Barnes*, 401 F.3d at 738 (noting the plaintiff had a "practice of dressing as a woman outside of work.").

20

> *He wanted to dress as a woman.*
>
> **. . . .**
>
> Q.   *Did he indicate that he would dress as a woman?*
> A.   *Yes. Yes.*
> Q.   Okay.  *Is it – the reason you fired him*, was it because he claimed that he was really a woman; is that why you fired him or was it because he claimed – or that he would no longer dress as a man?
> A.   *That he would no longer dress as a man.*
> Q.   And why was that a problem?
> A.   Well, because we – *we have a dress code that is very specific that men will dress as men*; *in appropriate manner*, in a suit and tie that we provide and that women will conform to their dress code that we specify.
> Q.   So hypothetically speaking, if Stephens had told you that he believed that he was a woman, but would only present as a woman outside of work, would you have terminated him?
> A.   No.

(Rost Dep. at 135-37) (emphasis added).  Thus, while this Court does not often see cases where there is direct evidence to support a claim of employment discrimination, it appears to exist here.

The Funeral Home asserts that the EEOC's motion should be denied, and that summary judgment should be entered in its favor, based upon two defenses.  First, it asserts that its enforcement of its sex-specific dress code does not constitute impermissible sex stereotyping under Title VII.  Second, the Funeral Home asserts that RFRA prohibits the EEOC from applying Title VII to force the Funeral Home to violate its sincerely held religious beliefs.[6]

### A.   The Court Rejects The Funeral Home's Sex-Specific Dress-Code Defense.

The Funeral Home argues that its enforcement of its sex-specific dress code cannot constitute impermissible sex stereotyping under Title VII.  It asserts that several courts have

---

[6]The EEOC's Motion, and the ACLU's brief, both address a First Amendment Free Exercise defense by the Funeral Home.  (*See, e.g.*, EEOC's motion at 13).  The Funeral Home, however, did not respond to the arguments concerning that defense because it believes that RFRA provides it more expansive protection.  (*See* D.E. No. 60 at Pg ID 1797, n.4).

concluded that sex-specific dress codes and grooming policies that impose equal burdens on men and women do not violate Title VII. The Funeral Home essentially asks the Court to rule that its sex-specific dress code operates as a defense to the wrongful termination claim because the Funeral Home's dress code does not impose an unequal burden on male and female employees. The Funeral Home relies primarily on two cases to support its position: 1) *Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104 (9th Cir. 2006) (*en banc*); and 2) *Barker v. Taft Broadcasting Co.*, 549 F.2d 400 (6th Cir. 1977).

As explained below, the Court concludes that this defense must be rejected because: 1) the sex-specific dress code cases that the Funeral Home relies on involved claims that challenged an employer's dress code as violative of Title VII, and this case involves no such claim; 2) the Funeral Home's argument is based upon a non-binding decision of the Ninth Circuit; 3) the Ninth Circuit decision is divided and the dissent is more in line with the views expressed by the Sixth Circuit as to *post-Price Waterhouse* sex-stereotyping claims; and 4) the only Sixth Circuit case on dress codes cited by the Funeral Home is from 1977 – a decade before *Price Waterhouse* was decided.

Unlike the cases that the Funeral Home relies on, as the EEOC and ACLU both note, the EEOC has not asserted any claims in this action based upon the Funeral Home's dress code policy. That is, the Funeral Home's sex-specific dress code policy *has not* been challenged by the EEOC in this action. Rather, the dress code is only being injected because the Funeral Home is using its dress code as a *defense* to the Title VII sex-stereotyping claim asserted on behalf of Stephens. Indeed, the Funeral Home listed this as an affirmative defense:

> The EEOC's claims are barred by virtue of the fact that the Funeral Home was

22

legally justified in any and all acts of which the EEOC complains, including but
not limited to the Funeral Home's right to impose sex-specific dress codes on its
employees.

(D.E. No. 14 at Pg ID 202).

The primary case the Funeral Home relies on is *Jespersen*. In that case, the Ninth Circuit

issued an *en banc* decision in order to clarify its "circuit law concerning appearance and

grooming standards, and to clarify [its] evolving law of sex stereotyping claims." *Jespersen*, 444

F.3d at 1105. In that case, the plaintiff was a female bartender who was terminated from her

position after she refused to follow the company's "Personal Best" policy, which required female

employees to wear specified make-up[7] and prohibited male employees from wearing any

makeup. The plaintiff alleged that the policy discriminated against women by: 1) subjecting

them to terms and conditions of employment to which men are not similarly subjected; and 2)

requiring that women conform to sex-based stereotypes as a term and condition of employment.

The majority affirmed the district court's dismissal of the plaintiff's claims. In doing so,

the majority stated:

> We agree with the district court and the panel majority that on this record,
> Jespersen has failed to present evidence sufficient to survive summary judgment
> on her claim that the policy imposes an unequal burden on women. With respect
> to sex stereotyping, *we hold that appearance standards,* including makeup
> requirements*, may well be the subject of a Title VII claim for sexual stereotyping*,
> but that on this record Jespersen has failed to create any triable issue of fact that
> the challenged policy was part of a policy motivated by sex stereotyping. We
> therefore affirm.

*Id.* at 1106 (emphasis added). Even though the majority affirmed the district court, it emphasized

that it was "not preclud[ing], as a matter of law, a claim of sex-stereotyping on the basis of dress

---

[7]Face powder, blush, mascara, and lip color.

23

or appearance codes. Others may well be filed, and any bases for such claims refined as law in this area evolves." *Id*. at 1113.

Moreover, the dissent lays out a cogent explanation as to why the plaintiff in that case had a sex-stereotyping claim under *Price Waterhouse*:

> I agree with the majority that appearance standards and grooming policies may be subject to Title VII claims. . . I part ways with the majority, however, inasmuch as I believe that the "Personal Best" program was part of a policy motivated by sex stereotyping and that Jespersen's termination for failing to comply with the program's requirements was "because of" her sex. Accordingly, I dissent from Part III of the majority opinion and from the judgment of the court.
>
> Jespersen's evidence showed that Harrah's fired her because she did not comply with a grooming policy that imposed a facial uniform (full makeup) on only female bartenders. Harrah's stringent "Personal Best" policy required female beverage servers to wear foundation, blush, mascara, and lip color, and to ensure that lip color was on at all times. Jespersen and her female colleagues were required to meet with professional image consultants who in turn created a facial template for each woman. Jespersen was required not simply to wear makeup; in addition, the consultants dictated where and how the makeup had to be applied. Quite simply, her termination for failing to comply with a grooming policy that imposed a facial uniform on only female bartenders is discrimination "because of" sex. Such discrimination is clearly and unambiguously impermissible under Title VII, which requires that "gender must be irrelevant to employment decisions." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) (emphasis added).

*Jespersen*, 444 F.3d at 1113-14. The dissent noted that "*Price Waterhouse* recognizes that gender discrimination may manifest itself in stereotypical notions as to how women should dress and present themselves" and cited the Sixth Circuit's decision in *Smith*, wherein it had stated "[a]fter *Price Waterhouse*, an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex." *Jespersen*, 444 F.3d at 1115 (quoting *Smith, supra*). The dissent further stated, "I believe that the fact that Harrah's designed and promoted a policy

24

that required women to conform to a sex stereotype by wearing full makeup is sufficient 'direct evidence' of discrimination." *Id*. The dissent concluded that the plaintiff presented a "classic case" of *Price Waterhouse* discrimination. *Id.* at 1116.

The Funeral Home has not directed the Court to any cases wherein the Sixth Circuit has endorsed the majority view in *Jespersen*. And the only Sixth Circuit dress-code case that it cites is from 1977 – a decade before *Price Waterhouse* was decided.

