(Slip Opinion)   OCTOBER TERM, 2019   1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BOSTOCK *v.* CLAYTON COUNTY, GEORGIA

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 17–1618.   Argued October 8, 2019—Decided June 15, 2020*

In each of these cases, an employer allegedly fired a long-time employee
simply for being homosexual or transgender. Clayton County, Geor-
gia, fired Gerald Bostock for conduct "unbecoming" a county employee
shortly after he began participating in a gay recreational softball
league. Altitude Express fired Donald Zarda days after he mentioned
being gay. And R. G. & G. R. Harris Funeral Homes fired Aimee Ste-
phens, who presented as a male when she was hired, after she in-
formed her employer that she planned to "live and work full-time as a
woman." Each employee sued, alleging sex discrimination under Title
VII of the Civil Rights Act of 1964. The Eleventh Circuit held that
Title VII does not prohibit employers from firing employees for being
gay and so Mr. Bostock's suit could be dismissed as a matter of law.
The Second and Sixth Circuits, however, allowed the claims of Mr.
Zarda and Ms. Stephens, respectively, to proceed.

*Held*: An employer who fires an individual merely for being gay or
transgender violates Title VII. Pp. 4–33.

(a) Title VII makes it "unlawful . . . for an employer to fail or refuse
to hire or to discharge any individual, or otherwise to discriminate
against any individual . . . because of such individual's race, color, re-
ligion, sex, or national origin."   42 U. S. C. §2000e–2(a)(1).   The
straightforward application of Title VII's terms interpreted in accord

———————

*Together with No. 17–1623, *Altitude Express, Inc., et al.* v. *Zarda
et al., as Co-Independent Executors of the Estate of Zarda*, on certiorari
to the United States Court of Appeals for the Second Circuit, and No. 18–
107, *R. G. & G. R. Harris Funeral Homes*, *Inc.* v. *Equal Employment Op-
portunity Commission et al.*, on certiorari to the United States Court of
Appeals for the Sixth Circuit.

Syllabus

with their ordinary public meaning at the time of their enactment resolves these cases. Pp. 4–12.

(1) The parties concede that the term "sex" in 1964 referred to the biological distinctions between male and female. And "the ordinary meaning of 'because of' is 'by reason of' or 'on account of,'" *University of Tex. Southwestern Medical Center* v. *Nassar,* 570 U. S. 338, 350. That term incorporates the but-for causation standard, *id.,* at 346, 360, which, for Title VII, means that a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment action. The term "discriminate" meant "[t]o make a difference in treatment or favor (of one as compared with others)." Webster's New International Dictionary 745. In so-called "disparate treatment" cases, this Court has held that the difference in treatment based on sex must be intentional. See, *e.g.*, *Watson* v. *Fort Worth Bank & Trust,* 487 U. S. 977, 986. And the statute's repeated use of the term "individual" means that the focus is on "[a] particular being as distinguished from a class." Webster's New International Dictionary, at 1267. Pp. 4–9.

(2) These terms generate the following rule: An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It makes no difference if other factors besides the plaintiff's sex contributed to the decision or that the employer treated women as a group the same when compared to men as a group. A statutory violation occurs if an employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee. Because discrimination on the basis of homosexuality or transgender status requires an employer to intentionally treat individual employees differently because of their sex, an employer who intentionally penalizes an employee for being homosexual or transgender also violates Title VII. There is no escaping the role intent plays: Just as sex is necessarily a but-for cause when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably intends to rely on sex in its decisionmaking. Pp. 9–12.

(b) Three leading precedents confirm what the statute's plain terms suggest. In *Phillips* v. *Martin Marietta Corp.,* 400 U. S. 542, a company was held to have violated Title VII by refusing to hire women with young children, despite the fact that the discrimination also depended on being a parent of young children and the fact that the company favored hiring women over men. In *Los Angeles Dept. of Water and Power* v. *Manhart,* 435 U. S. 702, an employer's policy of requiring women to make larger pension fund contributions than men because women tend to live longer was held to violate Title VII, notwithstanding the policy's evenhandedness between men and women as groups.

Syllabus

And in *Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U. S. 75, a male plaintiff alleged a triable Title VII claim for sexual harassment by co-workers who were members of the same sex.

The lessons these cases hold are instructive here. First, it is irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it. In *Manhart*, the employer might have called its rule a "life expectancy" adjustment, and in *Phillips*, the employer could have accurately spoken of its policy as one based on "motherhood." But such labels and additional intentions or motivations did not make a difference there, and they cannot make a difference here. When an employer fires an employee for being homosexual or transgender, it necessarily intentionally discriminates against that individual in part because of sex. Second, the plaintiff's sex need not be the sole or primary cause of the employer's adverse action. In *Phillips*, *Manhart*, and *Oncale*, the employer easily could have pointed to some other, nonprotected trait and insisted it was the more important factor in the adverse employment outcome. Here, too, it is of no significance if another factor, such as the plaintiff's attraction to the same sex or presentation as a different sex from the one assigned at birth, might also be at work, or even play a more important role in the employer's decision. Finally, an employer cannot escape liability by demonstrating that it treats males and females comparably as groups. *Manhart* is instructive here. An employer who intentionally fires an individual homosexual or transgender employee in part because of that individual's sex violates the law even if the employer is willing to subject all male and female homosexual or transgender employees to the same rule. Pp. 12–15.

(c) The employers do not dispute that they fired their employees for being homosexual or transgender. Rather, they contend that even intentional discrimination against employees based on their homosexual or transgender status is not a basis for Title VII liability. But their statutory text arguments have already been rejected by this Court's precedents. And none of their other contentions about what they think the law was meant to do, or should do, allow for ignoring the law as it is. Pp. 15–33.

(1) The employers assert that it should make a difference that plaintiffs would likely respond in conversation that they were fired for being gay or transgender and not because of sex. But conversational conventions do not control Title VII's legal analysis, which asks simply whether sex is a but-for cause. Nor is it a defense to insist that intentional discrimination based on homosexuality or transgender status is not intentional discrimination based on sex. An employer who discriminates against homosexual or transgender employees necessarily and intentionally applies sex-based rules. Nor does it make a difference

4   BOSTOCK *v.* CLAYTON COUNTY

Syllabus

that an employer could refuse to hire a gay or transgender individual without learning that person's sex. By intentionally setting out a rule that makes hiring turn on sex, the employer violates the law, whatever he might know or not know about individual applicants. The employers also stress that homosexuality and transgender status are distinct concepts from sex, and that if Congress wanted to address these matters in Title VII, it would have referenced them specifically. But when Congress chooses not to include any exceptions to a broad rule, this Court applies the broad rule. Finally, the employers suggest that because the policies at issue have the same adverse consequences for men and women, a stricter causation test should apply. That argument unavoidably comes down to a suggestion that sex must be the sole or primary cause of an adverse employment action under Title VII, a suggestion at odds with the statute. Pp. 16–23.

  (2) The employers contend that few in 1964 would have expected Title VII to apply to discrimination against homosexual and transgender persons. But legislative history has no bearing here, where no ambiguity exists about how Title VII's terms apply to the facts. See *Milner* v. *Department of Navy,* 562 U. S. 562, 574. While it is possible that a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context, the employers do not seek to use historical sources to illustrate that the meaning of any of Title VII's language has changed since 1964 or that the statute's terms ordinarily carried some missed message. Instead, they seem to say when a new application is both unexpected and important, even if it is clearly commanded by existing law, the Court should merely point out the question, refer the subject back to Congress, and decline to enforce the law's plain terms in the meantime. This Court has long rejected that sort of reasoning. And the employers' new framing may only add new problems and leave the Court with more than a little law to overturn. Finally, the employers turn to naked policy appeals, suggesting that the Court proceed without the law's guidance to do what it thinks best. That is an invitation that no court should ever take up. Pp. 23–33.

No. 17–1618, 723 Fed. Appx. 964, reversed and remanded; No. 17–1623, 883 F. 3d 100, and No. 18–107, 884 F. 3d 560, affirmed.

  Gorsuch, J., delivered the opinion of the Court, in which Roberts, C. J., and Ginsburg, Breyer, Sotomayor, and Kagan, JJ., joined. Alito, J., filed a dissenting opinion, in which Thomas, J., joined. Kavanaugh, J., filed a dissenting opinion.

Cite as: 590 U. S. ____ (2020)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 17–1618, 17–1623 and 18–107

_____

GERALD LYNN BOSTOCK, PETITIONER
17–1618                    *v.*

CLAYTON COUNTY, GEORGIA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT


ALTITUDE EXPRESS, INC., ET AL., PETITIONERS
17–1623                    *v.*
MELISSA ZARDA AND WILLIAM ALLEN MOORE, JR.,
CO-INDEPENDENT EXECUTORS OF THE ESTATE OF
DONALD ZARDA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT


R.G. & G.R. HARRIS FUNERAL HOMES, INC.,
PETITIONER
18–107                    *v.*
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 15, 2020]

JUSTICE GORSUCH delivered the opinion of the Court.

Opinion of the Court

Sometimes small gestures can have unexpected consequences. Major initiatives practically guarantee them. In our time, few pieces of federal legislation rank in significance with the Civil Rights Act of 1964. There, in Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin. Today, we must decide whether an employer can fire someone simply for being homosexual or transgender. The answer is clear. An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids.

Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. Likely, they weren't thinking about many of the Act's consequences that have become apparent over the years, including its prohibition against discrimination on the basis of motherhood or its ban on the sexual harassment of male employees. But the limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit.

I

Few facts are needed to appreciate the legal question we face. Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status.

Gerald Bostock worked for Clayton County, Georgia, as a child welfare advocate. Under his leadership, the county won national awards for its work. After a decade with the

Opinion of the Court

county, Mr. Bostock began participating in a gay recreational softball league. Not long after that, influential members of the community allegedly made disparaging comments about Mr. Bostock's sexual orientation and participation in the league. Soon, he was fired for conduct "unbecoming" a county employee.

Donald Zarda worked as a skydiving instructor at Altitude Express in New York. After several seasons with the company, Mr. Zarda mentioned that he was gay and, days later, was fired.

Aimee Stephens worked at R. G. & G. R. Harris Funeral Homes in Garden City, Michigan. When she got the job, Ms. Stephens presented as a male. But two years into her service with the company, she began treatment for despair and loneliness. Ultimately, clinicians diagnosed her with gender dysphoria and recommended that she begin living as a woman. In her sixth year with the company, Ms. Stephens wrote a letter to her employer explaining that she planned to "live and work full-time as a woman" after she returned from an upcoming vacation. The funeral home fired her before she left, telling her "this is not going to work out."

While these cases began the same way, they ended differently. Each employee brought suit under Title VII alleging unlawful discrimination on the basis of sex. 78 Stat. 255, 42 U. S. C. §2000e–2(a)(1). In Mr. Bostock's case, the Eleventh Circuit held that the law does not prohibit employers from firing employees for being gay and so his suit could be dismissed as a matter of law. 723 Fed. Appx. 964 (2018). Meanwhile, in Mr. Zarda's case, the Second Circuit concluded that sexual orientation discrimination does violate Title VII and allowed his case to proceed. 883 F. 3d 100 (2018). Ms. Stephens's case has a more complex procedural history, but in the end the Sixth Circuit reached a decision along the same lines as the Second Circuit's, holding that Title VII bars employers from firing employees because of

their transgender status.  884 F. 3d 560 (2018).  During the course of the proceedings in these long-running disputes, both Mr. Zarda and Ms. Stephens have passed away.  But their estates continue to press their causes for the benefit of their heirs.  And we granted certiorari in these matters to resolve at last the disagreement among the courts of appeals over the scope of Title VII's protections for homosexual and transgender persons.  587 U. S. ___ (2019).

## II

This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment.  After all, only the words on the page constitute the law adopted by Congress and approved by the President.  If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.  And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.  See *New Prime Inc.* v. *Oliveira*, 586 U. S. ___, ___–___ (2019) (slip op., at 6–7).

With this in mind, our task is clear.  We must determine the ordinary public meaning of Title VII's command that it is "unlawful . . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." §2000e–2(a)(1).  To do so, we orient ourselves to the time of the statute's adoption, here 1964, and begin by examining the key statutory terms in turn before assessing their impact on the cases at hand and then confirming our work against this Court's precedents.

Opinion of the Court

### A

The only statutorily protected characteristic at issue in today's cases is "sex"—and that is also the primary term in Title VII whose meaning the parties dispute. Appealing to roughly contemporaneous dictionaries, the employers say that, as used here, the term "sex" in 1964 referred to "status as either male or female [as] determined by reproductive biology." The employees counter by submitting that, even in 1964, the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation. But because nothing in our approach to these cases turns on the outcome of the parties' debate, and because the employees concede the point for argument's sake, we proceed on the assumption that "sex" signified what the employers suggest, referring only to biological distinctions between male and female.

Still, that's just a starting point. The question isn't just what "sex" meant, but what Title VII says about it. Most notably, the statute prohibits employers from taking certain actions "because of" sex. And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 350 (2013) (citing *Gross* v. *FBL Financial Services, Inc.*, 557 U. S. 167, 176 (2009); quotation altered). In the language of law, this means that Title VII's "because of" test incorporates the "'simple'" and "traditional" standard of but-for causation. *Nassar*, 570 U. S., at 346, 360. That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. See *Gross*, 557 U. S., at 176. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.

This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident

occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. Cf. *Burrage* v. *United States*, 571 U. S. 204, 211–212 (2014). When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law. See *ibid.*; *Nassar*, 570 U. S., at 350.

No doubt, Congress could have taken a more parsimonious approach. As it has in other statutes, it could have added "solely" to indicate that actions taken "because of" the confluence of multiple factors do not violate the law. Cf. 11 U. S. C. §525; 16 U. S. C. §511. Or it could have written "primarily because of" to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision. Cf. 22 U. S. C. §2688. But none of this is the law we have. If anything, Congress has moved in the opposite direction, supplementing Title VII in 1991 to allow a plaintiff to prevail merely by showing that a protected trait like sex was a "motivating factor" in a defendant's challenged employment practice. Civil Rights Act of 1991, §107, 105 Stat. 1075, codified at 42 U. S. C. §2000e–2(m). Under this more forgiving standard, liability can sometimes follow even if sex *wasn't* a but-for cause of the employer's challenged decision. Still, because nothing in our analysis depends on the motivating factor test, we focus on the more traditional but-for causation standard that continues to afford a viable, if no longer exclusive, path to relief under Title VII. §2000e–2(a)(1).

As sweeping as even the but-for causation standard can be, Title VII does not concern itself with everything that happens "because of" sex. The statute imposes liability on

employers only when they "fail or refuse to hire," "discharge," "or otherwise . . . discriminate against" someone because of a statutorily protected characteristic like sex. *Ibid.* The employers acknowledge that they discharged the plaintiffs in today's cases, but assert that the statute's list of verbs is qualified by the last item on it: "otherwise . . . discriminate against." By virtue of the word *otherwise*, the employers suggest, Title VII concerns itself not with every discharge, only with those discharges that involve discrimination.

Accepting this point, too, for argument's sake, the question becomes: What did "discriminate" mean in 1964? As it turns out, it meant then roughly what it means today: "To make a difference in treatment or favor (of one as compared with others)." Webster's New International Dictionary 745 (2d ed. 1954). To "discriminate against" a person, then, would seem to mean treating that individual worse than others who are similarly situated. See *Burlington N. & S. F. R. Co.* v. *White*, 548 U. S. 53, 59 (2006). In so-called "disparate treatment" cases like today's, this Court has also held that the difference in treatment based on sex must be intentional. See, *e.g., Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 986 (1988). So, taken together, an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII.

At first glance, another interpretation might seem possible. Discrimination sometimes involves "the act, practice, or an instance of discriminating categorically rather than individually." Webster's New Collegiate Dictionary 326 (1975); see also *post,* at 27–28, n. 22 (ALITO, J., dissenting). On that understanding, the statute would require us to consider the employer's treatment of groups rather than individuals, to see how a policy affects one sex as a whole versus the other as a whole. That idea holds some intuitive appeal

Opinion of the Court

too. Maybe the law concerns itself simply with ensuring that employers don't treat women generally less favorably than they do men. So how can we tell which sense, individual or group, "discriminate" carries in Title VII?

The statute answers that question directly. It tells us three times—including immediately after the words "discriminate against"—that our focus should be on individuals, not groups: Employers may not "fail or refuse to hire or . . . discharge any *individual*, or otherwise . . . discriminate against any *individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such *individual's* . . . sex." §2000e–2(a)(1) (emphasis added). And the meaning of "individual" was as uncontroversial in 1964 as it is today: "A particular being as distinguished from a class, species, or collection." Webster's New International Dictionary, at 1267. Here, again, Congress could have written the law differently. It might have said that "it shall be an unlawful employment practice to prefer one sex to the other in hiring, firing, or the terms or conditions of employment." It might have said that there should be no "sex discrimination," perhaps implying a focus on differential treatment between the two sexes as groups. More narrowly still, it could have forbidden only "sexist policies" against women as a class. But, once again, that is not the law we have.

The consequences of the law's focus on individuals rather than groups are anything but academic. Suppose an employer fires a woman for refusing his sexual advances. It's no defense for the employer to note that, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall. The employer is liable for treating *this* woman worse in part because of her sex. Nor is it a defense for an employer to say it discriminates against both men and women because of sex. This statute works to protect individuals of both sexes from discrimination, and does so

Opinion of the Court

equally. So an employer who fires a woman, Hannah, be-
cause she is insufficiently feminine and also fires a man,
Bob, for being insufficiently masculine may treat men and
women as groups more or less equally. But in *both* cases
the employer fires an individual in part because of sex. In-
stead of avoiding Title VII exposure, this employer doubles
it.

### B

From the ordinary public meaning of the statute's lan-
guage at the time of the law's adoption, a straightforward
rule emerges: An employer violates Title VII when it inten-
tionally fires an individual employee based in part on sex.
It doesn't matter if other factors besides the plaintiff's sex
contributed to the decision. And it doesn't matter if the em-
ployer treated women as a group the same when compared
to men as a group. If the employer intentionally relies in
part on an individual employee's sex when deciding to dis-
charge the employee—put differently, if changing the em-
ployee's sex would have yielded a different choice by the em-
ployer—a statutory violation has occurred. Title VII's
message is "simple but momentous": An individual em-
ployee's sex is "not relevant to the selection, evaluation, or
compensation of employees." *Price Waterhouse* v. *Hopkins*,
490 U. S. 228, 239 (1989) (plurality opinion).

The statute's message for our cases is equally simple and
momentous: An individual's homosexuality or transgender
status is not relevant to employment decisions. That's be-
cause it is impossible to discriminate against a person for
being homosexual or transgender without discriminating
against that individual based on sex. Consider, for exam-
ple, an employer with two employees, both of whom are at-
tracted to men. The two individuals are, to the employer's
mind, materially identical in all respects, except that one is
a man and the other a woman. If the employer fires the

male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

That distinguishes these cases from countless others where Title VII has nothing to say. Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent. But unlike any of these other traits or actions, homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.

Nor does it matter that, when an employer treats one employee worse because of that individual's sex, other factors may contribute to the decision. Consider an employer with a policy of firing any woman he discovers to be a Yankees fan. Carrying out that rule because an employee is a woman *and* a fan of the Yankees is a firing "because of sex" if the employer would have tolerated the same allegiance in a male employee. Likewise here.

Opinion of the Court

When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play—*both* the individual's sex *and* something else (the sex to which the individual is attracted or with which the individual identifies).  But Title VII doesn't care.  If an employer would not have discharged an employee but for that individual's sex, the statute's causation standard is met, and liability may attach.

Reframing the additional causes in today's cases as additional intentions can do no more to insulate the employers from liability.  Intentionally burning down a neighbor's house is arson, even if the perpetrator's ultimate intention (or motivation) is only to improve the view.  No less, intentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal of discriminating against homosexual or transgender employees.  There is simply no escaping the role intent plays here: Just as sex is necessarily a but-for *cause* when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably *intends* to rely on sex in its decisionmaking.  Imagine an employer who has a policy of firing any employee known to be homosexual.  The employer hosts an office holiday party and invites employees to bring their spouses.  A model employee arrives and introduces a manager to Susan, the employee's wife.  Will that employee be fired?  If the policy works as the employer intends, the answer depends entirely on whether the model employee is a man or a woman.  To be sure, that employer's ultimate goal might be to discriminate on the basis of sexual orientation.  But to achieve that purpose the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex.

An employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender.  Title VII liability is

not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women. Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII. So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.

At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings. For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex. That has always been prohibited by Title VII's plain terms—and that "should be the end of the analysis." 883 F. 3d, at 135 (Cabranes, J., concurring in judgment).

### C

If more support for our conclusion were required, there's no need to look far. All that the statute's plain terms suggest, this Court's cases have already confirmed. Consider three of our leading precedents.

In *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 (1971) (*per curiam*), a company allegedly refused to hire women with young children, but did hire men with children the same age. Because its discrimination depended not only on the employee's sex as a female but also on the presence of another criterion—namely, being a parent of young children—the company contended it hadn't engaged in discrimination "because of" sex. The company maintained, too, that it hadn't violated the law because, as a whole, it tended to favor hiring women over men. Unsurprisingly by now,

Opinion of the Court

these submissions did not sway the Court. That an employer discriminates intentionally against an individual only in part because of sex supplies no defense to Title VII. Nor does the fact an employer may happen to favor women as a class.

In *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702 (1978), an employer required women to make larger pension fund contributions than men. The employer sought to justify its disparate treatment on the ground that women tend to live longer than men, and thus are likely to receive more from the pension fund over time. By everyone's admission, the employer was not guilty of animosity against women or a "purely habitual assumptio[n] about a woman's inability to perform certain kinds of work"; instead, it relied on what appeared to be a statistically accurate statement about life expectancy. *Id.*, at 707–708. Even so, the Court recognized, a rule that appears evenhanded at the group level can prove discriminatory at the level of individuals. True, women as a class may live longer than men as a class. But "[t]he statute's focus on the individual is unambiguous," and any individual woman might make the larger pension contributions and still die as early as a man. *Id.*, at 708. Likewise, the Court dismissed as irrelevant the employer's insistence that its actions were motivated by a wish to achieve classwide equality between the sexes: An employer's intentional discrimination on the basis of sex is no more permissible when it is prompted by some further intention (or motivation), even one as prosaic as seeking to account for actuarial tables. *Ibid.* The employer violated Title VII because, when its policy worked exactly as planned, it could not "pass the simple test" asking whether an individual female employee would have been treated the same regardless of her sex. *Id.*, at 711.

In *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75 (1998), a male plaintiff alleged that he was singled out by his male co-workers for sexual harassment. The Court

14  BOSTOCK *v.* CLAYTON COUNTY

Opinion of the Court

held it was immaterial that members of the same sex as the victim committed the alleged discrimination. Nor did the Court concern itself with whether men as a group were subject to discrimination or whether something in addition to sex contributed to the discrimination, like the plaintiff's conduct or personal attributes. "[A]ssuredly," the case didn't involve "the principal evil Congress was concerned with when it enacted Title VII." *Id.*, at 79. But, the Court unanimously explained, it is "the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Ibid.* Because the plaintiff alleged that the harassment would not have taken place but for his sex—that is, the plaintiff would not have suffered similar treatment if he were female—a triable Title VII claim existed.

The lessons these cases hold for ours are by now familiar.

First, it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it. In *Manhart*, the employer called its rule requiring women to pay more into the pension fund a "life expectancy" adjustment necessary to achieve sex equality. In *Phillips*, the employer could have accurately spoken of its policy as one based on "motherhood." In much the same way, today's employers might describe their actions as motivated by their employees' homosexuality or transgender status. But just as labels and additional intentions or motivations didn't make a difference in *Manhart* or *Phillips*, they cannot make a difference here. When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex. And that is all Title VII has ever demanded to establish liability.

Second, the plaintiff's sex need not be the sole or primary cause of the employer's adverse action. In *Phillips*, *Manhart*, and *Oncale*, the defendant easily could have pointed to some other, nonprotected trait and insisted it was the

Opinion of the Court

more important factor in the adverse employment outcome. So, too, it has no significance here if another factor—such as the sex the plaintiff is attracted to or presents as—might also be at work, or even play a more important role in the employer's decision.

Finally, an employer cannot escape liability by demonstrating that it treats males and females comparably as groups. As *Manhart* teaches, an employer is liable for intentionally requiring an individual female employee to pay more into a pension plan than a male counterpart even if the scheme promotes equality at the group level. Likewise, an employer who intentionally fires an individual homosexual or transgender employee in part because of that individual's sex violates the law even if the employer is willing to subject all male and female homosexual or transgender employees to the same rule.

III

What do the employers have to say in reply? For present purposes, they do not dispute that they fired the plaintiffs for being homosexual or transgender. Sorting out the true reasons for an adverse employment decision is often a hard business, but none of that is at issue here. Rather, the employers submit that even intentional discrimination against employees based on their homosexuality or transgender status supplies no basis for liability under Title VII.

The employers' argument proceeds in two stages. Seeking footing in the statutory text, they begin by advancing a number of reasons why discrimination on the basis of homosexuality or transgender status doesn't involve discrimination because of sex. But each of these arguments turns out only to repackage errors we've already seen and this Court's precedents have already rejected. In the end, the employers are left to retreat beyond the statute's text, where they fault us for ignoring the legislature's purposes

in enacting Title VII or certain expectations about its oper-
ation. They warn, too, about consequences that might fol-
low a ruling for the employees. But none of these conten-
tions about what the employers think the law was meant to
do, or should do, allow us to ignore the law as it is.

### A

Maybe most intuitively, the employers assert that dis-
crimination on the basis of homosexuality and transgender
status aren't referred to as sex discrimination in ordinary
conversation. If asked by a friend (rather than a judge) why
they were fired, even today's plaintiffs would likely respond
that it was because they were gay or transgender, not be-
cause of sex. According to the employers, that conversa-
tional answer, not the statute's strict terms, should guide
our thinking and suffice to defeat any suggestion that the
employees now before us were fired because of sex. Cf. *post,*
at 3 (ALITO, J., dissenting); *post,* at 8–13 (KAVANAUGH, J.,
dissenting).

But this submission rests on a mistaken understanding
of what kind of cause the law is looking for in a Title VII
case. In conversation, a speaker is likely to focus on what
seems most relevant or informative to the listener. So an
employee who has just been fired is likely to identify the
primary or most direct cause rather than list literally every
but-for cause. To do otherwise would be tiring at best. But
these conversational conventions do not control Title VII's
legal analysis, which asks simply whether sex was a but-for
cause. In *Phillips,* for example, a woman who was not hired
under the employer's policy might have told her friends that
her application was rejected because she was a mother, or
because she had young children. Given that many women
could be hired under the policy, it's unlikely she would say
she was not hired because she was a woman. But the Court
did not hesitate to recognize that the employer in *Phillips*
discriminated against the plaintiff because of her sex. Sex

Opinion of the Court

wasn't the only factor, or maybe even the main factor, but it was one but-for cause—and that was enough. You can call the statute's but-for causation test what you will—expansive, legalistic, the dissents even dismiss it as wooden or literal. But it is the law.

Trying another angle, the defendants before us suggest that an employer who discriminates based on homosexuality or transgender status doesn't *intentionally* discriminate based on sex, as a disparate treatment claim requires. See *post*, at 9–12 (ALITO, J., dissenting); *post*, at 12–13 (KAVANAUGH, J., dissenting). But, as we've seen, an employer who discriminates against homosexual or transgender employees necessarily and intentionally applies sex-based rules. An employer that announces it will not employ anyone who is homosexual, for example, intends to penalize male employees for being attracted to men and female employees for being attracted to women.

What, then, do the employers mean when they insist intentional discrimination based on homosexuality or transgender status isn't intentional discrimination based on sex? Maybe the employers mean they don't intend to harm one sex or the other as a class. But as should be clear by now, the statute focuses on discrimination against individuals, not groups. Alternatively, the employers may mean that they don't perceive themselves as motivated by a desire to discriminate based on sex. But nothing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination. In *Manhart*, the employer intentionally required women to make higher pension contributions only to fulfill the further purpose of making things more equitable between men and women as groups. In *Phillips*, the employer may have perceived itself as discriminating based on motherhood, not sex, given that its hiring policies as a whole *favored* women. But in both cases, the Court set all this aside as irrelevant. The employers' policies involved intentional discrimination

because of sex, and Title VII liability necessarily followed.

Aren't these cases different, the employers ask, given that an employer could refuse to hire a gay or transgender individual without ever learning the applicant's sex? Suppose an employer asked homosexual or transgender applicants to tick a box on its application form. The employer then had someone else redact any information that could be used to discern sex. The resulting applications would disclose which individuals are homosexual or transgender without revealing whether they also happen to be men or women. Doesn't that possibility indicate that the employer's discrimination against homosexual or transgender persons cannot be sex discrimination?

No, it doesn't. Even in this example, the individual applicant's sex still weighs as a factor in the employer's decision. Change the hypothetical ever so slightly and its flaws become apparent. Suppose an employer's application form offered a single box to check if the applicant is either black or Catholic. If the employer refuses to hire anyone who checks that box, would we conclude the employer has complied with Title VII, so long as it studiously avoids learning any particular applicant's race or religion? Of course not: By intentionally setting out a rule that makes hiring turn on race or religion, the employer violates the law, whatever he might know or not know about individual applicants.

The same holds here. There is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex. To see why, imagine an applicant doesn't know what the words homosexual or transgender mean. Then try writing out instructions for who should check the box without using the words man, woman, or sex (or some synonym). It can't be done. Likewise, there is no way an employer can discriminate against those who check the homosexual or transgender box without discriminating in part because of an applicant's sex. By discriminating against homosexuals, the employer intentionally penalizes

Opinion of the Court

men for being attracted to men and women for being attracted to women.  By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today.  Any way you slice it, the employer intentionally refuses to hire applicants in part because of the affected individuals' sex, even if it never learns any applicant's sex.

Next, the employers turn to Title VII's list of protected characteristics—race, color, religion, sex, and national origin.  Because homosexuality and transgender status can't be found on that list and because they are conceptually distinct from sex, the employers reason, they are implicitly excluded from Title VII's reach.  Put another way, if Congress had wanted to address these matters in Title VII, it would have referenced them specifically.  Cf. *post,* at 7–8 (ALITO, J., dissenting); *post,* at 13–15 (KAVANAUGH, J., dissenting).

But that much does not follow.  We agree that homosexuality and transgender status are distinct concepts from sex.  But, as we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.  Nor is there any such thing as a "canon of donut holes," in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception.  Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.  And that is exactly how this Court has always approached Title VII.  "Sexual harassment" is conceptually distinct from sex discrimination, but it can fall within Title VII's sweep.  *Oncale*, 523 U. S., at 79–80.  Same with "motherhood discrimination."  See *Phillips*, 400 U. S., at 544.  Would the employers have us reverse those cases on the theory that Congress could have spoken to those problems more specifically?  Of course not.  As enacted, Title VII prohibits all forms of discrimination because of sex, however

they may manifest themselves or whatever other labels might attach to them.

The employers try the same point another way. Since 1964, they observe, Congress has considered several proposals to add sexual orientation to Title VII's list of protected characteristics, but no such amendment has become law. Meanwhile, Congress has enacted other statutes addressing other topics that do discuss sexual orientation. This postenactment legislative history, they urge, should tell us something. Cf. *post*, at 2, 42–43 (ALITO, J., dissenting); *post*, at 4, 15–16 (KAVANAUGH, J., dissenting).

But what? There's no authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one. Maybe some in the later legislatures understood the impact Title VII's broad language already promised for cases like ours and didn't think a revision needed. Maybe others knew about its impact but hoped no one else would notice. Maybe still others, occupied by other concerns, didn't consider the issue at all. All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a "particularly dangerous" basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt. *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 650 (1990); see also *United States* v. *Wells*, 519 U. S. 482, 496 (1997); *Sullivan* v. *Finkelstein*, 496 U. S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote").

That leaves the employers to seek a different sort of exception. Maybe the traditional and simple but-for causation test should apply in all other Title VII cases, but it just doesn't work when it comes to cases involving homosexual and transgender employees. The test is too blunt to capture the nuances here. The employers illustrate their concern with an example. When we apply the simple test to Mr.

Case 16-2424   Document 95   Filed 06/30/17   Page 25

Opinion of the Court

Bostock—asking whether Mr. Bostock, a man attracted to
other men, would have been fired had he been a woman—
we don't just change his sex. Along the way, we change his
sexual orientation too (from homosexual to heterosexual).
If the aim is to isolate whether a plaintiff's sex caused the
dismissal, the employers stress, we must hold sexual orien-
tation constant—meaning we need to change both his sex
and the sex to which he is attracted. So for Mr. Bostock,
the question should be whether he would've been fired if he
were a woman attracted to women. And because his em-
ployer would have been as quick to fire a lesbian as it was
a gay man, the employers conclude, no Title VII violation
has occurred.

    While the explanation is new, the mistakes are the same.
The employers might be onto something if Title VII only en-
sured equal treatment between groups of men and women
or if the statute applied only when sex is the sole or primary
reason for an employer's challenged adverse employment
action. But both of these premises are mistaken. Title VII's
plain terms and our precedents don't care if an employer
treats men and women comparably as groups; an employer
who fires both lesbians and gay men equally doesn't dimin-
ish but doubles its liability. Just cast a glance back to *Man-
hart*, where it was no defense that the employer sought to
equalize pension contributions based on life expectancy.
Nor does the statute care if other factors besides sex con-
tribute to an employer's discharge decision. Mr. Bostock's
employer might have decided to fire him only because of the
confluence of two factors, his sex and the sex to which he is
attracted. But exactly the same might have been said in
*Phillips*, where motherhood was the added variable.

    Still, the employers insist, something seems different
here. Unlike certain other employment policies this Court
has addressed that harmed only women or only men, the
employers' policies in the cases before us have the same ad-
verse consequences for men and women. How could sex be

necessary to the result if a member of the opposite sex
might face the same outcome from the same policy?