In pre-*Price Waterhouse* decisions, dating back to the 1970's, other circuits have held that employer personal appearance codes with differing requirements for men and women do not violate Title VII as long as there is "some justification in commonly accepted social norms and are reasonably related to the employer's business needs." *Carroll v. Talman Fed. Savings & Loan*, 604 F.2d 1028, 1032 (7th Cir. 1979); *see also Fountain v. Safeway Stores, Inc*., 555 F.2d 753, 755 (9th Cir. 1977) ("regulations promulgated by employers which require male employees to conform to different grooming and dress standards than female employees is not sex discrimination within the meaning of Title VII."). In *Barker v. Taft Broadcasting, Co.,* 549 F.2d 400 (6th Cir. 1977), a majority of a Sixth Circuit panel expressed a similar view, ruling that an employer's grooming code that required a shorter hair length for men than women did not violate Title VII, while the dissent concluded that a Title VII claim was stated.

But the Sixth Circuit has not provided any post-*Price Waterhouse* guidance as to whether sex-specific dress codes, that have slightly differing clothing requirements for men and women, either violate Title VII or provide a defense to a sex stereotyping claim. This evolving area of the law – how to reconcile this previous line of authority regarding sex-specific dress/grooming codes with the more recent sex/gender-stereotyping theory of sex discrimination under Title VII

25

– has not been addressed by the Sixth Circuit.

Lacking such guidance, this Court finds that the dissent in *Jespersen* appears more in line with the post-*Price Waterhouse* views that *have been* expressed by the Sixth Circuit. This is illustrated by a comparison of the majority's ruling in *Jespersen* to the portion of the Sixth Circuit's decision in *Smith* that was quoted by the dissent in *Jespersen:*

| | |
|---|---|
| The majority in *Jespersen* upheld the dismissal of a sex discrimination claim where the female plaintiff was terminated for not complying with a policy that required women (but not men) to wear makeup. | "After *Price Waterhouse*, an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex." *Smith, supra*, at 1115. |

It appears unlikely that the *Smith* court would allow an employer like the employer in *Jespersen* to avoid liability for a Title VII sex-stereotyping claim simply by virtue of having put its gender-based stereotypes into a formal policy.

Accordingly, for all of these reasons, the Court rejects the Funeral Home's sex-specific dress code defense to the Title VII sex-stereotyping claim asserted on behalf of Stephens in this case.

### B.     The Funeral Home Is Entitled To A RFRA Exemption Under The Unique Facts And Circumstances Presented Here.

The Funeral Home also argues that the Religious Freedom Restoration Act of 1993 ("RFRA") prohibits the EEOC from applying Title VII to force the Funeral Home to violate its sincerely held religious beliefs. It asserts this defense on the heels of the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014).

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious

liberty. RFRA's enactment came three years after" the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990), "which largely repudiated the method of analyzing free-exercise claims that had been used" in cases such as *Sherbert v. Verner* and *Wisconsin v. Yoder. Hobby Lobby*, 134 S.Ct. 2760. In short, in *Smith*, the Supreme Court rejected the previous balancing test set forth in *Sherbert* and "held that, under the First Amendment, 'neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.'" *Id.*

"Congress responded to *Smith* by enacting RFRA." *Hobby Lobby*, 134 S.Ct. at 2761. "RFRA prohibits the "Government [from] substantially burden[ing] a *person's* exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), (b) (emphasis added). The majority in *Hobby Lobby* further held:

> "[L]aws [that are] 'neutral' toward religion," Congress found, "may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. § 2000bb(a)(2); *see also* § 2000bb(a)(4). In order to ensure broad protection for religious liberty, RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." § 2000bb–1(a). If the Government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b).

*Id.* at 2761.

One of the stated purposes of RFRA is to provide a "defense to persons whose religious

exercise is substantially burdened by the government."  42 U.S.C. § 2000bb(b)(2).  RFRA

provides that "[a] person whose religious exercise has been burdened in violation of this section

may assert that violation as a claim or *defense in a judicial proceeding*." 42 U.S.C. § 2000bb-1(c)

(emphasis added).

By its terms, RFRA "applies to *all Federal law*, and the implementation of that law,

whether statutory or otherwise, and whether adopted before or after November 16, 1993."  42

U.S.C. § 2000bb-3(a) (emphasis added).

> ### 1. The Funeral Home Is Entitled To Protection Under RFRA And RFRA Applies To The EEOC, A Federal Agency.

The majority in *Hobby Lobby* concluded that a for-profit corporation is considered a

"person" for purposes of RFRA protection.  *Hobby Lobby*, 134 S.Ct. at 2768-69.  The Funeral

Home, a for-profit, closely-held corporation, is therefore entitled to protection under RFRA.

RFRA applies to the "government," which is defined to include "a branch, department,

*agency*, instrumentality, and official (or other person acting under color of law) of the United

States." 42 U.S.C. § 2000bb–2(1) (emphasis added).  On its face, the statute applies to the

EEOC, a federal agency, and the EEOC has not argued otherwise.

> ### 2. The Funeral Home Has Met Its Initial Burden Of Establishing That Compliance With Title VII "Substantially Burdens" Its Exercise Of Religion.

If RFRA applies in this case, then the Court "must next ask" whether the law at issue

"substantially burdens" the Funeral Home's exercise of religion.  *Hobby Lobby*, 134 S.Ct. at

2775.  "Whether a government action substantially burdens a plaintiff's religious exercise is a

question of law for a court to decide."  *Singh v. McHugh*, __ F. Supp.3d __, 2016 WL 2770874 at

*5 (D.C. Cir. 2016).

As the challenging party, the Funeral Home has the initial burden of showing a substantial burden on its exercise of religion.  For purposes of RFRA, "exercise of religion" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious beliefs." *Hobby Lobby*, 134 S.Ct. at 2762.

Moreover, the majority in *Hobby Lobby* explained that the "question that RFRA presents" is whether the law at issue "imposes a substantial burden on the *ability of the objecting parties to conduct business in accordance with their religious beliefs*."[8]  *Hobby Lobby*, 134 S.Ct. at 2778 (emphasis in original).  Thus, the question becomes whether the law at issue here, Title VII and the body of sex-stereotyping case law that has developed under it, imposes a substantial burden on the ability of the Funeral Home to conduct business in accordance with its religious beliefs. The Court concludes that the Funeral Home has shown that it does.

Rost has been a Christian for over sixty-five years.  The Funeral Home's mission statement is published on its website, which reads "R.G. & G.R. Harris Funeral Homes recognize that its highest priority is to honor God in all that we do as a company and as individuals.  With respect, dignity, and personal attention, our team of caring professionals strive to exceed expectations, offering options and assistance designed to facilitate healing and wholeness in serving the personal needs of family and friends as they experience a loss of life."  (Smts. B at ¶ 21).

---

[8]The EEOC's brief asserts that RFRA protects only specific religious activities, not beliefs, and that the Funeral Home is still able to engage in its limited religious activities, like the placing of devotional cards in the funeral homes.  The EEOC's limited view is not supported by the majority opinion in *Hobby Lobby*.

29

Rost believes that God has called him to serve grieving people and that his purpose in life is to minister to the grieving, and his religious faith compels him to do that important work. (Stmts. B. at ¶ 31).  Rost believes that the "Bible teaches that a person's sex (whether male or female) is an immutable God-given gift and that it is wrong for a person to deny his or her God-given sex."  (Stmt. B at ¶ 28).