What the employers see as unique isn't even unusual. Of-
ten in life and law two but-for factors combine to yield a
result that could have also occurred in some other way. Im-
agine that it's a nice day outside and your house is too
warm, so you decide to open the window. Both the cool tem-
perature outside and the heat inside are but-for causes of
your choice to open the window. That doesn't change just
because you also would have opened the window had it been
warm outside and cold inside. In either case, no one would
deny that the window is open "because of" the outside tem-
perature. Our cases are much the same. So, for example,
when it comes to homosexual employees, male sex and at-
traction to men are but-for factors that can combine to get
them fired. The fact that female sex and attraction to
women can *also* get an employee fired does no more than
show the same outcome can be achieved through the com-
bination of different factors. In either case, though, sex
plays an essential but-for role.

At bottom, the employers' argument unavoidably comes
down to a suggestion that sex must be the sole or primary
cause of an adverse employment action for Title VII liability
to follow. And, as we've seen, that suggestion is at odds
with everything we know about the statute. Consider an
employer eager to revive the workplace gender roles of the
1950s. He enforces a policy that he will hire only men as
mechanics and only women as secretaries. When a quali-
fied woman applies for a mechanic position and is denied,
the "simple test" immediately spots the discrimination: A
qualified man would have been given the job, so sex was a
but-for cause of the employer's refusal to hire. But like the
employers before us today, this employer would say not so
fast. By comparing the woman who applied to be a me-
chanic to a man who applied to be a mechanic, we've quietly

Opinion of the Court

changed two things: the applicant's sex and her trait of fail-
ing to conform to 1950s gender roles. The "simple test" thus
overlooks that it is really the applicant's bucking of 1950s
gender roles, not her sex, doing the work. So we need to
hold that second trait constant: Instead of comparing the
disappointed female applicant to a man who applied for the
same position, the employer would say, we should compare
her to a man who applied to be a secretary. And because
that jobseeker would be refused too, this must not be sex
discrimination.

No one thinks *that*, so the employers must scramble to
justify deploying a stricter causation test for use only in
cases involving discrimination based on sexual orientation
or transgender status. Such a rule would create a curious
discontinuity in our case law, to put it mildly. Employer
hires based on sexual stereotypes? Simple test. Employer
sets pension contributions based on sex? Simple test. Em-
ployer fires men who do not behave in a sufficiently mascu-
line way around the office? Simple test. But when that
same employer discriminates against women who are at-
tracted to women, or persons identified at birth as women
who later identify as men, we suddenly roll out a new and
more rigorous standard? Why are *these* reasons for taking
sex into account different from all the rest? Title VII's text
can offer no answer.

### B

Ultimately, the employers are forced to abandon the stat-
utory text and precedent altogether and appeal to assump-
tions and policy. Most pointedly, they contend that few in
1964 would have expected Title VII to apply to discrimina-
tion against homosexual and transgender persons. And
whatever the text and our precedent indicate, they say,
shouldn't this fact cause us to pause before recognizing lia-
bility?

It might be tempting to reject this argument out of hand.

24          BOSTOCK *v.* CLAYTON COUNTY

This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.  The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration.  See, *e.g.*, *Carcieri* v. *Salazar*, 555 U. S. 379, 387 (2009); *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992); *Rubin* v. *United States*, 449 U. S. 424, 430 (1981).  Of course, some Members of this Court have consulted legislative history when interpreting *ambiguous* statutory language.  Cf. *post*, at 40 (ALITO, J., dissenting).  But that has no bearing here.  "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner* v. *Department of Navy*, 562 U. S. 562, 574 (2011). And as we have seen, no ambiguity exists about how Title VII's terms apply to the facts before us.  To be sure, the statute's application in these cases reaches "beyond the principal evil" legislators may have intended or expected to address.  *Oncale*, 523 U. S., at 79.  But "'the fact that [a statute] has been applied in situations not expressly anticipated by Congress'" does not demonstrate ambiguity; instead, it simply "'demonstrates [the] breadth'" of a legislative command.  *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 499 (1985).  And "it is ultimately the provisions of" those legislative commands "rather than the principal concerns of our legislators by which we are governed."  *Oncale*, 523 U. S., at 79; see also A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) (noting that unexpected applications of broad language reflect only Congress's "presumed point [to] produce general coverage— not to leave room for courts to recognize ad hoc exceptions").

Still, while legislative history can never defeat unambiguous statutory text, historical sources can be useful for a different purpose: Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing

Opinion of the Court

today or in one context might have meant something else at the time of its adoption or might mean something different in another context.  And we must be attuned to the possibility that a statutory phrase ordinarily bears a different meaning than the terms do when viewed individually or literally.  To ferret out such shifts in linguistic usage or subtle distinctions between literal and ordinary meaning, this Court has sometimes consulted the understandings of the law's drafters as some (not always conclusive) evidence.  For example, in the context of the National Motor Vehicle Theft Act, this Court admitted that the term "vehicle" in 1931 could literally mean "a conveyance working on land, water or air." *McBoyle* v. *United States*, 283 U. S. 25, 26 (1931).  But given contextual clues and "everyday speech" at the time of the Act's adoption in 1919, this Court concluded that "vehicles" in that statute included only things "moving on land," not airplanes too. *Ibid.*  Similarly, in *New Prime*, we held that, while the term "contracts of employment" today might seem to encompass only contracts with employees, at the time of the statute's adoption the phrase was ordinarily understood to cover contracts with independent contractors as well.  586 U. S., at ___–___ (slip op., at 6–9).  Cf. *post,* at 7–8 (KAVANAUGH, J., dissenting) (providing additional examples).

The employers, however, advocate nothing like that here. They do not seek to use historical sources to illustrate that the meaning of any of Title VII's language has changed since 1964 or that the statute's terms, whether viewed individually or as a whole, ordinarily carried some message we have missed.  To the contrary, as we have seen, the employers *agree* with our understanding of all the statutory language—"discriminate against any individual . . . because of such individual's . . . sex."  Nor do the competing dissents offer an alternative account about what these terms mean either when viewed individually or in the ag-

26        BOSTOCK *v.* CLAYTON COUNTY

Opinion of the Court

gregate. Rather than suggesting that the statutory language bears some other *meaning*, the employers and dissents merely suggest that, because few in 1964 expected today's *result*, we should not dare to admit that it follows ineluctably from the statutory text. When a new application emerges that is both unexpected and important, they would seemingly have us merely point out the question, refer the subject back to Congress, and decline to enforce the plain terms of the law in the meantime.

That is exactly the sort of reasoning this Court has long rejected. Admittedly, the employers take pains to couch their argument in terms of seeking to honor the statute's "expected applications" rather than vindicate its "legislative intent." But the concepts are closely related. One could easily contend that legislators only intended expected applications or that a statute's purpose is limited to achieving applications foreseen at the time of enactment. However framed, the employer's logic impermissibly seeks to displace the plain meaning of the law in favor of something lying beyond it.

If anything, the employers' new framing may only add new problems. The employers assert that "no one" in 1964 or for some time after would have anticipated today's result. But is that really true? Not long after the law's passage, gay and transgender employees began filing Title VII complaints, so at least *some* people foresaw this potential application. See, *e.g.*, *Smith* v. *Liberty Mut. Ins. Co.*, 395 F. Supp. 1098, 1099 (ND Ga. 1975) (addressing claim from 1969); *Holloway* v. *Arthur Andersen & Co.*, 566 F. 2d 659, 661 (CA9 1977) (addressing claim from 1974). And less than a decade after Title VII's passage, during debates over the Equal Rights Amendment, others counseled that its language—which was strikingly similar to Title VII's—might also protect homosexuals from discrimination. See, *e.g.*, Note, The Legality of Homosexual Marriage, 82 Yale L. J. 573, 583–584 (1973).

Opinion of the Court

Why isn't that enough to demonstrate that today's result isn't totally unexpected? How many people have to foresee the application for it to qualify as "expected"? Do we look only at the moment the statute was enacted, or do we allow some time for the implications of a new statute to be worked out? Should we consider the expectations of those who had no reason to give a particular application any thought or only those with reason to think about the question? How do we account for those who change their minds over time, after learning new facts or hearing a new argument? How specifically or generally should we frame the "application" at issue? None of these questions have obvious answers, and the employers don't propose any.

One could also reasonably fear that objections about unexpected applications will not be deployed neutrally. Often lurking just behind such objections resides a cynicism that Congress could not *possibly* have meant to protect a disfavored group. Take this Court's encounter with the Americans with Disabilities Act's directive that no "'public entity'" can discriminate against any "'qualified individual with a disability.'" *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 208 (1998). Congress, of course, didn't list every public entity the statute would apply to. And no one batted an eye at its application to, say, post offices. But when the statute was applied to *prisons*, curiously, some demanded a closer look: Pennsylvania argued that "Congress did not 'envisio[n] that the ADA would be applied to state prisoners.'" *Id.*, at 211–212. This Court emphatically rejected that view, explaining that, "in the context of an unambiguous statutory text," whether a specific application was anticipated by Congress "is irrelevant." *Id.*, at 212. As *Yeskey* and today's cases exemplify, applying protective laws to groups that were politically unpopular at the time of the law's passage—whether prisoners in the 1990s or homosexual and transgender employees

in the 1960s—often may be seen as unexpected.  But to re-
fuse enforcement just because of that, because the parties
before us happened to be unpopular at the time of the law's
passage, would not only require us to abandon our role as
interpreters of statutes; it would tilt the scales of justice in
favor of the strong or popular and neglect the promise that
all persons are entitled to the benefit of the law's terms.  Cf.
*post*, at 28–35 (ALITO, J., dissenting); *post,* at 21–22
(KAVANAUGH, J., dissenting).

   The employer's position also proves too much.  If we ap-
plied Title VII's plain text only to applications some (yet-to-
be-determined) group expected in 1964, we'd have more
than a little law to overturn.  Start with *Oncale*.  How many
people in 1964 could have expected that the law would turn
out to protect male employees?  Let alone to protect them
from harassment by other male employees?  As we acknowl-
edged at the time, "male-on-male sexual harassment in the
workplace was assuredly not the principal evil Congress
was concerned with when it enacted Title VII."  523 U. S.,
at 79.  Yet the Court did not hesitate to recognize that Title
VII's plain terms forbade it.  Under the employer's logic, it
would seem this was a mistake.

   That's just the beginning of the law we would have to un-
ravel.  As one Equal Employment Opportunity Commission
(EEOC) Commissioner observed shortly after the law's pas-
sage, the words of "'the sex provision of Title VII [are] diffi-
cult to . . . control.'"  Franklin, Inventing the "Traditional
Concept" of Sex Discrimination, 125 Harv. L. Rev. 1307,
1338 (2012) (quoting Federal Mediation Service To Play
Role in Implementing Title VII, [1965–1968 Transfer
Binder] CCH Employment Practices ¶8046, p. 6074).  The
"difficult[y]" may owe something to the initial proponent of
the sex discrimination rule in Title VII, Representative
Howard Smith.  On some accounts, the congressman may
have wanted (or at least was indifferent to the possibility

Opinion of the Court

of ) broad language with wide-ranging effect. Not neces-
sarily because he was interested in rooting out sex discrim-
ination in all its forms, but because he may have hoped to
scuttle the whole Civil Rights Act and thought that adding
language covering sex discrimination would serve as a poi-
son pill. See C. Whalen & B. Whalen, The Longest Debate:
A Legislative History of the 1964 Civil Rights Act 115–118
(1985). Certainly nothing in the meager legislative history
of this provision suggests it was meant to be read narrowly.

Whatever his reasons,    thanks to the broad language
Representative Smith introduced, many, maybe most, ap-
plications of Title VII's sex provision were "unanticipated"
at the time of the law's adoption. In fact, many now-obvious
applications met with heated opposition early on, even
among those tasked with enforcing the law. In the years
immediately following Title VII's passage, the EEOC offi-
cially opined that listing men's positions and women's posi-
tions separately in job postings was simply helpful rather
than discriminatory. Franklin, 125 Harv. L. Rev., at 1340
(citing Press Release, EEOC (Sept. 22, 1965)). Some courts
held that Title VII did not prevent an employer from firing
an employee for refusing his sexual advances. See, *e.g.*,
*Barnes* v. *Train*, 1974 WL 10628, *1 (D DC, Aug. 9, 1974).
And courts held that a policy against hiring mothers but not
fathers of young children wasn't discrimination because of
sex. See *Phillips* v. *Martin Marietta Corp.*, 411 F. 2d 1 (CA5
1969), rev'd, 400 U. S. 542 (1971) (*per curiam*).

Over time, though, the breadth of the statutory language
proved too difficult to deny. By the end of the 1960s, the
EEOC reversed its stance on sex-segregated job advertis-
ing. See Franklin, 125 Harv. L. Rev., at 1345. In 1971, this
Court held that treating women with children differently
from men with children violated Title VII. *Phillips*, 400
U. S., at 544. And by the late 1970s, courts began to recog-
nize that sexual harassment can sometimes amount to sex
discrimination. See, *e.g.*, *Barnes* v. *Costle*, 561 F. 2d 983,

Opinion of the Court

990 (CADC 1977). While to the modern eye each of these examples may seem "plainly [to] constitut[e] discrimination because of biological sex," *post*, at 38 (ALITO, J., dissenting), all were hotly contested for years following Title VII's enactment. And as with the discrimination we consider today, many federal judges long accepted interpretations of Title VII that excluded these situations. Cf. *post*, at 21–22 (KAVANAUGH, J., dissenting) (highlighting that certain lower courts have rejected Title VII claims based on homosexuality and transgender status). Would the employers have us undo every one of these unexpected applications too?

The weighty implications of the employers' argument from expectations also reveal why they cannot hide behind the no-elephants-in-mouseholes canon. That canon recognizes that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman* v. *American Trucking Assns.*, *Inc.*, 531 U. S. 457, 468 (2001). But it has no relevance here. We can't deny that today's holding—that employers are prohibited from firing employees on the basis of homosexuality or transgender status—is an elephant. But where's the mousehole? Title VII's prohibition of sex discrimination in employment is a major piece of federal civil rights legislation. It is written in starkly broad terms. It has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them. Congress's key drafting choices—to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff's injuries— virtually guaranteed that unexpected applications would emerge over time. This elephant has never hidden in a mousehole; it has been standing before us all along.

With that, the employers are left to abandon their concern for expected applications and fall back to the last line

Cite as: 590 U. S. ____ (2020)          31

Opinion of the Court

of defense for all failing statutory interpretation argu-
ments: naked policy appeals. If we were to apply the stat-
ute's plain language, they complain, any number of unde-
sirable policy consequences would follow. Cf. *post*, at 44–54
(ALITO, J., dissenting). Gone here is any pretense of statu-
tory interpretation; all that's left is a suggestion we should
proceed without the law's guidance to do as we think best.
But that's an invitation no court should ever take up. The
place to make new legislation, or address unwanted conse-
quences of old legislation, lies in Congress. When it comes
to statutory interpretation, our role is limited to applying
the law's demands as faithfully as we can in the cases that
come before us. As judges we possess no special expertise
or authority to declare for ourselves what a self-governing
people should consider just or wise. And the same judicial
humility that requires us to refrain from adding to statutes
requires us to refrain from diminishing them.

What are these consequences anyway? The employers
worry that our decision will sweep beyond Title VII to other
federal or state laws that prohibit sex discrimination. And,
under Title VII itself, they say sex-segregated bathrooms,
locker rooms, and dress codes will prove unsustainable af-
ter our decision today. But none of these other laws are
before us; we have not had the benefit of adversarial testing
about the meaning of their terms, and we do not prejudge
any such question today. Under Title VII, too, we do not
purport to address bathrooms, locker rooms, or anything
else of the kind. The only question before us is whether an
employer who fires someone simply for being homosexual
or transgender has discharged or otherwise discriminated
against that individual "because of such individual's sex."
As used in Title VII, the term "'discriminate against'" refers
to "distinctions or differences in treatment that injure pro-
tected individuals." *Burlington N. & S. F. R.*, 548 U. S., at
59. Firing employees because of a statutorily protected
trait surely counts. Whether other policies and practices

Case 16-2424   Document: 95   Page: 36   Date Filed: 06/17/2020

might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these.

Separately, the employers fear that complying with Title VII's requirement in cases like ours may require some employers to violate their religious convictions. We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society. But worries about how Title VII may intersect with religious liberties are nothing new; they even predate the statute's passage. As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations. §2000e–1(a). This Court has also recognized that the First Amendment can bar the application of employment discrimination laws "to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 188 (2012). And Congress has gone a step further yet in the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, codified at 42 U. S. C. §2000bb *et seq.* That statute prohibits the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest. §2000bb–1. Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases. See §2000bb–3.

But how these doctrines protecting religious liberty interact with Title VII are questions for future cases too. Harris Funeral Homes did unsuccessfully pursue a RFRA-based defense in the proceedings below. In its certiorari petition, however, the company declined to seek review of that adverse decision, and no other religious liberty claim is now

Opinion of the Court

before us. So while other employers in other cases may raise free exercise arguments that merit careful consideration, none of the employers before us today represent in this Court that compliance with Title VII will infringe their own religious liberties in any way.

<div align="center">*</div>

Some of those who supported adding language to Title VII to ban sex discrimination may have hoped it would derail the entire Civil Rights Act. Yet, contrary to those intentions, the bill became law. Since then, Title VII's effects have unfolded with far-reaching consequences, some likely beyond what many in Congress or elsewhere expected.

But none of this helps decide today's cases. Ours is a society of written laws. Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations. In Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize today a necessary consequence of that legislative choice: An employer who fires an individual merely for being gay or transgender defies the law.

The judgments of the Second and Sixth Circuits in Nos. 17–1623 and 18–107 are affirmed. The judgment of the Eleventh Circuit in No. 17–1618 is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 17–1618, 17–1623 and 18–107

————

GERALD LYNN BOSTOCK, PETITIONER
17–1618       *v.*
CLAYTON COUNTY, GEORGIA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

ALTITUDE EXPRESS, INC., ET AL., PETITIONERS
17–1623       *v.*
MELISSA ZARDA AND WILLIAM ALLEN MOORE, JR.,
CO-INDEPENDENT EXECUTORS OF THE ESTATE OF
DONALD ZARDA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

R.G. & G.R. HARRIS FUNERAL HOMES, INC.,
PETITIONER
18–107       *v.*
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 15, 2020]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

There is only one word for what the Court has done today: legislation. The document that the Court releases is in the form of a judicial opinion interpreting a statute, but that is deceptive.

2                BOSTOCK *v.* CLAYTON COUNTY

ALITO, J., dissenting

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on any of five specified grounds: "race, color, religion, sex, [and] national origin." 42 U. S. C. §2000e–2(a)(1). Neither "sexual orientation" nor "gender identity" appears on that list. For the past 45 years, bills have been introduced in Congress to add "sexual orientation" to the list,[1] and in recent years, bills have included "gender identity" as well.[2] But to date, none has passed both Houses.

Last year, the House of Representatives passed a bill that would amend Title VII by defining sex discrimination to include both "sexual orientation" and "gender identity," H. R. 5, 116th Cong., 1st Sess. (2019), but the bill has stalled in the Senate. An alternative bill, H. R. 5331, 116th Cong., 1st Sess. (2019), would add similar prohibitions but contains provisions to protect religious liberty.[3] This bill remains before a House Subcommittee.

Because no such amendment of Title VII has been enacted in accordance with the requirements in the Constitution (passage in both Houses and presentment to the President, Art. I, §7, cl. 2), Title VII's prohibition of

———————

[1] *E.g.,* H. R. 166, 94th Cong., 1st Sess., §6 (1975); H. R. 451, 95th Cong., 1st Sess., §6 (1977); S. 2081, 96th Cong., 1st Sess. (1979); S. 1708, 97th Cong., 1st Sess. (1981); S. 430, 98th Cong., 1st Sess. (1983); S. 1432, 99th Cong., 1st Sess., §5 (1985); S. 464, 100th Cong., 1st Sess., §5 (1987); H. R. 655, 101st Cong., 1st Sess., §2 (1989); S. 574, 102d Cong., 1st Sess., §5 (1991); H. R. 423, 103d Cong., 1st Sess., §2 (1993); S. 932, 104th Cong., 1st Sess. (1995); H. R. 365, 105th Cong., 1st Sess., §2 (1997); H. R. 311, 106th Cong., 1st Sess., §2 (1999); H. R. 217, 107th Cong., 1st Sess., §2 (2001); S. 16, 108th Cong., 1st Sess., §§701–704 (2003); H. R. 288, 109th Cong., 1st Sess., §2 (2005).

[2] See, *e.g.,* H. R. 2015, 110th Cong., 1st Sess. (2007); H. R. 3017, 111th Cong., 1st Sess. (2009); H. R. 1397, 112th Cong., 1st Sess. (2011); H. R. 1755, 113th Cong., 1st Sess. (2013); H. R. 3185, 114th Cong., 1st Sess., §7 (2015); H. R. 2282, 115th Cong., 1st Sess., §7 (2017); H. R. 5, 116th Cong., 1st Sess. (2019).

[3] H. R. 5331, 116th Cong., 1st Sess., §§4(b), (c) (2019).

Alito, J., dissenting

discrimination because of "sex" still means what it has al-
ways meant. But the Court is not deterred by these consti-
tutional niceties. Usurping the constitutional authority of
the other branches, the Court has essentially taken H. R.
5's provision on employment discrimination and issued it
under the guise of statutory interpretation.[4] A more brazen
abuse of our authority to interpret statutes is hard to recall.

The Court tries to convince readers that it is merely en-
forcing the terms of the statute, but that is preposterous.
Even as understood today, the concept of discrimination be-
cause of "sex" is different from discrimination because of
"sexual orientation" or "gender identity." And in any event,
our duty is to interpret statutory terms to "mean what they
conveyed to reasonable people *at the time they were writ-
ten*." A. Scalia & B. Garner, Reading Law: The Interpreta-
tion of Legal Texts 16 (2012) (emphasis added). If every
single living American had been surveyed in 1964, it would
have been hard to find any who thought that discrimination
because of sex meant discrimination because of sexual ori-
entation—not to mention gender identity, a concept that
was essentially unknown at the time.

The Court attempts to pass off its decision as the inevita-
ble product of the textualist school of statutory interpreta-
tion championed by our late colleague Justice Scalia, but no
one should be fooled. The Court's opinion is like a pirate
ship. It sails under a textualist flag, but what it actually
represents is a theory of statutory interpretation that Jus-
tice Scalia excoriated—the theory that courts should "up-
date" old statutes so that they better reflect the current val-
ues of society. See A. Scalia, A Matter of Interpretation 22

_____

[4] Section 7(b) of H. R. 5 strikes the term "sex" in 42 U. S. C. §2000e–2
and inserts: "SEX (INCLUDING SEXUAL ORIENTATION AND
GENDER IDENTITY)."

(1997). If the Court finds it appropriate to adopt this the-
ory, it should own up to what it is doing.[5]

Many will applaud today's decision because they agree on
policy grounds with the Court's updating of Title VII. But
the question in these cases is not whether discrimination
because of sexual orientation or gender identity *should be*
outlawed. The question is *whether Congress did that in
1964*.

It indisputably did not.

## I
## A

Title VII, as noted, prohibits discrimination "because of
. . . sex," §2000e–2(a)(1), and in 1964, it was as clear as clear
could be that this meant discrimination because of the ge-
netic and anatomical characteristics that men and women
have at the time of birth. Determined searching has not
found a single dictionary from that time that defined "sex"
to mean sexual orientation, gender identity, or
"transgender status."[6] *Ante*, at 2. (Appendix A, *infra*, to

_____

[5] That is what Judge Posner did in the Seventh Circuit case holding
that Title VII prohibits discrimination because of sexual orientation. See
*Hively* v. *Ivy Tech Community College of Ind.*, 853 F. 3d 339 (2017) (en
banc). Judge Posner agreed with that result but wrote:

"*I would prefer to see us acknowledge openly that today we, who are
judges rather than members of Congress, are imposing on a half-century-
old statute a meaning of 'sex discrimination' that the Congress that en-
acted it would not have accepted.*" *Id.*, at 357 (concurring opinion) (em-
phasis added).

[6] The Court does not define what it means by "transgender status," but
the American Psychological Association describes "transgender" as "[a]n
umbrella term encompassing those whose gender identities or gender
roles differ from those typically associated with the sex they were as-
signed at birth." A Glossary: Defining Transgender Terms, 49 Monitor
on Psychology 32 (Sept. 2018), https://www.apa.org/monitor/2018/09/ce-
corner-glossary. It defines "gender identity" as "[a]n internal sense of
being male, female or something else, which may or may not correspond

ALITO, J., dissenting

this opinion includes the full definitions of "sex" in the un-
abridged dictionaries in use in the 1960s.)

In all those dictionaries, the primary definition of "sex"
was essentially the same as that in the then-most recent
edition of Webster's New International Dictionary 2296
(def. 1) (2d ed. 1953): "[o]ne of the two divisions of organisms
formed on the distinction of male and female." See also
American Heritage Dictionary 1187 (def. 1(a)) (1969) ("The
property or quality by which organisms are classified ac-
cording to their reproductive functions"); Random House
Dictionary of the English Language 1307 (def. 1) (1966)
(Random House Dictionary) ("the fact or character of being
either male or female"); 9 Oxford English Dictionary 577
(def. 1) (1933) ("Either of the two divisions of organic beings
distinguished as male and female respectively").

The Court does not dispute that this is what "sex" means
in Title VII, although it coyly suggests that there is at least
some support for a different and potentially relevant defi-
nition. *Ante*, at 5. (I address alternative definitions below.
See Part I–B–3, *infra*.) But the Court declines to stand on
that ground and instead "proceed[s] on the assumption that
'sex' . . . refer[s] only to biological distinctions between male
and female." *Ante*, at 5.

If that is so, it should be perfectly clear that Title VII does
not reach discrimination because of sexual orientation or
gender identity. If "sex" in Title VII means biologically
male or female, then discrimination because of sex means
discrimination because the person in question is biologi-
cally male or biologically female, not because that person is
sexually attracted to members of the same sex or identifies
as a member of a particular gender.

How then does the Court claim to avoid that conclusion?

─────────────

to an individual's sex assigned at birth or sex characteristics." *Ibid.* Un-
der these definitions, there is no apparent difference between discrimi-
nation because of transgender status and discrimination because of gen-
der identity.

6                    BOSTOCK *v.* CLAYTON COUNTY

Alito, J., dissenting

The Court tries to cloud the issue by spending many pages discussing matters that are beside the point. The Court observes that a Title VII plaintiff need not show that "sex" was the sole or primary motive for a challenged employment decision or its sole or primary cause; that Title VII is limited to discrimination with respect to a list of specified actions (such as hiring, firing, etc.); and that Title VII protects individual rights, not group rights. See *ante*, at 5–9, 11.

All that is true, but so what? In cases like those before us, a plaintiff must show that sex was a "motivating factor" in the challenged employment action, 42 U. S. C. §2000e–2(m), so the question we must decide comes down to this: if an individual employee or applicant for employment shows that his or her sexual orientation or gender identity was a "motivating factor" in a hiring or discharge decision, for example, is that enough to establish that the employer discriminated "because of . . . sex"? Or, to put the same question in different terms, if an employer takes an employment action solely because of the sexual orientation or gender identity of an employee or applicant, has that employer necessarily discriminated because of biological sex?

The answers to those questions must be no, unless discrimination because of sexual orientation or gender identity inherently constitutes discrimination because of sex. The Court attempts to prove that point, and it argues, not merely that the terms of Title VII *can* be interpreted that way but that they *cannot reasonably be interpreted any other way*. According to the Court, the text is unambiguous. See *ante*, at 24, 27, 30.

The arrogance of this argument is breathtaking. As I will show, there is not a shred of evidence that any Member of Congress interpreted the statutory text that way when Title VII was enacted. See Part III–B, *infra*. But the Court apparently thinks that this was because the Members were not "smart enough to realize" what its language means.

ALITO, J., dissenting

*Hively* v. *Ivy Tech Community College of Ind.*, 853 F. 3d 339, 357 (CA7 2017) (Posner, J., concurring). The Court seemingly has the same opinion about our colleagues on the Courts of Appeals, because until 2017, every single Court of Appeals to consider the question interpreted Title VII's prohibition against sex discrimination to mean discrimination on the basis of biological sex. See Part III–C, *infra*. And for good measure, the Court's conclusion that Title VII unambiguously reaches discrimination on the basis of sexual orientation and gender identity necessarily means that the EEOC failed to see the obvious for the first 48 years after Title VII became law.[7] Day in and day out, the Commission enforced Title VII but did not grasp what discrimination "because of . . . sex" unambiguously means. See Part III–C, *infra*.

The Court's argument is not only arrogant, it is wrong. It fails on its own terms. "Sex," "sexual orientation," and "gender identity" are different concepts, as the Court concedes. *Ante*, at 19 ("homosexuality and transgender status are distinct concepts from sex"). And neither "sexual orientation" nor "gender identity" is tied to either of the two biological sexes. See *ante*, at 10 (recognizing that "discrimination on these bases" does not have "some disparate impact on one sex or another"). Both men and women may be attracted to members of the opposite sex, members of the same sex, or members of both sexes.[8] And individuals who are born with

---

[7] The EEOC first held that "discrimination against a transgender individual because that person is transgender" violates Title VII in 2012 in *Macy* v. *Holder*, 2012 WL 1435995, *11 (Apr. 20, 2012), though it earlier advanced that position in an *amicus* brief in Federal District Court in 2011, *ibid.*, n. 16. It did not hold that discrimination on the basis of sexual orientation violated Title VII until 2015. See *Baldwin* v. *Foxx*, 2015 WL 4397641 (July 15, 2015).

[8] "Sexual orientation refers to a person's erotic response tendency or sexual attractions, be they directed toward individuals of the same sex (homosexual), the other sex (heterosexual), or both sexes (bisexual)." 1 B.

8                    BOSTOCK *v.* CLAYTON COUNTY

                      ALITO, J., dissenting

the genes and organs of either biological sex may identify
with a different gender.[9]

   Using slightly different terms, the Court asserts again
and again that discrimination because of sexual orientation
or gender identity inherently or necessarily entails discrim-
ination because of sex.   See *ante*, at 2 (When an employer
"fires an individual for being homosexual or transgender,"
"[s]ex plays a necessary and undisguisable role in the deci-
sion"); *ante*, at 9 ("[I]t is impossible to discriminate against
a person for being homosexual or transgender without dis-
criminating against that individual based on sex"); *ante*, at
11 ("[W]hen an employer discriminates against homosexual
or transgender employees, [the] employer . . . inescapably
*intends* to rely on sex in its decisionmaking"); *ante*, at 12
("For an employer to discriminate against employees for be-
ing homosexual or transgender, the employer must inten-
tionally discriminate against individual men and women in
part because of sex"); *ante*, at 14 ("When an employer fires
an employee for being homosexual or transgender, it neces-
sarily and intentionally discriminates against that individ-
ual in part because of sex"); *ante*, at 19 ("[D]iscrimination
based on homosexuality or transgender status necessarily
entails discrimination based on sex").  But repetition of an
assertion does not make it so, and the Court's repeated as-
sertion is demonstrably untrue.

   Contrary to the Court's contention, discrimination be-
cause of sexual orientation or gender identity does not in

_____

Sadock, V. Sadock, & P. Ruiz, Comprehensive Textbook of Psychiatry
2061 (9th ed. 2009); see also American Heritage Dictionary 1607 (5th ed.
2011) (defining "sexual orientation" as "[t]he direction of a person's sex-
ual interest, as toward people of the opposite sex, the same sex, or both
sexes"); Webster's New College Dictionary 1036 (3d ed. 2008) (defining
"sexual orientation" as "[t]he direction of one's sexual interest toward
members of the same, opposite, or both sexes").

   [9]See n. 6, *supra*; see also Sadock, *supra*, at 2063 ("transgender" refers
to "any individual who identifies with and adopts the gender role of a
member of the other biological sex").

ALITO, J., dissenting

and of itself entail discrimination because of sex. We can
see this because it is quite possible for an employer to dis-
criminate on those grounds without taking the sex of an in-
dividual applicant or employee into account. An employer
can have a policy that says: "We do not hire gays, lesbians,
or transgender individuals." And an employer can imple-
ment this policy without paying any attention to or even
knowing the biological sex of gay, lesbian, and transgender
applicants. In fact, at the time of the enactment of Title
VII, the United States military had a blanket policy of re-
fusing to enlist gays or lesbians, and under this policy for
years thereafter, applicants for enlistment were required to
complete a form that asked whether they were "homosex-
ual." Appendix D, *infra*, at 88, 101.

At oral argument, the attorney representing the employ-
ees, a prominent professor of constitutional law, was asked
if there would be discrimination because of sex if an em-
ployer with a blanket policy against hiring gays, lesbians,
and transgender individuals implemented that policy with-
out knowing the biological sex of any job applicants. Her
candid answer was that this would "not" be sex discrimina-
tion.[10] And she was right.

The attorney's concession was necessary, but it is fatal to
the Court's interpretation, for if an employer discriminates
against individual applicants or employees without even
knowing whether they are male or female, it is impossible
to argue that the employer intentionally discriminated be-
cause of sex. Contra, *ante*, at 19. An employer cannot in-
tentionally discriminate on the basis of a characteristic of
which the employer has no knowledge. And if an employer
does not violate Title VII by discriminating on the basis of

––––––––––

[10] See Tr. of Oral Arg. in Nos. 17–1618, 17–1623, pp. 69–70 ("If there
was that case, it might be the rare case in which sexual orientation dis-
crimination is not a subset of sex"); see also *id.*, at 69 ("Somebody who
comes in and says I'm not going to tell you what my sex is, but, believe
me, I was fired for my sexual orientation, that person will lose").