The EEOC attempts to cast the Funeral Home as asserting that it would only be substantially burdened if it were required to provide female work clothing to Stephens.  (D.E. 63 at Pg ID 1935).  The Funeral Home's position is not so limited.

Rost believes "that the Bible teaches that God creates people male or female."  (*Id*. at ¶ 41).  He believes that "the Bible teaches that a person's sex is an immutable God-given gift and that people should not deny or attempt to change their sex." (*Id*. at ¶ 42).  Rost believes that he "would be violating God's commands" if he were to permit one of the Funeral Home's funeral directors "to deny their sex while acting as a representative of [the Funeral Home].  This would violate God's commands because, among other reasons, [Rost] would be directly involved in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift."  (*Id*. at ¶ 43).  Rost believes that "the Bible teaches that it is wrong for a biological male to deny his sex by dressing as a woman." (*Id*. at ¶ 44).  Rost believes that he "would be violating God's commands" if he were to permit one of the Funeral Home's biologically-male-born funeral directors to wear the skirt-suit uniform for female directors while at work, because Rost "would be directly involved in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift."  (*Id*. at ¶ 45).

Such beliefs implicate questions of religion and moral philosophy.  *Hobby Lobby*, 134

30

S.Ct. at 2779.  Rost sincerely believes that it would be violating God's commands if he were to permit an employee who was born a biological male to dress in a traditionally female skirt-suit at the funeral home because doing so would support the idea that sex is a changeable social construct rather than an immutable God-given gift.  The Supreme Court has directed that it is not this Court's role to decide whether those "religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 134 S.Ct. at 2779.  Instead, this Court's "narrow function" is to determine if this is  "an honest  conviction" and, as in *Hobby Lobby*, there is no dispute that it is.

Notably, the EEOC concedes that the Funeral Home's religious beliefs are sincerely held. (*See* D.E. No. 51 at Pg ID 596 & 612, "The Commission does not contest Defendant's religious sincerity.").

The Court finds that the Funeral Home has shown that the burden is "substantial."  Rost has a sincere religious belief that it would be violating God's commands if he were to permit an employee who was born a biological male to dress in a traditionally female skirt-suit at one of his funeral homes because doing so would support the idea that sex is a changeable social construct rather than an immutable God-given gift.   Rost objects on religious grounds to: 1) being compelled to provide a skirt to an employee who was born a biological male; and 2) being compelled to allow an employee who was born a biological male to wear a skirt while working as a funeral director for his business.  To enforce Title VII (and the sex stereotyping body of case law that has developed under it) by requiring the Funeral Home to provide a skirt to and/or allow an employee born a biological male to wear a skirt at work would impose a substantial burden on the ability of Rost to conduct his business in accordance with his sincerely-held religious beliefs.

If Rost and the Funeral Home do not yield to Title VII and the body of sex stereotyping

31

case law under it, the economic consequences for the Funeral Home could be severe – having to pay back and front pay to Stephens in connection with this case.

Moreover, Rost testified that if he "were forced as the owner of [the Funeral Home] to violate [his] sincerely held religious beliefs by paying for or otherwise permitting one of [his] employees to dress inconsistent with his or her biological sex, [Rost] would feel significant pressure to sell [the] business and give up [his] life's calling of ministering to grieving people as a funeral home director and owner."  (Rost Aff. at ¶ 48).

The Court concludes that the Funeral Home has met its initial burden of showing that enforcement of Title VII, and the body of sex-stereotyping case law that has developed under it, would impose a substantial burden on the ability of the Funeral Home to conduct business in accordance with its sincerely-held religious beliefs.

       **3.**      **The Funeral Home Is Entitled To An Exemption Unless The EEOC Meets Its Demanding Two-Part Burden.**

Once a claimant demonstrates a substantial burden to his religious exercise, that person "is entitled to an exemption from" the law unless the Government can meet its burden of showing that application of the burden "to the person:" 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.  *Hobby Lobby,* 134 S.Ct. at 2761.

The Supreme Court has described the dual justificatory burdens imposed on the government by RFRA as "the most demanding test known to constitutional law."  *City of Boerne v. P.F. Flores*, 117 S.Ct. 2157, 2171 (1997).

32

a.      **The Court Assumes, Without Deciding, That The EEOC Has Met Its Compelling Governmental Interest Burden.**

The EEOC appears to take the position that RFRA can never succeed as a defense to a Title VII claim or that Title VII will always be presumed to serve a compelling governmental interest and be narrowly tailored for purposes of a RFRA analysis.  (*See* D.E. No. 63 at Pg ID 1899, asserting that RFRA "does not protect employers from the mandates of Title VII" and D.E. No. 51 at Pg ID 628, asserting that the majority in *Hobby Lobby* "*suggested* in a colloquy" with the principal dissent "that Title VII serves a compelling governmental interest which cannot be overridden by RFRA.") (emphasis added).

The majority did reference employment discrimination, in discounting the dissent's concern that the majority's ruling may lead to widespread discrimination cloaked in religion, stating:

> The principal dissent raises the possibility that discrimination in hiring, for example on the basis of race, might be cloaked as religious practice to escape legal sanction. *See post*, at 2804 – 2805. Our decision today provides no such shield. The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal.

*Hobby Lobby*, 134 S.Ct. at 2784.  This Court does not read that paragraph as indicating that a RFRA defense can never prevail as a defense to Title VII or that Title VII is exempt from the focused analysis set forth by the majority.  If that were the case, the majority would presumably have said so.  It did not.

Moreover, the majority stated "[t]he dissent worries about forcing the federal courts to apply RFRA to a host of claims made by litigants seeking a religious exemption from generally

33

applicable laws, and the dissent expresses a desire to keep the courts out of this business" but

noted that it was Congress that enacted RFRA and explained "[t]he wisdom of Congress's

judgment on this matter is not our concern.  Our responsibility is to enforce RFRA as written."

*Id*. at 2784-85.[9]

And the dissent surely does not read the majority opinion as exempting Title VII (or other

generally-applicable anti-discrimination laws) from a RFRA defense or the focused analysis set

forth in the majority opinion:

> Why should decisions of this order be made by Congress or the regulatory
> authority, and not this Court? Hobby Lobby and Conestoga surely do not stand
> alone as commercial enterprises seeking exemptions from generally applicable
> laws on the basis of their religious beliefs. *See, e.g., Newman v. Piggie Park
> Enterprises, Inc*., 256 F.Supp. 941, 945 (D.S.C. 1966) (owner of restaurant chain
> refused to serve black patrons based on his religious beliefs opposing racial
> integration), *aff'd in relevant part and rev'd in part on other grounds*, 377 F.2d
> 433 (C.A.4 1967), *aff'd and modified on other grounds*, 390 U.S. 400, 88 S.Ct.
> 964, 19 L.Ed.2d 1263 (1968); *In re Minnesota ex rel. McClure*, 370 N.W.2d 844,
> 847 (Minn.1985) (born-again Christians who owned closely held, for-profit health
> clubs believed that the Bible proscribed hiring or retaining an "individua[l] living
> with but not married to a person of the opposite sex," "a young, single woman
> working without her father's consent or a married woman working without her
> husband's consent," and any person "antagonistic to the Bible," including
> "fornicators and homosexuals" (internal quotation marks omitted)), *appeal
> dismissed*, 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986); *Elane
> Photography, LLC v. Willock*, 2013–NMSC–040, —— N.M. ——, 309 P.3d 53
> (for-profit photography business owned by a husband and wife refused to
> photograph a lesbian couple's commitment ceremony based on the religious
> beliefs of the company's owners), *cert. denied*, 572 U.S. ——, 134 S.Ct. 1787,
> 188 L.Ed.2d 757 (2014). Would RFRA require exemptions in cases of this ilk?
> And if not, how does the Court divine which religious beliefs are worthy of
> accommodation, and which are not? Isn't the Court disarmed from making such a
> judgment given its recognition that "courts must not presume to determine ... the
> plausibility of a religious claim"? *Ante,* at 2778.