ALITO, J., dissenting

sexual orientation or gender identity without knowing the sex of the affected individuals, there is no reason why the same employer could not lawfully implement the same policy even if it knows the sex of these individuals. If an employer takes an adverse employment action for a perfectly legitimate reason—for example, because an employee stole company property—that action is not converted into sex discrimination simply because the employer knows the employee's sex. As explained, a disparate treatment case requires proof of intent—*i.e.,* that the employee's sex motivated the firing. In short, what this example shows is that discrimination because of sexual orientation or gender identity does not inherently or necessarily entail discrimination because of sex, and for that reason, the Court's chief argument collapses.

Trying to escape the consequences of the attorney's concession, the Court offers its own hypothetical:

> "Suppose an employer's application form offered a single box to check if the applicant is either black or Catholic. If the employer refuses to hire anyone who checks that box, would we conclude the employer has complied with Title VII, so long as it studiously avoids learning any particular applicant's race or religion? Of course not." *Ante,* at 18.

How this hypothetical proves the Court's point is a mystery. A person who checked that box would presumably be black, Catholic, or both, and refusing to hire an applicant because of race or religion is prohibited by Title VII. Rejecting applicants who checked a box indicating that they are homosexual is entirely different because it is impossible to tell from that answer whether an applicant is male or female.

The Court follows this strange hypothetical with an even stranger argument. The Court argues that an applicant

ALITO, J., dissenting

could not answer the question whether he or she is homo-
sexual without knowing something about sex. If the appli-
cant was unfamiliar with the term "homosexual," the appli-
cant would have to look it up or ask what the term means.
And because this applicant would have to take into account
his or her sex and that of the persons to whom he or she is
sexually attracted to answer the question, it follows, the
Court reasons, that an employer could not reject this appli-
cant without taking the applicant's sex into account. See
*ante*, at 18–19.

This is illogical. Just because an applicant cannot say
whether he or she is homosexual without knowing his or
her own sex and that of the persons to whom the applicant
is attracted, it does not follow that an employer cannot re-
ject an applicant based on homosexuality without knowing
the applicant's sex.

While the Court's imagined application form proves noth-
ing, another hypothetical case offered by the Court is tell-
ing. But what it proves is not what the Court thinks. The
Court posits:

> "Imagine an employer who has a policy of firing any
> employee known to be homosexual. The employer
> hosts an office holiday party and invites employees to
> bring their spouses. A model employee arrives and in-
> troduces a manager to Susan, the employee's wife. Will
> that employee be fired? If the policy works as the em-
> ployer intends, the answer depends entirely on
> whether the model employee is a man or a woman."
> *Ante*, at 11.

This example disproves the Court's argument because it
is perfectly clear that the employer's motivation in firing
the female employee had nothing to do with that employee's
sex. The employer presumably knew that this employee
was a woman before she was invited to the fateful party.
Yet the employer, far from holding her biological sex

against her, rated her a "model employee." At the party, the employer learned something new, her sexual orientation, and it was this new information that motivated her discharge. So this is another example showing that discrimination because of sexual orientation does not inherently involve discrimination because of sex.

In addition to the failed argument just discussed, the Court makes two other arguments, more or less in passing. The first of these is essentially that sexual orientation and gender identity are closely related to sex. The Court argues that sexual orientation and gender identity are "inextricably bound up with sex," *ante*, at 10, and that discrimination on the basis of sexual orientation or gender identity involves the application of "sex-based rules," *ante*, at 17. This is a variant of an argument found in many of the briefs filed in support of the employees and in the lower court decisions that agreed with the Court's interpretation. All these variants stress that sex, sexual orientation, and gender identity are related concepts. The Seventh Circuit observed that "[i]t would require considerable calisthenics to remove 'sex' from 'sexual orientation.'" *Hively*, 853 F. 3d, at 350.[11] The Second Circuit wrote that sex is necessarily "a factor in sexual orientation" and further concluded that "sexual orientation is a function of sex." 883 F. 3d 100, 112–113 (CA2 2018) (en banc). Bostock's brief and those of *amici* supporting his position contend that sexual orientation is "a sex-based consideration."[12] Other briefs state that sexual orientation is "a function of sex"[13] or is "intrinsically related to

---

[11] See also Brief for William N. Eskridge Jr. et al. as *Amici Curiae* 2 ("[T]here is no reasonable way to disentangle sex from same-sex attraction or transgender status").

[12] Brief for Petitioner in No. 17–1618, at 14; see also Brief for Southern Poverty Law Center et al. as *Amici Curiae* 7–8.

[13] Brief for Scholars Who Study the LGB Population as *Amici Curiae* in Nos. 17–1618, 17–1623, p. 10.

ALITO, J., dissenting

sex."[14]  Similarly, Stephens argues that sex and gender identity are necessarily intertwined: "By definition, a transgender person is someone who lives and identifies with a sex different than the sex assigned to the person at birth."[15]

It is curious to see this argument in an opinion that purports to apply the purest and highest form of textualism because the argument effectively amends the statutory text. Title VII prohibits discrimination because of *sex itself,* not everything that is related to, based on, or defined with reference to, "sex."  Many things are related to sex.  Think of all the nouns other than "orientation" that are commonly modified by the adjective "sexual."  Some examples yielded by a quick computer search are "sexual harassment," "sexual assault, "sexual violence," "sexual intercourse," and "sexual content."

Does the Court really think that Title VII prohibits discrimination on all these grounds?  Is it unlawful for an employer to refuse to hire an employee with a record of sexual harassment in prior jobs?  Or a record of sexual assault or violence?

To be fair, the Court does not claim that Title VII prohibits discrimination because of *everything* that is related to sex.  The Court draws a distinction between things that are "inextricably" related and those that are related in "some vague sense."  *Ante*, at 10.  Apparently the Court would graft onto Title VII some arbitrary line separating the things that are related closely enough and those that are not.[16]  And it would do this in the name of high textualism.

———————
[14] Brief for American Psychological Association et al. as *Amici Curiae* 11.

[15] Reply Brief for Respondent Aimee Stephens in No. 18–107, p. 5.

[16] Notably, Title VII itself already suggests a line, which the Court ignores.  The statute specifies that the terms "because of sex" and "on the basis of sex" cover certain conditions that are biologically tied to sex,

Case 16-1424 Document: 99 Filed 06/30/17 Page: 51

14          BOSTOCK *v.* CLAYTON COUNTY

Alito, J., dissenting

An additional argument made in passing also fights the text of Title VII and the policy it reflects. The Court proclaims that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Ante*, at 9. That is the policy view of many people in 2020, and perhaps Congress would have amended Title VII to implement it if this Court had not intervened. But that is not the policy embodied in Title VII in its current form. Title VII prohibits discrimination based on five specified grounds, and neither sexual orientation nor gender identity is on the list. As long as an employer does not discriminate based on one of the listed grounds, the employer is free to decide for itself which characteristics are "relevant to [its] employment decisions." *Ibid.* By proclaiming that sexual orientation and gender identity are "not relevant to employment decisions," the Court updates Title VII to reflect what it regards as 2020 values.

The Court's remaining argument is based on a hypothetical that the Court finds instructive. In this hypothetical, an employer has two employees who are "attracted to men," and "*to the employer's mind*" the two employees are "materially identical" except that one is a man and the other is a woman. *Ante*, at 9 (emphasis added). The Court reasons that if the employer fires the man but not the woman, the employer is necessarily motivated by the man's biological sex. *Ante*, at 9–10. After all, if two employees are identical in every respect but sex, and the employer fires only one, what other reason could there be?

The problem with this argument is that the Court loads the dice. That is so because in the mind of an employer who does not want to employ individuals who are attracted to

_____

namely, "pregnancy, childbirth, [and] related medical conditions." 42 U. S. C. §2000e(k). This definition should inform the meaning of "because of sex" in Title VII more generally. Unlike pregnancy, neither sexual orientation nor gender identity is biologically linked to women or men.

members of the same sex, these two employees are not ma-
terially identical in every respect but sex.  On the contrary,
they differ in another way that the employer thinks is quite
material.  And until Title VII is amended to add sexual ori-
entation as a prohibited ground, this is a view that an em-
ployer is permitted to implement.  As noted, other than pro-
hibiting discrimination on any of five specified grounds,
"race, color, religion, sex, [and] national origin." 42 U. S. C.
§2000e–2(a)(1), Title VII allows employers to decide
whether two employees are "materially identical."  Even id-
iosyncratic criteria are permitted; if an employer thinks
that Scorpios make bad employees, the employer can refuse
to hire Scorpios.  Such a policy would be unfair and foolish,
but under Title VII, it is permitted.  And until Title VII is
amended, so is a policy against employing gays, lesbians, or
transgender individuals.

Once this is recognized, what we have in the Court's hy-
pothetical case are two employees who differ in *two* ways—
sex and sexual orientation—and if the employer fires one
and keeps the other, all that can be inferred is that the em-
ployer was motivated either entirely by sexual orientation,
entirely by sex, or in part by both.  We cannot infer with
any certainty, as the hypothetical is apparently meant to
suggest, that the employer was motivated even in part by
sex.  The Court harps on the fact that under Title VII a pro-
hibited ground need not be the sole motivation for an ad-
verse employment action, see *ante*, at 10–11, 14–15, 21, but
its example does not show that sex necessarily played *any*
part in the employer's thinking.

The Court tries to avoid this inescapable conclusion by
arguing that sex is really the only difference between the
two employees.  This is so, the Court maintains, because
both employees "are attracted to men."  *Ante*, at 9–10.  Of
course, the employer would couch its objection to the man
differently.  It would say that its objection was his sexual
orientation.  So this may appear to leave us with a battle of

labels. If the employer's objection to the male employee is characterized as attraction to men, it seems that he is just like the woman in all respects except sex and that the employer's disparate treatment must be based on that one difference. On the other hand, if the employer's objection is sexual orientation or homosexuality, the two employees differ in two respects, and it cannot be inferred that the disparate treatment was due even in part to sex.

The Court insists that its label is the right one, and that presumably is why it makes such a point of arguing that an employer cannot escape liability under Title VII by giving sex discrimination some other name. See *ante*, at 14, 17. That is certainly true, but so is the opposite. Something that is *not* sex discrimination cannot be converted into sex discrimination by slapping on that label. So the Court cannot prove its point simply by labeling the employer's objection as "attract[ion] to men." *Ante*, at 9–10. Rather, the Court needs to show that its label is the correct one.

And a labeling standoff would not help the Court because that would mean that the bare text of Title VII does not unambiguously show that its interpretation is right. The Court would have no justification for its stubborn refusal to look any further.

As it turns out, however, there is no standoff. It can easily be shown that the employer's real objection is not "attract[ion] to men" but homosexual orientation.

In an effort to prove its point, the Court carefully includes in its example just two employees, a homosexual man and a heterosexual woman, but suppose we add two more individuals, a woman who is attracted to women and a man who is attracted to women. (A large employer will likely have applicants and employees who fall into all four categories, and a small employer can potentially have all four as well.) We now have the four exemplars listed below, with the discharged employees crossed out:

~~Man attracted to men~~
Woman attracted to men
~~Woman attracted to women~~
Man attracted to women

The discharged employees have one thing in common. It is not biological sex, attraction to men, or attraction to women. It is attraction to members of their own sex—in a word, sexual orientation. And that, we can infer, is the employer's real motive.

In sum, the Court's textual arguments fail on their own terms. The Court tries to prove that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," *ante,* at 9, but as has been shown, it is entirely possible for an employer to do just that. "[H]omosexuality and transgender status are distinct concepts from sex," *ante*, at 19, and discrimination because of sexual orientation or transgender status does not inherently or necessarily constitute discrimination because of sex. The Court's arguments are squarely contrary to the statutory text.

But even if the words of Title VII did not definitively refute the Court's interpretation, that would not justify the Court's refusal to consider alternative interpretations. The Court's excuse for ignoring everything other than the bare statutory text is that the text is unambiguous and therefore no one can reasonably interpret the text in any way other than the Court does. Unless the Court has met that high standard, it has no justification for its blinkered approach. And to say that the Court's interpretation is the only possible reading is indefensible.

B

Although the Court relies solely on the arguments discussed above, several other arguments figure prominently in the decisions of the lower courts and in briefs submitted

18                    BOSTOCK *v.* CLAYTON COUNTY

by or in support of the employees. The Court apparently finds these arguments unpersuasive, and so do I, but for the sake of completeness, I will address them briefly.

1

One argument, which relies on our decision in *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989) (plurality opinion), is that discrimination because of sexual orientation or gender identity violates Title VII because it constitutes prohibited discrimination on the basis of sex stereotypes. See 883 F. 3d, at 119–123; *Hively*, 853 F. 3d, at 346; 884 F. 3d 560, 576–577 (CA6 2018). The argument goes like this. Title VII prohibits discrimination based on stereotypes about the way men and women should behave; the belief that a person should be attracted only to persons of the opposite sex and the belief that a person should identify with his or her biological sex are examples of such stereotypes; therefore, discrimination on either of these grounds is unlawful.

This argument fails because it is based on a faulty premise, namely, that Title VII forbids discrimination based on sex stereotypes. It does not. It prohibits discrimination because of "sex," and the two concepts are not the same. See *Price Waterhouse*, 490 U. S., at 251. That does not mean, however, that an employee or applicant for employment cannot prevail by showing that a challenged decision was based on a sex stereotype. Such evidence is relevant to prove discrimination because of sex, and it may be convincing where the trait that is inconsistent with the stereotype is one that would be tolerated and perhaps even valued in a person of the opposite sex. See *ibid.*

Much of the plaintiff's evidence in *Price Waterhouse* was of this nature. The plaintiff was a woman who was passed over for partnership at an accounting firm, and some of the adverse comments about her work appeared to criticize her for being forceful and insufficiently "feminin[e]." *Id.*, at 235–236.

ALITO, J., dissenting

The main issue in *Price Waterhouse*—the proper alloca-tion of the burdens of proof in a so-called mixed motives Ti-tle VII case—is not relevant here, but the plurality opinion, endorsed by four Justices, commented on the issue of sex stereotypes. The plurality observed that "sex stereotypes do not inevitably prove that gender played a part in a par-ticular employment decision" but "can certainly be *evidence* that gender played a part." *Id.*, at 251.[17] And the plurality made it clear that "[t]he plaintiff must show that the em-ployer actually relied on her gender in making its decision." *Ibid.*

Plaintiffs who allege that they were treated unfavorably because of their sexual orientation or gender identity are not in the same position as the plaintiff in *Price Water-house*. In cases involving discrimination based on sexual orientation or gender identity, the grounds for the em-ployer's decision—that individuals should be sexually at-tracted only to persons of the opposite biological sex or should identify with their biological sex—apply equally to men and women. "[H]eterosexuality is not a *female* stereo-type; it not a *male* stereotype; it is not a *sex-specific* stereotype at all." *Hively*, 853 F. 3d, at 370 (Sykes, J., dissenting).

To be sure, there may be cases in which a gay, lesbian, or transgender individual can make a claim like the one in *Price Waterhouse*. That is, there may be cases where traits or behaviors that some people associate with gays, lesbians, or transgender individuals are tolerated or valued in per-sons of one biological sex but not the other. But that is a

_____

[17] Two other Justices concurred in the judgment but did not comment on the issue of stereotypes. See *id.*, at 258–261 (opinion of White, J.); *id.*, at 261–279 (opinion of O'Connor, J.). And Justice Kennedy reiterated on behalf of the three Justices in dissent that "Title VII creates no independ-ent cause of action for sex stereotyping," but he added that "[e]vidence of use by decisionmakers of sex stereotypes is, of course, quite relevant to the question of discriminatory intent." *Id.*, at 294.

different matter.

### 2

A second prominent argument made in support of the result that the Court now reaches analogizes discrimination against gays and lesbians to discrimination against a person who is married to or has an intimate relationship with a person of a different race. Several lower court cases have held that discrimination on this ground violates Title VII. See, *e.g.*, *Holcomb* v. *Iona College*, 521 F. 3d 130 (CA2 2008); *Parr* v. *Woodmen of World Life Ins. Co.*, 791 F. 2d 888 (CA11 1986). And the logic of these decisions, it is argued, applies equally where an employee or applicant is treated unfavorably because he or she is married to, or has an intimate relationship with, a person of the same sex.

This argument totally ignores the historically rooted reason why discrimination on the basis of an interracial relationship constitutes race discrimination. And without taking history into account, it is not easy to see how the decisions in question fit the terms of Title VII.

Recall that Title VII makes it unlawful for an employer to discriminate against an individual "because of *such individual's race*." 42 U. S. C. §2000e–2(a) (emphasis added). So if an employer is happy to employ whites and blacks but will not employ any employee in an interracial relationship, how can it be said that the employer is discriminating against either whites or blacks "because of such individual's race"? This employer would be applying the same rule to all its employees regardless of their race.

The answer is that this employer is discriminating on a ground that history tells us is a core form of race discrimination.[18] "It would require absolute blindness to the history

_____

[18] Notably, Title VII recognizes that in light of history distinctions on the basis of race are always disadvantageous, but it permits certain dis-

ALITO, J., dissenting

of racial discrimination in this country not to understand what is at stake in such cases . . . .  A prohibition on 'race-mixing' was . . . grounded in bigotry against a particular race and was an integral part of preserving the rigid hierarchical distinction that denominated members of the black race as inferior to whites."  883 F. 3d, at 158–159 (Lynch, J., dissenting).

Discrimination because of sexual orientation is different. It cannot be regarded as a form of sex discrimination on the ground that applies in race cases since discrimination because of sexual orientation is not historically tied to a project that aims to subjugate either men or women. An employer who discriminates on this ground might be called "homophobic" or "transphobic," but not sexist.  See *Wittmer* v. *Phillips 66 Co.*, 915 F. 3d 328, 338 (CA5 2019) (Ho, J., concurring).

### 3

The opinion of the Court intimates that the term "sex" was not universally understood in 1964 to refer just to the categories of male and female, see *ante*, at 5, and while the Court does not take up any alternative definition as a ground for its decision, I will say a word on this subject.

As previously noted, the definitions of "sex" in the unabridged dictionaries in use in the 1960s are reproduced in Appendix A, *infra*.  Anyone who examines those definitions can see that the primary definition in every one of them refers to the division of living things into two groups, male and female, based on biology, and most of the definitions further down the list are the same or very similar.  In addition, some definitions refer to heterosexual sex acts.  See

—————

tinctions based on sex.  Title 42 U. S. C. §2000e–2(e)(1) allows for "instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise."  Race is wholly absent from this list.

22          BOSTOCK *v.* CLAYTON COUNTY

ALITO, J., dissenting

Random House Dictionary 1307 ("coitus," "sexual inter-
course" (defs. 5–6)); American Heritage Dictionary, at 1187
("sexual intercourse" (def. 5)).[19]

Aside from these, what is there?  One definition, "to neck
passionately," Random House Dictionary 1307 (def. 8), re-
fers to sexual conduct that is not necessarily heterosexual.
But can it be seriously argued that one of the aims of Title
VII is to outlaw employment discrimination against em-
ployees, whether heterosexual or homosexual, who engage
in necking?  And even if Title VII had that effect, that is not
what is at issue in cases like those before us.

That brings us to the two remaining subsidiary defini-
tions, both of which refer to sexual urges or instincts and
their manifestations.  See the fourth definition in the Amer-
ican Heritage Dictionary, at 1187 ("the sexual urge or in-
stinct as it manifests itself in behavior"), and the fourth def-
inition in both Webster's Second and Third ("[p]henomena
of sexual instincts and their manifestations," Webster's
New International Dictionary, at 2296 (2d ed.); Webster's
Third New International Dictionary 2081 (1966)).  Since
both of these come after three prior definitions that refer to
men and women, they are most naturally read to have the
same association, and in any event, is it plausible that Title
VII prohibits discrimination based on *any* sexual urge or
instinct and its manifestations?  The urge to rape?

Viewing all these definitions, the overwhelming impact is
that discrimination because of "sex" was understood during
the era when Title VII was enacted to refer to men and
women.  (The same is true of current definitions, which are
reproduced in Appendix B, *infra*.)  This no doubt explains
why neither this Court nor any of the lower courts have
tried to make much of the dictionary definitions of sex just

––––––––––
[19] See American Heritage Dictionary 1188 (1969) (defining "sexual in-
tercourse"); Webster's Third New International Dictionary 2082 (1966)
(same); Random House Dictionary of the English Language 1308 (1966)
(same).

ALITO, J., dissenting

discussed.

## II

### A

So far, I have not looked beyond dictionary definitions of "sex," but textualists like Justice Scalia do not confine their inquiry to the scrutiny of dictionaries. See Manning, Textualism and the Equity of the Statute, 101 Colum. L. Rev. 1, 109 (2001). Dictionary definitions are valuable because they are evidence of what people at the time of a statute's enactment would have understood its words to mean. *Ibid.* But they are not the only source of relevant evidence, and what matters in the end is the answer to the question that the evidence is gathered to resolve: How would the terms of a statute have been understood by ordinary people at the time of enactment?

Justice Scalia was perfectly clear on this point. The words of a law, he insisted, "mean *what they conveyed to reasonable people at the time.*" Reading Law, at 16 (emphasis added).[20]

Leading proponents of Justice Scalia's school of textualism have expounded on this principle and explained that it is grounded on an understanding of the way language works. As Dean John F. Manning explains, "the meaning of language depends on the way a linguistic community uses words and phrases in context." What Divides Textualists From Purposivists? 106 Colum. L. Rev. 70, 78 (2006). "[O]ne can make sense of others' communications only by placing them in their appropriate social and linguistic context," *id.*, at 79–80, and this is no less true of statutes than any other verbal communications. "[S]tatutes convey meaning only because members of a relevant linguistic

─────────
[20] See also *Chisom* v. *Roemer*, 501 U. S. 380, 405 (1991) (Scalia, J., dissenting) ("We are to read the words of [a statutory] text as any ordinary Member of Congress would have read them . . . and apply the meaning so determined").

community apply shared background conventions for understanding how particular words are used in particular contexts." Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2457 (2003). Therefore, judges should ascribe to the words of a statute "what a reasonable person conversant with applicable social conventions would have understood them to be adopting." Manning, 106 Colum. L. Rev., at 77. Or, to put the point in slightly different terms, a judge interpreting a statute should ask "'what one would ordinarily be understood as saying, given the circumstances in which one said it.'" Manning, 116 Harv. L. Rev., at 2397–2398.

Judge Frank Easterbrook has made the same points:

> "Words are arbitrary signs, having meaning only to the extent writers and readers share an understanding. . . . Language in general, and legislation in particular, is a social enterprise to which both speakers and listeners contribute, drawing on background understandings and the structure and circumstances of the utterance." *Herrmann* v. *Cencom Cable Assocs., Inc.*, 978 F. 2d 978, 982 (CA7 1992).

Consequently, "[s]licing a statute into phrases while ignoring . . . the setting of the enactment . . . is a formula for disaster." *Ibid.*; see also *Continental Can Co.* v. *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund*, 916 F. 2d 1154, 1157 (CA7 1990) ("You don't have to be Ludwig Wittgenstein or Hans-Georg Gadamer to know that successful communication depends on meanings shared by interpretive communities").

Thus, when textualism is properly understood, it calls for an examination of the social context in which a statute was enacted because this may have an important bearing on what its words were understood to mean at the time of enactment. Textualists do not read statutes as if they were messages picked up by a powerful radio telescope from a

ALITO, J., dissenting

distant and utterly unknown civilization. Statutes consist of communications between members of a particular linguistic community, one that existed in a particular place and at a particular time, and these communications must therefore be interpreted as they were understood by that community at that time.

For this reason, it is imperative to consider how Americans in 1964 would have understood Title VII's prohibition of discrimination because of sex. To get a picture of this, we may imagine this scene. Suppose that, while Title VII was under consideration in Congress, a group of average Americans decided to read the text of the bill with the aim of writing or calling their representatives in Congress and conveying their approval or disapproval. What would these ordinary citizens have taken "discrimination because of sex" to mean? Would they have thought that this language prohibited discrimination because of sexual orientation or gender identity?

### B

The answer could not be clearer. In 1964, ordinary Americans reading the text of Title VII would not have dreamed that discrimination because of sex meant discrimination because of sexual orientation, much less gender identity. The *ordinary meaning* of discrimination because of "sex" was discrimination because of a person's biological sex, not sexual orientation or gender identity. The possibility that discrimination on either of these grounds might fit within some exotic understanding of sex discrimination would not have crossed their minds.

### 1

In 1964, the concept of prohibiting discrimination "because of sex" was no novelty. It was a familiar and well-understood concept, and what it meant was equal treatment for men and women.

ALITO, J., dissenting

Long before Title VII was adopted, many pioneering state and federal laws had used language substantively indistinguishable from Title VII's critical phrase, "discrimination because of sex." For example, the California Constitution of 1879 stipulated that no one, "*on account of sex*, [could] be disqualified from entering upon or pursuing any lawful business, vocation, or profession." Art. XX, §18 (emphasis added). It also prohibited a student's exclusion from any state university department "on account of sex." Art. IX, §9; accord, Mont. Const., Art. XI, §9 (1889).

Wyoming's first Constitution proclaimed broadly that "[b]oth male and female citizens of this state shall equally enjoy all civil, political and religious rights and privileges," Art. VI, §1 (1890), and then provided specifically that "[i]n none of the public schools . . . shall distinction or discrimination be made *on account of sex*," Art. VII, §10 (emphasis added); see also §16 (the "university shall be equally open to students of both sexes"). Washington's Constitution likewise required "ample provision for the education of all children . . . without distinction or preference *on account of . . . sex*." Art. IX, §1 (1889) (emphasis added).

The Constitution of Utah, adopted in 1895, provided that the right to vote and hold public office "shall not be denied or abridged *on account of sex*." Art. IV, §1 (emphasis added). And in the next sentence it made clear what "on account of sex" meant, stating that "[b]oth male and female citizens . . . shall enjoy equally all civil, political and religious rights and privileges." *Ibid*.

The most prominent example of a provision using this language was the Nineteenth Amendment, ratified in 1920, which bans the denial or abridgment of the right to vote "on account of sex." U. S. Const., Amdt. 19. Similar language appeared in the proposal of the National Woman's Party for an Equal Rights Amendment. As framed in 1921, this proposal forbade all "political, civil or legal disabilities or inequalities *on account of sex*, [o]r on account of marriage."

ALITO, J., dissenting

Women Lawyers Meet: Representatives of 20 States Endorse Proposed Equal Rights Amendment, N. Y. Times, Sept. 16, 1921, p. 10.

Similar terms were used in the precursor to the Equal Pay Act. Introduced in 1944 by Congresswoman Winifred C. Stanley, it proclaimed that "[d]iscrimination against employees, in rates of compensation paid, *on account of sex*" was "contrary to the public interest." H. R. 5056, 78th Cong., 2d Sess.

In 1952, the new Constitution for Puerto Rico, which was approved by Congress, 66 Stat. 327, prohibited all "discrimination . . . *on account of* . . . *sex*," Art. II, Bill of Rights §1 (emphasis added), and in the landmark Immigration and Nationality Act of 1952, Congress outlawed discrimination in naturalization "*because of* . . . *sex.*" 8 U. S. C. §1422 (emphasis added).

In 1958, the International Labour Organisation, a United Nations agency of which the United States is a member, recommended that nations bar employment discrimination "made *on the basis of* . . . *sex.*" Convention (No. 111) Concerning Discrimination in Respect of Employment and Occupation, Art. 1(a), June 25, 1958, 362 U. N. T. S. 32 (emphasis added).

In 1961, President Kennedy ordered the Civil Service Commission to review and modify personnel policies "to assure that selection for any career position is hereinafter made solely on the basis of individual merit and fitness, *without regard to sex.*"[21] He concurrently established a "Commission on the Status of Women" and directed it to recommend policies "for overcoming discriminations in government and private employment *on the basis of sex.*" Exec. Order No. 10980, 3 CFR 138 (1961 Supp.) (emphasis

––––––––

[21] J. Kennedy, Statement by the President on the Establishment of the President's Commission on the Status of Women 3 (Dec. 14, 1961) (emphasis added), https://www.jfklibrary.org/asset-viewer/archives/JFKPOF/093/JFKPOF-093-004.

ALITO, J., dissenting

added).

In short, the concept of discrimination "because of," "on account of," or "on the basis of" sex was well understood. It was part of the campaign for equality that had been waged by women's rights advocates for more than a century, and what it meant was equal treatment for men and women.[22]

### 2

Discrimination "because of sex" was not understood as having anything to do with discrimination because of sexual orientation or transgender status. Any such notion would have clashed in spectacular fashion with the societal norms of the day.

For most 21st-century Americans, it is painful to be reminded of the way our society once treated gays and lesbians, but any honest effort to understand what the terms of Title VII were understood to mean when enacted must take into account the societal norms of that time. And the plain truth is that in 1964 homosexuality was thought to be a mental disorder, and homosexual conduct was regarded as morally culpable and worthy of punishment.

————————

[22] Analysis of the way Title VII's key language was used in books and articles during the relevant time period supports this conclusion. A study searched a vast database of documents from that time to determine how the phrase "discriminate against . . . because of [some trait]" was used. Phillips, The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality (manuscript, at 3) (May 11, 2020) (brackets in original), https://ssrn.com/abstract=3585940. The study found that the phrase was used to denote discrimination against "someone . . . motivated by prejudice, or biased ideas or attitudes . . . directed at people with that trait in particular." *Id.,* at 7 (emphasis deleted). In other words, "*discriminate against*" was "associated with negative treatment directed at members of a discrete group." *Id.,* at 5. Thus, as used in 1964, "discrimination because of sex" would have been understood to mean discrimination against a woman or a man based on "unfair beliefs or attitudes" about members of that particular sex. *Id.,* at 7.

ALITO, J., dissenting

In its then-most recent Diagnostic and Statistical Manual of Mental Disorders (1952) (DSM–I), the American Psychiatric Association (APA) classified same-sex attraction as a "sexual deviation," a particular type of "sociopathic personality disturbance," *id.*, at 38–39, and the next edition, issued in 1968, similarly classified homosexuality as a "sexual deviatio[n]," Diagnostic and Statistical Manual of Mental Disorders 44 (2d ed.) (DSM–II). It was not until the sixth printing of the DSM–II in 1973 that this was changed.[23]

Society's treatment of homosexuality and homosexual conduct was consistent with this understanding. Sodomy was a crime in every State but Illinois, see W. Eskridge, Dishonorable Passions 387–407 (2008), and in the District of Columbia, a law enacted by Congress made sodomy a felony punishable by imprisonment for up to 10 years and permitted the indefinite civil commitment of "sexual psychopath[s]," Act of June 9, 1948, §§104, 201–207, 62 Stat. 347–349.[24]

---

[23] APA, Homosexuality and Sexual Orientation Disturbance: Proposed Change in DSM–II, 6th Printing, p. 44 (APA Doc. Ref. No. 730008, 1973) (reclassifying "homosexuality" as a "[s]exual orientation disturbance," a category "for individuals whose sexual interests are directed primarily toward people of the same sex and who are either disturbed by . . . or wish to change their sexual orientation," and explaining that "homosexuality . . . by itself does not constitute a psychiatric disorder"); see also APA, Diagnostic and Statistical Manual of Mental Disorders 281–282 (3d ed. 1980) (DSM–III) (similarly creating category of "Ego-dystonic Homosexuality" for "homosexuals for whom changing sexual orientation is a persistent concern," while observing that "homosexuality itself is not considered a mental disorder"); *Obergefell* v. *Hodges*, 576 U. S. 644, 661 (2015).

[24] In 1981, after achieving home rule, the District attempted to decriminalize sodomy, see D. C. Act No. 4–69, but the House of Representatives vetoed the bill, H. Res. 208, 97th Cong., 1st Sess. (1981); 127 Cong. Rec. 22764–22779 (1981). Sodomy was not decriminalized in the District until 1995. See Anti-Sexual Abuse Act of 1994, §501(b), 41 D. C. Reg. 53 (1995), enacted as D. C. Law 10–257.

This view of homosexuality was reflected in the rules governing the federal work force. In 1964, federal "[a]gencies could deny homosexual men and women employment because of their sexual orientation," and this practice continued until 1975. GAO, D. Heivilin, Security Clearances: Consideration of Sexual Orientation in the Clearance Process 2 (GAO/NSIAD–95–21, 1995). See, *e.g.*, *Anonymous* v. *Macy*, 398 F. 2d 317, 318 (CA5 1968) (affirming dismissal of postal employee for homosexual acts).

In 1964, individuals who were known to be homosexual could not obtain security clearances, and any who possessed clearances were likely to lose them if their orientation was discovered. A 1953 Executive Order provided that background investigations should look for evidence of "sexual perversion," as well as "[a]ny criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct." Exec. Order No. 10450, §8(a)(1)(iii), 3 CFR 938 (1949–1953 Comp.). "Until about 1991, when agencies began to change their security policies and practices regarding sexual orientation, there were a number of documented cases where defense civilian or contractor employees' security clearances were denied or revoked because of their sexual orientation." GAO, Security Clearances, at 2. See, *e.g.*, *Adams* v. *Laird*, 420 F. 2d 230, 240 (CADC 1969) (upholding denial of security clearance to defense contractor employee because he had "engaged in repeated homosexual acts"); see also *Webster* v. *Doe*, 486 U. S. 592, 595, 601 (1988) (concluding that decision to fire a particular individual because he was homosexual fell within the "discretion" of the Director of Central Intelligence under the National Security Act of 1947 and thus was unreviewable under the APA).