*Id*. at 2804-05.

---

[9]The same is true of this Court.

Without any authority to indicate that Title VII is exempted from the analysis set forth in *Hobby Lobby*, this Court concludes that it must be applied here. *See also Holt v. Hobbs*, 135 S. Ct. 853, 858 (2015) (discussing, in a RLUIPA case, how the lower court believed it was somehow bound to defer to the Department of Correction's security policy as a compelling interest that is narrowly tailored and explaining that the statute "does not permit such *unquestioning deference*. RLUIPA, like RFRA, 'makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.'") (emphasis added).

The majority in *Hobby Lobby* instructed that when determining whether a challenged law serves a compelling interest, it is not sufficient to use "very broad terms," such as "promoting" "gender equality." *Hobby Lobby*, 134 S.Ct. at 2779. That is because "RFRA contemplates a '*more focused inquiry*: It 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' – the particular claimant whose sincere exercise of religion is being substantially burdened." *Id*. (citations omitted) (emphasis added). This is critical because it means the Government's showing must focus on justification of the particular person burdened – here, the Funeral Home. In other words, even if the Government can show that the law is in furtherance of a generalized or broad compelling interest, it must still demonstrate the compelling interest is satisfied through application of the law *to the Funeral Home under the facts of this case*.

The majority in *Hobby Lobby* held that this requires this Court to scrutinize "the asserted harm of granting specific exemptions to [the] particular religious claimant" and "look to the marginal interest in enforcing" the challenged law in this particular context. *Hobby Lobby*, 134

S.Ct. at 2779.  The majority in *Hobby Lobby*, however, assumed without deciding that the requisite "to the person" compelling interest existed.  Thus, it did not provide any real guidance for how to go about doing that.  As the principal dissent noted, the majority opinion provides "[n]ot much help" for "the lower courts bound by" it.  *Id*. at 2804.

Here, in response to the Funeral Home's motion, the EEOC very broadly asserts that "Congress's mandate to eliminate workplace discrimination" is the compelling governmental interest that warrants burdening the Funeral Home's exercise of religion.  (D.E. No. 63 at Pg ID 1934).  In the section of its own motion that deals with the government's burden, the EEOC more specifically asserts that Title VII's prohibitions against sex discrimination establish that the government has a compelling interest in protecting employees from gender stereotyping in the workplace.  (D.E. No. 51 at Pg ID 629).

The Court fails to see how the EEOC has met its requisite "to the person"-focused showing here.  But this Court is also at a loss for how this Court is supposed to scrutinize "the asserted harm of granting specific exemptions to [the] particular religious claimant" and "look to the marginal interest in enforcing" the challenged law in this particular context.  *Hobby Lobby*, 134 S.Ct. at 2779.  This Court will therefore assume without deciding that the EEOC has met its first burden and proceed to the least restrictive means burden.

> **b.   The EEOC Has Failed To Meet Its Burden Of Showing That Application Of The Burden On The Funeral Home, Under The Facts Presented Here, Is The Least Restrictive Means Of Furthering The Compelling Governmental Interest Of Protecting Employees From Gender Stereotyping In The Workplace.**

If the EEOC meets its burden regarding showing a compelling interest, then the Court

36

must determine if the EEOC has met its additional, and separate, burden of showing that application of the burden "to the person" is the least restrictive means of furthering that compelling governmental interest. *Hobby Lobby,* 134 S.Ct. at 2761.

The "least-restrictive means standard is exceptionally demanding." *Hobby Lobby*, 134 S.Ct. at 2780. That standard requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Id*. at 2780.

If a less restrictive means is available for the government to achieve the goal, the government must use it. *Holt v. Hobbs*, 135 S.Ct. 853, 864 (2015). As another district court within the Sixth Circuit has explained, "[t]his 'exceptionally demanding' standard, *Burwell*, 134 S.Ct. at 2780, begs for the Government to show *a degree of situational flexibility, creativity, and accommodation* when putative interests clash with religious exercise." *United States v. Girod*, __ F. Supp.3d __, 2015 WL 10031958 at *8 (E.D. Ky. 2015) (emphasis added).

Again, it is the EEOC that has the burden of showing that enforcement of the religious burden on the Funeral Home is the least restrictive means of furthering its compelling interest of protecting employees from gender stereotyping in the workplace.

As to this burden, the EEOC's position is stated in: 1) a page and a half in its own motion (D.E. No. 51 at Pg ID 629-30); and 2) two paragraphs that respond to the Funeral Home's motion. (D.E. No. 63 at Pg ID 1939). Essentially, the EEOC asserts, in a conclusory fashion, that Title VII is narrowly tailored:

> Title VII's prohibitions against sex discrimination in the workplace demonstrate
> that the government has a compelling interest in protecting employees from losing
> their jobs on the basis of an employer's gender stereotyping, and they are precisely

tailored to ensure this.

(D.E. No. 51 at Pg ID 629).[10]

Thus, the EEOC has not provided a focused "to the person" analysis of how the burden on the Funeral Home's religious exercise is the least restrictive means of eliminating clothing[11] gender stereotypes at the Funeral Home under the facts and circumstances presented here.

The Funeral Home argues that "the EEOC does not even attempt to explain" how requiring the Funeral Home to allow a funeral director who was born a biological male to wear a skirt-suit to work could be found to satisfy RFRA's least-restrictive means requirement. (D.E. No. 60 at Pg ID 1797).[12]

Indeed, the EEOC's briefs do not contain *any discussion* to indicate that the EEOC has ever (in either the administrative proceedings or during the course of this litigation) explored the possibility of any solutions or potential accommodations that might work under the unique facts

---

[10]The Sixth Circuit could conclude, on appeal, that the more focused analysis set forth in *Hobby Lobby* should not apply in a Title VII case.  There is no existing authority to support such a position and it is not this Court's role to create such an exception.

[11]Again, because the parties have confined their claims, defenses, and analysis to work place clothing, and have not discussed hair styles or makeup, this Court also confines its analysis to clothing.

[12]Although it is not its burden, the Funeral Home asserts that "[a] number of available alternatives" could allow the government to achieve its stated goal without violating the Funeral Home's religious rights. In response to those least-restrictive-means arguments, the EEOC states that the Funeral Home never proposed that Stephens could continue to dress in "men's clothing" while at work, but could dress in "female clothing" outside of work, prior to Rost's deposition. (D.E. No. 63 at 1924).  The EEOC further asserts that the Funeral Home was "free to offer counter-proposals" but failed to do so.  (D.E. No. 69 at Pg ID 2131).  Such arguments overlook that it is *the EEOC's burden* to establish that enforcement of the burden on the Funeral Home is the least restrictive means of furthering its compelling interest under the facts presented here.

and circumstances presented here.  As a practical matter, the EEOC likely did not do so because

it has been proceeding as if gender identity or transgender status is a protected class under Title

VII,[13] taking the approach that the Funeral Home cannot prohibit Stephens from dressing as a

female, in order to express her female gender identity.  This is one of the first two cases that the

EEOC has ever brought on behalf of a transgender person.[14]  The EEOC appears to have taken

the position that the only acceptable solution would be for the Funeral Home to allow Stephens

to wear a skirt while working as a funeral director at the Funeral Home in order to express

Stephens's female gender identity.  (*See, e.g.*, D.E. No. 69 at Pg ID, arguing that the Funeral

Home cannot require that "an employee dress inconsistently with his or her gender identity;"

D.E. No. 63 at Pg ID 1923, arguing that "Defendant's insistence that Stephens wear men's

clothing at work, despite knowledge that [Stephens] now identifies as female," violates Title VII;

D.E. No. 63 at Pg ID 1927, stating that Stephens would present according to the dress code for

females; D.E. No. 63 at Pg ID 1936-37, arguing that the Funeral Home having to provide "female

clothing to Stephens" would not impose a substantial burden because doing so would not be

unduly costly.).