The picture in state employment was similar. In 1964, it was common for States to bar homosexuals from serving as teachers. An article summarizing the situation *15 years after Title VII became law* reported that "[a]ll states have statutes that permit the revocation of teaching certificates

(or credentials) for immorality, moral turpitude, or unprofessionalism," and, the survey added, "[h]omosexuality is considered to fall within all three categories."[25]

The situation in California is illustrative. California laws prohibited individuals who engaged in "immoral conduct" (which was construed to include homosexual behavior), as well as those convicted of "sex offenses" (like sodomy), from employment as teachers. Cal. Educ. Code Ann. §§13202, 13207, 13209, 13218, 13255 (West 1960). The teaching certificates of individuals convicted of engaging in homosexual acts were revoked. See, *e.g.*, *Sarac* v. *State Bd. of Ed.*, 249 Cal. App. 2d 58, 62–64, 57 Cal. Rptr. 69, 72–73 (1967) (upholding revocation of secondary teaching credential from teacher who was convicted of engaging in homosexual conduct on public beach), overruled in part, *Morrison* v. *State Bd. of Ed.*, 1 Cal. 3d 214, 461 P. 2d 375 (1969).

In Florida, the legislature enacted laws authorizing the revocation of teaching certificates for "misconduct involving moral turpitude," Fla. Stat. Ann. §229.08(16) (1961), and this law was used to target homosexual conduct. In 1964, a legislative committee was wrapping up a 6-year campaign to remove homosexual teachers from public schools and state universities. As a result of these efforts, the state board of education apparently revoked at least 71 teachers' certificates and removed at least 14 university professors. Eskridge, Dishonorable Passions, at 103.

Individuals who engaged in homosexual acts also faced the loss of other occupational licenses, such as those needed to work as a "lawyer, doctor, mortician, [or] beautician."[26] See, *e.g.*, *Florida Bar* v. *Kay*, 232 So. 2d 378 (Fla. 1970) (attorney disbarred after conviction for homosexual conduct in

――――――――

[25] Rivera, Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States, 30 Hastings L. J. 799, 861 (1979).

[26] Eskridge, Challenging the Apartheid of the Closet: Establishing Conditions for Lesbian and Gay Intimacy, *Nomos*, and Citizenship, 1961–1981, 25 Hofstra L. Rev. 817, 819 (1997).

public bathroom).

In 1964 and for many years thereafter, homosexuals were barred from the military. See, *e.g.*, Army Reg. 635–89, §I(2)(a) (July 15, 1966) ("Personnel who voluntarily engage in homosexual acts, irrespective of sex, will not be permitted to serve in the Army in any capacity, and their prompt separation is mandatory"); Army Reg. 600–443, §I(2) (April 10, 1953) (similar). Prohibitions against homosexual conduct by members of the military were not eliminated until 2010. See Don't Ask, Don't Tell Repeal Act of 2010, 124 Stat. 3515 (repealing 10 U. S. C. §654, which required members of the Armed Forces to be separated for engaging in homosexual conduct).

Homosexuals were also excluded from entry into the United States. The Immigration and Nationality Act of 1952 (INA) excluded aliens "afflicted with psychopathic personality." 8 U. S. C. §1182(a)(4) (1964 ed.). In *Boutilier* v. *INS*, 387 U. S. 118, 120–123 (1967), this Court, relying on the INA's legislative history, interpreted that term to encompass homosexuals and upheld an alien's deportation on that ground. Three Justices disagreed with the majority's interpretation of the phrase "psychopathic personality."[27] But it apparently did not occur to anyone to argue that the Court's interpretation was inconsistent with the INA's express prohibition of discrimination "because of sex." That was how our society—and this Court—saw things a half century ago. Discrimination because of sex and discrimination because of sexual orientation were viewed as two entirely different concepts.

To its credit, our society has now come to recognize the injustice of past practices, and this recognition provides the impetus to "update" Title VII. But that is not our job. Our

---

[27] Justices Douglas and Fortas thought that a homosexual is merely "one, who by some freak, is the product of an arrested development." *Boutilier*, 387 U. S., at 127 (Douglas, J., dissenting); see also *id.*, at 125 (Brennan, J., dissenting) (based on lower court dissent).

Alito, J., dissenting

duty is to understand what the terms of Title VII were understood to mean when enacted, and in doing so, we must take into account the societal norms of that time. We must therefore ask whether ordinary Americans in 1964 would have thought that discrimination because of "sex" carried some exotic meaning under which private-sector employers would be prohibited from engaging in a practice that represented the official policy of the Federal Government with respect to its own employees. We must ask whether Americans at that time would have thought that Title VII banned discrimination against an employee for engaging in conduct that Congress had made a felony and a ground for civil commitment.

The questions answer themselves. Even if discrimination based on sexual orientation or gender identity could be squeezed into some arcane understanding of sex discrimination, the context in which Title VII was enacted would tell us that this is not what the statute's terms were understood to mean at that time. To paraphrase something Justice Scalia once wrote, "our job is not to scavenge the world of English usage to discover whether there is any possible meaning" of discrimination because of sex that might be broad enough to encompass discrimination because of sexual orientation or gender identity. *Chisom* v. *Roemer*, 501 U. S. 380, 410 (1991) (dissenting opinion). Without strong evidence to the contrary (and there is none here), our job is to ascertain and apply the "*ordinary* meaning" of the statute. *Ibid.* And in 1964, ordinary Americans most certainly would not have understood Title VII to ban discrimination because of sexual orientation or gender identity.

The Court makes a tiny effort to suggest that at least some people in 1964 might have seen what Title VII really means. *Ante*, at 26. What evidence does it adduce? One complaint filed in 1969, another filed in 1974, and arguments made in the mid-1970s about the meaning of the Equal Rights Amendment. *Ibid.* To call this evidence

34          BOSTOCK *v.* CLAYTON COUNTY

ALITO, J., dissenting

merely feeble would be generous.

C

While Americans in 1964 would have been shocked to
learn that Congress had enacted a law prohibiting sexual
orientation discrimination, they would have been bewil-
dered to hear that this law also forbids discrimination on
the basis of "transgender status" or "gender identity," terms
that would have left people at the time scratching their
heads. The term "transgender" is said to have been coined
"'in the early 1970s,'"[28] and the term "gender identity," now
understood to mean "[a]n internal sense of being male, fe-
male or something else,"[29] apparently first appeared in an
academic article in 1964.[30] Certainly, neither term was in
common parlance; indeed, dictionaries of the time still pri-
marily defined the word "gender" by reference to grammat-
ical classifications. See, *e.g.*, American Heritage Diction-
ary, at 548 (def. 1(a)) ("Any set of two or more categories,
such as masculine, feminine, and neuter, into which words
are divided . . . and that determine agreement with or the

———————

[28] Drescher, Transsexualism, Gender Identity Disorder and the DSM,
14 J. Gay & Lesbian Mental Health 109, 110 (2010).

[29] American Psychological Association, 49 Monitor on Psychology, at
32.

[30] Green, Robert Stoller's *Sex and Gender*: 40 Years On, 39 Archives
Sexual Behav. 1457 (2010); see Stoller, A Contribution to the Study of
Gender Identity, 45 Int'l J. Psychoanalysis 220 (1964). The term
appears to have been coined a year or two earlier. See Haig, The Inexorable Rise
of Gender and the Decline of Sex: Social Change in Academic Titles,
1945–2001, 33 Archives Sexual Behav. 87, 93 (2004) (suggesting the
term was first introduced at 23rd International Psycho-Analytical Con-
gress in Stockholm in 1963); J. Meyerowitz, How Sex Changed 213 (2002)
(referring to founding of "Gender Identity Research Clinic" at UCLA in
1962). In his book, Sex and Gender, published in 1968, Robert Stoller
referred to "*gender identity*" as "a working term" "associated with" his
research team but noted that they were not "fixed on copyrighting the
term or on defending the concept as one of the splendors of the scientific
world." Sex and Gender, p. viii.

Alito, J., dissenting

selection of modifiers, referents, or grammatical forms").

While it is likely true that there have always been individuals who experience what is now termed "gender dysphoria," *i.e.*, "[d]iscomfort or distress related to an incongruence between an individual's gender identity and the gender assigned at birth,"[31] the current understanding of the concept postdates the enactment of Title VII. Nothing resembling what is now called gender dysphoria appeared in either DSM–I (1952) or DSM–II (1968). It was not until 1980 that the APA, in DSM–III, recognized two main psychiatric diagnoses related to this condition, "Gender Identity Disorder of Childhood" and "Transsexualism" in adolescents and adults.[32] DSM–III, at 261–266.

The first widely publicized sex reassignment surgeries in the United States were not performed until 1966,[33] and the great majority of physicians surveyed in 1969 thought that an individual who sought sex reassignment surgery was either "'severely neurotic'" or "'psychotic.'"[34]

It defies belief to suggest that the public meaning of discrimination because of sex in 1964 encompassed discrimination on the basis of a concept that was essentially unknown to the public at that time.

### D

#### 1

The Court's main excuse for entirely ignoring the social context in which Title VII was enacted is that the meaning of Title VII's prohibition of discrimination because of sex is

---

[31] American Psychological Association, 49 Monitor on Psychology, at 32.

[32] See Drescher, *supra*, at 112.

[33] Buckley, A Changing of Sex by Surgery Begun at Johns Hopkins, N. Y. Times, Nov. 21, 1966, p. 1, col. 8; see also J. Meyerowitz, How Sex Changed 218–220 (2002).

[34] Drescher, *supra*, at 112 (quoting Green, Attitudes Toward Transsexualism and Sex-Reassignment Procedures, in Transsexualism and Sex Reassignment 241–242 (R. Green & J. Money eds. 1969)).

Case 16-2424   Document: 91   Filed: 06/30/17   Page: 73

36                  BOSTOCK *v.* CLAYTON COUNTY

Alito, J., dissenting

clear, and therefore it simply does not matter whether people in 1964 were "smart enough to realize" what its language means. *Hively,* 853 F. 3d, at 357 (Posner, J., concurring). According to the Court, an argument that looks to the societal norms of those times represents an impermissible attempt to displace the statutory language. *Ante,* at 25–26.

The Court's argument rests on a false premise. As already explained at length, the text of Title VII does not prohibit discrimination because of sexual orientation or gender identity. And what the public thought about those issues in 1964 is relevant and important, not because it provides a ground for departing from the statutory text, but because it helps to explain what the text was understood to mean when adopted.

In arguing that we must put out of our minds what we know about the time when Title VII was enacted, the Court relies on Justice Scalia's opinion for the Court in *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75 (1998). But *Oncale* is nothing like these cases, and no one should be taken in by the majority's effort to enlist Justice Scalia in its updating project.

The Court's unanimous decision in *Oncale* was thoroughly unremarkable. The Court held that a male employee who alleged that he had been sexually harassed at work by other men stated a claim under Title VII. Although the impetus for Title VII's prohibition of sex discrimination was to protect women, anybody reading its terms would immediately appreciate that it applies equally to both sexes, and by the time *Oncale* reached the Court, our precedent already established that sexual harassment may constitute sex discrimination within the meaning of Title VII. See *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S. 57 (1986). Given these premises, syllogistic reasoning dictated the holding.

Alito, J., dissenting

What today's decision latches onto are *Oncale*'s comments about whether "'male-on-male sexual harassment'" was on Congress's mind when it enacted Title VII. *Ante*, at 28 (quoting 523 U. S., at 79). The Court in *Oncale* observed that this specific type of behavior "was assuredly not the *principal evil* Congress was concerned with when it enacted Title VII," but it found that immaterial because "statutory prohibitions often go beyond the *principal evil* to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the *principal concerns* of our legislators by which we are governed." 523 U. S., at 79 (emphasis added).

It takes considerable audacity to read these comments as committing the Court to a position on deep philosophical questions about the meaning of language and their implications for the interpretation of legal rules. These comments are better understood as stating mundane and uncontroversial truths. Who would argue that a statute applies only to the "principal evils" and not lesser evils that fall within the plain scope of its terms? Would even the most ardent "purposivists" and fans of legislative history contend that congressional intent is restricted to Congress's "*principal concerns*"?

Properly understood, *Oncale* does not provide the slightest support for what the Court has done today. For one thing, it would be a wild understatement to say that discrimination because of sexual orientation and transgender status was not the "principal evil" on Congress's mind in 1964. Whether we like to admit it now or not, in the thinking of Congress and the public at that time, such discrimination would not have been evil at all.

But the more important difference between these cases and *Oncale* is that here the interpretation that the Court adopts does not fall within the ordinary meaning of the statutory text as it would have been understood in 1964. To

Alito, J., dissenting

decide for the defendants in *Oncale*, it would have been nec-
essary to carve out an exception to the statutory text. Here,
no such surgery is at issue. Even if we totally disregard the
societal norms of 1964, the text of Title VII does not support
the Court's holding. And the reasoning of *Oncale* does not
preclude or counsel against our taking those norms into ac-
count. They are relevant, not for the purpose of creating an
exception to the terms of the statute, but for the purpose of
better appreciating how those terms would have been un-
derstood at the time.

2

The Court argues that two other decisions—*Phillips* v.
*Martin Marietta Corp.*, 400 U. S. 542 (1971) (*per curiam*),
and *Los Angeles Dept. of Water and Power* v. *Manhart*, 435
U. S. 702 (1978)—buttress its decision, but those cases
merely held that Title VII prohibits employer conduct that
plainly constitutes discrimination because of biological sex.
In *Philips*, the employer treated women with young chil-
dren less favorably than men with young children. In *Man-
hart*, the employer required women to make larger pension
contributions than men. It is hard to see how these hold-
ings assist the Court.

The Court extracts three "lessons" from *Phillips*, *Man-
hart*, and *Oncale*, but none sheds any light on the question
before us. The first lesson is that "it's irrelevant what an
employer might call its discriminatory practice, how others
might label it, or what else might motivate it." *Ante*, at 14.
This lesson is obviously true but proves nothing. As to the
label attached to a practice, has anyone ever thought that
the application of a law to a person's conduct depends on
how it is labeled? Could a bank robber escape conviction by
saying he was engaged in asset enhancement? So if an em-
ployer discriminates because of sex, the employer is liable
no matter what it calls its conduct, but if the employer's

ALITO, J., dissenting

conduct is not sex discrimination, the statute does not apply. Thus, this lesson simply takes us back to the question whether discrimination because of sexual orientation or gender identity is a form of discrimination because of biological sex. For reasons already discussed, see Part I–A, *supra*, it is not.

It likewise proves nothing of relevance here to note that an employer cannot escape liability by showing that discrimination on a prohibited ground was not its sole motivation. So long as a prohibited ground was a motivating factor, the existence of other motivating factors does not defeat liability.

The Court makes much of the argument that "[i]n *Phillips*, the employer could have accurately spoken of its policy as one based on 'motherhood.'" *Ante*, at 14; see also *ante,* at 16. But motherhood, by definition, is a condition that can be experienced only by women, so a policy that distinguishes between motherhood and parenthood is necessarily a policy that draws a sex-based distinction. There was sex discrimination in *Phillips*, because women with children were treated disadvantageously compared to men with children.

Lesson number two—"the plaintiff's sex need not be the sole or primary cause of the employer's adverse action," *ante*, at 14—is similarly unhelpful. The standard of causation in these cases is whether sex is necessarily a "motivating factor" when an employer discriminates on the basis of sexual orientation or gender identity. 42 U. S. C. §2000e–2(m). But the essential question—whether discrimination because of sexual orientation or gender identity constitutes sex discrimination—would be the same no matter what causation standard applied. The Court's extensive discussion of causation standards is so much smoke.

Lesson number three—"an employer cannot escape liability by demonstrating that it treats males and females comparably as groups," *ante*, at 15, is also irrelevant. There

is no dispute that discrimination against an individual employee based on that person's sex cannot be justified on the ground that the employer's treatment of the average employee of that sex is at least as favorable as its treatment of the average employee of the opposite sex. Nor does it matter if an employer discriminates against only a subset of men or women, where the same subset of the opposite sex is treated differently, as in *Phillips*. That is not the issue here. An employer who discriminates equally on the basis of sexual orientation or gender identity applies the same criterion to every affected *individual* regardless of sex. See Part I–A, *supra*.

### III

#### A

Because the opinion of the Court flies a textualist flag, I have taken pains to show that it cannot be defended on textualist grounds. But even if the Court's textualist argument were stronger, that would not explain today's decision. Many Justices of this Court, both past and present, have not espoused or practiced a method of statutory interpretation that is limited to the analysis of statutory text. Instead, when there is ambiguity in the terms of a statute, they have found it appropriate to look to other evidence of "congressional intent," including legislative history.

So, why in these cases are congressional intent and the legislative history of Title VII totally ignored? Any assessment of congressional intent or legislative history seriously undermines the Court's interpretation.

#### B

As the Court explained in *General Elec. Co.* v. *Gilbert*, 429 U. S. 125, 143 (1976), the legislative history of Title VII's prohibition of sex discrimination is brief, but it is nevertheless revealing. The prohibition of sex discrimination was "added to Title VII at the last minute on the floor of the

ALITO, J., dissenting

House of Representatives," *Meritor Savings Bank*, 477 U. S., at 63, by Representative Howard Smith, the Chairman of the Rules Committee. See 110 Cong. Rec. 2577 (1964). Representative Smith had been an ardent opponent of the civil rights bill, and it has been suggested that he added the prohibition against discrimination on the basis of "sex" as a poison pill. See, *e.g.*, *Ulane* v. *Eastern Airlines, Inc.*, 742 F. 2d 1081, 1085 (CA7 1984). On this theory, Representative Smith thought that prohibiting employment discrimination against women would be unacceptable to Members who might have otherwise voted in favor of the bill and that the addition of this prohibition might bring about the bill's defeat.[35] But if Representative Smith had been looking for a poison pill, prohibiting discrimination on the basis of sexual orientation or gender identity would have been far more potent. However, neither Representative Smith nor any other Member said one word about the possibility that the prohibition of sex discrimination might have that meaning. Instead, all the debate concerned discrimination on the basis of biological sex.[36] See 110 Cong. Rec. 2577–2584.

Representative Smith's motivations are contested, 883 F. 3d, at 139–140 (Lynch, J., dissenting), but whatever they

_____

[35] See Osterman, Origins of a Myth: Why Courts, Scholars, and the Public Think Title VII's Ban on Sex Discrimination Was an Accident, 20 Yale J. L. & Feminism 409, 409–410 (2009).

[36] Recent scholarship has linked the adoption of the Smith Amendment to the broader campaign for women's rights that was underway at the time. *E.g.*, Osterman, *supra*; Freeman, How Sex Got Into Title VII: Persistent Opportunism as a Maker of Public Policy, 9 L. & Ineq. 163 (1991); Barzilay, Parenting Title VII: Rethinking the History of the Sex Discrimination Provision, 28 Yale J. L. & Feminism 55 (2016); Gold, A Tale of Two Amendments: The Reasons Congress Added Sex to Title VII and Their Implication for the Issue of Comparable Worth, 19 Duquesne L. Rev. 453 (1981). None of these studies has unearthed evidence that the amendment was understood to apply to discrimination because of sexual orientation or gender identity.

ALITO, J., dissenting

were, the meaning of *the adoption of the prohibition* of sex discrimination is clear.  It was no accident.  It grew out of "a long history of women's rights advocacy that had increasingly been gaining mainstream recognition and acceptance," and it marked a landmark achievement in the path toward fully equal rights for women.  *Id.*, at 140.  "Discrimination against gay women and men, by contrast, was not on the table for public debate . . . [i]n those dark, pre-Stonewall days."  *Ibid.*

For those who regard congressional intent as the touchstone of statutory interpretation, the message of Title VII's legislative history cannot be missed.

C

Post-enactment events only clarify what was apparent when Title VII was enacted.  As noted, bills to add "sexual orientation" to Title VII's list of prohibited grounds were introduced in every Congress beginning in 1975, see *supra*, at 2, and two such bills were before Congress in 1991[37] when it made major changes in Title VII.  At that time, the three Courts of Appeals to reach the issue had held that Title VII does not prohibit discrimination because of sexual orientation,[38] two other Circuits had endorsed that interpretation in dicta,[39] and no Court of Appeals had held otherwise.  Similarly, the three Circuits to address the application of Title VII to transgender persons had all rejected the argument

---

[37] H. R. 1430, 102d Cong., 1st Sess., §2(d) (as introduced in the House on Mar. 13, 1991); S. 574, 102d Cong., 1st Sess., §5 (as introduced in the Senate on Mar. 6, 1991).

[38] See *Williamson* v. *A. G. Edwards & Sons, Inc.*, 876 F. 2d 69, 70 (CA8 1989) (*per curiam*), cert. denied, 493 U. S. 1089 (1990); *DeSantis* v. *Pacific Tel. & Tel. Co.*, 608 F. 2d 327, 329–330 (CA9 1979); *Blum* v. *Gulf Oil Corp.*, 597 F. 2d 936, 938 (CA5 1979) (*per curiam*).

[39] *Ruth* v. *Children's Med. Ctr.*, 1991 WL 151158, *5 (CA6, Aug. 8, 1991) (*per curiam*); *Ulane* v. *Eastern Airlines, Inc.*, 742 F. 2d 1081, 1084–1085 (CA7 1984), cert. denied, 471 U. S. 1017 (1985).

ALITO, J., dissenting

that it covered discrimination on this basis.[40]  These were also the positions of the EEOC.[41]  In enacting substantial changes to Title VII, the 1991 Congress abrogated numerous judicial decisions with which it disagreed.  If it also disagreed with the decisions regarding sexual orientation and transgender discrimination, it could have easily overruled those as well, but it did not do so.[42]

After 1991, six other Courts of Appeals reached the issue of sexual orientation discrimination, and until 2017, every single Court of Appeals decision understood Title VII's prohibition of "discrimination because of sex" to mean discrimination because of biological sex.  See, *e.g.*, *Higgins* v. *New Balance Athletic Shoe, Inc.*, 194 F. 3d 252, 259 (CA1 1999); *Simonton* v. *Runyon*, 232 F. 3d 33, 36 (CA2 2000); *Bibby* v. *Philadelphia Coca Cola Bottling Co.*, 260 F. 3d 257, 261 (CA3 2001), cert. denied, 534 U. S. 1155 (2002); *Wrightson* v. *Pizza Hut of Am., Inc.*, 99 F. 3d 138, 143 (CA4 1996); *Hamm* v. *Weyauwega Milk Products, Inc.*, 332 F. 3d 1058, 1062 (CA7 2003); *Medina* v. *Income Support Div., N. M.*, 413 F. 3d 1131, 1135 (CA10 2005); *Evans* v. *Georgia Regional Hospital*, 850 F. 3d 1248, 1255 (CA11), cert. denied, 583 U. S. ___ (2017).  Similarly, the other Circuit to formally address whether Title VII applies to claims of discrimination based on transgender status had also rejected the argument, creating unanimous consensus prior to the Sixth Circuit's decision below.  See *Etsitty* v. *Utah Transit Authority*, 502 F. 3d 1215, 1220–1221 (CA10

─────────

[40] See *Ulane*, 742 F. 2d, at 1084–1085; *Sommers* v. *Budget Mktg., Inc.*, 667 F. 2d 748, 750 (CA8 1982) (*per curiam*); *Holloway* v. *Arthur Andersen & Co.*, 566 F. 2d 659, 661–663 (CA9 1977).

[41] *Dillon* v. *Frank*, 1990 WL 1111074, *3–*4 (EEOC, Feb. 14, 1990); *LaBate* v. *USPS*, 1987 WL 774785, *2 (EEOC, Feb. 11, 1987).

[42] In more recent legislation, when Congress has wanted to reach acts committed because of sexual orientation or gender identity, it has referred to those grounds by name.  See, *e.g.*, 18 U. S. C. §249(a)(2)(A) (hate crimes) (enacted 2009); 34 U. S. C. §12291(b)(13)(A) (certain federally funded programs) (enacted 2013).

2007).

The Court observes that "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms," *ante*, at 24, but it has no qualms about disregarding over 50 years of uniform judicial interpretation of Title VII's plain text. Rather, the Court makes the jaw-dropping statement that its decision exemplifies "judicial humility." *Ante*, at 31. Is it humble to maintain, not only that Congress did not understand the terms it enacted in 1964, but that all the Circuit Judges on all the pre-2017 cases could not see what the phrase discrimination "because of sex" really means? If today's decision is humble, it is sobering to imagine what the Court might do if it decided to be bold.

## IV

What the Court has done today—interpreting discrimination because of "sex" to encompass discrimination because of sexual orientation or gender identity—is virtually certain to have far-reaching consequences. Over 100 federal statutes prohibit discrimination because of sex. See Appendix C, *infra*; *e.g.*, 20 U. S. C. §1681(a) (Title IX); 42 U. S. C. §3631 (Fair Housing Act); 15 U. S. C. 1691(a)(1) (Equal Credit Opportunity Act). The briefs in these cases have called to our attention the potential effects that the Court's reasoning may have under some of these laws, but the Court waves those considerations aside. As to Title VII itself, the Court dismisses questions about "bathrooms, locker rooms, or anything else of the kind." *Ante*, at 31. And it declines to say anything about other statutes whose terms mirror Title VII's.

The Court's brusque refusal to consider the consequences of its reasoning is irresponsible. If the Court had allowed the legislative process to take its course, Congress would have had the opportunity to consider competing interests and might have found a way of accommodating at least

ALITO, J., dissenting

some of them. In addition, Congress might have crafted special rules for some of the relevant statutes. But by intervening and proclaiming categorically that employment discrimination based on sexual orientation or gender identity is simply a form of discrimination because of sex, the Court has greatly impeded—and perhaps effectively ended—any chance of a bargained legislative resolution. Before issuing today's radical decision, the Court should have given some thought to where its decision would lead.

As the briefing in these cases has warned, the position that the Court now adopts will threaten freedom of religion, freedom of speech, and personal privacy and safety. No one should think that the Court's decision represents an unalloyed victory for individual liberty.

I will briefly note some of the potential consequences of the Court's decision, but I do not claim to provide a comprehensive survey or to suggest how any of these issues should necessarily play out under the Court's reasoning.[43]

*"[B]athrooms, locker rooms, [and other things] of [that] kind."* The Court may wish to avoid this subject, but it is a matter of concern to many people who are reticent about disrobing or using toilet facilities in the presence of individuals whom they regard as members of the opposite sex. For some, this may simply be a question of modesty, but for others, there is more at stake. For women who have been victimized by sexual assault or abuse, the experience of seeing an unclothed person with the anatomy of a male in a confined and sensitive location such as a bathroom or locker room can cause serious psychological harm.[44]

Under the Court's decision, however, transgender persons will be able to argue that they are entitled to use a bathroom or locker room that is reserved for persons of the

---

[43] Contrary to the implication in the Court's opinion, I do not label these potential consequences "undesirable." *Ante*, at 31. I mention them only as possible implications of the Court's reasoning.

[44] Brief for Defend My Privacy et al. as *Amici Curiae* 7–10.

sex with which they identify, and while the Court does not
define what it means by a transgender person, the term
may apply to individuals who are "gender fluid," that is, in-
dividuals whose gender identity is mixed or changes over
time.[45]  Thus, a person who has not undertaken any physi-
cal transitioning may claim the right to use the bathroom
or locker room assigned to the sex with which the individual
identifies at that particular time.  The Court provides no
clue why a transgender person's claim to such bathroom or
locker room access might not succeed.

   A similar issue has arisen under Title IX, which prohibits
sex discrimination by any elementary or secondary school
and any college or university that receives federal financial
assistance.[46]  In 2016, a Department of Justice advisory
warned that barring a student from a bathroom assigned to
individuals of the gender with which the student identifies
constitutes unlawful sex discrimination,[47] and some lower
court decisions have agreed.  See *Whitaker* v. *Kenosha Uni-
fied School Dist. No. 1 Bd. of Ed.*, 858 F. 3d 1034, 1049 (CA7
2017); *G. G.* v. *Gloucester Cty. School Bd.*, 822 F. 3d 709,
715 (CA4 2016), vacated and remanded, 580 U. S. ___
(2017); *Adams* v. *School Bd. of St. Johns Cty.*, 318 F. Supp.
3d 1293, 1325 (MD Fla. 2018); cf. *Doe* v. *Boyertown Area*

––––––––––––

   [45]See 1 Sadock, Comprehensive Textbook of Psychiatry, at 2063 (ex-
plaining that "gender is now often regarded as more *fluid*" and "[t]hus,
gender identity may be described as masculine, feminine, or somewhere
in between").
   [46]Title IX makes it unlawful to discriminate on the basis of sex in ed-
ucation: "No person in the United States shall, on the basis of sex, be
excluded from participation in, be denied the benefits of, or be subjected
to discrimination under any education program or activity receiving Fed-
eral financial assistance." 20 U. S. C. §1681(a).
   [47]See Dept. of Justice & Dept. of Education, Dear Colleague Letter on
Transgender Students, May 13, 2016 (Dear Colleague Letter),
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-
ix-transgender.pdf.

ALITO, J., dissenting

*School Dist.*, 897 F. 3d 518, 533 (CA3 2018), cert. denied,
587 U. S. ___ (2019).

*Women's sports.* Another issue that may come up under
both Title VII and Title IX is the right of a transgender in-
dividual to participate on a sports team or in an athletic
competition previously reserved for members of one biolog-
ical sex.[48] This issue has already arisen under Title IX,
where it threatens to undermine one of that law's major
achievements, giving young women an equal opportunity to
participate in sports. The effect of the Court's reasoning
may be to force young women to compete against students
who have a very significant biological advantage, including
students who have the size and strength of a male but iden-
tify as female and students who are taking male hormones
in order to transition from female to male. See, *e.g.*, Com-
plaint in *Soule* v. *Connecticut Assn. of Schools*, No. 3:20–cv–
00201 (D Conn., Apr. 17, 2020) (challenging Connecticut
policy allowing transgender students to compete in girls'
high school sports); Complaint in *Hecox* v. *Little*, No. 1:20–
cv–00184 (D Idaho, Apr. 15, 2020) (challenging state law
that bars transgender students from participating in school
sports in accordance with gender identity). Students in
these latter categories have found success in athletic com-
petitions reserved for females.[49]

_____

[48] A regulation allows single-sex teams, 34 CFR §106.41(b) (2019), but
the statute itself would of course take precedence.

[49] "[S]ince 2017, two biological males [in Connecticut] have collectively
won 15 women's state championship titles (previously held by ten differ-
ent Connecticut girls) against biologically female track athletes." Brief
for Independent Women's Forum et al. as *Amici Curiae* in No. 18–107,
pp. 14–15.

At the college level, a transgendered woman (biological male) switched
from competing on the men's Division II track team to the women's Divi-
sion II track team at Franklin Pierce University in New Hampshire after
taking a year of testosterone suppressants. While this student had
placed "eighth out of nine male athletes in the 400 meter hurdles the

ALITO, J., dissenting

The logic of the Court's decision could even affect professional sports. Under the Court's holding that Title VII prohibits employment discrimination because of transgender status, an athlete who has the physique of a man but identifies as a woman could claim the right to play on a women's professional sports team. The owners of the team might try to claim that biological sex is a bona fide occupational qualification (BFOQ) under 42 U. S. C. §2000e–2(e), but the BFOQ exception has been read very narrowly. See *Dothard* v. *Rawlinson*, 433 U. S. 321, 334 (1977).

*Housing.* The Court's decision may lead to Title IX cases against any college that resists assigning students of the opposite biological sex as roommates. A provision of Title IX, 20 U. S. C. §1686, allows schools to maintain "separate living facilities for the different sexes," but it may be argued that a student's "sex" is the gender with which the student identifies.[50] Similar claims may be brought under the Fair Housing Act. See 42 U. S. C. §3604.

*Employment by religious organizations.* Briefs filed by a wide range of religious groups—Christian, Jewish, and Muslim—express deep concern that the position now adopted by the Court "will trigger open conflict with faith-

---

year before, the student won the women's competition by over a second and a half—a time that had garnered tenth place in the men's conference meet just three years before." *Id.*, at 15.

A transgender male—*i.e.*, a biological female who was in the process of transitioning to male and actively taking testosterone injections—won the Texas girls' state championship in high school wrestling in 2017. Babb, Transgender Issue Hits Mat in Texas, Washington Post, Feb. 26, 2017, p. A1, col. 1.

[50] Indeed, the 2016 advisory letter issued by the Department of Justice took the position that under Title IX schools "must allow transgender students to access housing consistent with their gender identity." Dear Colleague Letter 4.

ALITO, J., dissenting

based employment practices of numerous churches, syna-gogues, mosques, and other religious institutions."[51] They argue that "[r]eligious organizations need employees who actually live the faith,"[52] and that compelling a religious or-ganization to employ individuals whose conduct flouts the tenets of the organization's faith forces the group to com-municate an objectionable message.

This problem is perhaps most acute when it comes to the employment of teachers. A school's standards for its faculty "communicate a particular way of life to its students," and a "violation by the faculty of those precepts" may under-mine the school's "moral teaching."[53] Thus, if a religious school teaches that sex outside marriage and sex reassign-ment procedures are immoral, the message may be lost if the school employs a teacher who is in a same-sex relation-ship or has undergone or is undergoing sex reassignment. Yet today's decision may lead to Title VII claims by such teachers and applicants for employment.

At least some teachers and applicants for teaching posi-tions may be blocked from recovering on such claims by the "ministerial exception" recognized in *Hosanna-Tabor Evan-gelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171 (2012). Two cases now pending before the Court present the question whether teachers who provide religious in-struction can be considered to be "ministers."[54] But even if teachers with those responsibilities qualify, what about other very visible school employees who may not qualify for

---

[51] Brief for National Association of Evangelicals et al. as *Amici Curiae* 3; see also Brief for United States Conference of Catholic Bishops et al. as *Amici Curiae* in No. 18–107, pp. 8–18.

[52] Brief for National Association of Evangelicals et al. as *Amici Curiae* 7.

[53] McConnell, Academic Freedom in Religious Colleges and Universi-ties, 53 Law & Contemp. Prob. 303, 322 (1990).

[54] See *Our Lady of Guadalupe School* v. *Morrissey-Berru*, No. 19–267; *St. James School* v. *Biel*, No. 19–348.