    Understanding the narrow context of the discrimination claim stated in this case is

important.  The wrongful discharge claim in this case is brought under a very specific theory of

---

[13]*See, e.g.*, EEOC Determination, finding reasonable cause to believe that charging party
was discharged due to sex and "gender identity" (D.E. No. 63-4); Amended Complaint (D.E. No.
21 at Pg ID 244-45), alleging that the Funeral Home discharged Stephens "because Stephens is
transgender," and "because of Stephens's transition from male to female."

[14]*See, e.g*., EEOC's 9/25/14 Press Release (stating that this "Lawsuit is One of Two the
Agency Filed Today – the First Suits in its History – Challenging Transgender Discrimination
Under 1964 Civil Rights Act.").

sex discrimination under Title VII.  The EEOC's claim on behalf of Stephens is brought under a *Price Waterhouse* sex/gender stereotyping theory.  *Price Waterhouse* recognized that sex discrimination may manifest itself in stereotypical notions as to how women and men should dress and present themselves in the workplace.

As the Supreme Court recognized in *Price Waterhouse*, the intent behind Title VII's inclusion of sex as a protected class expressed "Congress' intent to forbid employers to take gender into account" in the employment context.  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989).  The goal of the sex-stereotyping theory of sex discrimination is that "gender" "be *irrelevant*" with respect to the terms and conditions of employment and to employment decisions.  *Id.* (emphasis added).

Significantly, neither transgender status nor gender identity are protected classes under Title VII. [15]  The only reason that the EEOC can pursue a Title VII claim on behalf of Stephens in this case is under the theory that the Funeral Home discriminated against Stephens because Stephens failed to conform to the "masculine gender stereotypes that Rost expected" in terms of the clothing Stephens would wear at work.  The EEOC asserts that Stephens has a "Title VII right *not to be subject to gender stereotypes* in the workplace."  (D.E. No. 51 at Pg ID 607) (emphasis added).

Yet the EEOC has not challenged the Funeral Home's sex-specific dress code, that requires female employees to wear a skirt-suit and requires male employees to wear a suit with pants and a neck tie, in this action.   If the EEOC were truly interested in eliminating gender

---

[15]Congress can change that by amending Title VII.  It is not this Court's role to create new protected classes under Title VII.

40

stereotypes as to clothing in the workplace, it presumably would have attempted to do so.

Rather than challenge the sex-specific dress code, the EEOC takes the position that Stephens has the right, under Title VII, to "dress as a woman" or wear "female clothing"[16] while working at the Funeral Home. That is, the EEOC wants Stephens to be permitted to dress in a stereotypical feminine manner (wearing a skirt-suit), in order to express Stephens's gender identity.

If the EEOC truly has a compelling governmental interest in ensuring that Stephens is not subject to gender stereotypes in the workplace in terms of required clothing at the Funeral Home,[17] couldn't the EEOC propose a gender-neutral dress code (dark-colored suit, consisting of a matching business jacket and pants, but without a neck tie) as a reasonable accommodation that would be a less restrictive means of furthering that goal under the facts presented here?[18] Both women and men wear professional-looking pants and pants-suits in the workplace in this country, and do so across virtually all professions.

The following deposition testimony from Rost supports that such an accommodation could be a less restrictive means of furthering the goal of eliminating sex stereotypes as to the clothing worn at the Funeral Home:

Q.   Now, do you currently have any female funeral directors?

---

[16]This is the language used by the parties. (*See, e.g.*, D.E. No. 21 at Pg ID 244; D.E. No. 63 at 1935; D.E. No. 59 at Pg ID 1749).

[17]Rost's Affidavit states that he would not dismiss Stephens or other employees if they dressed as members of the opposite sex while *outside* of work. (Rost Affidavit at ¶¶ 50-51). Rost also so testified. (*See* Rost Dep., D.E. No. 54-5 at Pg ID 1372).

[18]Similar to the gender-neutral pants, business suit jackets, and white shirts that the male and female Court Security Officers in this building wear.

41

A.      I do not.

Q.      If you did have a female funeral director, what would describe what her
        uniform would be or what she would be required to wear?
        MR. PRICE: Objection, speculation. But go ahead.
        THE WITNESS: She would have a dark jacket and a dark skirt, matching.
Matching.

BY MR. KIRKPATRICK:

Q.      Okay.  A skirt.  So just like the male funeral director she would have a
        business suit, but a female business suit?

A.      Yes.

Q.      As a skirt?

A.      Yes.

. . . .

Q.      Okay.  Why do you have a dress code?

A.      Well, we have a dress code because it allows us to make sure that our staff
        – is dressed in a professional manner that's acceptable to the
        families that we serve, and that is understood by the community at-
        large what these individuals would look like.

Q.      Is that based on the specific profession that you're in?

A.      It is.

Q.      And again, tell us why it fits into the specific profession that you're in that
        you have a dress code?

A.      Well, it's just the funeral profession in general, if you went to all funeral
        homes, would have pretty much the same look.  Men would be in a dark
        suit, white shirt and a tie and women would be appropriately attired in a
        professional manner.

. . . .

Q.      Okay.  Now, have you been to funeral homes where there have been
        women wearing businesslike pants before?

A.      I believe I have.

Q.      Okay.  So, the fact that you require women to wear skirts is something that
        you prefer, it's not necessarily an industry requirement?

A.      That's correct.

Q.      Okay.  But women could look businesslike and appropriate in pants,
        correct?

A.      They could.

(D.E. No. 63-11 at Pg ID 1999-2000; *see also* Rost Dep., D.E. 54-11 at Pg ID 1423, wherein

Rost testified that female employees at the Funeral Home's Detroit location sometimes wear

pants with a jacket to work).  In addition, Stephens testified:

42

> Q.      Okay.  Did you have a uniform or a dress code that you had to follow
>            while with R.G. & G.R. Funeral Home?
> A.      They bought suits.
> Q.      Okay.
> A.      I wore it.
> Q.      So they being the company, bought you a suit or suits?
> A.      Yes.
> Q.      Were they male suits?
> A.      I would assume they were.
> Q.      Okay.
> A.      I guess a female could have dressed in them.

(Stephens's Dep., D.E. No. 54-15 at Pg ID 1453).[19]

But the EEOC has not even discussed the possibility of any such accommodation or less restrictive means as applied to this case.[20]  Rather, the EEOC takes the position that Stephens must be allowed to wear a skirt-suit in order to *express* Stephens's female gender identity.  That is, the EEOC wants Stephens to be able to dress in a *stereotypical feminine* manner.  If the compelling governmental interest is truly in *removing or eliminating* gender stereotypes in the workplace in terms of clothing (*i.e.*, making gender "irrelevant"), the EEOC's manner of enforcement in this action (insisting that Stephens be permitted to dress in a stereotypical feminine manner at work) does not accomplish that goal.

This Court concludes that the EEOC has not met its demanding burden.  As a result, the

---

[19]The Court notes that Rost's affidavit appears to indicate that he would be opposed to allowing a funeral director who was born a biological female to wear a male funeral director uniform (which consists of a pant-suit with a neck tie) while at work.  (Rost Aff. at ¶ 45).  Notably, however, Rost has *already allowed* female employees to wear a pants-suit to work without a neck tie.