ALITO, J., dissenting

the ministerial exception? Provisions of Title VII provide exemptions for certain religious organizations and schools "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on" of the "activities" of the organization or school, 42 U. S. C. §2000e–1(a); see also §2000e–2(e)(2), but the scope of these provisions is disputed, and as interpreted by some lower courts, they provide only narrow protection.[55]

*Healthcare.* Healthcare benefits may emerge as an intense battleground under the Court's holding. Transgender employees have brought suit under Title VII to challenge employer-provided health insurance plans that do not cover costly sex reassignment surgery.[56] Similar claims have been brought under the Affordable Care Act (ACA), which broadly prohibits sex discrimination in the provision of healthcare.[57]

---

[55] See, *e.g.*, *EEOC* v. *Kamehameha Schools/Bishop Estate*, 990 F. 2d 458, 460 (CA9 1993); *EEOC* v. *Fremont Christian School*, 781 F. 2d 1362, 1365–1367 (CA9 1986); *Rayburn* v. *General Conference of Seventh-day Adventists*, 772 F. 2d 1164, 1166 (CA4 1985); *EEOC* v. *Mississippi College*, 626 F. 2d 477, 484–486 (CA5 1980); see also Brief for United States Conference of Catholic Bishops et al. as *Amici Curiae* in No. 18–107, at 30, n. 28 (discussing disputed scope). In addition, 42 U. S. C. §2000e–2(e)(1) provides that religion may be a BFOQ, and allows religious schools to hire religious employees, but as noted, the BFOQ exception has been read narrowly. See *supra*, at 48.

[56] See, *e.g.*, Amended Complaint in *Toomey* v. *Arizona*, No. 4:19–cv–00035 (D Ariz., Mar. 2, 2020). At least one District Court has already held that a state health insurance policy that does not provide coverage for sex reassignment surgery violates Title VII. *Fletcher* v. *Alaska*, ___ F. Supp. 3d ___, ___, 2020 WL 2487060, *5 (D Alaska, Mar. 6, 2020).

[57] See, *e.g.*, Complaint in *Conforti* v. *St. Joseph's Healthcare System*, No. 2:17–cv–00050 (D NJ, Jan. 5, 2017) (transgender man claims discrimination under the ACA because a Catholic hospital refused to allow a surgeon to perform a hysterectomy). And multiple District Courts have already concluded that the ACA requires health insurance coverage for sex reassignment surgery and treatment. *Kadel* v. *Folwell*, ___ F. Supp. 3d ___, ___, 2020 WL 1169271, *12 (MDNC, Mar. 11, 2020) (allowing

ALITO, J., dissenting

Such claims present difficult religious liberty issues because some employers and healthcare providers have strong religious objections to sex reassignment procedures, and therefore requiring them to pay for or to perform these procedures will have a severe impact on their ability to honor their deeply held religious beliefs.

*Freedom of speech*. The Court's decision may even affect the way employers address their employees and the way teachers and school officials address students. Under established English usage, two sets of sex-specific singular personal pronouns are used to refer to someone in the third person (he, him, and his for males; she, her, and hers for females). But several different sets of gender-neutral pronouns have now been created and are preferred by some individuals who do not identify as falling into either of the two traditional categories.[58]   Some jurisdictions, such as

─────────

claims of discrimination under ACA, Title IX, and Equal Protection Clause); *Tovar* v. *Essentia Health*, 342 F. Supp. 3d 947, 952–954 (D Minn. 2018) (allowing ACA claim).

Section 1557 of the ACA, 42 U. S. C. §18116, provides:

"Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U. S. C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U. S. C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U. S. C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection." (Footnote omitted.)

[58] See, *e.g.*, University of Wisconsin Milwaukee Lesbian, Gay, Bisexual, Transgender, Queer Plus (LGBTQ+) Resource Center, Gender Pronouns (2020), https://uwm.edu/lgbtrc/support/gender-pronouns/ (listing six new categories of pronouns: (f)ae, (f)aer, (f)aers; e/ey, em, eir, eirs; per, pers;

ALITO, J., dissenting

New York City, have ordinances making the failure to use an individual's preferred pronoun a punishable offense,[59] and some colleges have similar rules.[60] After today's decision, plaintiffs may claim that the failure to use their preferred pronoun violates one of the federal laws prohibiting sex discrimination. See *Prescott* v. *Rady Children's Hospital San Diego*, 265 F. Supp. 3d 1090, 1098–1100 (SD Cal. 2017) (hospital staff's refusal to use preferred pronoun violates ACA).[61]

The Court's decision may also pressure employers to suppress any statements by employees expressing disapproval of same-sex relationships and sex reassignment procedures. Employers are already imposing such restrictions voluntarily, and after today's decisions employers will fear

_____

ve, ver, vis; xe, xem, xyr, xyrs; ze/zie, hir, hirs).

[59] See 47 N. Y. C. R. R. §2–06(a) (2020) (stating that a "deliberate refusal to use an individual's self-identified name, pronoun and gendered title" is a violation of N. Y. C. Admin. Code §8–107 "where the refusal is motivated by the individual's gender"); see also N. Y. C. Admin. Code §§8–107(1), (4), (5) (2020) (making it unlawful to discriminate on the basis of "gender" in employment, housing, and public accommodations); cf. D. C. Mun. Regs., tit. 4, §801.1 (2020) (making it "unlawful . . . to discriminate . . . on the basis of . . . actual or perceived gender identity or expression" in "employment, housing, public accommodations, or educational institutions" and further proscribing "engaging in verbal . . . harassment").

[60] See University of Minn., Equity and Access: Gender Identity, Gender Expression, Names, and Pronouns, Administrative Policy (Dec. 11, 2019), https://policy.umn.edu/operations/genderequity ("University members and units are expected to use the names, gender identities, and pronouns specified to them by other University members, except as legally required"); *Meriwether* v. *Trustees of Shawnee State Univ.*, 2020 WL 704615, *1 (SD Ohio, Feb. 12, 2020) (rejecting First Amendment challenge to university's nondiscrimination policy brought by evangelical Christian professor who was subjected to disciplinary actions for failing to use student's preferred pronouns).

[61] Cf. Notice of Removal in *Vlaming* v. *West Point School Board*, No. 3:19–cv–00773 (ED Va., Oct. 22, 2019) (contending that high school teacher's firing for failure to use student's preferred pronouns was based on nondiscrimination policy adopted pursuant to Title IX).

that allowing employees to express their religious views on these subjects may give rise to Title VII harassment claims.

*Constitutional claims.* Finally, despite the important differences between the Fourteenth Amendment and Title VII, the Court's decision may exert a gravitational pull in constitutional cases. Under our precedents, the Equal Protection Clause prohibits sex-based discrimination unless a "heightened" standard of review is met. *Sessions* v. *Morales-Santana*, 582 U. S. ___, ___ (2017) (slip op., at 8); *United States* v. *Virginia*, 518 U. S. 515, 532–534 (1996). By equating discrimination because of sexual orientation or gender identity with discrimination because of sex, the Court's decision will be cited as a ground for subjecting all three forms of discrimination to the same exacting standard of review.

Under this logic, today's decision may have effects that extend well beyond the domain of federal antidiscrimination statutes. This potential is illustrated by pending and recent lower court cases in which transgender individuals have challenged a variety of federal, state, and local laws and policies on constitutional grounds. See, *e.g.*, Complaint in *Hecox*, No. 1: 20–CV–00184 (state law prohibiting transgender students from competing in school sports in accordance with their gender identity); Second Amended Complaint in *Karnoski* v. *Trump*, No. 2:17–cv–01297 (WD Wash., July 31, 2019) (military's ban on transgender members); *Kadel* v. *Folwell*, ___ F. Supp. 3d ___, ___–___, 2020 WL 1169271, *10–*11 (MDNC, Mar. 11, 2020) (state health plan's exclusion of coverage for sex reassignment procedures); Complaint in *Gore* v. *Lee*, No. 3:19–cv–00328 (MD Tenn., Mar. 3, 2020) (change of gender on birth certificates); Brief for Appellee in *Grimm* v. *Gloucester Cty. School Bd.*, No. 19–1952 (CA4, Nov. 18, 2019) (transgender student forced to use gender neutral bathrooms at school); Complaint in *Corbitt* v. *Taylor*, No. 2:18–cv–00091 (MD Ala.,

54              BOSTOCK *v.* CLAYTON COUNTY

July 25, 2018) (change of gender on driver's licenses); *Whitaker*, 858 F. 3d, at 1054 (school policy requiring students to use the bathroom that corresponds to the sex on birth certificate); *Keohane* v. *Florida Dept. of Corrections Secretary*, 952 F. 3d 1257, 1262–1265 (CA11 2020) (transgender prisoner denied hormone therapy and ability to dress and groom as a female); *Edmo* v. *Corizon, Inc.*, 935 F. 3d 757, 767 (CA9 2019) (transgender prisoner requested sex reassignment surgery); cf. *Glenn* v. *Brumby*, 663 F. 3d 1312, 1320 (CA11 2011) (transgender individual fired for gender non-conformity).

Although the Court does not want to think about the consequences of its decision, we will not be able to avoid those issues for long. The entire Federal Judiciary will be mired for years in disputes about the reach of the Court's reasoning.

*           *           *

The updating desire to which the Court succumbs no doubt arises from humane and generous impulses. Today, many Americans know individuals who are gay, lesbian, or transgender and want them to be treated with the dignity, consideration, and fairness that everyone deserves. But the authority of this Court is limited to saying what the law *is*.

The Court itself recognizes this:

> "The place to make new legislation . . . lies in Congress. When it comes to statutory interpretation, our role is limited to applying the law's demands as faithfully as we can in the cases that come before us." *Ante*, at 31.

It is easy to utter such words. If only the Court would live by them.

I respectfully dissent.

Cite as: 590 U. S. ____ (2020)                55

Appendix A to opinion of ALITO, J.

# APPENDIXES
## A

**Webster's New International Dictionary 2296 (2d ed. 1953):**

**sex** (sĕks), *n.* [F. *sexe*, fr. L. *sexus;* prob. orig., division, and akin to L. *secare* to cut.  See SECTION.] **1.** One of the two divisions of organisms formed on the distinction of male and female; males or females collectively. **2.** The sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female, or of pertaining to the distinctive function of the male or female in reproduction. *Conjugation,* or *fertilization* (union of germplasm of two individuals), a process evidently of great but not readily explainable importance in the perpetuation of most organisms, seems to be the function of differentiation of sex, which occurs in nearly all organisms at least at some stage in their life history. Sex is manifested in the conjugating cells by the larger size, abundant food material, and immobility of the female gamete (*egg, egg cell*, or *ovum*), and the small size and the locomotive power of the male gamete (*spermatozoon* or *spermatozoid*), and in the adult organisms often by many structural, physiological, and (in higher forms) psychological characters, aside from the necessary modification of the reproductive apparatus. Cf. HERMAPHRODITE, 1. In botany the term *sex* is often extended to the distinguishing peculiarities of staminate and pistillate flowers, and hence in dioecious plants to the individuals bearing them.

In many animals and plants the body and germ cells have been shown to contain one or more chromosomes of a special kind (called *sex chromosomes; idiochromosomes; accessory chromosomes*) in addition to the ordinary paired autosomes. These special chromosomes serve to

determine sex. In the simplest case, the male germ cells
are of two types, one with and one without a single extra
chromosome (*X chromosome*, or *monosome*). The egg cells
in this case all possess an *X chromosome*, and on fertili-
zation by the two types of sperm, male and female zygotes
result, of respective constitution *X*, and *XX*. In many
other animals and plants (probably including man) the
male organism produces two types of gametes, one pos-
sessing an *X chromosome*, the other a *Y chromosome*,
these being visibly different members of a pair of chromo-
somes present in the diploid state. In this case also, the
female organism is *XX*, the eggs *X*, and the zygotes re-
spectively male (*XY*) and female (*XX*). In another type of
sex determination, as in certain moths and possibly in the
fowl, the female produces two kinds of eggs, the male only
one kind of sperm. Each type of egg contains one member
of a pair of differentiated chromosomes, called respec-
tively *Z chromosomes* and *W chromosomes*, while all the
sperm cells contain a *Z* chromosome. In fertilization, un-
ion of a *Z* with a *W* gives rise to a female, while union of
two *Z* chromosomes produces a male. Cf. SECONDARY SEX
CHARACTER.

**3. a** The sphere of behavior dominated by the relations
between male and female. **b** *Psychoanalysis*. By exten-
sion, the whole sphere of behavior related even indirectly
to the sexual functions and embracing all affectionate
and pleasure-seeking conduct.

**4.** Phenomena of sexual instincts and their manifesta-
tions.

**5.** Sect;—a confused use.

**Syn.**—SEX, GENDER. SEX refers to physiological distinc-
tions; GENDER, to distinctions in grammar.

**—*the sex.*** The female sex; women, in general.

**sex,** *adj.* Based on or appealing to sex.

**sex,** *v. t.* To determine the sex of, as skeletal remains.

Appendix A to opinion of ALITO, J.

## Webster's Third New International Dictionary 2081 (1966):

[1]**sex** \'seks\ n –*ES often attrib* [ME, fr. L *sexus;* prob. akin to L *secare* to cut–more at SAW] **1:** one of the two divisions of organic esp. human beings respectively designated male or female <a member of the opposite ~> **2:** the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu. genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness with one or the other of these being present in most higher animals though both may occur in the same individual in many plants and some invertebrates and though no such distinction can be made in many lower forms (as some fungi, protozoans, and possibly bacteria and viruses) either because males and females are replaced by mating types or because the participants in sexual reproduction are indistinguishable—compare HETEROTHALLIC, HOMOTHALLIC; FERTILIZATION, MEIOSIS, MENDEL'S LAW; FREEMARTIN, HERMAPHRODITE, INTERSEX **3:** the sphere of interpersonal behavior esp. between male and female most directly associated with, leading up to, substituting for, or resulting from genital union <agree that the Christian's attitude toward ~ should not be considered apart from love, marriage, family—M. M. Forney> **4:** the phenomena of sexual instincts and their manifestations <with his customary combination of philosophy, insight, good will toward the world, and entertaining interest in ~—Allen Drury> <studying and assembling what modern scientists have discovered about ~—*Time*>; *specif:* SEXUAL INTERCOURSE <an old law imposing death for ~ outside marriage—William

BOSTOCK *v.* CLAYTON COUNTY

Appendix A to opinion of ALITO, J.

Empson>

**²sex** \ˈ“\ *vt* –ED/–ING/–ES **1:** to determine the sex of (an organic being) <it is difficult to ~ the animals at a distance—E. A. Hooton>—compare AUTOSEXING **2 a:** to increase the sexual appeal or attraction of—usu. used with *up* <titles must be ~*ed* up to attract 56 million customers—*Time*> **b:** to arouse the sexual instincts or desires of—usu. used with *up* <watching you ~*ing* up that bar kitten—Oakley Hall>

## 9 Oxford English Dictionary 577–578 (1933):

**Sex** (seks), *sb.* Also 6–7 sexe, (6 seex, 7 pl. sexe, 8 *poss.* sexe's). [ad. L. *sexus* (*u*-stem), whence also F. *sexe* (12th c.), Sp., Pg. *sexo*, It. *sesso*. Latin had also a form *secus* neut. (indeclinable).]

**1.** Either of the two divisions of organic beings distinguished as male and female respectively; the males or the females (of a species, etc., esp. of the human race) viewed collectively.

**1382** WYCLIF *Gen.* vi. 19 Of alle thingis hauynge sowle of ony flehs, two thow shalt brynge into the ark, that maal sex and femaal lyuen with thee. **1532** MORE *Confut. Tindale* II. 152, I had as leue he bare them both a bare cheryte, as wyth the frayle feminyne sexe fall to far in loue. **1559** ALYMER *Harborowe* E 4 b, Neither of them debarred the heires female .. as though it had ben .. vnnatural for that sexe to gouern. **1576** GASCOIGNE *Philomene* xcviii, I speake against my sex. *a* **1586** SIDNEY *Arcadia* II. (1912) 158 The sexe of womankind of all other is most bound to have regardfull eie to mens judgements. **1600** NASHE *Summer's Last Will* F 3 b, A woman they imagine her to be, Because that sexe keepes nothing close they heare. **1615** CROOKE *Body of Man* 274 If wee respect the .. conformation of both the Sexes, the Male is sooner perfected .. in the wombe. **1634** SIR T. HERBERT *Trav.* 19 Both sexe goe naked. **1667** MILTON *P. L.* IX, 822 To add what wants In Femal Sex. **1671**—*Samson* 774 It was a weakness In me, but incident to all our sex. **1679** DRYDEN *Troilus & Cr.* I. ii, A strange dissembling sex we women are. **1711** ADDISON *Spect.* No. 10 ¶ 6 Their Amusements .. are more adapted to the Sex than to the Species. **1730** SWIFT *Let. to Mrs. Whiteway* 28 Dec., You have neither the scrawl nor the spelling of your sex. **1742** GRAY *Propertius* II. 73 She .. Condemns her fickle Sexe's fond Mistake. **1763** G. WILLIAMS in Jesse *Selwyn & Contemp.* (1843) I. 265 It would

Appendix A to opinion of ALITO, J.

astonish you to see the mixture of sexes at this place. **1780** BENTHAM *Princ. Legisl.* VI. §35 The sensibility of the female sex appears .. to be greater than that of the male. **1814** SCOTT *Ld. of Isles* VI. iii, Her sex's dress regain'd. **1836** THIRLWALL *Greece* xi. II. 51 Solon also made regulations for the government of the other sex. **1846** *Ecclesiologist* Feb. 41 The propriety and necessity of dividing the sexes during the publick offices of the Church. **1848** THACKERAY *Van. Fair* xxv, She was by no means so far superior to her sex as to be above jealousy. **1865** DICKENS *Mut. Fr.* II. i, It was a school for both sexes. **1886** MABEL COLLINS *Prettiest Woman* ii, Zadwiga had not yet given any serious attention to the other sex.

**b.** *collect.* followed by plural verb. *rare.*

**1768** GOLDSM. *Good. n. Man* IV. (Globe) 632/2 Our sex are like poor tradesmen. **1839** MALCOM *Trav.* (1840) 40/I Neither sex tattoo any part of their bodies.

**c.** *The fair(er), gentle(r), soft(er), weak(er) sex; the devout sex; the second sex;* † *the woman sex:* the female sex, women. *The* † *better, sterner sex:* the male sex, men.

[**1583** STUBBES *Anat. Abus.* E vij b, Ye magnificency & liberalitie of that gentle sex. **1613** PURCHAS *Pilgrimage* (1614) 38 Strong Sampson and wise Solomon are witnesses, that the strong men are slaine by this weaker sexe.]

**1641** BROME *Jovial Crew* III. (1652) H 4, I am bound by a strong vow to kisse all of the woman sex I meet this morning. **1648** J. BEAUMONT *Psyche* XIV. I, The softer sex, attending Him And his still-growing woes. **1665** SIR T. HERBERT *Trav.* (1677) 22 Whiles the better sex seek prey abroad, the women (therein like themselves) keep home and spin. **1665** BOYLE *Occas. Refl.* v. ix. 176 Persons of the fairer Sex. a **1700** EVELYN *Diary* 12 Nov. an. 1644, The Pillar .. at which the devout sex are always rubbing their chaplets. **1701** STANHOPE *St. Aug. Medit.* I. xxxv. (1704) 82, I may .. not suffer my self to be outdone by the weaker Sex. **1732** [see FAIR a. I b]. **1753** HOGARTH *Anal. Beauty* x. 65 An elegant degree of plumpness peculiar to the skin of the softer sex. **1820** BYRON *Juan* IV. cviii, Benign Ceruleans of the second sex! Who advertise new poems by your looks. **1838** *Murray's Hand-bk. N. Germ.* 430 It is much frequented by the fair sex. **1894** C. D. TYLER in *Geog. Jrnl.* III. 479 They are beardless, and usually wear a shock of unkempt hair, which is somewhat finer in the gentler sex.

**¶d.** Used occas. with extended notion. *The third sex:* eunuchs. Also *sarcastically* (see quot. 1873).

**1820** BYRON *Juan* IV. lxxxvi, From all the Pope makes yearly, 'twould perplex To find three perfect pipes of the third sex. *Ibid.* V. xxvi, A black old neutral personage Of the third sex stept up. [**1873** LD. HOUGHTON *Monogr.* 280 Sydney Smith .. often spoke with much bitterness of the growing belief in three Sexes of Humanity—Men, Women, and Clergymen.]

**e.** *The sex:* the female sex. [F. *le sexe.*] Now *rare.*

BOSTOCK *v.* CLAYTON COUNTY

Appendix A to opinion of ALITO, J.

**1589** PUTTENHAM *Eng. Poesie* III. xix. (Arb.) 235 As he that had tolde a long tale before certaine noble women, of a matter somewhat in honour touching the Sex. **1608** D. T[UVILL] *Ess. Pol. & Mor.* 101 b, Not yet weighing with himselfe, the weaknesse and imbecillitie of the sex. **1631** MASSINGER *Emperor East* I. ii, I am called The Squire of Dames, or Servant of the Sex. **1697** VANBRUGH *Prov. Wife* II. ii, He has a strange penchant to grow fond of me, in spite of his aversion to the sex. **1760-2** GOLDSM. *Cit. W.* xcix, The men of Asia behave with more deference to the sex than you seem to imagine. **1792** A. YOUNG *Trav. France* I. 220 The sex of Venice are undoubtedly of a distinguished beauty. **1823** BYRON *Juan* XIII. lxxix, We give the sex the *pas.* **1863** R. F. BURTON *W. Africa* I. 22 Going 'up stairs', as the sex says, at 5 a.m. on the day after arrival, I cast the first glance at Funchal.

**f.** Without *the*, in predicative quasi-adj. use=feminine. *rare.*

**a 1700** DRYDEN *Cymon & Iph.* 368 She hugg'd th' Offender, and forgave th' Offence, Sex to the last!

**2.** Quality in respect of being male or female.
**a.** With regard to persons or animals.

**1526** *Pilgr. Perf.* (W. de. W. 1531) 282 b, Ye bee, whiche neuer gendreth with ony make of his kynde, nor yet hath ony distinct sex. **1577** T. KENDALL *Flowers of Epigr.* 71 b, If by corps suppos'd may be her seex, then sure a virgin she. **1616** T. SCOTT *Philomythie* I. (ed. 2) A 3 Euen as Hares change shape and sex, some say Once euery yeare. **1658** SIR T. BROWNE *Hydriot.* iii. 18 A critical view of bones makes a good distinction of sexes. **a 1665** DIGBY *Chym. Secrets* (1682) II. 225 Persons of all Ages and Sexes. **1667** MILTON *P. L.* I. 424 For Spirits when they please can either Sex assume, or both. **1710-11** SWIFT *Jrnl. to Stella* 7 Mar., I find I was mistaken in the sex, 'tis a boy. **1757** SMOLLETT *Reprisal* IV. v, As for me, my sex protects me. **1825** SCOTT *Betrothed* xiii, I am but a poor and neglected woman, feeble both from sex and age. **1841** ELPHINSTONE *Hist. India* I. 349 When persons of different sexes walk together, the woman always follows the man. **1882** TENSION-WOODS *Fish N. S. Wales* 116 Oysters are of distinct sexes.

**b.** with regard to plants (see FEMALE *a.* 2, MALE *a.* 2).

**1567** MAPLET *Gr. Forest* 28 Some seeme to haue both sexes and kindes: as the Oke, the Lawrell and such others. **1631** WIDDOWES *Nat. Philos.* (ed. 2) 49 There be sexes of hearbes .. namely, the Male or Female. **1720** P. BLAIR *Bot. Ess.* iv. 237 These being very evident Proofs of a necessity of two Sexes in Plants as well as in Animals. **1790** SMELLIE *Philos. Nat. Hist.* I. 245 There is not a notion more generally adopted, that that vegetables have the distinction of sexes. **1848** LINDLEY *Introd. Bot.* (ed. 4) II. 80 Change of Sex under the influence of external causes.

Appendix A to opinion of ALITO, J.

**3.** The distinction between male and female in general. In recent use often with more explicit notion: The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these; the class of phenomena with which these differences are concerned.

*Organs of sex:* the reproductive organs in sexed animals or plants.

*a* **1631** DONNE *Songs & Sonn., The Printrose* Poems 1912 I. 61 Should she Be more then woman, she would get above All thought of sexe, and think to move My heart to study her, and not to love. *a* **1643** CARTWRIGHT *Siedge* III. vi, My Soul's As Male as yours; there's no Sex in the mind. **1748** MELMOTH *Fitzosborne Lett.* lxii. (1749) II. 119 There may be a kind of sex in the very soul. **1751** HARRIS *Hermes* Wks. (1841) 129 Besides number, another characteristic, visible in substances, is that of sex. **1878** GLADSTONE *Prim. Homer* 68 Athenè .. has nothing of sex except the gender, nothing of the woman except the form. **1887** K. PEARSON *Eth. Freethought* xv. (1888) 429 What is the true type of social (moral) action in matters of sex? **1895** CRACKANTHORPE in 19*th Cent.* Apr. 607 (art.) Sex in modern literature. *Ibid.* 614 The writers and readers who have strenuously refused to allow to sex its place in creative art. **1912** H. G. WELLS *Marriage* ii. § 6. 72 The young need .. to be told .. all we know of three fundamental things; the first of which is God, .. and the third Sex.

**¶ 4.** Used, by confusion, in senses of SECT (q. v. I, 4 b, 7, and cf. I d *note*).

**1575-85** ABP. SANDYS *Serm.* xx. 358 So are all sexes and sorts of people called vpon. **1583** MELBANCKE *Philotimus* L iij b, Whether thinkest thou better sporte & more absurd, to see an Asse play on an harpe contrary to his sex, or heare [etc.]. **1586** J. HOOKER *Hist. Irel.* 180/2 in *Holinshed,* The whole sex of the Oconhours. **1586** T. B. *La Primaud. Fr. Acad.* I. 359 O detestable furie, not to be found in most cruell beasts, which spare the blood of their sexe. *a* **1704** T BROWN *Dial. Dead, Friendship* Wks. 1711 IV. 56 We have had enough of these Christians, and sure there can be no worse among the other Sex of Mankind [i.e. Jews and Turks]? **1707** ATTERBURY *Large Vind. Doctr.* 47 Much less can I imagine, why a Jewish Sex (whether of Pharisees or Saducees) should be represented, as [etc.].

**5.** *attrib.* and *Comb.,* as *sex-distinction, function,* etc.; *sex-abusing, transforming* adjs.; sex-cell, a reproductive cell, with either male or female function; a sperm-cell or an egg-cell.

**1642** H. MORE *Song of Soul* I. III. lxxi, Mad-making waters, sex trans-forming springs.

BOSTOCK *v.* CLAYTON COUNTY

Appendix A to opinion of ALITO, J.

**1781** COWPER *Expost.* 415 Sin, that in old time Brought fire from heav'n, the sex-abusing crime. **1876** HARDY *Ethelberta* xxxvii, You cannot have celebrity and sex-privilege both. **1887** *Jrnl. Educ.* No. 210. 29 If this examination craze is to prevail, and the sex-abolitionists are to have their way. **1889** GEDDES & THOMSON *Evol. Sex* 91 Very commonly the sex-cells originate in the ectoderm and ripen there. **1894** H. DRUMMOND *Ascent of Man* 317 The sex-distinction slowly gathers definition. **1897** J. HUTCHINSON *in Arch. Surg.* VIII. 230 Loss of Sex Function.

**Sex** (seks), *v.* [f. SEX *sb.*] *trans.* To determine the sex of, by anatomical examination; to label as male or female.

**1884** GURNEY *Diurnal Birds Prey* 173 The specimen is not sexed, neither is the sex noted on the drawing. **1888** A. NEWTON in *Zoologist* Ser. 111. XII. 101 The .. barbarous phrase of 'collecting a specimen' and then of 'sexing' it.

## Concise Oxford Dictionary of Current English 1164 (5th ed. 1964):

**sĕx,** n. Being male or female or hermaphrodite (*what is its ~?; ~ does not matter; without distinction of age or ~*), whence ~'LESS a., ~'**lèss**NESS n., ~'Y² a., immoderately concerned with ~; males or females collectively (*all ranks & both ~es; the fair, gentle, softer, weaker, ~,* & joc. *the ~,* women; *the sterner ~,* men; *is the fairest of her ~*); (attrib.) arising from difference, or consciousness, of ~ (~ *antagonism, ~ instinct, ~ urge*); ~ *appeal*, attractiveness arising from difference of ~. [f. L *sexus –ūs;* partly thr. F]

## Random House Dictionary of the English Language 1307 (1966):

**sex** (seks), *n.* **1.** The fact or character of being either male or female: *persons of different sex.* **2.** either of the two groups of persons exhibiting this character: *the stronger sex; the gentle sex.* **3.** the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences. **4.** the instinct or attraction drawing one sex toward another, or its manifestation in life and

Appendix B to opinion of ALITO, J.

conduct. **5.** coitus. **6. to have sex,** *Informal.* to engage in sexual intercourse. –*v.t.* **7.** to ascertain the sex of, esp. of newly hatched chicks. **8. sex it up,** *Slang.* to neck passionately: *They were really sexing it up last night.* **9. sex up,** *Informal.* **a.** to arouse sexually: *She certainly knows how to sex up the men.* **b.** to increase the appeal of; to make more interesting, attractive, or exciting: *We've decided to sex up the movie with some battle scenes.* [ME < L *sex(us)*, akin to *secus*, deriv. of *secāre* to cut, divide; see SECTION]

## American Heritage Dictionary 1187 (1969):

**sex** (sĕks) *n.* **1. a.** The property or quality by which organisms are classified according to their reproductive functions. **b.** Either of two divisions, designated *male* and *female*, of this classification. **2.** Males or females collectively. **3.** The condition or character of being male or female; the physiological, functional, and psychological differences that distinguish the male and the female. **4.** The sexual urge or instinct as it manifests itself in behavior. **5.** Sexual intercourse. –*tr.v.* **sexed, sexing, sexes.** To determine the sex of (young chickens). [Middle English, from Old French *sexe*, from Latin *sexus*†.]

B

## Webster's Third New International Dictionary 2081 (2002):

**¹sex** \ˈseks\ n –ES *often attrib* [ME, fr. L *sexus*; prob. akin to L *secare* to cut—more at SAW] **1:** one of the two divisions of organic esp. human beings respectively designated male or female <a member of the opposite ~> **2:** the sum of the morphological, physiological, and behavioral

Appendix B to opinion of ALITO, J.

peculiarities of living beings that subserves biparental re-production with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu. genet-ically controlled and associated with special sex chromo-somes, and that is typically manifested as maleness and femaleness with one or the other of these being present in most higher animals though both may occur in the same individual in many plants and some invertebrates and though no such distinction can be made in many lower forms (as some fungi, protozoans, and possibly bac-teria and viruses) either because males and females are replaced by mating types or because the participants in sexual reproduction are indistinguishable—compare HETEROTHALLIC, HOMOTHALLIC; FERTILIZATION, MEIOSIS, MENDEL'S LAW; FREEMARTIN, HERMAPHRODITE, INTERSEX **3:** the sphere of interpersonal behavior esp. between male and female most directly associated with, leading up to, substituting for, or resulting from genital union <agree that the Christian's attitude toward ~ should not be con-sidered apart from love, marriage, family—M. M. For-ney> **4:** the phenomena of sexual instincts and their man-ifestations <with his customary combination of philosophy, insight, good will toward the world, and en-tertaining interest in ~—Allen Drury> <studying and as-sembling what modern scientists have discovered about ~—*Time*>; *specif*: SEXUAL INTERCOURSE <an old law im-posing death for ~ outside marriage—William Empson>
[2]**sex** \"̆\ *vt* –ED/–ING/–ES **1:** to determine the sex of (an organic being) <it is difficult to ~ the animals at a distance—E. A. Hooton>—compare AUTOSEXING **2 a:** to increase the sex-ual appeal or attraction of—usu. used with *up* <titles must be ~*ed* up to attract 56 million customers—*Time*> **b:** to arouse the sexual instincts or desires of—usu. used with *up* <watching you ~*ing* up that bar kitten—Oakley Hall>

Appendix B to opinion of ALITO, J.

## Random House Webster's Unabridged Dictionary 1754 (2d ed. 2001):

**Sex** (seks), *n*. **1**. either the male or female division of a species, esp. as differentiated with reference to the reproductive functions. **2**. the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences. **3**. the instinct or attraction drawing one sex toward another, or its manifestation in life and conduct. **4**. coitus. **5**. genitalia. **6**. **to have sex**, to engage in sexual intercourse. – *v.t.* **7**. to ascertain the sex of, esp. of newly-hatched chicks. **8**. **sex up**, *Informal*. **a**. to arouse sexually: *The only intent of that show was to sex up the audience*. **b**. to increase the appeal of; to make more interesting, attractive, or exciting: *We've decided to sex up the movie with some battle scenes*. [1350–1400; ME < L *Sexus*, perh. akin to *secāre* to divide (see SECTION)]

## American Heritage Dictionary 1605 (5th ed. 2011):

**Sex** (seks) *n*. **1a**. Sexual activity, especially sexual intercourse: *hasn't had sex in months*. **b**. The sexual urge or instinct as it manifests itself in behavior: *motivated by sex*. **2a**. Either of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions: *How do you determine the sex of a lobster?* **b**. The fact or condition of existing in these two divisions, especially the collection of characteristics that distinguish female and male: *the evolution of sex in plants; a study that takes sex into account*. See Usage Note at **gender. 3**. Females or males considered as a group: *dormitories that house only one sex*. **4**. One's identity as either female or male. **5**. The genitals. ÷ *tr.v.* **sexed, sex-ing, sex-es 1**. To determine the sex of (an organism). **2**. *Slang* **a**. To arouse sexually. Often used with *up*. **b**. To increase the

Appendix C to opinion of ALITO, J.

appeal or attractiveness of. Often used with *up* [Middle English < Latin *sexus.*]

## C

### Statutes Prohibiting Sex Discrimination

- 2 U. S. C. §658a(2) (Congressional Budget and Fiscal Operations; Federal Mandates)

- 2 U. S. C. §1311(a)(1) (Congressional Accountability; Extension of Rights and Protections)

- 2 U. S. C. §1503(2) (Unfunded Mandates Reform)

- 3 U. S. C. §411(a)(1) (Presidential Offices; Employment Discrimination)

- 5 U. S. C. §2301(b)(2) (Merit System Principles)

- 5 U. S. C. §2302(b)(1) (Prohibited Personnel Practices)

- 5 U. S. C. §7103(a)(4)(A) (Labor-Management Relations; Definitions)

- 5 U. S. C. §7116(b)(4) (Labor-Management Relations; Unfair Labor Practices)

- 5 U. S. C. §7201(b) (Antidiscrimination Policy; Minority Recruitment Program)

Appendix C to opinion of ALITO, J.