[20]This potential accommodation or least restrictive means of requiring a gender-neutral uniform may actually be consistent with what the EEOC proposed in the administrative proceedings.  (*See* D.E. No. 74-1 at Pg ID 2171, proposing that the Funeral Home reinstate Stephens and agree to "implement a Dress Code policy that *affords equivalent consideration to all sexes with respect to uniform requirements* and allowance/benefits.") (emphasis added).

43

Funeral Home is entitled to a RFRA exemption from Title VII, and the body of sex-stereotyping

case law that has developed under it, under the facts and circumstances of this unique case.

In its amicus brief, the ACLU asserts that the implications of allowing a RFRA

exemption to the Funeral Home in this case "are staggering" and essentially restates the *Hobby-*

*Lobby* principal dissenting opinion's fears about the impact of the majority's decision on

employment discrimination and other laws.  (*See* D.E. No. 59 at Pg ID 1767).  This Court is

bound by the majority opinion in *Hobby Lobby* and it makes clear that RFRA exemptions are

considered on a case-by-case basis.

Moreover, in *General Conf. of Seventh-Day Adventists*, 617 F.3d 402 (6th Cir. 2010), the

Sixth Circuit held, as a matter of first impression, that a RFRA defense does not apply in a suit

between private parties.[21]   The Seventh Circuit has also so ruled.  *See Listecki v. Official Comm.*

*of Unsecured Creditors*, 780 F.3d 731, 736-37 (7th Cir. 2015).  In the vast majority of Title VII

employment discrimination cases, the case is brought by the employee, not the EEOC.

Accordingly, at least in the Sixth and Seventh Circuits, it appears that there cannot be a RFRA

defense in a Title VII case brought by an employee against a private[22] employer because that

would be a case between private parties.  *See, e.g., Mathis v. Christian Heating and Air*

*Conditioning, Inc.*, 2016 WL 304766 (E.D. PA 2016) (district court ruled, in Title VII case

---

[21]The ACLU noted this ruling in a footnote in its brief.  (D.E. No. 59 at Pg ID 1761).
None of the parties addressed how that ruling by the Sixth Circuit, as a practical matter, appears
to prohibit a RFRA defense in a Title VII case brought by an employee against a private
employer.

[22]In Title VII cases brought by an employee against a governmental employer, such as the
United States Postal Service, there could not be a RFRA defense because the United States
federal government does not hold religious views.

brought by employee against private employer, that a RFRA defense is not available "because RFRA protects individuals only from the federal government's burden on the free exercise of religion.").[23]

## II.    Title VII Discriminatory Clothing Allowance Claim

As the second claim in this action, the EEOC alleges that the Funeral Home has violated Title VII by providing a clothing allowance/work clothes to male employees but failing to provide such assistance to female employees.  (Am. Compl. at ¶¶ 15 & 17).  The EEOC asserts that the effect of the Funeral Home's unlawful practice "has been to deprive a class of female employees of equal employment opportunities and otherwise adversely affect their status as employees because of their sex."  (*Id*. at ¶ 18). The EEOC alleges that "[s]ince at least September 13, 2011," the Funeral Home has provided a clothing allowance to male employees but not female employees.  (Am. Compl. at ¶ 12).

In the pending motions, each party contends that it is entitled to summary judgment as to this claim.  Before reaching the merits of the second claim, however, the Court must address the Funeral Home's assertion that the EEOC lacks the authority to bring the second claim in this action.

### A.    Under *Bailey*, The EEOC Cannot Bring The Second Claim In This Action.

Relying on *EEOC v. Bailey*, 563 F.2d 439 (6th Cir. 1977), the Funeral Home notes that the EEOC may include in a Title VII suit only claims that fall within an "investigation reasonably

---

[23]This Court recognizes that this appears to produce an odd result.  Under existing Sixth Circuit precedent, the Funeral Home could not assert a RFRA defense if Stephens had filed a Title VII suit on Stephens's own behalf because no federal agency would be a party to the case. But, because this is one of those rare instances where the EEOC (a federal agency) chose to bring suit on behalf of an individual, a RFRA defense can be asserted.

expected to grow out of the charge of discrimination." (D.E. No. 54 at Pg ID 1317). The Funeral Home asserts that, under *Bailey*, a claim falls outside that scope if: 1) the claim is unrelated to the charging party; and 2) it involves discrimination of a kind other than raised by the charging party. It asserts that those considerations show that the EEOC's clothing allowance claim does not result from an investigation reasonably expected to grow out of Stephens's EEOC charge. In making this argument, the Funeral Home states that the clothing allowance claim on behalf of a class of women is unrelated to Stephens – who *received and accepted* the clothing provided by the Funeral Home at all relevant times. The Funeral Home asserts that the clothing allowance claim alleges discrimination of a kind other than that raised by Stephens, wrongful discharge. In support of that proposition, it directs the Court to *Nelson v. Gen. Elect. Co.*, 2 F. App'x 425, 428 (6th Cir. 2001).

In response, the EEOC does not dispute that *Bailey* is good law. Rather, it attempts to distinguish this case from *Bailey*. (D.E. No. 63 at Pg ID 1942-43). It asserts that the situation here is more akin to *EEOC v. Cambridge Tile Mfg. Co.,* 590 F.2d 205 (6th Cir. 1979). That was a two-page per curiam decision that "involve[d] the scope of the investigatory and subpoena power of the EEOC." *Id.* at 205. It did not address the issue that the Court is presented with here. The EEOC does not direct the Court to any other Sixth Circuit authority regarding this challenge.

In *Bailey*, the underlying charge of discrimination that had triggered the investigation of the employer's employment practices was filed by a white female employee who alleged sex discrimination against women and race discrimination against black women. *Bailey,* 563 F.2d at 441 & 445. The EEOC later brought suit against the employer alleging racial and religious

46

discrimination.  The district court held that the employee's charge of discrimination could not

support the EEOC's lawsuit and dismissed it.

On appeal, the Sixth Circuit affirmed the dismissal of the religious discrimination charges

but reversed as to the race discrimination charges.  The opinion began by providing an overview

of the process that leads to a civil action being filed by the EEOC:

> "In the Equal Employment Opportunity Act of 1972 Congress established an
> integrated, multistep enforcement procedure culminating in the EEOC's authority
> to bring a civil action in a federal court." *Occidental Life Insurance Co. v. EEOC*,
> 432 U.S. 355, 97 S.Ct. 2447, 2451, 53 L.Ed.2d 402 (1977). The procedure is
> triggered when "a person claiming to be aggrieved" or a member of the EEOC
> files with the EEOC a charge alleging that an employer has engaged in an
> unlawful employment practice. Such a charge is to be filed within 180 days after
> the occurrence of the allegedly unlawful practice, and the EEOC is to serve notice
> of the charge on the employer within ten days of filing and to investigate the
> charge. s 706(b) of Title VII, 42 U.S.C. s 2000e-5(b). Under s 709(a) of Title VII,
> 42 U.S.C. s 2000e-8(a), the EEOC may gain access to evidence that is relevant to
> the charge under investigation, *see Blue Bell Boots, Inc. v. EEOC*, 418 F.2d 355,
> 358 (6th Cir. 1969), and under s 710, 42 U.S.C. s 2000e-9,  the EEOC may gain
> access to evidence that relates to any matter under investigation. The EEOC is
> then required to determine, "as promptly as possible and, so far as practicable, not
> later than one hundred and twenty days from the filing of the charge,   whether
> there is reasonable cause to believe the charge is true. s 706(b), 42 U.S.C. s
> 2000e-5(b). If there is no reasonable cause, the charge must be dismissed and the
> person claiming to be aggrieved shall be notified. If there is reasonable cause, the
> EEOC "shall endeavor to eliminate any such unlawful employment practice by
> informal methods of conference, conciliation, and persuasion." s 706(b), 42
> U.S.C. s 2000e-5(b). When the EEOC is unable to secure a conciliation agreement
> acceptable to the EEOC, the EEOC may bring a civil action.  s 706(f)(1), 42
> U.S.C. s 2000e-5(f)(1). *See Occidental Life Insurance Co. v. EEOC, supra*, 432
> U.S. at --, 97 S.Ct. at 2450-2452; Conference Committee Report,
> Section-by-Section Analysis of H.R. 1746, The Equal Employment Act of 1972,
> 118 Cong.Rec. 7168-69 (Mar. 6, 1972).