- 5 U. S. C. §7204(b) (Antidiscrimination; Other Prohibitions)

- 6 U. S. C. §488f(b) (Secure Handling of Ammonium Nitrate; Protection From Civil Liability)

- 7 U. S. C. §2020(c)(1) (Supplemental Nutrition Assistance Program)

- 8 U. S. C. §1152(a)(1)(A) (Immigration; Numerical Limitations on Individual Foreign States)

- 8 U. S. C. §1187(c)(6) (Visa Waiver Program for Certain Visitors)

- 8 U. S. C. §1522(a)(5) (Authorization for Programs for Domestic Resettlement of and Assistance to Refugees)

- 10 U. S. C. §932(b)(4) (Uniform Code of Military Justice; Article 132 Retaliation)

- 10 U. S. C. §1034(j)(3) (Protected Communications; Prohibition of Retaliatory Personnel Actions)

- 12 U. S. C. §302 (Directors of Federal Reserve Banks; Number of Members; Classes)

- 12 U. S. C. §1735f–5(a) (Prohibition Against Discrimination on Account of Sex in Extension of Mortgage Assistance)

68                BOSTOCK *v.* CLAYTON COUNTY

Appendix C to opinion of ALITO, J.

- 12 U. S. C. §1821(d)(13)(E)(iv) (Federal Deposit Insurance Corporation; Insurance Funds)

- 12 U. S. C. §1823(d)(3)(D)(iv) (Federal Deposit Insurance Corporation; Corporation Moneys)

- 12 U. S. C. §2277a–10c(b)(13)(E)(iv) (Farm Credit System Insurance Corporation; Corporation as Conservator or Receiver; Certain Other Powers)

- 12 U. S. C. §3015(a)(4) (National Consumer Cooperative Bank; Eligibility of Cooperatives)

- 12 U. S. C. §§3106a(1)(B) and (2)(B) (Foreign Bank Participation in Domestic Markets)

- 12 U. S. C. §4545(1) (Fair Housing)

- 12 U. S. C. §5390(a)(9)(E)(v) (Wall Street Reform and Consumer Protection; Powers and Duties of the Corporation)

- 15 U. S. C. §631(h) (Aid to Small Business)

- 15 U. S. C. §633(b)(1) (Small Business Administration)

- 15 U. S. C. §719 (Alaska Natural Gas Transportation; Civil Rights)

- 15 U. S. C. §775 (Federal Energy Administration; Sex Discrimination; Enforcement; Other Legal Remedies)

Cite as: 590 U. S. ____ (2020)          69

Appendix C to opinion of ALITO, J.

- 15 U. S. C. §1691(a)(1) (Equal Credit Opportunity Act)

- 15 U. S. C. §1691d(a) (Equal Credit Opportunity Act)

- 15 U. S. C. §3151(a) (Full Employment and Balanced Growth; Nondiscrimination)

- 18 U. S. C. §246 (Deprivation of Relief Benefits)

- 18 U. S. C. §3593(f) (Special Hearing To Determine Whether a Sentence of Death Is Justified)

- 20 U. S. C. §1011(a) (Higher Education Resources and Student Assistance; Antidiscrimination)

- 20 U. S. C. §1011f(h)(5)(D) (Disclosures of Foreign Gifts)

- 20 U. S. C. §1066c(d) (Historically Black College and University Capital Financing; Limitations on Federal Insurance Bonds Issued by Designated Bonding Authority)

- 20 U. S. C. §1071(a)(2) (Federal Family Education Loan Program)

- 20 U. S. C. §1078(c)(2)(F) (Federal Payments To Reduce Student Interest Costs)

- 20 U. S. C. §1087–1(e) (Federal Family Education Loan Program; Special Allowances)

70          BOSTOCK *v.* CLAYTON COUNTY

Appendix C to opinion of A<small>LITO</small>, J.

- 20 U. S. C. §1087–2(e) (Student Loan Marketing Association)

- 20 U. S. C. §1087–4 (Discrimination in Secondary Markets Prohibited)

- 20 U. S. C. §1087tt(c) (Discretion of Student Financial Aid Administrators)

- 20 U. S. C. §1231e(b)(2) (Education Programs; Use of Funds Withheld)

- 20 U. S. C. §1681 (Title IX of the Education Amendments of 1972)

- 20 U. S. C. §1701(a)(1) (Equal Educational Opportunities; Congressional Declaration of Policy)

- 20 U. S. C. §1702(a)(1) (Equal Educational Opportunities; Congressional Findings)

- 20 U. S. C. §1703 (Denial of Equal Educational Opportunity Prohibited)

- 20 U. S. C. §1705 (Assignment on Neighborhood Basis Not a Denial of Equal Educational Opportunity)

- 20 U. S. C. §1715 (District Lines)

- 20 U. S. C. §1720 (Equal Educational Opportunities; Definitions)

Cite as: 590 U. S. ____ (2020)                71

Appendix C to opinion of ALITO, J.

- 20 U. S. C. §1756 (Remedies With Respect to School District Lines)

- 20 U. S. C. §2396 (Career and Technical Education; Federal Laws Guaranteeing Civil Rights)

- 20 U. S. C. §3401(2) (Department of Education; Congressional Findings)

- 20 U. S. C. §7231d(b)(2)(C) (Magnet Schools Assistance; Applications and Requirements)

- 20 U. S. C. §7914 (Strengthening and Improvement of Elementary and Secondary Schools; Civil Rights)

- 22 U. S. C. §262p–4n (Foreign Relations and Intercourse; Equal Employment Opportunities)

- 22 U. S. C. §2304(a)(1) (Human Rights and Security Assistance)

- 22 U. S. C. §2314(g) (Furnishing of Defense Articles or Related Training or Other Defense Service on Grant Basis)

- 22 U. S. C. §2426 (Discrimination Against United States Personnel)

- 22 U. S. C. §2504(a) (Peace Corps Volunteers)

- 22 U. S. C. §2661a (Foreign Contracts or Arrangements; Discrimination)

BOSTOCK *v.* CLAYTON COUNTY

Appendix C to opinion of ALITO, J.

- 22 U. S. C. §2755 (Discrimination Prohibited if Based on Race, Religion, National Origin, or Sex)

- 22 U. S. C. §3901(b)(2) (Foreign Service; Congressional Findings and Objectives)

- 22 U. S. C. §3905(b)(1) (Foreign Service; Personnel Actions)

- 22 U. S. C. §4102(11)(A) (Foreign Service; Definitions)

- 22 U. S. C. §4115(b)(4) (Foreign Service; Unfair Labor Practices)

- 22 U. S. C. §6401(a)(3) (International Religious Freedom; Findings; Policy)

- 22 U. S. C. §8303(c)(2) (Office of Volunteers for Prosperity)

- 23 U. S. C. §140(a) (Federal-Aid Highways; Nondiscrimination)

- 23 U. S. C. §324 (Highways; Prohibition of Discrimination on the Basis of Sex)

- 25 U. S. C. §4223(d)(2) (Housing Assistance for Native Hawaiians)

- 26 U. S. C. §7471(a)(6)(A) (Tax Court; Employees)

Cite as: 590 U. S. ____ (2020)          73

Appendix C to opinion of ALITO, J.

- 28 U. S. C. §994(d) (Duties of the United States Sentencing Commission)

- 28 U. S. C. §1862 (Trial by Jury; Discrimination Prohibited)

- 28 U. S. C. §1867(e) (Trial by Jury; Challenging Compliance With Selection Procedures)

- 29 U. S. C. §206(d)(1) (Equal Pay Act of 1963)

- 29 U. S. C. §§2601(a)(6) and (b)(4) (Family and Medical Leave; Findings and Purposes)

- 29 U. S. C. §2651(a) (Family and Medical Leave; Effect on Other Laws)

- 29 U. S. C. §3248 (Workforce Development Opportunities; Nondiscrimination)

- 30 U. S. C. §1222(c) (Research Funds to Institutes)

- 31 U. S. C. §732(f) (Government Accountability Office; Personnel Management System)

- 31 U. S. C. §6711 (Federal Payments; Prohibited Discrimination)

- 31 U. S. C. §6720(a)(8) (Federal Payments; Definitions, Application, and Administration)

74 BOSTOCK *v.* CLAYTON COUNTY

Appendix C to opinion of ALITO, J.

- 34 U. S. C. §10228(c) (Prohibition of Federal Control Over State and Local Criminal Justice Agencies; Prohibition of Discrimination)

- 34 U. S. C. §11133(a)(16) (Juvenile Justice and Delinquency Prevention; State Plans)

- 34 U. S. C. §12161(g) (Community Schools Youth Services and Supervision Grant Program)

- 34 U. S. C. §12361 (Violent Crime Control and Law Enforcement; Civil Rights for Women)

- 34 U. S. C. §20110(e) (Crime Victims Fund; Administration Provisions)

- 34 U. S. C. §50104(a) (Emergency Federal Law Enforcement Assistance)

- 36 U. S. C. §20204(b) (Air Force Sergeants Association; Membership)

- 36 U. S. C. §20205(c) (Air Force Sergeants Association; Governing Body)

- 36 U. S. C. §21003(a)(4) (American GI Forum of the United States; Purposes)

- 36 U. S. C. §21004(b) (American GI Forum of the United States; Membership)

- 36 U. S. C. §21005(c) (American GI Forum of the United States; Governing Body)

Cite as: 590 U. S. ____ (2020)          75

Appendix C to opinion of ALITO, J.

- 36 U. S. C. §21704A (The American Legion)

- 36 U. S. C. §22703(c) (Amvets; Membership)

- 36 U. S. C. §22704(d) (Amvets; Governing Body)

- 36 U. S. C. §60104(b) (82nd Airborne Division Association, Incorporated; Membership)

- 36 U. S. C. §60105(c) (82nd Airborne Division Association, Incorporated; Governing Body)

- 36 U. S. C. §70104(b) (Fleet Reserve Association; Membership)

- 36 U. S. C. §70105(c) (Fleet Reserve Association; Governing Body)

- 36 U. S. C. §140704(b) (Military Order of the World Wars; Membership)

- 36 U. S. C. §140705(c) (Military Order of the World Wars; Governing Body)

- 36 U. S. C. §154704(b) (Non Commissioned Officers Association of the United States of America, Incorporated; Membership)

- 36 U. S. C. §154705(c) (Non Commissioned Officers Association of the United States of America, Incorporated; Governing Body)

- 36 U. S. C. §190304(b) (Retired Enlisted Association, Incorporated; Membership)

Appendix C to opinion of ALITO, J.

- 36 U. S. C. §190305(c) (Retired Enlisted Association, Incorporated; Governing Body)

- 36 U. S. C. §220522(a)(8) and (9) (United States Olympic Committee; Eligibility Requirements)

- 36 U. S. C. §230504(b) (Vietnam Veterans of America, Inc.; Membership)

- 36 U. S. C. §230505(c) (Vietnam Veterans of America, Inc.; Governing Body)

- 40 U. S. C. §122(a) (Federal Property and Administrative Services; Prohibition on Sex Discrimination)

- 40 U. S. C. §14702 (Appalachian Regional Development; Nondiscrimination)

- 42 U. S. C. §213(f) (Military Benefits)

- 42 U. S. C. §290cc–33(a) (Projects for Assistance in Transition From Homelessness)

- 42 U. S. C. §290ff–1(e)(2)(C) (Children With Serious Emotional Disturbances; Requirements With Respect to Carrying Out Purpose of Grants)

- 42 U. S. C. §295m (Public Health Service; Prohibition Against Discrimination on Basis of Sex)

Case: 16-2424   Document: 9   Filed: 06/17/2020   Page: 114

Cite as: 590 U. S. ____ (2020)                77

Appendix C to opinion of ALITO, J.

- 42 U. S. C. §296g (Public Health Service; Prohibition Against Discrimination by Schools on Basis of Sex)

- 42 U. S. C. §300w–7(a)(2) (Preventive Health and Health Services Block Grants; Nondiscrimination Provisions)

- 42 U. S. C. §300x–57(a)(2) (Block Grants Regarding Mental Health and Substance Abuse; Nondiscrimination)

- 42 U. S. C. §603(a)(5)(I)(iii) (Block Grants to States for Temporary Assistance for Needy Families)

- 42 U. S. C. §708(a)(2) (Maternal and Child Health Services Block Grant; Nondiscrimination Provisions)

- 42 U. S. C. §1975a(a) (Duties of Civil Rights Commission)

- 42 U. S. C. §2000c(b) (Civil Rights; Public Education; Definitions)

- 42 U. S. C. §2000c–6(a)(2) (Civil Rights; Public Education; Civil Actions by the Attorney General)

- 42 U. S. C. §2000e–2 (Equal Employment Opportunities; Unlawful Employment Practices)

Appendix C to opinion of ALITO, J.

- 42 U. S. C. §2000e–3(b) (Equal Employment Opportunities; Other Unlawful Employment Practices)

- 42 U. S. C. §2000e–16(a) (Employment by Federal Government)

- 42 U. S. C. §2000e–16a(b) (Government Employee Rights Act of 1991)

- 42 U. S. C. §2000e–16b(a)(1) (Discriminatory Practices Prohibited)

- 42 U. S. C. §2000h–2 (Intervention by Attorney General; Denial of Equal Protection on Account of Race, Color, Religion, Sex or National Origin)

- 42 U. S. C. §3123 (Discrimination on Basis of Sex Prohibited in Federally Assisted Programs)

- 42 U. S. C. §3604 (Fair Housing Act; Discrimination in the Sale or Rental of Housing and Other Prohibited Practices)

- 42 U. S. C. §3605 (Fair Housing Act; Discrimination in Residential Real Estate-Related Transactions)

- 42 U. S. C. §3606 (Fair Housing Act; Discrimination in the Provision of Brokerage Services)

- 42 U. S. C. §3631 (Fair Housing Act; Violations; Penalties)

Cite as: 590 U. S. ____ (2020)          79

Appendix C to opinion of ALITO, J.

- 42 U. S. C. §4701 (Intergovernmental Personnel Program; Congressional Findings and Declaration of Policy)

- 42 U. S. C. §5057(a)(1) (Domestic Volunteer Services; Nondiscrimination Provisions)

- 42 U. S. C. §5151(a) (Nondiscrimination in Disaster Assistance)

- 42 U. S. C. §5309(a) (Community Development; Nondiscrimination in Programs and Activities)

- 42 U. S. C. §5891 (Development of Energy Sources; Sex Discrimination Prohibited)

- 42 U. S. C. §6709 (Public Works Employment; Sex Discrimination; Prohibition; Enforcement)

- 42 U. S. C. §6727(a)(1) (Public Works Employment; Nondiscrimination)

- 42 U. S. C. §6870(a) (Weatherization Assistance for Low-Income Persons)

- 42 U. S. C. §8625(a) (Low-Income Home Energy Assistance; Nondiscrimination Provisions)

- 42 U. S. C. §9821 (Community Economic Development; Nondiscrimination Provisions)

- 42 U. S. C. §9849 (Head Start Programs; Nondiscrimination Provisions)

80                    BOSTOCK *v.* CLAYTON COUNTY

                    Appendix C to opinion of ALITO, J.

- 42 U. S. C. §9918(c)(1) (Community Services
  Block Grant Program; Limitations on Use of
  Funds)

- 42 U. S. C. §10406(c)(2)(B)(i) (Family Violence
  Prevention and Services; Formula Grants to
  States)

- 42 U. S. C. §11504(b) (Enterprise Zone Develop-
  ment; Waiver of Modification of Housing and
  Community Development Rules in Enterprise
  Zones)

- 42 U. S. C. §12635(a)(1) (National and Commu-
  nity Service State Grant Program; Nondiscrim-
  ination)

- 42 U. S. C. §12832 (Investment in Affordable
  Housing; Nondiscrimination)

- 43 U. S. C. §1747(10) (Loans to States and Po-
  litical Subdivisions; Discrimination Prohibited)

- 43 U. S. C. §1863 (Outer Continental Shelf Re-
  source Management; Unlawful Employment
  Practices; Regulations)

- 47 U. S. C. §151 (Federal Communications
  Commission)

- 47 U. S. C. §398(b)(1) (Public Broadcasting;
  Equal Opportunity Employment)

Appendix C to opinion of ALITO, J.

- 47 U. S. C. §§554(b) and (c) (Cable Communications; Equal Employment Opportunity)

- 47 U. S. C. §555a(c) (Cable Communications; Limitation of Franchising Authority Liability)

- 48 U. S. C. §1542(a) (Virgin Islands; Voting Franchise; Discrimination Prohibited)

- 48 U. S. C. §1708 (Discrimination Prohibited in Rights of Access to, and Benefits From, Conveyed Lands)

- 49 U. S. C. §306(b) (Duties of the Secretary of Transportation; Prohibited Discrimination)

- 49 U. S. C. §5332(b) (Public Transportation; Nondiscrimination)

- 49 U. S. C. §40127 (Air Commerce and Safety; Prohibitions on Discrimination)

- 49 U. S. C. §47123(a) (Airport Improvement; Nondiscrimination)

- 50 U. S. C. §3809(b)(3) (Selective Service System)

- 50 U. S. C. §4842(a)(1)(B) (Anti-Boycott Act of 2018)

82 BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

D

Form Approved
OMB 22-R 0331

## APPLICATION FOR ENLISTMENT — ARMED FORCES OF THE UNITED STATES

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

AUTHORITY: Title 10, United States Code, Sections 504, 505, 508, 510, and Executive Order 9397.

PRINCIPAL PURPOSE: To determine your eligibility for enlistment.

ROUTINE USES: If you are enlisted, this form becomes the principal source document for, and a part of, your military personnel records which are used to make decisions related to your training, promotion, reassignment, and other personnel management actions.

DISCLOSURE: Voluntary; failure to answer all questions on this form except 12, 26, 32, and 35 may result in denial of your enlistment.

### WARNING

Information provided by you on this form is FOR OFFICIAL USE ONLY and will be maintained and used in strict compliance with Federal law and regulation. The information provided by you becomes the property of the United States Government and it may be considered throughout your military service career, particularly whenever either favorable or adverse administrative or disciplinary actions related to you are involved.

YOU CAN BE FURNISHED BY FINE, IMPRISONMENT OR BOTH
IF YOU ARE FOUND GUILTY OF MAKING A KNOWING AND WILLFUL, FALSE STATEMENT ON THIS APPLICATION.

### INSTRUCTIONS (Read carefully BEFORE filling out this form)

1. Type or print LEGIBLY all answers; if the answer is "None" or "Not Applicable," so state.
2. Questions 12, 26, and 32 are optional and may be left blank. Question 35 may be answered orally.
3. If additional space is needed for any answer, continue it in Item 37, "REMARKS."

### SECTION I — PERSONAL DATA

1. SOCIAL SECURITY ACCOUNT NUMBER
2. NAME (Last - First - Middle) (& Maiden, if any, Jr. - Sr. - etc.)
3. CURRENT ADDRESS (Street, City, County, State, & ZIP Code)
4. HOME OF RECORD (City, County, State, & ZIP Code)
5. CITIZENSHIP: U.S. (BIRTH), U.S. (NATURALIZED), U.S. NATIONAL
6. SEX: MALE, FEMALE
7. POPULATION GROUP: AM INDIAN, WHITE, URBAN, OTHER (Specify), BLACK
8. ETHNIC GROUP
9. MARITAL STATUS
10. NO. OF DEPENDENTS
11. DATE OF BIRTH: Y Y M M D D
12. RELIGIOUS PREFERENCE
13. RENC. (signed grade completed)
14. SELECTIVE SERVICE INFORMATION: NUMBER, CLASS, NOT REGISTERED
15. FOREIGN LANGUAGE AND SKILL: SPEAK, READ, WHITE
16. DRIVER'S LICENSE INFORMATION: STATE, NUMBER, EXPIRES

Cite as: 590 U. S. ____ (2020)          83

Appendix D to opinion of ALITO, J.

84       BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

LAST NAME: _____ SSN: _____

**III. VERIFICATION OF PERSONAL DATA**

23. If Preferred Enlistment Name (name given in block 1) is not the same as on your birth certificate and has not been changed by legal procedure prescribed by state law, complete the following:

    a. NAME AS SHOWN ON BIRTH CERTIFICATE

I hereby state that I have not changed my name through any court procedure; and that I prefer to use the name by which I am known in the community as a matter of convenience and with no criminal or fraudulent intent. I further state that I am the same person as the one whose name is shown in block 1.

b. WITNESS (Name, grade, and signature)      c. SIGNATURE OF APPLICANT

24. EDUCATION

| YEAR & MONTH | | NAME AND LOCATION OF SCHOOL | GRADUATE | | DEGREE RECEIVED |
|---|---|---|---|---|---|
| FROM | TO | | YES | NO | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

25. CITIZENSHIP VERIFICATION (To be completed in presence of your recruiter).

| a. PLACE OF BIRTH (City, State and (if not in USA) Country) | b. BIRTH CERTIFICATE ISSUED BY (County and State) |
|---|---|
| c. BIRTH CERTIFICATE FILE NUMBER | d. IF NATURALIZED, CERTIFICATE NO. | e. IF DERIVED, PARENTS' CERTIFICATE NO(S), DATE, PLACE AND COURT |

f. IF ALIEN, ALIEN REGISTRATION NUMBER

| g. NATIVE COUNTRY | h. DATE AND PORT OF ENTRY |
|---|---|

Cite as: 590 U. S. ____ (2020)　　　85

Appendix D to opinion of ALITO, J.

| 26. MILITARY SERVICE | | | | | | | |
|---|---|---|---|---|---|---|---|
| a. Are you now or have ever been in the Regular, Reserve or National Guard of the United States? ☐ No ☐ Yes. If "yes", complete the following: | | | | | | | |
| b. PAY GRADE AND SERVICE NUMBER | c. SERVICE AND COMPONENT | d. DATE OF ENTRY | e. DATE OF DISCH | f. TYPE DISCH/REL | g. TIME LOST (NO. OF DAYS) | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| h. If you are now a member of a US Reserve or National Guard organization, fill in organization name and unit address: | | | | | | | |
| 27a. PREVIOUS MILITARY SERVICE DO NOT WRITE IN THIS BLOCK | Total Active Military Service | Years | Months | Days | a. PEBD | b. PEBD | c. ADSD |
| | Total Inactive Military Service | | | | | | |
| IV. OTHER BACKGROUND DATA | | | | | | | |
| 28b. RELATIVES | b. DATE AND PLACE OF BIRTH | | | c. PRESENT ADDRESS | | | d. CITIZENSHIP |
| FATHER | | | | | | | |
| MOTHER (Maiden-name) | | | | | | | |
| SPOUSE (Maiden-name) | | | | | | | |
| CHILDREN (Show Relationship) | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

DD FORM 1966/2　REPLACES DD FORM 1966, 1 JUN 75, WHICH WILL BE USED　　PAGE 2
1 AUG 75

86      BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.



LAST NAME: _____ SSN: _____

**29. COMMERCIAL LIFE INSURANCE POLICIES YOU OWN ON YOUR LIFE** — Optional entry; used to assist your survivors in filing claims should you die while on active duty.

| a. NAME OF COMPANY ISSUING POLICY | b. POLICY NUMBER |
|---|---|
| | |
| | |

**30. RELATIVES AND ALIEN FRIENDS LIVING IN FOREIGN COUNTRIES** — List anyone with whom you had or have a close relationship, who lives in a foreign country.

| a. NAME AND RELATIONSHIP | b. AGE | c. OCCUPATION | d. ADDRESS | e. CITIZENSHIP |
|---|---|---|---|---|
| | | | | |
| | | | | |

**31. RESIDENCES** — List all from 10th birthday.

| YEAR & MONTH | | NUMBER AND STREET | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| FROM | TO | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**32. EMPLOYMENT** — Show every employment you have had and all periods of unemployment.

| YEAR & MONTH | | b. Company name and address (Street, City, State, and Zip Code) | c. JOB TITLE | d. SUPERVISOR NAME |
|---|---|---|---|---|
| FROM | TO | | | |
| | | | | |
| | | | | |

a. HAVE YOU EVER WORKED FOR A FOREIGN GOVERNMENT? ☐ NO ☐ YES (If "yes" give dates of employment, Government you worked for, location and nature of your duties)

Appendix D to opinion of ALITO, J.

**33. MEMBERSHIP IN YOUTH PROGRAMS**—Optional entry, you may be eligible for a higher paygrade, based on membership and participation in the youth programs listed below.

☐ No membership

| ORGANIZATION | MEMBERSHIP HELD | | CONDUCTED BY (SPONSOR) | LOCATION (SCHOOL AND ADDRESS) | YEARS COMPLETED OR LEVEL REACHED |
|---|---|---|---|---|---|
| | FROM | TO | | | |
| ROTC | | | | | (YEARS) |
| JROTC | | | | | (YEARS) |
| CAP | | | AIR FORCE | | (LEVEL) |
| SEA CADET | | | NAVY | | (LEVEL) |
| OTHER (Specify) | | | | | |

**34. FOREIGN TRAVEL**—Other than as a direct result of military service.

| YEAR & MONTH | | COUNTRY VISITED | PURPOSE OF TRAVEL |
|---|---|---|---|
| FROM | TO | | |
| | | | |

**35. DECLARATIONS**—Explain "Yes" answers in item 41.

a. HAVE YOU EVER BEEN REJECTED FOR ENLISTMENT, REENLISTMENT, OR INDUCTION IN ANY BRANCH OF THE ARMED FORCES OF THE UNITED STATES?
☐ NO ☐ YES

b. ARE YOU A CONSCIENTIOUS OBJECTOR?
☐ NO ☐ YES

c. ARE YOU NOW OR HAVE YOU EVER BEEN A DESERTER FROM ANY BRANCH OF THE ARMED FORCES OF THE UNITED STATES?
☐ NO ☐ YES

d. ARE YOU NOW DRAWING, OR DO YOU HAVE AN APPLICATION PENDING OR APPROVAL FOR, RETIRED PAY, DISABILITY ALLOWANCE OR SEVERANCE PAY OR A PENSION FROM THE GOVERNMENT OF THE UNITED STATES?
☐ NO ☐ YES

e. ARE YOU THE ONLY LIVING CHILD OF YOUR PARENTS?
☐ NO ☐ YES

**36. UNDERSTANDINGS.**

a. I understand that if I am rejected for enlistment because of a disqualification I have concealed, I may not be provided return transportation from the place of examination to my home. (INITIALS)

b. (For male applicants only). I understand that if I have not reached my 26th birthday that an original enlistment obligates me to serve in the Armed Forces for a period of six (6) years (active and reserve) unless sooner discharged. (INITIALS)

DD 1 AUG 75 FORM **1966/3** REPLACES DD FORM 1966, 1 JUN 75, WHICH WILL BE USED

PAGE 3

88     BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.



LAST NAME: _____  SSN: _____

37. CHARACTER AND SOCIAL ADJUSTMENT: Read and consider the following instructions carefully BEFORE answering questions a through f.

1. If your answer to every question is truthfully "NO", please indicate in the appropriate space.

2. If your answer to any questions in this item is "YES", or you have reservations about answering questions of this nature, you are not required to answer, or explain any of these questions in writing. Instead, you may request a personal interview in which you may provide the required information for each question orally.

3. If you choose the personal interview, the information you give may be investigated; however, any written record of the interview itself will not be retained more than six months after entry upon active duty, and it will not become a part of your permanent military personnel service record.

4. If you enlist, this information may be requested from you again at some future date and may become a part of your security investigative file at that time. This could occur as a result of your being considered for duties involving access to classified information or other types of duty requiring a personnel security investigation.

5. A "YES" answer will not necessarily disqualify you for enlistment. It will depend on the circumstances surrounding the situation involved.

INITIAL HERE IF YOU PREFER A PERSONAL INTERVIEW: _____

APPLICANT HAS BEEN INTERVIEWED AND IS ☐ ELIGIBLE FOR ENLISTMENT, ☐ INELIGIBLE FOR ENLISTMENT

DATE OF INTERVIEW | NAME ORGANIZATION & TITLE | SIGNATURE OF INTERVIEWER

EXPLAIN "YES" ANSWERS IN ITEM 41.

| | NO | YES |
|---|---|---|
| a. HAVE YOU EVER TAKEN, ANY NARCOTIC SUBSTANCE, SEDATIVE, STIMULANT, OR TRANQUILIZER DRUGS EXCEPT AS PRESCRIBED BY A LICENSED PHYSICIAN? | | |
| b. HAVE YOU EVER INTENTIONALLY SNIFFED GLUE, PAINT, HAIRSPRAY, OR OTHER CHEMICAL FUMES? | | |
| c. HAVE YOU EVER BEEN INVOLVED IN THE USE, PURCHASE, POSSESSION OR SALE OF MARIJUANA, LSD, OR ANY HARMFUL OR HABIT-FORMING DRUGS AND/OR CHEMICALS EXCEPT AS PRESCRIBED BY A LICENSED PHYSICIAN? | | |
| d. HAS YOUR USE OF ALCOHOLIC BEVERAGES *(SUCH AS LIQUOR, BEER, WINE)* EVER RESULTED IN THE LOSS OF A JOB, ARREST BY POLICE, or TREATMENT FOR ALCOHOLISM? | | |
| e. HAVE YOU EVER BEEN A PATIENT *(WHETHER OR NOT FORMALLY COMMITTED)* IN ANY INSTITUTION PRIMARILY DEVOTED TO THE TREATMENT OF MENTAL, NERVOUS, EMOTIONAL, PSYCHOLOGICAL, OR PERSONALITY DISORDERS? | | |
| f. HAVE YOU EVER ENGAGED IN HOMOSEXUAL ACTIVITY (SEXUAL RELATIONS WITH ANOTHER PERSON OF THE SAME SEX)? | | |

Cite as: 590 U. S. ____ (2020)          89

Appendix D to opinion of ALITO, J.

| | | NO | YES |
|---|---|---|---|
| 38. | MARITAL STATUS AND DEPENDENCY | | |
| a. | ARE YOU NOW, OR HAVE YOU EVER BEEN MARRIED? | | |
| b. | IF YOU HAVE BEEN MARRIED, ARE YOU NOW LIVING WITH YOUR SPOUSE? | | |
| c. | HAVE YOU EVER BEEN DIVORCED? (If yes, enter date, place and court which granted divorce or legal separation) | | |
| d. | IS ANY COURT ORDER OR JUDGEMENT DIRECTING SUPPORT FOR CHILDREN OF ALIMONY IN EFFECT? (Enter date, place, and court which granted alimony decree, or support as the result of a paternity suit) | | |
| e. | IS ANYONE OTHER THAN YOUR SPOUSE AND/OR CHILDREN SOLELY OR PARTIALLY DEPENDENT UPON YOU? (List name & address) | | |

| | | NO | YES |
|---|---|---|---|
| 39. | Do you now have, or within the past ten years, have you had knowing membership with the specific intent of furthering the aims of, or adherence to and active participation in any foreign or domestic organizations, association, movement, group, or combination of persons (hereinafter referred to as organizations) which unlawfully advocates or practices the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or laws of the United States or of any State, or which seeks to overthrow the Government of the United States or any State or subdivision thereof by unlawful means? | | |
| | If you answered "yes", give the names of the organizations and inclusive dates (month and year) of your membership; describe the nature of your activities as a member of the organization(s) in the "Remarks" section, Item 41. | | |

| | | NO | YES |
|---|---|---|---|
| 40. | INVOLVEMENT WITH POLICE OR JUDICIAL AUTHORITIES | | |
| | YOUR ANSWERS TO THE FOLLOWING QUESTIONS WILL BE VERIFIED WITH THE FEDERAL BUREAU OF INVESTIGATION (FBI), AND OTHER AGENCIES TO DETERMINE ANY PREVIOUS RECORDS OF ARREST OR CONVICTIONS OR JUVENILE COURT ADJUDICATIONS. IF YOU CONCEAL SUCH RECORDS AT THIS TIME, YOU MAY, UPON ENLISTMENT, BE SUBJECT TO DISCIPLINARY ACTION UNDER THE UNIFORM CODE OF MILITARY JUSTICE AND/OR DISCHARGE FROM THE MILITARY SERVICE WITH OTHER THAN AN HONORABLE DISCHARGE. | | |
| a. | Have you ever been arrested, charged, cited, or held by Federal, State, or other law enforcement or juvenile authorities regardless of whether the citation or charge was dropped or dismissed or you were found not guilty? | | |
| b. | As a result of being arrested, charged, cited, or held by law enforcement or juvenile authorities, have you ever been convicted, fined by or forfeited bond to a Federal, State, or other judicial authority or adjudicated a youthful offender or juvenile delinquent (regardless of whether the record in your case has been "sealed" or otherwise stricken from the court record)? | | |
| c. | Have you ever been detained, held in, or served time in any jail or prison, or reform or industrial school or any juvenile facility or institution under the jurisdiction of any City, County, State, Federal or foreign country? | | |
| d. | Have you ever been awarded, or are you now under suspended sentence, parole, or probation or awaiting any action on charges against you? | | |

DD, FORM, AUG 75 1966/4    REPLACES DD FORM 1966, 1 JUN 75, WHICH WILL BE USED AND DD FORM 373, 1 MAR 74; DD FORM 1916, 1 JUL. 73, WHICH ARE OBSOLETE.          PAGE 4

90      BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

LAST NAME: _____ SSN: _____

**40. Continued**

|  | NO | YES |
|---|---|---|
| e. HAVE YOU BEEN RELEASED FROM PAROLE, PROBATION, JUVENILE SUPERVISION, OR GIVEN A SUSPENDED SENTENCE OR RELIEVED OF CHARGES PENDING ON CONDITION THAT YOU APPLY FOR OR ENLIST IN THE US ARMED FORCES? |  |  |
| f. ARE YOU NOW INVOLVED IN OR A PARTY TO OR CONNECTED WITH ANY COURT ACTION OR CIVIL SUIT? (EXPLAIN "YES" ANSWER IN ITEM 41) |  |  |

g. EXPLAIN BELOW "YES" ANSWERS IN "e" THROUGH "g". BE CAREFUL TO INCLUDE *ALL* INCIDENTS WITH LAW ENFORCEMENT AUTHORITIES THAT YOU DISCUSSED WITH YOUR RECRUITER.

| OFFENSE | DATE/PLACE | AGE | DISPOSITION | COURT |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**41. REMARKS**

Cite as: 590 U. S. ____ (2020)   91

Appendix D to opinion of ALITO, J.