*Id*. at 445.

The Sixth Circuit agreed with the district court that it did not have jurisdiction over the

allegations of religious discrimination in the EEOC's lawsuit because the "portion of the EEOC's

complaint incorporating allegations of religious discrimination exceeded the scope of the EEOC

investigation [of the employer] reasonably expected to grow out of the charge of discrimination."

*Id*. at 446.

The court noted that the "clearly stated rule in this Circuit is that the EEOC's complaint is

'limited to the scope of the EEOC' investigation reasonably expected to grow out of the charge

of discrimination." *Id*. at 446 (citations omitted). The court explained that there are two reasons

for that rule:

> There are two reasons for the rule that the EEOC complaint is limited to the scope
> of the EEOC investigation reasonably expected to grow out of the charge of
> discrimination. The first reason is that the rule permits an effective functioning of
> Title VII when the persons filing complaints are not trained legal technicians.
> "(T)his Court has recognized that Title VII of the Civil Rights Act of 1964 should
> not be construed narrowly," *Blue Bell Boots, Inc. v. EEOC, supra*, 418 F.2d at
> 358, and thus adopted the rule because "charges of discrimination filed before the
> EEOC will generally be filed by lay complainants who are unfamiliar with the
> niceties of pleading and are acting without the assistance of counsel." *Tipler v. E.
> I. duPont deNemours & Co., supra*, 443 F.2d at 131. Similarly, we stated in
> *McBride v. Delta Air Lines, Inc., supra*, 551 F.2d at 115:
>
>> Because administrative complaints are filed by completing a form
>> designed to elicit specificity in charges, and because the forms are
>> not legal pleadings and are rarely filed with the advice of legal
>> counsel, any other standard would unreasonably limit subsequent
>> judicial proceedings which Congress has determined are necessary
>> for effective enforcement of the legal standards established by Title
>> VII. See House Report No. 92-238, U.S.Code Cong. and
>> Admin.News, pp. 2141, 2147-48 (1972).
>
> The second reason for limiting the scope of the EEOC complaint to the scope of
> the EEOC investigation that can be reasonably expected to grow out of the private
> party's charge is explained in *Sanchez v. Standard Brands, Inc., supra*, 431 F.2d
> at 466.
>
>> The logic of this rule is inherent in the statutory scheme of Title
>> VII. A charge of discrimination is not filed as a preliminary to a
>> lawsuit. On the contrary, the purpose of a charge of discrimination

48

> is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, the Commission carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation.

*Bailey*, 563 F.2d at 446-47.

The Sixth Circuit then explained that in light of those two reasons, the allegations of religious discrimination in the EEOC's complaint could not reasonably be expected to grow out of the plaintiff's charge.

First, the case simply did not involve the "situation in which a lay person has inadequately set forth in the complaint filed with the EEOC the discrimination affecting that person." *Id.* at 447. That is because the EEOC's allegations regarding religious discrimination did not involve practices affecting the plaintiff who filed the EEOC charge. *Id.*

Second, the court concluded that the present case does not involve a situation in which it would be proper, in view of the statutory scheme of Title VII, to permit the lawsuit to include the allegations of religious discrimination. The court explained that "to allow the EEOC, as it did in the present case, to issue a reasonable cause determination, to conciliate, and to sue on allegations of religious discrimination unrelated to the private party's charge of sex discrimination would result in undue violence to the legal process that Congress established to achieve equal employment opportunities in country." *Id*. at 447-448.

The Sixth Circuit then held that "[t]he procedure to be followed when instances of discrimination, of a kind other than that raised by a charge filed by an individual party and

unrelated to the individual party, come to the EEOC's attention during the course of an

investigation of the private party's charge is for the filing of a charge by a member of the EEOC

and for a full EEOC investigation of that charge." *Id*. at 448.  It explained its rationale for

requiring a new charge by the EEOC:

> Then the employer is afforded notice of the allegation, an opportunity to
> participate in a complete investigation of such allegation, and an opportunity to
> participate in meaningful conciliation discussions should reasonable cause be
> found following the EEOC investigation. Section 706(b) of Title VII, 42 U.S.C. s
> 2000e-5(b), provides for the filing of a charge by a member of the EEOC, and
> under such a filing, an employer will not be stripped of formal notice of the charge
> and of the opportunity to respond to the EEOC's inquiry into employment
> practices with respect to allegations of discrimination unrelated to the individual
> party's charge. In addition, the filing of a charge will permit settlement discussions
> to take place pursuant to 29 C.F.R. s 1601.19a5 after a preliminary investigation
> but before any finding of reasonable cause.

> Several reasons support this position. The filing of a charge by a member of the
> EEOC as urged by this Court should lead to a more focused investigation on the
> facts of possible discrimination by an employer when that possible discrimination
> is not related to the individual party's charge.

*Id.*  Another reason for that position is "the importance of conciliation to Title VII." *Id*. at 449.

The court noted that the EEOC's duty to attempt conciliation is among its "most essential

functions" and explained:

> It is our belief that if conciliation is to work properly, charges of discrimination
> must be fully investigated after the employer receives notice in a charge alleging
> unlawful discriminatory employment practices. *See EEOC v. MacMillan Bloedel
> Containers, Inc., supra*, 503 F.2d at 1092. The requirement that a member of the
> EEOC file a charge when facts suggesting unlawful discrimination are discovered
> that are unrelated to the individual party's charge does serve the purposes of
> treating the employer fairly and forcing the employer and the EEOC to focus
> attention during investigation on the facts of such possible discrimination and
> thereby does serve the goal of obtaining voluntary compliance with Title VII.

*Id*. at 449.  The court rejected the EEOC's position that "it would be a matter of placing form

50

over substance, resulting in the waste of administrative resources and the delay in the enforcement of rights," to require "a member of the EEOC to file a charge with respect to the allegations of discrimination uncovered in an EEOC investigation which were of a kind not raised by the individual party and which did not affect the individual party." *Id*. at 449.

Accordingly, "[i]f an EEOC investigation of an employer uncovers possible unlawful discrimination of a kind not raised by the charging party and not affecting that party, then the employer should be given notice if the EEOC intends to hold the employer accountable before the EEOC and in court." *Id*. at 450.

Finally, the court rejected the EEOC's position that it did not need to file a new charge because the employer received notice of the new alleged discrimination by virtue of having received a reasonable cause determination that included religious discrimination:

> We are unable to accept the EEOC's argument that it was immaterial that appellee received notice and opportunity to comment at the time the EEOC issued its reasonable cause determination and during conciliation rather than before the issuance of the reasonable cause determination. While a court might conclude that the Due Process Clause of the Fifth Amendment was not violated by the procedure followed by the EEOC in the present case, our concern is with the legislative judgment of due process incorporated into the specific statutory scheme of Title VII. Evidence of that legislative intent indicates a concern for fair treatment of employers.