I am interested in the following options or programs:

## V. CERTIFICATION

42. BY APPLICANT, I UNDERSTAND THAT THE ARMED FORCES REPRESENTATIVE WHO WILL ACCEPT MY ENLISTMENT DOES SO IN RELIANCE ON THE INFORMATION PROVIDED BY ME IN THIS DOCUMENT. THAT IF ANY OF THE INFORMATION IS KNOWINGLY FALSE OR INCORRECT, I MAY BE PROSECUTED UNDER FEDERAL CIVILIAN OR MILITARY LAW OR SUBJECT TO ADMINISTRATIVE SEPARATION PROCEEDINGS AND, IN EITHER INSTANCE, I MAY RECEIVE A LESS THAN HONORABLE DISCHARGE WHICH COULD AFFECT MY FUTURE EMPLOYMENT OPPORTUNITIES. I CERTIFY THAT THE INFORMATION GIVEN BY ME IN THIS DOCUMENT IS TRUE, COMPLETE, AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| a. DATE | b. NAME of Veterans Branch | c. SIGNATURE OF APPLICANT |
|---|---|---|
| | | |

43. DATA VERIFICATION: To be completed by the recruiter who enters a description of the actual documents reviewed by him/her to verify:

| NAME | AGE | CITIZENSHIP |
|---|---|---|
| | | |
| EDUCATION | PRIOR MILITARY SERVICE | |
| | | |
| OTHER (Specify) | | |

DD FORM 1966/5   REPLACES DD FORM 1966, 1 JUN 75, WHICH WILL BE USED
1 AUG 79

PAGE 5

Case 1:16-2R4 Document 9 filed 06/17/2020 Page 129

92        BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

LAST NAME: _____    SSN: _____

| a. DATE | b. NAME, GRADE, SSN, AND RECRUITER ID NO. (Type or Print) | c. SIGNATURE OF RECRUITER |
|---|---|---|

**45. RECRUITER:** I certify that I have witnessed applicant's signature above and further certify that I have verified the data in Sections I, III, and IV of this document; and the documents listed above as prescribed by my directives. I understand that my liability to trial by court-martial under the Uniform Code of Military Justice should I effect or cause to be effected the enlistment of anyone known by me to be ineligible for enlistment.

**VI. PARENTAL/GUARDIAN CONSENT FOR ENLISTMENT**

45. I/we certify that the applicant named herein has no other legal guardian than me/us and I/we consent to his/her enlistment in the _____ subject to all the requirements and lawful commands of the officers who may, from time to time, be placed over him/her; and I/we certify that no promise of any kind has been made to me/us concerning assignment to duty, or promotion during his/her enlistment as an inducement to me/us to sign this consent. I/we hereby authorized the Armed Forces representatives concerned to administer medical examination, mental and/or aptitude testing, and conduct records checks to determine applicant's enlistment eligibility. I/we relinquish all claim to his/her service and to any wage or compensation for such service.

46. *For enlistment in a Reserve Component:* I/we understand that as a member of a Reserve Component, he/she must serve minimum periods of active duty unless excused by competent authority. In the event he/she fails to fulfill the obligations of his/her Reserve commitment, he/she may be recalled to active duty as prescribed by law. I/we further understand that while the applicant is in the Ready Reserve, he/she may be ordered to extended active duty in time of war or national emergency declared by the Congress or the President or when otherwise authorized by law.

47. I/we certify that the applicant's birth date is:

| NAME AND SIGNATURE OF WITNESSING OFFICIAL | SIGNATURE OF PARENT OR LEGAL GUARDIAN |
|---|---|
| NAME AND SIGNATURE OF WITNESSING OFFICIAL | SIGNATURE OF PARENT OR LEGAL GUARDIAN |

VERIFICATION OF SINGLE SIGNATURE CONSENT

**VII. ENLISTMENT OPTIONS** — Completed by guidance counsellor, career counsellor, recruiter, AFEES Liaison NCO, etc., as specified by sponsoring service.

| ENL. COMP. | GRADE/RATE | DATE OF RANK | TERM ENL. | T-E MOS/AFS | PMOS/AFS | WAIVER INFO | OPT ANAL | PROG ENL FOR |
|---|---|---|---|---|---|---|---|---|

Cite as: 590 U. S. ____ (2020)     93

Appendix D to opinion of ALITO, J.

SPECIFIC OPTIONS ENLISTED FOR

I certify that I have reviewed all information contained in this document and, to the best of my judgment and belief, applicant fulfills all legal and policy requirements for enlistment. I accept his/her enlistment on behalf of the ___. I further certify that service regulations governing such enlistment have been strictly complied with and any waivers required to effect applicant's enlistment have been secured and are attached to this document.

SIGNATURE

| DATE | NAME, GRADE, AND SSN, ORGANIZATION OR RECRUITER ID (Type or Print) | |

VIII. RECERTIFICATION BY APPLICANT, AND CORRECTION OF DATA AT TIME OF ENLISTMENT

I HAVE REVIEWED ALL INFORMATION CONTAINED IN THIS DOCUMENT, THAT INFORMATION IS STILL CORRECT AND TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF. IF CHANGES WERE REQUIRED, THE ORIGINAL ENTRY HAS BEEN MARKED. "SEE VIII" AND THE CORRECTED INFORMATION IS PROVIDED BELOW, KEYED TO THE APPROPRIATE QUESTION.

| QUESTION | CHANGE REQUIRED |
|---|---|
| | |
| | |
| | |
| | |

| DATE | NAME, GRADE, SSN AND SIGNATURE OF WITNESS (Type or Print) | SIGNATURE OF APPLICANT |

DD FORM 1966/6, 1 AUG 78   REPLACES DD FORM 1966, 1 JUN 75, WHICH WILL BE USED

PAGE 6

94              BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

Cite as: 590 U. S. ____ (2020)                    95

Appendix D to opinion of ALITO, J.

Appendix D to opinion of ALITO, J.

DD Form 1966

## RECORD OF MILITARY PROCESSING
## ARMED FORCES OF THE UNITED STATES

### Privacy Act Statement

**AUTHORITY:** Title 10, United States Code, Sections 504, 505, 508, 510, and 520a, and Title 50 USC Appendix 451 and following section.

**PRINCIPAL PURPOSE:** To determine your eligibility for military service.

**ROUTINE USES:** This form becomes the principal source document for, and part of, your military personnel records which are used to make decisions related to your training, promotion, assignments, and other personnel management actions.

**DISCLOSURE:**
*(Applicants)* — Voluntary; however, failure to answer all questions on this form, except "optional" items, may result in denial of your enlistment.

*(Selective Service Registrants)* — Disclosure of requested information is mandatory except "optional" items, disclosure of which is voluntary.

### WARNING

Information provided by you on this form is FOR OFFICIAL USE ONLY and will be maintained and used in strict compliance with Federal laws and regulations. The information provided by you becomes the property of the United States Government, and it may be consulted throughout your military service career, particularly whenever either favorable or adverse administrative or disciplinary actions related to you are involved.

Cite as: 590 U. S. ____ (2020)          97

Appendix D to opinion of ALITO, J.

YOU CAN BE PUNISHED BY FINE, IMPRISONMENT OR BOTH IF YOU ARE FOUND
GUILTY OF MAKING A KNOWING AND WILLFUL FALSE STATEMENT ON THIS DOCUMENT.

## INSTRUCTIONS

*(Read carefully BEFORE filling out this form.)*

1. Read Privacy Act Statement above before completing form.

2. Type or print LEGIBLY all answers; if the answer is "None" or "Not Applicable," so state. "OPTIONAL" questions may be left blank.

3. List all responses requiring dates (schools, employment/residences) in chronological order beginning with present or the most recent and work backwards. Show all (employers/residences) for the last five years or since 13th birthday. Give inclusive dates for each period of residence/employment/school. If additional space is needed for any answer, continue it in item 39, "Remarks."

4. Unless otherwise specified, write all dates as 6 digits (with no spaces or marks) in YY/MM/DD fashion. February 13, 1985 is written 850213.

DD Form 1966/1R, AUG 85          Previous editions are obsolete          Reverse of Page 1

98 BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

Cite as: 590 U. S. ____ (2020)                99

Appendix D to opinion of ALITO, J.

100     BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.



NAME     SOCIAL SECURITY NUMBER

| | YES | NO |
|---|---|---|
| 28. Are you now or have you ever been in any regular or reserve branch of the Armed Forces or in the Army National Guard or the Air National Guard? (Give your record on the appropriate DD Form 214 and/or DD Form 215 or NGB Form 22 for review.) | | |
| 29. Are you now or have you ever been divorced or legally separated? If "YES," enter in item 39 "REMARKS" the date, place and court which granted divorce or legal separation. | | |
| 30. Is any court order or judgment in effect that directs you to provide support for children or alimony? If "YES," enter in item 39, "REMARKS," the date, place, and court which granted alimony or support including orders resulting from paternity suits. | | |
| 31. Have you ever been arrested, apprehended, charged, cited or held by Federal, State, military or other law enforcement or juvenile authorities, regardless of whether the citation was dropped or dismissed or you were found not guilty? Include all courts-martial or non-judicial punishment while in military service. If "YES," enter details in item 35. | | |
| 32. As a result of being arrested, apprehended, charged, cited or held by Federal, State, military or other law enforcement or juvenile authorities, have you ever been convicted, fined by or forfeited bond to a Federal, State or other judicial authority or adjudicated a youthful offender or juvenile delinquent (regardless of whether the record in your case has been "sealed" or otherwise stricken from the court record); or have you been released from parole, probation, juvenile supervision or given a suspended sentence or reserved of charges pending on condition that you apply for or enlist in the United States Armed Forces? If "YES," enter details in item 35. | | |
| 33. Have you ever been detained, held in, or served time in any jail or prison, reform or industrial school, or a juvenile facility or institution under the jurisdiction of any city, state, Federal or foreign country? If "YES," enter details in item 35. | | |
| 34. Have you ever been a ward, or are you now under suspended sentence, parole, or probation or awaiting any action on criminal/civil charges against you? If "YES," enter details in item 35. | | |

35. LAW VIOLATIONS. Explain below. "YES" answers given in items 31 through 34 above (include all incidents with law enforcement authorities even if the citation or charge was dropped or dismissed or you were found not guilty or you have been told by recruiting personnel or anyone else that the incident was not important enough to list.)

| a. DATE (YYMMDD) | b. NATURE OF OFFENSE OR VIOLATION | c. PLACE OF OFFENSE | d. NAME AND LOCATION OF COURT | e. PENALTY IMPOSED OR OTHER DISPOSITION OF EACH CASE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Cite as: 590 U. S. ____ (2020)    101

Appendix D to opinion of ALITO, J.

**34. CHARACTER AND SOCIAL ADJUSTMENT:** If your answer to every question is truthfully "NO," indicate so in the appropriate space. If your answer is "YES," indicate so in the appropriate space and give details in Item 39 "REMARKS." A "YES" answer will not necessarily disqualify you for enlistment; it will depend on the circumstances surrounding the situation

a. Questions (1), (2), and (3) below concern possession, supply, use without a prescription of marijuana, narcotics, LSD or other dangerous drugs. A "yes" answer to (3) has no bearing on your eligibility to enlist or be commissioned but is essential to accurate job classification. Additional screening will occur during basic training or officer training school

(1) Have you ever used narcotics, LSD or other dangerous drugs?

(2) Have you ever been a supplier of narcotics, LSD or other dangerous drugs or marijuana?

(3) Have you used marijuana at any time in the past six months?

b. Has your use of drugs or alcoholic beverages (such as liquor, beer, wine), ever resulted in your loss of a job, arrest by police, or treatment of alcoholism?

Are you a homosexual or a bisexual? ("Homosexual" is defined as sexual desire or behavior directed at a person(s) of one's own sex. "Bisexual" is defined as a person sexually responsive to both sexes.)

Do you intend to engage in homosexual acts (sexual relations with another person of the same sex)?

e. Are you a conscientious objector? That is, do you have, or have you ever had, a firm, fixed, and sincere objection to participation in war in any form or to the bearing of arms because of religious training or belief?

f. Have you ever been rejected for enlistment, reenlistment, or induction by any branch of the Armed Forces of the United States?

g. Are you now, or have you ever been, a deserter from any branch of the Armed Forces of the United States?

h. Are you now, or have you ever been, a member of the Communist Party or any Communist organization? Are you now, or have you ever been, affiliated with any organization, association, movement, group, or combination of persons which advocates the overthrow of our constitutional form of government or which has adopted the policy of advocating the commission of acts of violence to deny other persons their rights under the Constitution of the United States or which seeks to alter the form of government of the United States by unconstitutional means? (If "YES," give details in Item 39 "REMARKS.")

YES | NO

DD Form 1966/3, AUG 85    Previous editions are obsolete    PAGE 3

102 BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

NAME | SOCIAL SECURITY NUMBER

**37. OTHER BACKGROUND DATA**

| | | YES | NO |

a. Have you ever traveled to, or resided in, a foreign country except as a member of the United States Armed Forces (including dependent travel) performing official duties? (If "YES," give details in item 39, "REMARKS.")

b. Are you the only living child of your parents?

c. Are you now drawing, or do you have an application pending, or approval for, retired pay, disability allowance, severance pay, or a pension from the government of the United States?

d. Have you been enrolled in ROTC, Junior ROTC, Sea Cadet Program, or have you been a member of the Civil Air Patrol? (If "YES," enter organization and its address in item 39, "REMARKS.")

**38. UNDERSTANDING**

| | b. APPLICANT'S INITIALS |

a. I understand that an original enlistment obligates me to serve in the Armed Forces for a period of eight (8) years (active and inactive duty) unless sooner discharged.

**SECTION IV - REMARKS**

**39. REMARKS** *(Enter item(s) being continued.)*

Cite as: 590 U. S. ____ (2020) 103

Appendix D to opinion of ALITO, J.



104            BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of A<small>LITO</small>, J.

Appendix D to opinion of ALITO, J.

SECTION VI – RECERTIFICATION

DD FORM 1966/5, AUG 85

106      BOSTOCK *v.* CLAYTON COUNTY

Appendix D to opinion of ALITO, J.

| NAME | | SOCIAL SECURITY NUMBER |
|---|---|---|
| **NOTE**<br>USE THIS DD FORM 1966 PAGE ONLY IF EITHER SECTION APPLIES TO THE APPLICANT'S RECORD OF MILITARY PROCESSING | | |
| **SECTION VII - PARENTAL/GUARDIAN CONSENT FOR ENLISTMENT** | | |

28. PARENT/GUARDIAN STATEMENT(S) *(Line out portion not applicable)*

a. I/we certify that *(Enter name of applicant)*

has no other legal guardian other than me/us and I/we consent to his/her enlistment in the United States *(Enter Branch of Service)*

I/we certify that no promises of any kind have been made to me/us concerning assignment to duty, training, or promotion during his/her enlistment as an inducement to me/us to sign this consent. I/we hereby authorize the Armed Forces representatives concerned to perform medical examinations, other examinations required, and to conduct records checks to determine his/her eligibility. I/we relinquish all claim to his/her service and to any wage or compensation for such service.

b. FOR ENLISTMENT IN A RESERVE COMPONENT

I/we understand that, as a member of a reserve component, he/she must serve minimum periods of active duty for training unless excused by competent authority. In the event he/she fails to fulfill the obligations of his/her reserve enlistment, he/she may be recalled to active duty as prescribed by law. I/we further understand that while he/she is in the ready reserve, he/she may be ordered to extended active duty in time of war or national emergency declared by the Congress or the President or when otherwise authorized by law.

| 1. PARENT | | |
|---|---|---|
| (1) TYPED OR PRINTED NAME *(Last, First, Middle Initial)* | (2) SIGNATURE | (3) DATE SIGNED *(YYMMDD)* |
| 2. WITNESS | | |
| (1) TYPED OR PRINTED NAME *(Last, First, Middle Initial)* | (2) SIGNATURE | (3) DATE SIGNED *(YYMMDD)* |

Appendix D to opinion of ALITO, J.

| PARENT | | |
|---|---|---|
| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) SIGNATURE | (3) DATE SIGNED (YYMMDD) |

| WITNESS | | |
|---|---|---|
| (1) TYPED OR PRINTED NAME (Last, First, Middle Initial) | (2) SIGNATURE | (3) DATE SIGNED (YYMMDD) |

**47. VERIFICATION OF SINGLE SIGNATURE CONSENT**

**SECTION VIII - STATEMENT OF NAME FOR OFFICIAL MILITARY RECORDS**

**48. NAME CHANGE.** If the present/no enlistment name (name given in item 2) is not the same as on your birth certificate, and it has not been changed by legal procedure prescribed by state law, and it is the same as on your social security number card, complete the following:

| a. NAME AS SHOWN ON BIRTH CERTIFICATE | b. NAME AS SHOWN ON SOCIAL SECURITY NUMBER CARD |
|---|---|

c. I hereby state that I have not changed my name through any court or other legal procedure; that I prefer to use the name of _____ by which I am known in the community as a matter of convenience and with no criminal intent. I further state that I am the same person as the person whose name is shown in item 2.

| d. WITNESS | | e. APPLICANT | |
|---|---|---|---|
| (1) TYPED OR PRINTED NAME | (2) PAY GRADE | (1) SIGNATURE | (2) DATE SIGNED (YYMMDD) |
| (2) SIGNATURE | | | |

DD Form 1966/6, AUG 85          Previous editions are obsolete          PAGE 6

KAVANAUGH, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 17–1618, 17–1623 and 18–107

————

GERALD LYNN BOSTOCK, PETITIONER
17–1618              *v.*
CLAYTON COUNTY, GEORGIA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

ALTITUDE EXPRESS, INC., ET AL., PETITIONERS
17–1623              *v.*
MELISSA ZARDA AND WILLIAM ALLEN MOORE, JR.,
CO-INDEPENDENT EXECUTORS OF THE ESTATE OF
DONALD ZARDA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

R.G. & G.R. HARRIS FUNERAL HOMES, INC.,
PETITIONER
18–107              *v.*
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 15, 2020]

JUSTICE KAVANAUGH, dissenting.

Like many cases in this Court, this case boils down to one
fundamental question: Who decides? Title VII of the Civil
Rights Act of 1964 prohibits employment discrimination
"because of" an individual's "race, color, religion, sex, or na-
tional origin." The question here is whether Title VII

2                 BOSTOCK *v.* CLAYTON COUNTY

KAVANAUGH, J., dissenting

should be expanded to prohibit employment discrimination because of sexual orientation.  Under the Constitution's separation of powers, the responsibility to amend Title VII belongs to Congress and the President in the legislative process, not to this Court.

The political branches are well aware of this issue.  In 2007, the U. S. House of Representatives voted 235 to 184 to prohibit employment discrimination on the basis of sexual orientation.  In 2013, the U. S. Senate voted 64 to 32 in favor of a similar ban.  In 2019, the House again voted 236 to 173 to outlaw employment discrimination on the basis of sexual orientation.  Although both the House and Senate have voted at different times to prohibit sexual orientation discrimination, the two Houses have not yet come together with the President to enact a bill into law.

The policy arguments for amending Title VII are very weighty.  The Court has previously stated, and I fully agree, that gay and lesbian Americans "cannot be treated as social outcasts or as inferior in dignity and worth."  *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___ (2018) (slip op., at 9).

But we are judges, not Members of Congress.  And in Alexander Hamilton's words, federal judges exercise "neither Force nor Will, but merely judgment."  The Federalist No. 78, p. 523 (J. Cooke ed. 1961).  Under the Constitution's separation of powers, our role as judges is to interpret and follow the law as written, regardless of whether we like the result.  Cf. *Texas* v. *Johnson*, 491 U. S. 397, 420–421 (1989) (Kennedy, J., concurring).  Our role is not to make or amend the law.  As written, Title VII does not prohibit employment discrimination because of sexual orientation.[1]

_____

[1] Although this opinion does not separately analyze discrimination on the basis of gender identity, this opinion's legal analysis of discrimination on the basis of sexual orientation would apply in much the same way to discrimination on the basis of gender identity.

3

KAVANAUGH, J., dissenting

## I

Title VII makes it unlawful for employers to discriminate because of "race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a)(1).[2]  As enacted in 1964, Title VII did not prohibit other forms of employment discrimination, such as age discrimination, disability discrimination, or sexual orientation discrimination.

Over time, Congress has enacted new employment discrimination laws.  In 1967, Congress passed and President Johnson signed the Age Discrimination in Employment Act. 81 Stat. 602.  In 1973, Congress passed and President Nixon signed the Rehabilitation Act, which in substance prohibited disability discrimination against federal and certain other employees.  87 Stat. 355.  In 1990, Congress passed and President George H. W. Bush signed the comprehensive Americans with Disabilities Act.  104 Stat. 327.

To prohibit age discrimination and disability discrimination, this Court did not unilaterally rewrite or update the

─────────

[2] In full, the statute provides:

"*It shall be an unlawful employment practice for an employer—*

"*(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's race, color, religion, sex, or national origin*; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a) (emphasis added).

As the Court today recognizes, Title VII contains an important exemption for religious organizations. §2000e–1(a); see also §2000e–2(e).  The First Amendment also safeguards the employment decisions of religious employers.  See *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 188–195 (2012).  So too, the Religious Freedom Restoration Act of 1993 exempts employers from federal laws that substantially burden the exercise of religion, subject to limited exceptions. §2000bb–1.

4                    BOSTOCK *v.* CLAYTON COUNTY

KAVANAUGH, J., dissenting

law.  Rather, Congress and the President enacted new leg-
islation, as prescribed by the Constitution's separation of
powers.

  For several decades, Congress has considered numerous
bills to prohibit employment discrimination based on sexual
orientation.  But as noted above, although Congress has
come close, it has not yet shouldered a bill over the legisla-
tive finish line.

  In the face of the unsuccessful legislative efforts (so far)
to prohibit sexual orientation discrimination, judges may
not rewrite the law simply because of their own policy
views.  Judges may not update the law merely because they
think that Congress does not have the votes or the fortitude.
Judges may not predictively amend the law just because
they believe that Congress is likely to do it soon anyway.

  If judges could rewrite laws based on their own policy
views, or based on their own assessments of likely future
legislative action, the critical distinction between legisla-
tive authority and judicial authority that undergirds the
Constitution's separation of powers would collapse, thereby
threatening the impartial rule of law and individual liberty.
As James Madison stated: "Were the power of judging
joined with the legislative, the life and liberty of the subject
would be exposed to arbitrary controul, for *the judge* would
then be *the legislator*."  The Federalist No. 47, at 326 (citing
Montesquieu).  If judges could, for example, rewrite or up-
date securities laws or healthcare laws or gun laws or envi-
ronmental laws simply based on their own policy views, the
Judiciary would become a democratically illegitimate su-
per-legislature—unelected, and hijacking the important
policy decisions reserved by the Constitution to the people's
elected representatives.

  Because judges interpret the law as written, not as they
might wish it were written, the first 10 U. S. Courts of Ap-
peals to consider whether Title VII prohibits sexual orien-
tation discrimination all said no.  Some 30 federal judges

KAVANAUGH, J., dissenting

considered the question. All 30 judges said no, based on the text of the statute. 30 out of 30.

But in the last few years, a new theory has emerged. To end-run the bedrock separation-of-powers principle that courts may not unilaterally rewrite statutes, the plaintiffs here (and, recently, two Courts of Appeals) have advanced a novel and creative argument. They contend that discrimination "because of sexual orientation" and discrimination "because of sex" are actually not separate categories of discrimination after all. Instead, the theory goes, discrimination because of sexual orientation always qualifies as discrimination because of sex: When a gay man is fired because he is gay, he is fired because he is attracted to men, even though a similarly situated woman would not be fired just because she is attracted to men. According to this theory, it follows that the man has been fired, at least as a literal matter, because of his sex.

Under this literalist approach, sexual orientation discrimination automatically qualifies as sex discrimination, and Title VII's prohibition against sex discrimination therefore also prohibits sexual orientation discrimination—and actually has done so since 1964, unbeknownst to everyone. Surprisingly, the Court today buys into this approach. *Ante*, at 9–12.

For the sake of argument, I will assume that firing someone because of their sexual orientation may, as a very literal matter, entail making a distinction based on sex. But to prevail in this case with their literalist approach, the plaintiffs must *also* establish one of two other points. The plaintiffs must establish that courts, when interpreting a statute, adhere to literal meaning rather than ordinary meaning. Or alternatively, the plaintiffs must establish that the ordinary meaning of "discriminate because of sex"—not just the literal meaning—encompasses sexual orientation discrimination. The plaintiffs fall short on both counts.

KAVANAUGH, J., dissenting

*First*, courts must follow ordinary meaning, not literal meaning. And courts must adhere to the ordinary meaning of phrases, not just the meaning of the words in a phrase.

There is no serious debate about the foundational interpretive principle that courts adhere to ordinary meaning, not literal meaning, when interpreting statutes. As Justice Scalia explained, "the good textualist is not a literalist." A. Scalia, A Matter of Interpretation 24 (1997). Or as Professor Eskridge stated: The "prime directive in statutory interpretation is to apply the meaning that a reasonable reader would derive from the text of the law," so that "for hard cases as well as easy ones, the *ordinary meaning* (or the 'everyday meaning' or the 'commonsense' reading) of the relevant statutory text is the anchor for statutory interpretation." W. Eskridge, Interpreting Law 33, 34–35 (2016) (footnote omitted). Or as Professor Manning put it, proper statutory interpretation asks "how a reasonable person, conversant with the relevant social and linguistic conventions, would read the text in context. This approach recognizes that the literal or dictionary definitions of words will often fail to account for settled nuances or background conventions that qualify the literal meaning of language and, in particular, of legal language." Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2392–2393 (2003). Or as Professor Nelson wrote: No "mainstream judge is interested solely in the literal definitions of a statute's words." Nelson, What Is Textualism?, 91 Va. L. Rev. 347, 376 (2005). The ordinary meaning that counts is the ordinary public meaning at the time of enactment—although in this case, that temporal principle matters little because the ordinary meaning of "discriminate because of sex" was the same in 1964 as it is now.

Judges adhere to ordinary meaning for two main reasons: rule of law and democratic accountability. A society governed by the rule of law must have laws that are known and understandable to the citizenry. And judicial adherence to

KAVANAUGH, J., dissenting

ordinary meaning facilitates the democratic accountability of America's elected representatives for the laws they enact. Citizens and legislators must be able to ascertain the law by reading the words of the statute. Both the rule of law and democratic accountability badly suffer when a court adopts a hidden or obscure interpretation of the law, and not its ordinary meaning.

Consider a simple example of how ordinary meaning differs from literal meaning. A statutory ban on "vehicles in the park" would literally encompass a baby stroller. But no good judge would interpret the statute that way because the word "vehicle," in its ordinary meaning, does not encompass baby strollers.

The ordinary meaning principle is longstanding and well settled. Time and again, this Court has rejected literalism in favor of ordinary meaning. Take a few examples:

- The Court recognized that beans may be seeds "in the language of botany or natural history," but concluded that beans are not seeds "in commerce" or "in common parlance." *Robertson* v. *Salomon*, 130 U. S. 412, 414 (1889).

- The Court explained that tomatoes are literally "the fruit of a vine," but "in the common language of the people," tomatoes are vegetables. *Nix* v. *Hedden*, 149 U. S. 304, 307 (1893).

- The Court stated that the statutory term "vehicle" does not cover an aircraft: "No doubt etymologically it is possible to use the word to signify a conveyance working on land, water or air . . . . But in everyday speech 'vehicle' calls up the picture of a thing moving on land." *McBoyle* v. *United States*, 283 U. S. 25, 26 (1931).

- The Court pointed out that "this Court's interpretation of the three-judge-court statutes has frequently deviated from the path of literalism." *Gonzalez* v. *Automatic Employees Credit Union*, 419 U. S. 90, 96 (1974).

KAVANAUGH, J., dissenting

- The Court refused a reading of "mineral deposits" that would include water, even if "water is a 'mineral,' in the broadest sense of that word," because it would bring about a "major . . . alteration in established legal relationships based on nothing more than an overly literal reading of a statute, without any regard for its context or history." *Andrus* v. *Charlestone Stone Products Co.*, 436 U. S. 604, 610, 616 (1978).
- The Court declined to interpret "facilitating" a drug distribution crime in a way that would cover purchasing drugs, because the "literal sweep of 'facilitate' sits uncomfortably with common usage." *Abuelhawa* v. *United States*, 556 U. S. 816, 820 (2009).
- The Court rebuffed a literal reading of "personnel rules" that would encompass any rules that personnel must follow (as opposed to human resources rules *about* personnel), and stated that no one "using ordinary language would describe" personnel rules "in this manner." *Milner* v. *Department of Navy*, 562 U. S. 562, 578 (2011).
- The Court explained that, when construing statutory phrases such as "arising from," it avoids "uncritical literalism leading to results that no sensible person could have intended." *Jennings* v. *Rodriguez*, 583 U. S. ___, ___–___ (2018) (plurality opinion) (slip op., at 9–10) (internal quotation marks omitted).

Those cases exemplify a deeply rooted principle: When there is a divide between the literal meaning and the ordinary meaning, courts must follow the ordinary meaning.

Next is a critical point of emphasis in this case. The difference between literal and ordinary meaning becomes especially important when—as in this case—judges consider *phrases* in statutes. (Recall that the shorthand version of the phrase at issue here is "discriminate because of sex.")[3]

---

[3] The full phrasing of the statute is provided above in footnote 2. This

KAVANAUGH, J., dissenting

Courts must heed the ordinary meaning of the *phrase as a whole*, not just the meaning of the words in the phrase. That is because a phrase may have a more precise or confined meaning than the literal meaning of the individual words in the phrase. Examples abound. An "American flag" could literally encompass a flag made in America, but in common parlance it denotes the Stars and Stripes. A "three-pointer" could literally include a field goal in football, but in common parlance, it is a shot from behind the arc in basketball. A "cold war" could literally mean any wintertime war, but in common parlance it signifies a conflict short of open warfare. A "washing machine" could literally refer to any machine used for washing any item, but in everyday speech it means a machine for washing clothes.

This Court has often emphasized the importance of sticking to the ordinary meaning *of a phrase*, rather than the meaning of words in the phrase. In *FCC* v. *AT&T Inc.*, 562 U. S. 397 (2011), for example, the Court explained:

> "AT&T's argument treats the term 'personal privacy' as simply the sum of its two words: the privacy of a person. . . . But two words together may assume a more particular meaning than those words in isolation. We understand a golden cup to be a cup made of or resembling gold. A golden boy, on the other hand, is one who is charming, lucky, and talented. A golden opportunity is one not to be missed. 'Personal' in the phrase 'personal privacy' conveys more than just 'of a person.' It suggests a type of privacy evocative of human concerns—not the sort usually associated with an entity like, say, AT&T." *Id.,* at 406.

––––––––––

opinion uses "discriminate because of sex" as shorthand for "discriminate . . . because of . . . sex." Also, the plaintiffs do not dispute that the ordinary meaning of the statutory phrase "discriminate" because of sex is the same as the statutory phrase "to fail or refuse to hire or to discharge any individual" because of sex.

Case: 16-2424 Document: 99 Filed: 06/30/17 Page: 154

10 BOSTOCK *v.* CLAYTON COUNTY

Exactly right and exactly on point in this case.

Justice Scalia explained the extraordinary importance of hewing to the ordinary meaning of a phrase: "Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text. In the words of Learned Hand: 'a sterile literalism . . . loses sight of the forest for the trees.' The full body of a text contains implications that can alter the literal meaning of individual words." A. Scalia & B. Garner, Reading Law 356 (2012) (footnote omitted). Put another way, "the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes." *Helvering* v. *Gregory*, 69 F. 2d 809, 810–811 (CA2 1934) (L. Hand, J.). Judges must take care to follow ordinary meaning "when two words combine to produce a meaning that is not the mechanical composition of the two words separately." Eskridge, Interpreting Law, at 62. Dictionaries are not "always useful for determining the ordinary meaning of word clusters (like 'driving a vehicle') or phrases and clauses or entire sentences." *Id.*, at 44. And we must recognize that a phrase can cover a "dramatically smaller category than either component term." *Id.,* at 62.