*Id.* at 450.

As was the situation in *Bailey*, the EEOC investigation here uncovered possible unlawful discrimination: 1) of a kind not raised by the charging party (Stephens); and 2) not affecting Stephens. As such, under *Bailey*, the proper procedure is for the filing of a charge by a member of the EEOC and for a full EEOC investigation of that charge.

1.    **The Discrimination Is Of A Kind Not Raised By Stephens In The
EEOC Charge.**

The Court concludes that the second discrimination claim alleged in this action is "of a

kind not raised by the charging party," Stephens.

Again, the rule in this Circuit is that the EEOC's complaint is limited to the scope of the

EEOC's investigation reasonably expected to grow out of the charge of discrimination.  "The

relevant inquiry is the scope of the investigation that the *EEOC charge* would have reasonably

prompted."  *EEOC v. Wal-Mart Stores, Inc.,* 2010 WL 567316 at * 2 (6th Cir. 2010) (emphasis

added).  Thus, the court looks to the *EEOC charge itself.  See, eg., Nelson v. General Elec. Co.*, 2

F. App'x 425, 428 (6th Cir. 2001).

In *Nelson*, the court looked to the EEOC charge, noting that the plaintiff's charge alleged

just two discriminatory actions, that the plaintiff was given a bad performance evaluation and

was laid off, because of her race and gender, and in retaliation for having complained about race

discrimination.  Moreover, that EEOC charge expressly confined the charged discrimination to

the time period between March 30 and September 22 of 1995.  After the EEOC administrative

process concluded, the plaintiff filed a complaint that included that her employer failed to

promote her because of her race and gender.  The district court concluded that the scope of the

investigation reasonably expected to grow out of her EEOC charge would not include failure to

promote claims.  The Sixth Circuit affirmed.

Here, the EEOC charge filed by Stephens checked the box for "sex" discrimination and

indicated that the discrimination took place from July 31, 2013 to August 15, 2013 – a two week

period in 2013.  (D.E. No. 54-22 at Pg ID 1497).  The charge stated "the particulars" of the

52

claimed sex discrimination Stephens experienced as follows:

> I began working for the above-named employer on 01 October 2007; I was last
> employed as a Funeral Director/Embalmer.
>
> On or about 31 July 2013, I notified management that I would be undergoing
> gender transitioning and that on 26 August 2013, I would return to work as my
> true self, a female. On 15 August 2013, my employment was terminated. The
> only explanation I was given was that management did not believe the public
> would be accepting of my transition. Moreover, during my entire employment I
> know there are no other female Funeral Directors/Embalmers.
>
> I can only conclude that I have been discharged due to my sex and gender identity,
> female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id*.).

Thus, Stephens alleged just one discriminatory action – termination – that occurred

during a two-week period in 2013. The charge alleged that Stephens alone, who was undergoing

a gender transition, was fired due to Stephens's gender identity and the Funeral Home's beliefs as

to the public's acceptance of Stephens's transition. Even though the Funeral Home later

asserted, during the administrative proceeding, its dress code as a defense to the alleged

discriminatory termination, the *EEOC charge itself* mentioned nothing about clothing, a clothing

allowance, or a dress code. Thus, this Court fails to see how Stephens's EEOC charge would

reasonably lead to an investigation of whether or not the Funeral Home has provided its male

employees with clothing that was not provided to females since September of 2011.[24]  *Nelson,*

*supra*; *see also EEOC v. Wal-Mart Stores, Inc., supra*, at * 2 (noting "this is not a case where the

---

[24]The EEOC attempts to characterize the clothing allowance claim as the same type of
discrimination in Stephens's EEOC charge because it is alleged sex/gender discrimination. By
that logic, the plaintiff in *Nelson* would have been found to have alleged the same type of
discrimination (race and gender) even though her EEOC charge did not allege any failure to
promote claims. That was not the case.

civil complaint alleges different kinds of discriminatory acts than the initial EEOC complaint," as was the case in *Nelson*.)

### 2.     The Alleged Clothing Discrimination Claim Does Not Involve Stephens.

In addition, this is not a case wherein Stephens has a claim for the alleged discriminatory clothing allowance, but inadequately set forth that claim in the EEOC charge by virtue of being a lay person. *Bailey,* 563 F.2d at 447.

Stephens is not included in the class of females who were allegedly discriminated against by the Funeral Home by virtue of not having received clothing that was provided to male employees.  That is because, at all relevant times, Stephens was one of the employees who *was provided* the clothing that was not provided to female employees.  Stephens was fired before Stephens ever attempted to "dress as a woman" at work.  Thus, Stephens cannot claim a denial of this benefit.[25]

### 3.     As A Result, Under *Bailey,* The EEOC Cannot Proceed With The Claim In This Action.

The Court concludes that the EEOC investigation here uncovered possible unlawful discrimination: 1) of a kind not raised by the charging party (Stephens); and 2) not affecting the

---

[25]It would not have been a problem if Stephens had asserted a clothing allowance claim on Stephen's own behalf in the EEOC charge and then the EEOC's complaint simply broadened that same claim to assert it on behalf of a class of women.  *See EEOC v. Keco Indust. Inc.*, 748 F.2d 1097, 1101 (6th Cir. 1984) (explaining that in *Bailey* the "additional and distinct claim of religious discrimination required a separate investigation, reasonable cause determination, and conciliation effort by the EEOC" and distinguishing it where the EEOC "merely broadened" the scope of the charging party's charge to assert the same claim on behalf of all female employees in the same division).

charging party (Stephens). As such, under *Bailey*, the proper procedure[26] is for the filing of a charge by a member of the EEOC and for a full EEOC investigation of that new claim of discrimination. Because the EEOC failed to do that, it cannot proceed with that claim in this civil action. Accordingly, the Court shall dismiss the clothing allowance claim without prejudice.

### CONCLUSION & ORDER

For the reasons set forth above, the Court **ORDERS** that the EEOC's Motion for Summary Judgment is **DENIED.**

It is further **ORDERED** that the Funeral Home's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

The Court **GRANTS** summary judgment in favor of the Funeral Home as to the wrongful termination claim. The Court rejects the Funeral Home's sex-specific dress code defense but concludes that, under the unique facts and circumstances of this case, the Funeral Home is entitled to a RFRA exemption from Title VII (and the sex-stereotyping body of case law under it).

As to the clothing allowance claim, the Court concludes that the EEOC administrative investigation uncovered possible unlawful discrimination of a kind not raised by the charging party and not affecting the charging party. Under *Bailey*, the proper procedure is for the filing of a charge by a member of the EEOC and for a full EEOC investigation of that new claim of

---

[26]The EEOC argues that it is not required to "ignore" discrimination that it inadvertently uncovers during an administrative proceeding. *Bailey* does not require the EEOC to "ignore" discriminatory acts that it uncovers during an administrative investigation that are of a kind not raised by the charging party and not affecting the charging party; it just requires the filing of a new charge by a member of the EEOC and a full investigation of the new claim.

discrimination.  Because the EEOC did not do that, it cannot proceed with that claim in this civil

action.  The Court therefore **DISMISSES WITHOUT PREJUDICE** the clothing allowance

claim.

      **IT IS SO ORDERED.**

                    S/Sean F. Cox_____
                    Sean F. Cox
                    United States District Judge

Dated:  August 18, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on
August 18, 2016, by electronic and/or ordinary mail.

                    S/Jennifer McCoy_____
                    Case Manager