If the usual evidence indicates that a statutory phrase bears an ordinary meaning different from the literal strung-together definitions of the individual words in the phrase, we may not ignore or gloss over that discrepancy. "Legislation cannot sensibly be interpreted by stringing together dictionary synonyms of each word and proclaiming that, if the right example of the meaning of each is selected, the 'plain meaning' of the statute leads to a particular result. No theory of interpretation, including textualism itself, is premised on such an approach." 883 F. 3d 100, 144, n. 7 (CA2 2018) (Lynch, J., dissenting).[4]

---

[4]Another longstanding canon of statutory interpretation—the absurdity canon—similarly reflects the law's focus on ordinary meaning rather

KAVANAUGH, J., dissenting

In other words, this Court's precedents and longstanding principles of statutory interpretation teach a clear lesson: Do not simply split statutory phrases into their component words, look up each in a dictionary, and then mechanically put them together again, as the majority opinion today mistakenly does. See *ante*, at 5–9. To reiterate Justice Scalia's caution, that approach misses the forest for the trees.

A literalist approach to interpreting phrases disrespects ordinary meaning and deprives the citizenry of fair notice of what the law is. It destabilizes the rule of law and thwarts democratic accountability. For phrases as well as terms, the "linchpin of statutory interpretation is *ordinary meaning*, for that is going to be most accessible to the citizenry desirous of following the law *and* to the legislators and their staffs drafting the legal terms of the plans launched by statutes *and* to the administrators and judges implementing the statutory plan." Eskridge, Interpreting Law, at 81; see Scalia, A Matter of Interpretation, at 17.

Bottom line: Statutory Interpretation 101 instructs courts to follow ordinary meaning, not literal meaning, and to adhere to the ordinary meaning of phrases, not just the meaning of the words in a phrase.

*Second*, in light of the bedrock principle that we must adhere to the ordinary meaning of a phrase, the question in this case boils down to the ordinary meaning of the phrase "discriminate because of sex." Does the ordinary meaning of that phrase encompass discrimination because of sexual orientation? The answer is plainly no.

────────

than literal meaning. That canon tells courts to avoid construing a statute in a way that would lead to absurd consequences. The absurdity canon, properly understood, is "an implementation of (rather than . . . an exception to) the ordinary meaning rule." W. Eskridge, Interpreting Law 72 (2016). "What the rule of absurdity seeks to do is what all rules of interpretation seek to do: *make sense* of the text." A. Scalia & B. Garner, Reading Law 235 (2012).

12          BOSTOCK *v.* CLAYTON COUNTY

KAVANAUGH, J., dissenting

On occasion, it can be difficult for judges to assess ordinary meaning. Not here. Both common parlance and common legal usage treat sex discrimination and sexual orientation discrimination as two distinct categories of discrimination—back in 1964 and still today.

As to common parlance, few in 1964 (or today) would describe a firing because of sexual orientation as a firing because of sex. As commonly understood, sexual orientation discrimination is distinct from, and not a form of, sex discrimination. The majority opinion acknowledges the common understanding, noting that the plaintiffs here probably did not tell their friends that they were fired because of their sex. *Ante*, at 16. That observation is clearly correct. In common parlance, Bostock and Zarda were fired because they were gay, not because they were men.

Contrary to the majority opinion's approach today, this Court has repeatedly emphasized that common parlance matters in assessing the ordinary meaning of a statute, because courts heed how "most people" "would have understood" the text of a statute when enacted. *New Prime Inc.* v. *Oliveira*, 586 U. S. ___, ___–___ (2019) (slip op., at 6–7); see *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. ___, ___ (2017) (slip op., at 4) (using a conversation between friends to demonstrate ordinary meaning); see also *Wisconsin Central Ltd.* v. *United States*, 585 U. S. ___, ___–___ (2018) (slip op., at 2–3) (similar); *AT&T*, 562 U. S., at 403–404 (similar).

Consider the employer who has four employees but must fire two of them for financial reasons. Suppose the four employees are a straight man, a straight woman, a gay man, and a lesbian. The employer with animosity against women (animosity based on sex) will fire the two women. The employer with animosity against gays (animosity based on sexual orientation) will fire the gay man and the lesbian. Those are two distinct harms caused by two distinct biases that have two different outcomes. To treat one as a form of

KAVANAUGH, J., dissenting

the other—as the majority opinion does—misapprehends common language, human psychology, and real life. See *Hively* v. *Ivy Tech Community College of Ind.*, 853 F. 3d 339, 363 (CA7 2017) (Sykes, J., dissenting).

It also rewrites history. Seneca Falls was not Stonewall. The women's rights movement was not (and is not) the gay rights movement, although many people obviously support or participate in both. So to think that sexual orientation discrimination is just a form of sex discrimination is not just a mistake of language and psychology, but also a mistake of history and sociology.

Importantly, an overwhelming body of federal law reflects and reinforces the ordinary meaning and demonstrates that sexual orientation discrimination is distinct from, and not a form of, sex discrimination. Since enacting Title VII in 1964, Congress has *never* treated sexual orientation discrimination the same as, or as a form of, sex discrimination. Instead, Congress has consistently treated sex discrimination and sexual orientation discrimination as legally distinct categories of discrimination.

Many federal statutes prohibit sex discrimination, and many federal statutes also prohibit sexual orientation discrimination. But those sexual orientation statutes expressly prohibit sexual orientation discrimination in addition to expressly prohibiting sex discrimination. *Every single one.* To this day, Congress has never defined sex discrimination to encompass sexual orientation discrimination. Instead, when Congress wants to prohibit sexual orientation discrimination in addition to sex discrimination, Congress explicitly refers to sexual orientation discrimination.[5]

---

[5] See 18 U. S. C. §249(a)(2)(A) (criminalizing violence because of "gender, sexual orientation"); 20 U. S. C. §1092(f)(1)(F)(ii) (requiring funding recipients to collect statistics on crimes motivated by the victim's "gender, . . . sexual orientation"); 34 U. S. C. §12291(b)(13)(A) (prohibiting discrimination on the basis of "sex, . . . sexual orientation"); §30501(1)

KAVANAUGH, J., dissenting

That longstanding and widespread congressional practice matters. When interpreting statutes, as the Court has often said, we "usually presume differences in language" convey "differences in meaning." *Wisconsin Central,* 585 U. S., at ___ (slip op., at 4) (internal quotation marks omitted). When Congress chooses distinct phrases to accomplish distinct purposes, and does so over and over again for decades, we may not lightly toss aside all of Congress's careful handiwork. As Justice Scalia explained for the Court, "it is not our function" to "treat alike subjects that different Congresses have chosen to treat differently." *West Virginia Univ. Hospitals, Inc.* v. *Casey,* 499 U. S. 83, 101 (1991); see *id.,* at 92.

And the Court has likewise stressed that we may not read "a specific concept into general words when precise language in other statutes reveals that Congress knew how to identify that concept." Eskridge, Interpreting Law, at 415; see *University of Tex. Southwestern Medical Center* v. *Nassar,* 570 U. S. 338, 357 (2013); *Arlington Central School Dist. Bd. of Ed.* v. *Murphy,* 548 U. S. 291, 297–298 (2006); *Jama* v. *Immigration and Customs Enforcement,* 543 U. S. 335, 341–342 (2005); *Custis* v. *United States,* 511 U. S. 485, 491–493 (1994); *West Virginia Univ. Hospitals,* 499 U. S., at 99.

---

(identifying violence motivated by "gender, sexual orientation" as national problem); §30503(a)(1)(C) (authorizing Attorney General to assist state, local, and tribal investigations of crimes motivated by the victim's "gender, sexual orientation"); §§41305(b)(1), (3) (requiring Attorney General to acquire data on crimes motivated by "gender . . . , sexual orientation," but disclaiming any cause of action including one "based on discrimination due to sexual orientation"); 42 U. S. C. §294e–1(b)(2) (conditioning funding on institution's inclusion of persons of "different genders and sexual orientations"); see also United States Sentencing Commission, Guidelines Manual §3A1.1(a) (Nov. 2018) (authorizing increased offense level if the crime was motivated by the victim's "gender . . . or sexual orientation"); 2E Guide to Judiciary Policy §320 (2019) (prohibiting judicial discrimination because of "sex, . . . sexual orientation").

KAVANAUGH, J., dissenting

So it is here. As demonstrated by all of the statutes covering sexual orientation discrimination, Congress knows how to prohibit sexual orientation discrimination. So courts should not read that specific concept into the general words "discriminate because of sex." We cannot close our eyes to the indisputable fact that Congress—for several decades in a large number of statutes—has identified sex discrimination and sexual orientation discrimination as two distinct categories.

Where possible, we also strive to interpret statutes so as not to create undue surplusage. It is not uncommon to find some scattered redundancies in statutes. But reading sex discrimination to encompass sexual orientation discrimination would cast aside as surplusage the numerous references to sexual orientation discrimination sprinkled throughout the U. S. Code in laws enacted over the last 25 years.

In short, an extensive body of federal law both reflects and reinforces the widespread understanding that sexual orientation discrimination is distinct from, and not a form of, sex discrimination.

The story is the same with bills proposed in Congress. Since the 1970s, Members of Congress have introduced many bills to prohibit sexual orientation discrimination in the workplace. Until very recently, all of those bills would have expressly established sexual orientation as a separately proscribed category of discrimination. The bills did not define sex discrimination to encompass sexual orientation discrimination.[6]

_____

[6] See, *e.g.*, H. R. 14752, 93d Cong., 2d Sess., §§6, 11 (1974) (amending Title VII "by adding after the word 'sex'" the words "'sexual orientation,'" defined as "choice of sexual partner according to gender"); H. R. 451, 95th Cong., 1st Sess., §§6, 11 (1977) ("adding after the word 'sex,' . . . 'affectional or sexual preference,'" defined as "having or manifesting an emotional or physical attachment to another consenting person or persons of either gender, or having or manifesting a preference for such

The proposed bills are telling not because they are relevant to congressional intent regarding Title VII. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 186–188 (1994). Rather, the proposed bills are telling because they, like the enacted laws, further demonstrate the widespread usage of the English language in the United States: Sexual orientation discrimination is distinct from, and not a form of, sex discrimination.

Presidential Executive Orders reflect that same common understanding. In 1967, President Johnson signed an Executive Order prohibiting sex discrimination in federal employment. In 1969, President Nixon issued a new order that did the same. Exec. Order No. 11375, 3 CFR 684 (1966–1970 Comp.); Exec. Order No. 11478, *id.,* at 803. In 1998, President Clinton charted a new path and signed an Executive Order prohibiting sexual orientation discrimination in federal employment. Exec. Order No. 13087, 3 CFR 191 (1999). The Nixon and Clinton Executive Orders remain in effect today.

————————

attachment"); S. 1708, 97th Cong., 1st Sess., §§1, 2 (1981) ("inserting after 'sex' . . . 'sexual orientation,'" defined as "'homosexuality, heterosexuality, and bisexuality'"); H. R. 230, 99th Cong., 1st Sess., §§4, 8 (1985) ("inserting after 'sex,' . . . 'affectional or sexual orientation,'" defined as "homosexuality, heterosexuality, and bisexuality"); S. 47, 101st Cong., 1st Sess., §§5, 9 (1989) ("inserting after 'sex,' . . . 'affectional or sexual orientation,'" defined as "homosexuality, heterosexuality, and bisexuality"); H. R. 431, 103d Cong., 1st Sess., §2 (1993) (prohibiting discrimination "on account of . . . sexual orientation" without definition); H. R. 1858, 105th Cong., 1st Sess., §§3, 4 (1997) (prohibiting discrimination "on the basis of sexual orientation," defined as "homosexuality, bisexuality, or heterosexuality"); H. R. 2692, 107th Cong., 1st Sess., §§3, 4 (2001) (prohibiting discrimination "because of . . . sexual orientation," defined as "homosexuality, bisexuality, or heterosexuality"); H. R. 2015, 110th Cong., 1st Sess., §§3, 4 (2007) (prohibiting discrimination "because of . . . sexual orientation," defined as "homosexuality, heterosexuality, or bisexuality"); S. 811, 112th Cong., 1st Sess., §§3, 4 (2011) (same).

Case: 16-2424   Document: 99   Filed: 06/17/2020   Page: 161

Cite as: 590 U. S. ____ (2020)    17

KAVANAUGH, J., dissenting

Like the relevant federal statutes, the 1998 Clinton Executive Order expressly added sexual orientation as a new, separately prohibited form of discrimination. As Judge Lynch cogently spelled out, "the Clinton Administration did not argue that the prohibition of sex discrimination in" the prior 1969 Executive Order "already banned, or henceforth would be deemed to ban, sexual orientation discrimination." 883 F. 3d, at 152, n. 22 (dissenting opinion). In short, President Clinton's 1998 Executive Order indicates that the Executive Branch, like Congress, has long understood sexual orientation discrimination to be distinct from, and not a form of, sex discrimination.

Federal regulations likewise reflect that same understanding. The Office of Personnel Management is the federal agency that administers and enforces personnel rules across the Federal Government. OPM has issued regulations that "govern . . . the employment practices of the Federal Government generally, and of individual agencies." 5 CFR §§300.101, 300.102 (2019). Like the federal statutes and the Presidential Executive Orders, those OPM regulations separately prohibit sex discrimination and sexual orientation discrimination.

The States have proceeded in the same fashion. A majority of States prohibit sexual orientation discrimination in

KAVANAUGH, J., dissenting

employment, either by legislation applying to most work-
ers,[7] an executive order applying to public employees,[8] or

———————

[7] See Cal. Govt. Code Ann. §12940(a) (West 2020 Cum. Supp.) (prohib-
iting discrimination because of "sex, . . . sexual orientation," etc.); Colo.
Rev. Stat. §24–34–402(1)(a) (2019) (prohibiting discrimination because
of "sex, sexual orientation," etc.); Conn. Gen. Stat. §46a–81c (2017) (pro-
hibiting discrimination because of "sexual orientation"); Del. Code Ann.,
Tit. 19, §711 (2018 Cum. Supp.) (prohibiting discrimination because of
"sex (including pregnancy), sexual orientation," etc.); D. C. Code §2–
1402.11(a)(1) (2019 Cum. Supp.) (prohibiting discrimination based on
"sex, . . . sexual orientation," etc.); Haw. Rev. Stat. §378–2(a)(1)(A) (2018
Cum. Supp.) (prohibiting discrimination because of "sex[,] . . . sexual ori-
entation," etc.); Ill. Comp. Stat., ch. 775, §§5/1–103(Q), 5/2–102(A) (West
2018) (prohibiting discrimination because of "sex, . . . sexual orientation,"
etc.); Iowa Code §216.6(1)(a) (2018) (prohibiting discrimination because
of "sex, sexual orientation," etc.); Me. Rev. Stat. Ann., Tit. 5, §4572(1)(A)
(2013) (prohibiting discrimination because of "sex, sexual orientation,"
etc.); Md. State Govt. Code Ann. §20–606(a)(1)(i) (Supp. 2019) (prohib-
iting discrimination because of "sex, . . . sexual orientation," etc.); Mass.
Gen. Laws, ch. 151B, §4 (2018) (prohibiting discrimination because of
"sex, . . . sexual orientation," etc.); Minn. Stat. §363A.08(2) (2018) (pro-
hibiting discrimination because of "sex, . . . sexual orientation," etc.);
Nev. Rev. Stat. §613.330(1) (2017) (prohibiting discrimination because of
"sex, sexual orientation," etc.); N. H. Rev. Stat. Ann. §354–A:7(I) (2018
Cum. Supp.) (prohibiting discrimination because of "sex," "sexual orien-
tation," etc.); N. J. Stat. Ann. §10:5–12(a) (West Supp. 2019) (prohibiting
discrimination because of "sexual orientation, . . . sex," etc.); N. M. Stat.
Ann. §28–1–7(A) (Supp. 2019) (prohibiting discrimination because of
"sex, sexual orientation," etc.); N. Y. Exec. Law Ann. §296(1)(a) (West
Supp. 2020) (prohibiting discrimination because of "sexual orientation,
. . . sex," etc.); Ore. Rev. Stat. §659A.030(1) (2019) (prohibiting discrimi-
nation because of "sex, sexual orientation," etc.); R. I. Gen. Laws §28–5–
7(1) (Supp. 2019) (prohibiting discrimination because of "sex, sexual ori-
entation," etc.); Utah Code §34A–5–106(1) (2019) (prohibiting discrimi-
nation because of "sex; . . . sexual orientation," etc.); Vt. Stat. Ann., Tit.
21, §495(a)(1) (2019 Cum. Supp.) (prohibiting discrimination because of
"sex, sexual orientation," etc.); Wash. Rev. Code §49.60.180 (2008) (pro-
hibiting discrimination because of "sex, . . . sexual orientation," etc.).

[8] See, *e.g.*, Alaska Admin. Order No. 195 (2002) (prohibiting public-em-
ployment discrimination because of "sex, . . . sexual orientation," etc.);
Ariz. Exec. Order No. 2003–22 (2003) (prohibiting public-employment
discrimination because of "sexual orientation"); Cal. Exec. Order No. B–

KAVANAUGH, J., dissenting

both. Almost every state statute or executive order pro-
scribing sexual orientation discrimination expressly pro-
hibits sexual orientation discrimination separately from
the State's ban on sex discrimination.

––––––––

54–79 (1979) (prohibiting public-employment discrimination because of
"sexual preference"); Colo. Exec. Order (Dec. 10, 1990) (prohibiting pub-
lic-employment discrimination because of "gender, sexual orientation,"
etc.); Del. Exec. Order No. 8 (2009) (prohibiting public-employment dis-
crimination because of "gender, . . . sexual orientation," etc.); Ind. Gover-
nor's Pol'y Statement (2018) (prohibiting public-employment discrimina-
tion because of "sex, . . . sexual orientation," etc.); Kan. Exec. Order No.
19–02 (2019) (prohibiting public-employment discrimination because of
"gender, sexual orientation," etc.); Ky. Exec. Order No. 2008–473 (2008)
(prohibiting public-employment discrimination because of "sex, . . . sex-
ual orientation," etc.); Mass. Exec. Order No. 526 (2011) (prohibiting pub-
lic-employment discrimination because of "gender, . . . sexual orienta-
tion," etc.); Minn. Exec. Order No. 86–14 (1986) (prohibiting public-
employment discrimination because of "sexual orientation"); Mo. Exec.
Order No. 10–24 (2010) (prohibiting public-employment discrimination
because of "sex, . . . sexual orientation," etc.); Mont. Exec. Order No. 04–
2016 (2016) (prohibiting public-employment discrimination because of
"sex, . . . sexual orientation," etc.); N. H. Exec. Order No. 2016–04 (2016)
(prohibiting public-employment discrimination because of "sex, sexual
orientation," etc.); N. J. Exec. Order No. 39 (1991) (prohibiting public-
employment discrimination because of "sexual orientation"); N. C. Exec.
Order No. 24 (2017) (prohibiting public-employment discrimination be-
cause of "sex, . . . sexual orientation," etc.); Ohio Exec. Order No. 2019–
05D (2019) (prohibiting public-employment discrimination because of
"gender, . . . sexual orientation," etc.); Ore. Exec. Order No. 19–08 (2019)
(prohibiting public-employment discrimination because of "sexual orien-
tation"); Pa. Exec. Order No. 2016–04 (2016) (prohibiting public-employ-
ment discrimination because of "gender, sexual orientation," etc.); R. I.
Exec. Order No. 93–1 (1993) (prohibiting public-employment discrimina-
tion because of "sex, . . . sexual orientation," etc.); Va. Exec. Order No. 1
(2018) (prohibiting public-employment discrimination because of "sex,
. . . sexual orientation," etc.); Wis. Exec. Order No. 1 (2019) (prohibiting
public-employment discrimination because of "sex, . . . sexual orienta-
tion," etc.); cf. Wis. Stat. §§111.36(1)(d)(1), 111.321 (2016) (prohibiting
employment discrimination because of sex, defined as including discrim-
ination because of "sexual orientation"); Mich. Exec. Directive No. 2019–
9 (2019) (prohibiting public-employment discrimination because of "sex,"
defined as including "sexual orientation").

That common usage in the States underscores that sexual orientation discrimination is commonly understood as a legal concept distinct from sex discrimination.

And it is the common understanding in this Court as well. Since 1971, the Court has employed rigorous or heightened constitutional scrutiny of laws that classify on the basis of sex. See *United States* v. *Virginia*, 518 U. S. 515, 531–533 (1996); *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 136–137 (1994); *Craig* v. *Boren*, 429 U. S. 190, 197–199 (1976); *Frontiero* v. *Richardson*, 411 U. S. 677, 682–684 (1973) (plurality opinion); *Reed* v. *Reed*, 404 U. S. 71, 75–77 (1971). Over the last several decades, the Court has also decided many cases involving sexual orientation. But in those cases, the Court never suggested that sexual orientation discrimination is just a form of sex discrimination. All of the Court's cases from *Bowers* to *Romer* to *Lawrence* to *Windsor* to *Obergefell* would have been far easier to analyze and decide if sexual orientation discrimination were just a form of sex discrimination and therefore received the same heightened scrutiny as sex discrimination under the Equal Protection Clause. See *Bowers* v. *Hardwick*, 478 U. S. 186 (1986); *Romer* v. *Evans*, 517 U. S. 620 (1996); *Lawrence* v. *Texas*, 539 U. S. 558 (2003); *United States* v. *Windsor*, 570 U. S. 744 (2013); *Obergefell* v. *Hodges*, 576 U. S. 644 (2015).

Did the Court in all of those sexual orientation cases just miss that obvious answer—and overlook the fact that sexual orientation discrimination is actually a form of sex discrimination? That seems implausible. Nineteen Justices have participated in those cases. Not a single Justice stated or even hinted that sexual orientation discrimination was just a form of sex discrimination and therefore entitled to the same heightened scrutiny under the Equal Protection Clause. The opinions in those five cases contain no trace of such reasoning. That is presumably because everyone on this Court, too, has long understood that sexual orientation

Case: 16-2424 Document: 99 Filed: 06/30/17 Page: 165

discrimination is distinct from, and not a form of, sex discrimination.

In sum, all of the usual indicators of ordinary meaning—common parlance, common usage by Congress, the practice in the Executive Branch, the laws in the States, and the decisions of this Court—overwhelmingly establish that sexual orientation discrimination is distinct from, and not a form of, sex discrimination. The usage has been consistent across decades, in both the federal and state contexts.

Judge Sykes summarized the law and language this way: "To a fluent speaker of the English language—then and now—. . . discrimination 'because of sex' is not reasonably understood to include discrimination based on sexual orientation, a different immutable characteristic. Classifying people by sexual orientation is different than classifying them by sex. The two traits are categorically distinct and widely recognized as such. There is no ambiguity or vagueness here." *Hively*, 853 F. 3d, at 363 (dissenting opinion).

To tie it all together, the plaintiffs have only two routes to succeed here. Either they can say that literal meaning overrides ordinary meaning when the two conflict. Or they can say that the ordinary meaning of the phrase "discriminate because of sex" encompasses sexual orientation discrimination. But the first flouts long-settled principles of statutory interpretation. And the second contradicts the widespread ordinary use of the English language in America.

## II

Until the last few years, every U. S. Court of Appeals to address this question concluded that Title VII does not prohibit discrimination because of sexual orientation. As noted above, in the first 10 Courts of Appeals to consider the issue, all 30 federal judges agreed that Title VII does not prohibit sexual orientation discrimination. 30 out of 30

22          BOSTOCK *v.* CLAYTON COUNTY

KAVANAUGH, J., dissenting

judges.[9]

The unanimity of those 30 federal judges shows that the question as a matter of law, as compared to as a matter of policy, was not deemed close. Those 30 judges realized a seemingly obvious point: Title VII is not a general grant of authority for judges to fashion an evolving common law of equal treatment in the workplace. Rather, Title VII identifies certain specific categories of prohibited discrimination. And under the separation of powers, Congress—not the courts—possesses the authority to amend or update the law, as Congress has done with age discrimination and disability discrimination, for example.

So what changed from the situation only a few years ago when 30 out of 30 federal judges had agreed on this question? Not the text of Title VII. The law has not changed. Rather, the judges' decisions have evolved.

To be sure, the majority opinion today does not openly profess that it is judicially updating or amending Title VII. Cf. *Hively*, 853 F. 3d, at 357 (Posner, J., concurring). But the majority opinion achieves the same outcome by seizing on literal meaning and overlooking the ordinary meaning of the phrase "discriminate because of sex." Although the majority opinion acknowledges that the meaning of a phrase and the meaning of a phrase's individual words *could* differ, it dismisses phrasal meaning for purposes of this case. The majority opinion repeatedly seizes on the meaning of the

---

[9]See *Higgins* v. *New Balance Athletic Shoe, Inc.*, 194 F. 3d 252, 258–259 (CA1 1999); *Simonton* v. *Runyon*, 232 F. 3d 33, 36 (CA2 2000); *Bibby* v. *Philadelphia Coca Cola Bottling Co.*, 260 F. 3d 257, 261 (CA3 2001); *Wrightson* v. *Pizza Hut of America, Inc.*, 99 F. 3d 138, 143 (CA4 1996); *Blum* v. *Gulf Oil Corp.*, 597 F. 2d 936, 938 (CA5 1979) (*per curiam*); *Ruth* v. *Children's Medical Center*, 1991 WL 151158, *5 (CA6, Aug. 8, 1991) (*per curiam*); *Ulane* v. *Eastern Airlines, Inc.*, 742 F. 2d 1081, 1084–1085 (CA7 1984); *Williamson* v. *A. G. Edwards & Sons, Inc.*, 876 F. 2d 69, 70 (CA8 1989) (*per curiam*); *DeSantis* v. *Pacific Tel. & Tel. Co.*, 608 F. 2d 327, 329–330 (CA9 1979); *Medina* v. *Income Support Div., N. M.*, 413 F. 3d 1131, 1135 (CA10 2005).

KAVANAUGH, J., dissenting

statute's individual terms, mechanically puts them back together, and generates an interpretation of the phrase "discriminate because of sex" that is literal. See *ante*, at 5–9, 17, 24–26. But to reiterate, that approach to statutory interpretation is fundamentally flawed. Bedrock principles of statutory interpretation dictate that we look to ordinary meaning, not literal meaning, and that we likewise adhere to the ordinary meaning of phrases, not just the meaning of words in a phrase. And the ordinary meaning of the phrase "discriminate because of sex" does not encompass sexual orientation discrimination.

The majority opinion deflects that critique by saying that courts should base their interpretation of statutes on the text as written, not on the legislators' subjective intentions. *Ante*, at 20, 23–30. Of course that is true. No one disagrees. It is "the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998).

But in my respectful view, the majority opinion makes a fundamental mistake by confusing ordinary meaning with subjective intentions. To briefly explain: In the early years after Title VII was enacted, some may have wondered whether Title VII's prohibition on sex discrimination protected male employees. After all, covering male employees may not have been the intent of some who voted for the statute. Nonetheless, discrimination on the basis of sex against women and discrimination on the basis of sex against men are both understood as discrimination because of sex (back in 1964 and now) and are therefore encompassed within Title VII. Cf. *id.,* at 78–79; see *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 682–685 (1983). So too, regardless of what the intentions of the drafters might have been, the ordinary meaning of the law demonstrates that harassing an employee because of her sex is discriminating against the employee because of her sex with respect

24                    BOSTOCK *v.* CLAYTON COUNTY

                          K<small>AVANAUGH</small>, J., dissenting

to the "terms, conditions, or privileges of employment," as this Court rightly concluded. *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S. 57, 64 (1986) (internal quotation marks omitted).[10]

By contrast, this case involves sexual orientation discrimination, which has long and widely been understood as distinct from, and not a form of, sex discrimination. Until now, federal law has always reflected that common usage and recognized that distinction between sex discrimination and sexual orientation discrimination. To fire one employee because she is a woman and another employee because he is gay implicates two distinct societal concerns, reveals two distinct biases, imposes two distinct harms, and falls within two distinct statutory prohibitions.

_____

[10] An *amicus* brief supporting the plaintiffs suggests that the plaintiffs' interpretive approach is supported by the interpretive approach employed by the Court in its landmark decision in *Brown* v. *Board of Education*, 347 U. S. 483 (1954). See Brief for Anti-Discrimination Scholars as *Amici Curiae* 4. That suggestion is incorrect. *Brown* is a correct decision as a matter of original public meaning. There were two analytical components of *Brown*. One issue was the meaning of "equal protection." The Court determined that black Americans—like all Americans—have an *individual* equal protection right against state discrimination on the basis of race. (That point is also directly made in *Bolling* v. *Sharpe*, 347 U. S. 497, 499–500 (1954).) Separate but equal is not equal. The other issue was whether that racial nondiscrimination principle applied to public schools, even though public schools did not exist in any comparable form in 1868. The answer was yes. The Court applied the equal protection principle to public schools in the same way that the Court applies, for example, the First Amendment to the Internet and the Fourth Amendment to cars.

  This case raises the same kind of inquiry as the *first* question in *Brown*. There, the question was what equal protection meant. Here, the question is what "discriminate because of sex" means. If this case raised the question whether the sex discrimination principle in Title VII applied to some category of employers unknown in 1964, such as to social media companies, it might be a case in *Brown*'s second category, akin to the question whether the racial nondiscrimination principle applied to public schools. But that is not this case.

Case: 16-2424  Document: 99  Filed: 06/17/2020  Page: 169

Cite as: 590 U. S. ____ (2020)           25

KAVANAUGH, J., dissenting

To be sure, as Judge Lynch appropriately recognized, it is "understandable" that those seeking legal protection for gay people "search for innovative arguments to classify workplace bias against gays as a form of discrimination that is already prohibited by federal law. But the arguments advanced by the majority ignore the evident meaning of the language of Title VII, the social realities that distinguish between the kinds of biases that the statute sought to exclude from the workplace from those it did not, and the distinctive nature of anti-gay prejudice." 883 F. 3d, at 162 (dissenting opinion).

The majority opinion insists that it is not rewriting or updating Title VII, but instead is just humbly reading the text of the statute as written. But that assertion is tough to accept. Most everyone familiar with the use of the English language in America understands that the ordinary meaning of sexual orientation discrimination is distinct from the ordinary meaning of sex discrimination. Federal law distinguishes the two. State law distinguishes the two. This Court's cases distinguish the two. Statistics on discrimination distinguish the two. History distinguishes the two. Psychology distinguishes the two. Sociology distinguishes the two. Human resources departments all over America distinguish the two. Sports leagues distinguish the two. Political groups distinguish the two. Advocacy groups distinguish the two. Common parlance distinguishes the two. Common sense distinguishes the two.

As a result, many Americans will not buy the novel interpretation unearthed and advanced by the Court today. Many will no doubt believe that the Court has unilaterally rewritten American vocabulary and American law—a "statutory amendment courtesy of unelected judges." *Hively*, 853 F. 3d, at 360 (Sykes, J., dissenting). Some will surmise that the Court succumbed to "the natural desire that beguiles judges along with other human beings into imposing their own views of goodness, truth, and justice upon others."

26                     BOSTOCK *v.* CLAYTON COUNTY

*Furman* v. *Georgia*, 408 U. S. 238, 467 (1972) (Rehnquist, J., dissenting).

I have the greatest, and unyielding, respect for my colleagues and for their good faith. But when this Court usurps the role of Congress, as it does today, the public understandably becomes confused about who the policymakers really are in our system of separated powers, and inevitably becomes cynical about the oft-repeated aspiration that judges base their decisions on law rather than on personal preference. The best way for judges to demonstrate that we are deciding cases based on the ordinary meaning of the law is to walk the walk, even in the hard cases when we might prefer a different policy outcome.

*        *        *

In judicially rewriting Title VII, the Court today cashiers an ongoing legislative process, at a time when a new law to prohibit sexual orientation discrimination was probably close at hand. After all, even back in 2007—a veritable lifetime ago in American attitudes about sexual orientation—the House voted 235 to 184 to prohibit sexual orientation discrimination in employment. H. R. 3685, 110th Cong., 1st Sess. In 2013, the Senate overwhelmingly approved a similar bill, 64 to 32. S. 815, 113th Cong., 1st Sess. In 2019, the House voted 236 to 173 to amend Title VII to prohibit employment discrimination on the basis of sexual orientation. H. R. 5, 116th Cong., 1st Sess. It was therefore easy to envision a day, likely just in the next few years, when the House and Senate took historic votes on a bill that would prohibit employment discrimination on the basis of sexual orientation. It was easy to picture a massive and celebratory Presidential signing ceremony in the East Room or on the South Lawn.

It is true that meaningful legislative action takes time—often too much time, especially in the unwieldy morass on

KAVANAUGH, J., dissenting

Capitol Hill. But the Constitution does not put the Legislative Branch in the "position of a television quiz show contestant so that when a given period of time has elapsed and a problem remains unsolved by them, the federal judiciary may press a buzzer and take its turn at fashioning a solution." Rehnquist, The Notion of a Living Constitution, 54 Texas L. Rev. 693, 700 (1976). The proper role of the Judiciary in statutory interpretation cases is "to apply, not amend, the work of the People's representatives," even when the judges might think that "Congress should reenter the field and alter the judgments it made in the past." *Henson*, 582 U. S., at ___–___ (slip op., at 10–11).

Instead of a hard-earned victory won through the democratic process, today's victory is brought about by judicial dictate—judges latching on to a novel form of living literalism to rewrite ordinary meaning and remake American law. Under the Constitution and laws of the United States, this Court is the wrong body to change American law in that way. The Court's ruling "comes at a great cost to representative self-government." *Hively*, 853 F. 3d, at 360 (Sykes, J., dissenting). And the implications of this Court's usurpation of the legislative process will likely reverberate in unpredictable ways for years to come.

Notwithstanding my concern about the Court's transgression of the Constitution's separation of powers, it is appropriate to acknowledge the important victory achieved today by gay and lesbian Americans. Millions of gay and lesbian Americans have worked hard for many decades to achieve equal treatment in fact and in law. They have exhibited extraordinary vision, tenacity, and grit—battling often steep odds in the legislative and judicial arenas, not to mention in their daily lives. They have advanced powerful policy arguments and can take pride in today's result. Under the Constitution's separation of powers, however, I believe that it was Congress's role, not this Court's, to amend Title VII. I therefore must respectfully dissent from the

28                    BOSTOCK *v.* CLAYTON COUNTY

KAVANAUGH, J., dissenting

Court's judgment.